IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| SARA MAIER, | ) |
|     Plaintiff, | ) Case No. 1:21-cv-3506 |
| v. | ) Judge Jorge L. Alonso |
| UNITED PARCEL SERVICE, INC. | ) Mag. Judge Gabriel A. Fuentes |
|     Defendant. | ) Jury Trial Demanded |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Gail S. Eisenberg
LOFTUS & EISENBERG LTD.
161 N. Clark St., Suite 1600
Chicago, IL 60601
Phone: 312-899-6625
GEisenberg@LoftusandEisenberg.com

Matthew J. Singer
MATT SINGER LAW, LLC
77 W. Wacker Dr., Suite 4500
Chicago, Illinois 60601
Phone: 312-248-9123
Matt@MattSingerLaw.com

Unlike the run-of-the-mill failure-to-promote case, Defendant UPS *actually decided to promote Plaintiff Sara Maier*. For years, Maier undisputedly was UPS's top HR supervisor in Illinois. (SAF[1] ¶¶1-3, 6-13, 22-23, 37.) Because the only required qualification for the next-level Area Human Resources Manager ("AHRM") position was a bachelor's degree, Maier's supervisors instructed her to go back to school, and she graduated. (*Id.* ¶6.) In 2018, UPS's senior HR executives engaged in extensive succession planning to fill soon-to-be-vacated roles and decided that "Sara will replace Carlos [Interial] as AHRM." (*Id.* ¶¶6-8.) This decision—along with others made at the time—was repeatedly reaffirmed over the ensuing months. (*Id.* ¶¶9-13.) In January 2019, the decision to promote Maier was communicated to many Illinois HR personnel and documented (along with other decisions made via succession planning in 2018) in UPS's phone lists, org charts, compensation system, and People Tracker personnel system. (*Id.* ¶12.) Her supervisor told her to pack her workstation and write up her bio so UPS could announce her promotion. (*Id.* ¶ 25.)

Maier was called in to meet with the new District Director, Chelsea Allison, and was told by her supervisor, AHRM Ron Macchia and the new HR Operations Manager, Carlos Interial, that the meeting was for Maier "to be promoted" to AHRM. (*Id.* ¶15.) At that meeting, in response to Allison's invitation to say something "personal or professional," Maier talked about her young children. (*Id.* ¶16.) Allison responded by questioning whether *Maier could handle "long hours, working in the middle of the night" with her "small children*." (*Id.*) As Maier tried to explain that she already did so (she had been working since the early morning that day), Allison cut off her answers. (*Id.*) In contrast, *in her earlier meeting with male Angel Paras*—an unqualified, less experienced HR supervisor with young children—*Allison did not ask similar questions*. (*Id.* ¶¶17-19, 21-23.) The next day, Interial told Maier that UPS chose Paras even though Maier was the "best fit" for the AHRM role because Allison believed Maier had "*a lot going on right now.*" (*Id.* ¶26.)

---

[1] Plaintiff cites to her Statement of Additional Facts as "SAF ¶ __."

Stunningly, *the selected male candidate Paras lacked the only required qualification for the position: a bachelor's degree.* (*Id.* ¶¶4, 19, 21-22.) Ignoring UPS's policy that "required" qualifications are "absolute," Allison and Interial rescinded Maier's promotion and handed it to Paras. (*Id.* ¶4.) But Maier's promotion had already been documented in UPS's personnel systems and reversing the decision required the involvement of many senior, regional HR managers. (*Id.* ¶¶27-28.) The weeklong email traffic shows, in real time, Interial and Allison's shifting and incredible attempts to justify why Paras was chosen, despite Maier's prior selection by senior HR managers who knew her outstanding work, and his lack of the only required qualification. (*Id.*)

Maier immediately and repeatedly challenged the decision to promote Paras. Despite UPS's policies requiring investigation of discrimination complaints, and despite testifying that they knew Maier was complaining of sex discrimination, *Macchia and Interial wrote off Maier's complaints as "venting" and refused to investigate*. (*Id.* ¶¶25-26, 29-30.) Instead, they shipped Maier off to UPS's downtown office over her objections, sending her seven months pregnant to a trailer office that tripled her commute, that lacked an easily accessible bathroom or running water—and, unlike her prior work location, a private office for breast pumping. (*Id.* ¶¶ 32, 35-36.)

After filing an EEOC charge and taking her full, protected FMLA maternity leave, Maier returned to her HR supervisor position and continued to perform outstandingly. She was the only Illinois HR supervisor considered a "Level 1 fit" for promotion to AHRM—which soon became relevant after ███████████████████████████████████████ UPS refused to consider Maier, the only valid internal candidate for the AHRM position. Instead, UPS transferred a non-EEOC charge filing, non-leave-taking, non-HR manager, Gloria Macias, into the AHRM role shortly after UPS and Maier participated in an unsuccessful EEOC mediation and Maier filed another charge, accusing UPS of retaliation. UPS's current explanation for this decision conflicts entirely with what it told the EEOC. (*Id.* ¶¶ 37-40.)

In light of the facts above—which UPS was aware of, having participated in discovery—this motion should not have been filed. The Seventh Circuit has expressed "disappointment" in the kinds of summary judgment practices illustrated in UPS's submissions: "selectively quoting deposition language it likes and ignoring deposition language it does not like"; conflating a plaintiff's testimony about her "subjective beliefs" with the "evidence … in the lawsuit"; and relying on "hope" that the court will not "take the time to check the record." *Malin v. Hospira, Inc.*, 762 F.3d 552, 564-65 (7th Cir. 2014). This approach—filing for summary judgment when the defendant knows that plaintiff has more than enough evidence to support a verdict in her favor—is "both costly and wasteful." *Id.* As Plaintiff's Rule 56.1 statements make clear, UPS has presented virtually no undisputed facts, let alone undisputed facts that could justify taking this case out of a jury's hands. Much of what UPS writes in its brief is supported by *no evidence whatsoever* (like counsel's citation free vamping (at 1) about an "HR Restructuring" that occurred in 2020). Other facts are contradicted by the evidence UPS itself cites, UPS's own witnesses' testimony, documents UPS produced, or Plaintiff's evidence. Summary judgment, of course, "cannot be used to resolve swearing contests between litigants." *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022).

It is an unfortunate fact of modern employment litigation that summary judgment motions are invariably filed, even where no judge, applying the law to the record evidence, and drawing inferences in the plaintiff's favor, could fairly dispose of the case. This is one such case. The Court should promptly deny UPS's motion and set this case for jury trial.

## ARGUMENT[2]

After *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016), the court's task is to "consider all available evidence and . . . ask whether a reasonable jury could find that the relevant decision was motivated in part by an unlawful criterion." *Runkel*, 51 F.4th at 742. "A plaintiff can prove

---

[2] As UPS did, Plaintiff incorporates by reference her Rule 56.1 statements herein.

3

discrimination through various types of circumstantial evidence," including the *McDonnell Douglas* burden-shifting framework, "because '[d]irect evidence—an overt admission of discriminatory intent—is rare.'" *Vega v. Chi. Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020); *see Ortiz*, 834 F.3d at 766. "[T]hree broad types of circumstantial evidence [] will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Comm. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020). But "it cannot be emphasized too strongly: 'Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself.'" *Id.* at 933 (quoting *Ortiz*, 834 F.3d at 765.)

I. **A reasonable jury could find that UPS discriminated against Maier based on sex.**

    A. **Paras lacked the only required qualification and was otherwise much less qualified.**

Maier satisfies the elements of a prima facie failure-to-promote sex discrimination[3] case under Title VII and the IHRA[4] regarding the 2019 AHRM position. She (1) is a woman; (2) sought and was qualified for the AHRM position; (3) was denied the position; (4) in favor of a man who "was not better qualified than she was." *Grayson v. City of Chi.*, 317 F.3d 745, 748 (7th Cir. 2003).[5]

As the AHRM job description shows and Allison admitted at her deposition—the selected male candidate lacked the only required qualification for the position, a bachelor's degree. At UPS, a required qualification is taken seriously: it is "**absolute. The applicant either has it or does not."**

---

[3] UPS tries to parse Maier's claims into sex and pregnancy discrimination. But under Title VII as amended by the Pregnancy Discrimination Act ("PDA"), "'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions," 42 U.S.C.S. § 2000e(k), including childbearing capacity, *Int'l Union v. Johnson Controls*, 499 U.S. 187, 206 (1991); *Hall v. Nalco Co.*, 534 F.3d 644, 649 (7th Cir. 2008), and intent to become pregnant, *Pacourek v. Inland Steel Co.*, 858 F. Supp. 1393, 1401 (N.D. Ill. 1994) ("potential or intended pregnancy is covered" by PDA). Whether Allison already knew Maier was pregnant during their initial meeting is a red herring.
[4] Like UPS, Maier analyzes the two claims together given substantially similar frameworks. (Mem. at 4 n.2.)
[5] Maier's claim is for sex discrimination, not "gender-plus." (Mem. at 4.) *Cf. Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559 (7th Cir. 2009) (undeveloped "short female" claim); *Palomares v. Second Fed. Sav.*, No. 10-cv-6124, 2011 U.S. Dist. LEXIS 19143, **7-9 (N.D. Ill. Feb. 25, 2011) (man compared to another man).

4

(SAF ¶28.) UPS told Maier she needed to obtain her bachelor's degree to be promoted to AHRM, and she did so. (*Id.* ¶4.) But UPS disregarded the bachelor's degree requirement in promoting Paras over Maier. UPS's summary judgment motion fails for this reason alone. A jury can infer discrimination when a man who lacks a required qualification for a position is promoted over a woman who has it. *See, e.g., Henderson v. Shulkin*, 720 F. App'x 776, 781-85 (7th Cir. 2017) (reversing summary judgment where man who lacked minimum qualification was promoted over plaintiff who had it); *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 444 (7th Cir. 2014) (reversing summary judgment where hires outside of the protected class lacked required experience); *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 260 (6th Cir. 2002) (reversing summary judgment where promoted employee "did not meet the minimum requirements for the position"); *EEOC v. Scion Dental, Inc.*, 379 F. Supp. 3d 757, 763 (E.D. Wis. 2018) (denying summary judgment where degree 'requirement' was ignored for individuals outside protected class); *Sommer v. City of Elkhart,* No. 3:08-CV-522, 2009 WL 5200525, at *10 (N.D. Ind. Dec. 23, 2009) (denying summary judgment where plaintiff raised questions about whether promoted employees "actually met all the [position] qualifications").[6]

More generally, UPS offers no argument that Paras was more qualified to be AHRM than Maier. For good reason: Maier surpassed him in every meaningful way. The senior HR managers at UPS who decided to promote Maier over Paras and reaffirmed that decision repeatedly between June 2018 and January 2019, recognized that Maier was the more qualified candidate. (SAF ¶¶6-13.) Maier had seven years more experience as an HR supervisor than Paras. (*Id.* ¶23.) *See Runkel*, 51

---

[6] In UPS's cited cases, *plaintiffs* lacked the essential or adequate qualifications. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 380 (7th Cir. 2020) (plaintiff lacked college degree); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 738 (7th Cir. 2006) (selected candidates had college and supervisory experience; plaintiff didn't); *Grayson*, 317 F.3d at 749 (plaintiff lacked equivalent job experience); *Hudson v. CTA*, 375 F.3d 552, 556-57 (7th Cir. 2003) (chosen candidates were recommended or more qualified); *Schaffner v. Glencoe Park Dist.*, 256 F.3d 616, 620 (7th Cir. 2001) (plaintiff lacked essential qualification); *Jordan v. Summers*, 205 F.3d 337, 343-44 (7th Cir. 2000) (plaintiff lacked minimum requirements). UPS's lead case, a never-cited, unpublished 1997 decision, *Ibarra-Deguzman v. Metro*, is easily distinguishable because plaintiff claimed she was better educated, but no education requirement existed, there was a structured interview, and plaintiff adduced no pretext evidence.

F.4th at 744 (reversing summary judgment on failure-to-promote claim where plaintiff had longer and more senior applicable experience). In fact, Maier herself trained and supervised Paras and helped him secure promotion to HR supervisor. (SAF ¶23.) *See Harvey v. Office of Banks & Real Estate,* 377 F.3d 698, 712 (7th Cir. 2004) (affirming jury verdict for plaintiff where less experienced and qualified individual "leapfrogged" plaintiff to a higher position). Maier served as lead HR supervisor for years, and her colleagues (including Paras) constantly came to her for advice as a leader and subject matter expert. (SAF ¶2.) Maier had stronger performance reviews, including and especially around the time of the decision: Maier achieved four of her five goals in 2018, while Paras achieved one of five. (*Id.* ¶22.) Recognizing her superior qualifications, UPS had already selected Maier as AHRM. *See Stegall v. Colvin,* No. 14-CV-0178, 2016 U.S. Dist LEXIS 96440, at **12-13 (N.D. Ill. July 22, 2016) (denying summary judgment, noting "there are a limited number of rational explanations as to why [employer] subsequently rescinded that offer, with discriminatory animus being one").

Here, where Maier was selected for the position, via UPS's standard practice of filling manager positions via succession planning, by the people who knew her work, while Paras lacked the sole required qualification and was less qualified in every other material respect, "there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Harvey* 377 F.3d at 711 (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002).) The qualification disparity "jump[s] off the page and slap[s] you in the face"—and therefore supports an inference of discriminatory intent. *Millbrook*, 280 F.3d at 1179.

**B. By questioning Maier, and not Paras, about whether she could handle long hours with her "small children," and denying Maier the AHRM position because she had "a lot going on right now," UPS unlawfully acted based on sex stereotypes.**

While promoting an unqualified man over a qualified woman, UPS's decision-makers made numerous statements reflecting that they reached their decision based on sex stereotypes regarding caregiving responsibilities. It is black letter law that decisions based on such stereotypes can support

6

a sex discrimination verdict in plaintiff's favor. *Joll*, 953 F.3d at 930-31; *Lust v. Sealy*, 383 F.3d 580, 583 (7th Cir. 2005); *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 45 (1st Cir. 2009); *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971); *see Nevada Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 731 (2003) (recognizing "pervasive sex-role stereotype that caring for family members is women's work").

When meeting with Allison and Interial, Allison invited Maier to share something "personal or professional" about herself, and Maier responded by talking about her young children. Allison aggressively questioned Maier about whether she could handle "long hours, working in the middle of the night" with her "small children." Maier attempted to explain that she could, and already was—she (unlike Paras) had been working since the early morning hours that very day. Allison cut off her answers and refused to listen. (SAF ¶¶15-16.) *See Stegall,* 2016 U.S. Dist LEXIS 96440, at *12 (emphasizing decision-maker's demeanor regarding protected status). In contrast, even though Paras *also* talked about his young children in his meeting with Allison and Interial, they did not ask him if he could handle the "long hours" of a manager with *his* "small children." (SAF ¶17.)

In a nearly identical situation (though without the dramatic qualification disparity or egregious pretext evidence), the Seventh Circuit reversed summary judgment in *Joll*. In *Joll*, the female applicant was questioned about her previous resignation due to family responsibilities while, in a "telling twist," the male applicant's commitment wasn't questioned, "although family matters had recently prompted his resignation from a similar position." 953 F.3d at 930. "A jury could find that the interviewers' questions, at least when they were asked only of Joll and not of a similarly situated male applicant, reflected such stereotyping." *Id.* at 931; *see Chadwick*, 561 F.3d at 42, 47. Notably, UPS instructs its interviewers that questions about pregnancy, child-bearing plans, or children are generally unacceptable, unless "the question is asked of both sexes." (SAF ¶18.) *See Joll*, 953 F.3d at 931 ("deviation from standard procedures" supports inference of discrimination and citing cases); *Rudin v. Lincoln Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005) (same).

7

The initial explanation for the decision—that Maier's "interview" was fine, that she was the "best fit" and the "right candidate," but that Allison felt she "had a lot going on right now"—demonstrates that UPS's decisionmakers were acting based on sex stereotypes.[7] (SAF ¶26.) There was no distinction in how much Maier and Paras (who discussed his young kids and non-UPS commitments) had "going on" outside of UPS; the only difference was that Maier was a woman. This stereotype-laced justification for the decision can support a jury's verdict in favor of Maier.[8] *E.g.*, *Chadwick*, 561 F.3d at 47 (reversing summary judgment where employer initially asserted high-performing plaintiff had "too much on her plate" with her kids and later claimed she had performed poorly in interviews); *Lust*, 383 F.3d at 583 (affirming verdict where employer denied promotion on assumption that woman with kids wouldn't want to relocate); *Maldonado v. United States Bank,* 186 F.3d 759, 766-78 (7th Cir. 1999) (reversing summary judgment where employer assumed plaintiff would need to be absent for pregnancy leave in the future).

There is still further evidence that sex stereotypes played a role in UPS's decision-making process. In advocating for Maier's promotion over Paras, Macchia told Allison that Maier's "kids had never caused any issues at work," illustrating that Maier's home responsibilities were an important part of the AHRM promotion discussion. (SAF ¶20.) Similarly, after Maier complained of discrimination, Macchia sent Allison a document full of information about Maier's pregnancies be presented at a high-level career development/succession planning meeting, establishing that UPS considered women's pregnancies when evaluating their career trajectories. (*Id.* ¶31.) Interial, who was heavily involved in the decision, wrote off Maier's repeated complaints about discrimination as

---

[7] This and other words by UPS's agents in the course of their duties are admissible as statements of a party-opponent. Fed. R. Evid. 801(d)(2); *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822-23 (7th Cir. 2011).
[8] UPS implies, but doesn't argue, that as a woman with children, Allison could not discriminate. (Mem. at 1.) That argument would be a non-starter. "The fact that the decision-maker is in the same protected class as the plaintiff, however, does not immunize an employer from employment discrimination claims." *Edelman v. Loyola Univ. Chi.*, No. 16 CV 07971, 2019 U.S. Dist. LEXIS 83498, at *12 n.8 (N.D. Ill. May 17, 2019); *see Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998); *Castaneda v. Partida,* 430 U.S. 482, 499 (1977).

"venting" (a disparaging word, when aimed at a woman who is speaking out) and violated UPS's policies by refusing to investigate Maier's complaints. (*Id.* ¶¶ 26, 29.) *See Joll*, 953 F.3d at 931; *Rudin*, 420 F.3d at 723. After Maier challenged the discrimination, Interial further asserted that it was Maier's responsibility to be more "proactive' in explaining to Allison why her kids would not present a problem with her schedule, which (a) Maier did, but Allison cut off her answers; and (b) was not asked of Paras, aptly illustrating the disparate treatment Maier faced. (SAF ¶¶ 16-17, 29.)

The decision-makers' comments were communicated by "the decision makers themselves, or those who provide input into the decision … (1) around the time of, and (2) in reference to, the adverse employment action complained of," so discrimination can be inferred. *Hunt v. City of Markham*, 219 F.3d 649, 652 (7th Cir. 2000) (citing cases, reversing summary judgment).

### C. Maier has amassed overwhelming evidence of pretext.

An "employer's dishonest explanation of a decision can support an inference that its real reason was unlawful . . . 'particularly if disbelief is accompanied by a suspicion of mendacity.'" *Joll*, 953 F.3d at 932 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). Here, Maier has amassed a raft of evidence that UPS was lying about the reasons for its decision.

First, a jury could easily conclude UPS's *only* purported justification for why it promoted Paras over Maier was a lie, because the January 17 meetings were never intended to be "interviews" until after the fact. In June 2018, after two HR managers announced their upcoming retirements, UPS engaged in extensive succession planning to backfill their roles. UPS decided that Interial would be promoted to HR Operations Manager. Maier and Paras's names were put up for Interial's to-be-vacated AHRM role, and Maier, the better (and only) qualified candidate, was selected. At the same time, a lower-level employee was selected to receive a promotion to HR supervisor because she had a bachelor's degree. These decisions were made through succession planning, were reaffirmed repeatedly over seven months, and no interviews took place. On her first day as Illinois

9

HR Director, Allison received a phone list that showed all the promotions had been implemented, including Maier's to AHRM. The same day, Interial received a document from his predecessor showing Maier and the newly promoted supervisor's increased salaries. The decisions were entered into People Tracker. UPS does not prepare this documentation until the associated personnel decisions are made. Indeed, on the day she met with Allison, Maier was told by both Interial and Macchia that she was meeting with Allison "to be promoted." (SAF ¶¶5-13, 15.)

Moreover, the January 17 meetings complied with none of UPS's proper interview practices, supporting the conclusion that they never were intended to be interviews. Allison claimed to do "hundreds of thousands" of interviews at UPS and testified that interviewers should use "consistency in the interviewing process across the candidates," consider "whatever's available from a document perspective … before making a final decision," use "documents or notes" to evaluate the candidates," and follow UPS's extensive interviewing training. (*Id.* ¶18.) But Allison and Interial did none of this. *See Joll*, 953 F.3d at 931; *Rudin*, 420 F.3d at 723. There was no "consistency" in the process: Paras was given a full day's notice to prepare, allowing him to show up in a suit at 9 a.m. and spent 40-plus minutes with Allison and Interial. In contrast, after working the early morning preload shift, Maier was informed around 11 a.m. that Allison wanted to meet, she spent 10-15 minutes in the room, and was questioned about her ability to work long hours with her "small children" while Paras was not. Contrary to its policies, UPS denied reviewing performance or succession planning documents (which would show Maier was more qualified), no notes were taken or reviewed, and produced no documentation regarding the meetings.[9] (*Id.* ¶¶ 15-17, 22-23.)

---

[9] UPS's *ad hoc* process that violated its own policies and resulted in an unqualified hire distinguishes this case from those where multiple qualified candidates were evaluated in structured, formal interview processes. *E.g.*, *Murray v. Golden Rule Ins. Co.*, 23 F. Supp. 3d 938, 951-52 (S.D. Ind. 2014) (job required undergraduate degree *or relevant experience*; plaintiff lacked supervisory experience or experience with subject matter); *Choy v. Chicago Park Dist.*, No. 19 C 4369, 2022 U.S. Dist. LEXIS 53165, at *18-19 (N.D. Ill. Mar. 24, 2022) (structured interview process, no meaningful difference in qualifications); *Hall v. Chi.*, 52 F. App'x 259, 260-63 (7th Cir. 2002) (structured interview, plaintiff lacked evidence of comparators' qualifications or pretext).

Further, UPS's explanations have a particularly strong "suspicion of mendacity," *Hicks*, 509 U.S. at 511, because its decision-makers were caught in numerous outright lies during discovery:

- Interial and Allison claimed that they had no idea that UPS's senior HR managers so much as "recommended" Maier for the AHRM position, but both received documents reflecting Maier's promotion to AHRM, and wrote repeatedly, in January 2019, that their predecessors had "recommended" Maier over Paras (RSOF[10] ¶¶24, 36);
- Interial and Allison claimed to believe Paras was a few months away from completing his bachelor's degree, but Paras was more than 20 classes and four years from graduation and denied telling Interial and Allison anything different (RSOF ¶¶36, 42; SAF ¶ 21);
- [redacted] SAF ¶ 14);
- In seeking her superiors' approval to rescind Maier's promotion in favor of Paras, Allison asserted that "all of" various attributes—like applying to international positions, being "open to constructive criticism," being fluent in three languages, and wanting to "give back" to the "community of Guam"—were "required" in the "AHRM role." She acknowledged this all was false at her deposition (RSOF ¶¶36,37; SAF ¶¶27-28);
- Allison testified that she, Interial, and the two AHRMs decided "collectively" and had "full agreement" and "consensus" that Paras was the better choice. The other two UPS witnesses involved contradicted her story. Interial testified that the two other AHRMs were indifferent but that he preferred Paras. Macchia testified, in contrast to both Allison and Interial, that he advocated for Maier's promotion (RSOF ¶35; SAF ¶20.)

In addition, a typical way a plaintiff can prove pretext is by pointing to the employer's shifting explanations. *E.g.*, *Runkel*, 51 F. 4th at 744-46; *Joll*, 952 F.3d at 932-33. Here, UPS has changed its story on essential aspects of this case. Interial initially told Maier "it wasn't the interview," that resulted in Paras's promotion, but the fact that "Chelsea felt like you had a lot going on right now." (SAF ¶26.) Interial also acknowledged that Maier was the best candidate, something he now disavows. (*Id.*) Further, the email chains where Allison and Interial tried to convince their superiors to rescind Maier's promotion are unusually powerful "shifting explanations" evidence. (SAF ¶ 27-28.) A jury can see the decision-makers' changing stories in real time, as they attempt to land on a justification to convince their superiors to push through Paras's undeserved promotion.

---

[10] Plaintiff cites her Response to Defendants' Statement of Fact as "RSOF ¶_."

11

Violating the Seventh Circuit's instructions, UPS wrenches snippets of Plaintiff's deposition, responding to objected-to hypothetical questions, out of context to suggest that Maier does not personally, subjectively believe that UPS was lying. *See Malin*, 762 F.3d at 564-65. The Court has Maier's full deposition testimony, which makes clear that she very much personally, subjectively believes that UPS discriminated against her (and lied). Regardless, Plaintiff has amassed a wealth of evidence—well beyond her subjective beliefs—that would support a jury's verdict that UPS discriminated against Maier when it promoted Paras over her. *Id.*; *Runkel*, 51 F.4th at 742.

## II. A Reasonable Jury Could Conclude that UPS Retaliated Against Maier.

To succeed on her retaliation claims under Title VII, IHRA, and the FMLA, Plaintiff must (a) show she engaged in activity protected under those statutes; (b) that she suffered an adverse action; (c) because of her protected activity. *Malin*, 762 F.3d at 558, 562. These claims can be pursued simultaneously. *Id.* at 562 n.3. Maier undisputedly engaged in protected activity: she complained internally of discrimination in January and March of 2019, requested 12 weeks of protected leave in the summer of 2019, filed an EEOC charge on July 31, 2019, took protected leave between August and November of 2019, participated in an EEOC mediation on January 14, 2020, and filed an amended EEOC charge on January 30, 2020. (SAF ¶¶25-26, 29, 34, 38-39; RSOF ¶74.) Failing to promote Maier is an adverse action. *Malin*, 762 F.3d at 558, 562.

Within months of his promotion,  Allison ▮▮▮ transferred Paras laterally to a different manager position, for which she publicly congratulated him. UPS's violation of its policy ▮▮▮ until Maier's EEOC mediation, offers

12

more reason to infer unlawful animus. (SAF ¶38.) *See Joll*, 953 F.3d at 931; *Rudin*, 420 F.3d at 723.

When the AHRM role became available again in early 2020, Maier was back to work and performing admirably. She was the only Illinois HR Supervisor considered a Level 1 fit for promotion to AHRM at the time. She was pursuing her EEOC charge against UPS, attended an EEOC mediation in mid-January, and filed an amended charge in late January. Allison and other HR managers were involved at the time in responding to Plaintiff's charges. Maier was not even considered for the open position for which UPS had formally identified her as the top candidate. (SAF ¶¶37-40.) This is strikingly similar to *Malin*, in which the Seventh Circuit reversed summary judgment where the plaintiff was shortlisted for promotion before taking FMLA leave but then was passed over. 762 F.3d at 563-64.

Instead, in February 2020, shortly after the EEOC mediation and Maier's filing of a supplemental charge, UPS transferred Gloria Macias, non-EEOC charge filing, non-leave taking, non-HR manager near retirement, who had no young children, to become AHRM. (SAF ¶40.) *See Hackworth v. Progressive Halcyon Insurance Co.*, No. 05-1467, 2007 U.S. Dist. LEXIS 7570, at *11 (W.D. Okla. Feb. 1, 2007) (denying summary judgment where adverse action occurred within weeks of mediation, suggesting causation). In asking the EEOC to dismiss Maier's retaliation Charge, UPS asserted that Allison considered six candidates, including Maier, for the AHRM role and conducted interviews, at which Macias blew Allison away with her "breadth of perspective, ideas for driving the success of her team, and sharp organizational skills." (SAF ¶40.) All that was false. UPS now acknowledges that no one was interviewed, that Maier was not even considered for the position she indisputably was qualified for, and that counsel was involved in the decision not to promote Maier. (*Id.*) UPS claims (thinly and absurdly, based on hearsay) that Maier was not promoted because Allison had a generic conversation about "rotational opportunities" for various employees at some time in the past. (RSOF ¶69.) Especially given UPS's prior lies on the topic, a jury need not accept

13

UPS's half-baked story. *See Donley v. Stryker Sales Corp.*, 906 F.3d 635, 637-39 (7th Cir. 2018) (reversing summary judgment where EEOC statement conflicted with employer's later story); *Runkel*, 51 F.4th at 744-46 (same).

UPS argues that Maier's transfer, over her objections, to Jefferson Street is not a sufficient adverse action. But "adverse action" has a broader meaning for retaliation than for discrimination claims. *Lewis v. City of Chi.*, 496 F.3d 645, 654-55 (7th Cir. 2007). Specifically, for retaliation, an adverse action is one that would "dissuade a reasonable worker" from challenging discrimination. *Burlington N. v. White*, 548 U.S. 53, 68 (2006). A jury could conclude that sending a seven-month pregnant employee to a location that tripled her commute, lacked adequate furniture, lacked running water, a nearby bathroom, or a private space for breast pumping, would dissuade a reasonable worker from speaking up.[11] *See Alamo v. Bliss,* 864 F.3d 541, 553 (7th Cir. 2017); *Wistrom v. Black*, No. 11-cv-515, 2012 U.S. Dist. LEXIS 202896, at *24-25 (W.D. Wis. Aug. 20, 2012) ("sudden, unceremonious reassignment" adverse action); *Owens-Floyd v. Chi.*, No. 5 C 3182, 2007 U.S. Dist. LEXIS 92225, at *12-13 (N.D. Ill. Dec. 11, 2007) (hour longer commute adverse action).

Ample evidence of causation exists, including Interial's dismissive refusal to investigate Maier's discrimination complaints ("venting"), Macchia's sending Allison (around the time of the transfer) a document loaded with personal details about Maier and her current pregnancy, and Macchia's harsh reaction to Maier's taking her full FMLA leave during "peak." *See Jackson v. Raemisch*, 726 F. Supp. 2d 991, 1007 (W.D. Wis. 2010) ("Disparaging comments made about a plaintiff's protected conduct followed shortly by adverse treatment is sufficient evidence to defeat defendants' motion for summary judgment"). And—like nearly every decision here—UPS has offered shifting

---

[11] UPS's cases generally involve plaintiffs claiming that a longer commute (or something more minor) *alone* is an adverse action, without aggravating circumstances like exist here. Several cases, including *Griffin v. Potter*, 356 F.3d 824 (7th Cir. 2004), predate the Supreme Court's seminal *Burlington Northern* case, or erroneously apply the more demanding standard for discrimination claims.

and conflicting accounts about why Maier was suddenly removed and sent to a less favorable location. The three decision-makers (Allison, Macchia, Interial) pointed fingers at each other, supporting an inference of retaliatory intent. *Runkel*, 51 F. 4th at 744-46; *Joll*, 952 F.3d at 932-33.

### III. A reasonable jury could conclude that UPS failed to accommodate Maier's nursing.

Illinois law requires UPS to "make *reasonable efforts* to provide a room or other location, *in close proximity to the work area*, other than a toilet stall, where an employee . . . can express her milk in privacy." 820 ILCS 260/15 (emphasis added). Reasonableness is, paradigmatically, an issue for the fact-finder, *Lorillard Tobacco Co. v. A & E Oil, Inc.*, 503 F.3d 588, 594 (7th Cir. 2007) ("as a general rule, a party's state of mind ... is a question of fact for the factfinder, to be determined after trial"), and should be considered given the legislative purposes of encouraging breastfeeding and worker productivity. *See* 92nd Ill. Gen. Assem., House Proceedings, April 19, 2001, at 14-15.

In contrast to the plaintiffs in *Tolene v. T-Mobile, USA, Inc.*, 178 F. Supp. 3d 674, 686 (N.D. Ill. 2016); *Lara-Woodcock v. United Air Lines, Inc.*, 999 F. Supp. 2d 1027, 1044-46 (N.D. Ill. 2013) (Mem at 15), Maier didn't quit her job. It was unreasonable (1) to ask Maier to kick out a Division Manager to pump in his office at Lockport, (2) have no lock on the trailer office door at the Jefferson Park facility upon her return after her prior privacy violation, (3) expect Maier to pump behind paper-thin walls in a shared HR trailer while interviews continued, (4) contemplate Maier walking up to ten minutes each way to pump in the automotive offices, and (5) compel Maier to search for appropriate alternatives herself. (SAF ¶¶ 35-36.) After weeks of trying, it was clear that UPS's unreasonable purported accommodations were insufficient to allow Maier to continue expressing milk for her baby, and Maier was compelled to stop breastfeeding earlier than she had desired. (*Id.*) *Lara-Woodcock,* 999 F. Supp. 2d at 1046. Of course, it would have been reasonable for UPS to have kept Maier at Bedford Park, where she had a private office and pumped without incident for her second child. But discrimination and retaliation are not reasonable.

Respectfully Submitted,

*s/ Matthew J. Singer*

| | |
|---|---|
| Gail S. Eisenberg | Matthew J. Singer |
| LOFTUS & EISENBERG LTD. | MATT SINGER LAW, LLC |
| 161 N. Clark St., Suite 1600 | 77 W. Wacker Dr., Suite 4500 |
| Chicago, IL 60601 | Chicago, Illinois 60601 |
| Phone: 312-899-6625 | Phone: 312-248-9123 |
| GEisenberg@LoftusandEisenberg.com | Matt@MattSingerLaw.com |