# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| **SARA MAIER,** | |
| Plaintiff, | |
| v. | Case No. 21-cv-3506 |
| **UNITED PARCEL SERVICE, INC.,** | Judge Jorge L. Alonso |
| Defendant. | |

## PLAINTIFF SARA MAIER'S STATEMENT OF ADDITIONAL MATERIAL FACTS

Plaintiff Sara Maier ("Maier" or "Plaintiff"), by and through its attorneys, in opposition to Defendant United Parcel Service, Inc.'s ("UPS" or "Defendant") Motion for Summary Judgment, hereby submits her statement of additional material facts, as follows:

**Maier performs outstandingly as a human resources supervisor and is groomed for the next available promotion to area human resources manager.**

1.      Plaintiff Sara Maier began working for UPS in 2003. (Maier Dep. 20:5-21:6.) In 2007, UPS promoted her to Human Resources ("HR") Supervisor. (Maier Dep. 25:10-28:3; Pl. Ex. 1, Maier Decl. ¶ 6.) Between 2015 and 2020, she reported to Area Human Resources Manager ("AHRM") Ron Macchia. (Maier Dep. 31:8-18; Macchia Dep. 20:5-21:4.) At or around the time Macchia became Maier's supervisor, Macchia recognized Maier as the top HR Supervisor reporting to him, and Maier had already been identified as a "ready now" candidate—at the time, UPS's parlance for an employee ready for a promotion to the next level—for promotion to AHRM, should an opportunity become available. (Macchia Dep. 19:13-21:4; Allison Dep. 33:16-34:3; Interial Dep. 17:10-23; Pl. Ex. 1, Maier Decl. ¶ 19.) Maier had received "strong performance" overall performance ratings for years before Macchia's arrival as her supervisor. (Pl. Ex. 21, Def.'s Request to Admit ("RTA") Response Nos. 16-

19.) Beginning in 2015, every year at UPS's annual career development/talent review/succession planning meeting, Macchia would speak with his fellow AHRMs—Carlos Interial and Mike Nugent—HR Operations Manager Frank Barre, and District HR Director Greg Barr, regarding Maier's outstanding performance and describe her readiness for promotion. (Macchia Dep. 19:8-25:22.)

      2.      In recognition of Maier's outstanding performance as HR Supervisor, and to continue preparing her for promotion to AHRM, UPS's HR leadership in Illinois began assigning her additional tasks as "lead supervisor," above and beyond the typical responsibilities of an HR Supervisor. (Pl. Ex. 1, Maier Decl. ¶¶ 16-18; Maier Dep. 211:15-213:8; Pl. Ex. 14 (UPS 4373).) Among other things, between 2016 and 2018, Maier was assigned and performed the following additional tasks as lead supervisor: (1) running the weekly, regional human resources call for the HR supervisors and other employees in the region (Pl. Ex. 1, Maier Decl. at ¶ 16; Maier Dep. 211:15-213:8; Interial Dep. 54:19-23; Macchia Dep. 30:10-31:11, 41:15-42:19, 47:7-48:1; Paras Dep. 21:17-23:3; Macchia Dep. Ex. 3 (UPS 2497); Macchia Dep. Ex. 4 (UPS 2549); Macchia Dep. Ex. 5 (UPS 2670); Pl. Ex. 14 (UPS 4373)); (2) serving as the lead instructor for "NSPT" and performing other important tasks relating to Integrad, UPS's training for new drivers (Pl. Ex. 1, Maier Decl. at ¶ 17; Macchia Dep. 31:13-32:12, 41:15-42:19, 47:7-48:1; Interial Dep. 54:24-56:8; Macchia Dep. Ex. 3 (UPS 2497); Macchia Dep. Ex. 4 (UPS 2549); Macchia Dep. Ex. 5 (UPS 2670); Pl. Ex. 14(UPS 4373), at 4382-84); (3) taking the lead on package/feeder queries (F. Barre Dep. 17:15-24; Pl. Ex. 14 (UPS 4373), at UPS 4373-74); (4) advising, teaching, and training other HR Supervisors (including Angel Paras) about Microsoft Access, including instructing them on how to perform advanced queries (Pl. Ex. 1, Maier Decl. at ¶ 18; Interial Dep. 56:12-15; Paras Dep. 24:1-11; Macchia Dep. 44:16-45:13, 47:7-48:1; Macchia Dep. Ex. 4 (UPS 2549); Macchia Dep. Ex. 5 (UPS 2670)); (5) serving as a mentor, advisor, and leader among the HR supervisors (Pl. Ex. 1, Maier Decl. at ¶¶ 8, 16-18; Macchia Dep. 37:19-

38:7, 43:12-44:19, 47:7-48:1; Paras Dep. 23:17-25:6; Macchia Dep. Ex. 2 (UPS 3218); Macchia Dep. Ex. 3 (UPS 2497); Macchia Dep. Ex. 4 (UPS 2549); Macchia Dep. Ex 5 (UPS 2670); (6) filling in for the AHRMs in situations where none of the three were available. (Pl. Ex. 1, Maier Decl. at ¶24; Interial Dep. 54:24-56:8; Macchia Dep. 67:2-17; Pl. Ex. 12, (UPS 4114).)

3. Maier successfully performed her additional lead supervisor responsibilities, along with her regular HR supervisor duties, which Macchia recognized while delivering her glowing performance reviews with "strong performance" overall ratings between 2016 and 2019. (Macchia Dep. 32:18-52:7; Macchia Dep. Ex. 2 (UPS 3218), Macchia Dep. Ex. 3 (UPS 2497), Macchia Dep. Ex. 4 (UPS 2549), Macchia Dep. Ex. 5 (UPS 2670); F. Barre Dep. 17:15-24, 137:19-139:24.)

**In accordance with her career development plan, Maier obtains her bachelor's degree and achieves the only required qualification for the AHRM position.**

4. There was only one required qualification for the AHRM position: a bachelor's degree. (Maier Dep. 79:21-80:6, 126:17-129:13, 248:19-249:3; Allison Dep. 166:11-167:1; Def's SJ Ex. J, at UPS 4256; Pl. Ex. 15 (UPS 4478), at UPS 4483.) At UPS, "required" qualifications mean "required"; the requirement is "absolute." A candidate for a position "either has" the required qualification "or does not." (Allison Dep. 44:20-46:5, 166:11-167:1; Pl. Ex. 15, (UPS 4478, at 4483.) AHRM positions in Illinois were rarely available. (Paras Dep. 71:11-24; F. Barre Dep. 25:2-5; G. Barr Dep. 44:1-10.) In the rare event an AHRM position came available, UPS filled it through its succession planning process. (F. Barre Dep. 25:2-9.) To ensure that Maier was positioned to be promoted to AHRM when an opportunity came available, Maier's career development plan—one aspect of UPS's extensive and formal career development and succession planning process—instructed her to obtain her bachelor's degree. (Macchia Dep. 25:23-29:1; Maier Dep. 17:1-18:15, 79:21-80:6, 126:17-129:13, 248:19-249:3; Allison Dep. 36:22-38:19; Macchia Dep. Ex. 1 (Maier 45); Def. Ex. J, at UPS 4256; Allison Dep. 116:21-117:4, 166:11-167:1; Pl. Ex. 15, (UPS 4478), at UPS 4483.) Nugent counseled Paras to finish his bachelor's degree as a part of his career development,

advice he ignored without consequence. (Paras Dep. 5:1-2, 8:21-23, 32:3-33:7, 72:10-14, 85:10-17, 90:7-17, 123:14-16; Paras Dep Ex. 2, UPS 2524.) Macchia told Maier she would be promoted to AHRM in early 2019 if she completed her bachelor's degree. (Pl. Ex. 1, Maier Decl. ¶ 23.) Based on UPS's instructions that obtaining her bachelor's degree was necessary for her advancement to AHRM, Maier took her final class and completed her bachelor's degree in business administration in 2018. (Maier Dep. 17:1-18:15, 79:21-80:6, 126:17-129:13, 248:19-249:3; Allison Dep. 116:21-117:4, 166:11-167:1; Pl. Ex. 1, Maier Decl. ¶ 23; Interial Dep. Ex. 10 (UPS 3709); Def. Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483.)

**UPS engages in extensive planning to backfill soon-to-be-vacated Illinois HR positions and decides to promote Carlos Interial to HR operations manager, Sara Maier to AHRM, and Ramina Chlimoun to HR supervisor.**

5.      UPS has an extensive and formal process for evaluating its current employees (at a supervisor level and above) for advancement, which UPS employees alternately refer to as "succession planning," "talent review," or "career development" processes. (Allison Dep. 25:14-36:15; G. Barr Dep. 24:6-31:6; Interial Dep. 14:21-21:24; Macchia Dep. 17:19-19:20, 24:22-25:7; F. Barre Dep. 36:24-38:16.) Most HR management positions at UPS were filled via the succession planning process. (F. Barre Dep. 36:24-38:16.) Performance reviews were one key metric by which potential candidates for promotion were evaluated during the succession planning process. (Allison Dep. 33:2-13; Barr Dep. 24:6-25:3; Macchia Dep. 17:19-19:20.) UPS's HR leadership generally "prefers to fill an open position via a career development opportunity or promotion rather than formally solicit applications because of the decision makers' familiarity with capable internal candidates." (Pl. Ex. 2, UPS May 7, 2020, EEOC Position Statement.)

6.      In early 2018, UPS offered certain senior employees the opportunity to participate in what UPS called the Voluntary Retirement Program ("VRP"). Under UPS's policies, positions that became available because of individuals taking VRP—as Greg Barr and Frank Barre did—could be

backfilled without competition or interviews, in what UPS refers to as "VRP backfill" "career development" moves made via the aforementioned succession planning process. (Allison Dep. 42:17-24, 55:2-58:6; F. Barre Dep. 103:6-104:12, 107:3-7; Interial Dep. 23:16-24:9; Rodriguez Dep. 15:6-20; G. Barr Dep. Ex. H (UPS 3676).) For example, UPS backfilled Greg Barr's position with Chelsea Allison without a competitive process or interviews. (Allison Dep. 42:17-24, 55:2-58:6.) UPS backfilled Frank Barre's position with Carlos Interial without a competitive process or interviews. (Allison Dep. 58:7-61:6, 63:23-64:13; Interial Dep. 43:7-43:22, 146:17-19; Barr Dep. Ex. E, UPS 3686; Barr Dep. Ex. F & Pl. Ex. 9 (UPS 3688); Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707).) UPS backfilled an HR supervisor position that came available as a result of VRP with Ramina (Ashtar) Chlimoun without a competitive process or interviews. (Interial Dep. 65:7-65:22; Allison Dep. 62:8-64:13; Barr Dep. Ex. E (UPS 3686); Barr Dep. Ex. F & Pl. Ex. 9 (UPS 3688); Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707).) Allison had no say on who would fill the HR operations manager position—the right-hand person for the HR Director, who reported directly to her—and no say in who would fill the HR supervisor role vacated by the newly promoted AHRM. (Allison Dep. 58:7-61:6, 62:8-23; Interial Dep. 43:7-43:22, 59:19-60:8; 65:7-65:22; 146:17-19; Barr Dep. Ex. E, UPS 3686; Barr Dep. Ex. F & Pl. Ex. 9 (UPS 3688); Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707).) UPS falsely asserted before the EEOC that Allison "concurred with the recommendation to select Interial for the HR Operations manager position," which Allison acknowledged at her deposition was not true. (Pl. Ex. 27, UPS Position Statement, at UPS 35; Allison Dep. 58:7-61:6.)

7.      In May 2018, the AHRMs (Ron Macchia, Mike Nugent, and Carlos Interial), Frank Barre, and Greg Barr attended a "career development" meeting, at which Macchia advocated for Maier's promotion. (Macchia Dep. 60:21-65:10, 67:18-68:4.) Subsequently, on May 31 and June 1, 2018, Greg Barr attended a "staff level" talent review meeting, attended by individuals at his level

and above, and at which the three HR supervisors who were then considered Level 1 fits for promotion to AHRM—Maier, Paras, and Mike Kish—were discussed. (G. Barr Dep. 48:6-60:18; G. Barr Dep. Ex. A (UPS 4091); G. Barr Dep. Ex. B (at UPS 4173-74, 4177-78, 4179-80); G. Barr Dep. Ex. C.) At the meeting, UPS's high-level HR staff determined that, upon Greg Barr and Frank Barre's retirements, Carlos Interial would fill Frank Barre's position and that Sara Maier would fill Carlos Interial's AHRM position. (G. Barr Dep. 63:11-71:18; G. Barr Dep. Ex. D (UPS 3684); G. Barr Dep. Ex. E (UPS 3686); G. Barr Dep. Ex. F, Pl. Ex. 9 (UPS 3688)). In addition, around this time, in June 2018, Frank Barre and Greg Barr decided that a UPS employee named Ramina (Ashtar) Chlimoun would be promoted to HR supervisor to backfill Maier's role; the determining factor was that Chlimoun had a bachelor's degree, which the other candidates (despite having more UPS experience) lacked. (G. Barr Dep. Ex. D (UPS 3684)).

8.     Greg Barr communicated these decisions to his dotted-line boss, Regional Manager Pete Elroy, in June 2018, in an email thread with the subject line "VRP confidential." Elroy specifically asked Barr to "backfill for Carlos and have him as replacement for Frank [Barre]." In response, Barr wrote that "Sara will replace Carlos as AHRM." Angel Paras, who was discussed with the UPS senior managers at the May 31-June 1 talent review meeting, was not mentioned anywhere on the documentation or communications regarding the VRP backfills and promotions, because he had not been selected for promotion. (G. Barr Dep. 63:11-71:18; G. Barr Dep. Ex. E (UPS 3686); G. Barr Dep. Ex. F, Pl. Ex. 9 (UPS 3688).)

9.     These decisions, including the decision to promote Maier, were reaffirmed again in August 2018, when UPS updated its procedures for backfilling positions that came open due to the VRP. (G. Barr Dep. Ex. K (UPS 3683), Pl. Ex. 8.) The spreadsheet reflecting UPS's decisions specifically referenced filling Maier's specific position as HR supervisor via "career development/VRP role to be backfilled." (G. Barr Dep. 71:19-72:23, 73:2-76:21, 77:7-79:7, 79:15-

6

82:20; Rodriguez Dep. 31:17-34:3; G. Barr Dep. Ex. G (UPS 3675); G. Barr Dep. Ex. H (UPS 3676); G. Barr Dep. Ex. I (UPS 3680), Pl. Ex. 7; G. Barr Dep. Ex. J (UPS 3681); G. Barr Dep. Ex. J (UPS 3681); G. Barr Dep. Ex. K, Pl. Ex. 8 (UPS 3683).)

10. These decisions were again reaffirmed again in late 2018 and early January 2019, when Frank Barre informed Marci Rodriguez—the person in charge of submitting VRP requisitions—that "Carlos would be replacing Frank, and Sara would be replacing Carlos." (Rodriguez Dep. 22:14-23:6, 23:24-25:13.) Barre further instructed Rodriguez that requisitions for these promotions should be entered in UPS's system as "VRP backfills," i.e., as promotions that would occur without going through "MCO," which is UPS's system for competitive internal job postings. (Rodriguez Dep. 15:6-15:20, 22:14-23:6, 23:24-25:13; Interial Dep. 23:16-24:9; Rodriguez Dep. Ex. 7 (UPS 4129); Pl. Ex. 13 (UPS 4127); Pl. Ex. 1, Maier Decl., at ¶¶ 7, 24.) Based on Barre's instructions, Rodriguez created the requested VRP backfill requisitions, which were approved on January 9. (Rodriguez Dep. 36:6-44:21; Rodriguez Dep. Ex. 7 (UPS 4129); Rodriguez Dep. Ex. 8 (UPS 4142).) Barre instructed Rodriguez not to put names in any of the requisitions for the VRP backfills in the HR department, for good reason—HR personnel at UPS could view the requisitions and see the decisions before they were ready to be announced. (Rodriguez Dep. 36:3-44:21, 46:24-47:16; Rodriguez Dep. Ex. 2, Rodriguez Dep. Ex. 7; Rodriguez Dep. Ex. 8; Pl. Ex. 1, Maier Decl. at ¶ 25). When a UPS employee at the regional level reached out to Rodriguez to find out which individuals would be filling the HR Operations Manager and AHRM roles, Rodriguez informed the caller that Interial and Maier, respectively, had been selected. (Rodriguez Dep. 42:5-44:21.) No one had given Rodriguez—the person listed as the "primary recruiter" on the requisition—any indication whatsoever that the decisions were tentative or up for further discussion. (Rodriguez Dep. 42:5-44:21; Rodriguez Dep. Ex. 7 (UPS 4129).)

11. The decisions to promote Interial, Chlimoun, and Maier were also entered into

People Tracker, which was UPS's system for documenting personnel moves such as promotions, demotions, and job moves. (Allison Dep. 157:9-23; Interial Dep. 125:22-127:3; Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707); Pl. Ex. 1, Maier Decl. ¶ 26.) Personnel moves are entered into "People Tracker" only when they occur, once a successor is in place. (Paras Dep. 75:22-76:1; Interial Dep. 124:3-129:13; Allison Dep. 156:20-157:23; Pl. Ex. 1, Maier Decl. ¶ 26.)

12.     These decisions—including Maier's promotion—were again reaffirmed on January 14, 2019, Allison's first day as Illinois District HR Director. (Allison Dep. 55:5-10.) On that date, Barre sent his replacement, Interial, copies of "salary impact sheets" showing the salaries that Maier and Chlimoun would receive upon their promotions. (Interial Dep. 63:22-67:11; Interial Dep. Ex. 7 (UPS 3696); Interial Dep. Ex. 8 (UPS 3699).) Salary impact sheets are prepared at UPS only when a promotion or salary change decision has already been made. (Interial Dep. 66:19-67:11; Paras Dep. 98:14-99:6; Rodriguez Dep. 45:16-46:16.) No salary impact sheet for Paras had been prepared at the time. (Interial Dep. 64:4-65:6; Interial Dep. Ex. 7 (UPS 3696).) On that same date, Greg Barr sent to his replacement Chelsea Allison a phone list of the employees reporting up to her that listed Carlos Interial as HR Operations Manager, Sara Maier as Area Human Resources Manager, and Ramina Chlimoun as HR supervisor; the document listed Paras as an HR supervisor. (Barr Dep. 91:23-95:15; Allison Dep. 65:4-69:1; Barr Dep. Ex. L (UPS 3483); Barr Dep. Ex. M (UPS 3484).) Also on that same date, Barr and Barre exchanged emails with organizational charts and phone lists reflecting Interial, Maier, and Chlimoun's promotions—exactly as had been planned since June 2018. (G. Barr Dep. 95:16-101:10; G. Barr Dep. Ex. N (UPS 3671); G. Barr Dep. Ex. O (UPS 3673).) Phone lists and organizational charts were prepared at UPS by Marcy Rodriguez's administrator, who would input information from managers reflecting personnel moves that had already been made. (Rodriguez Dep. 15:21-17:1; F. Barre Dep. 130:20-131:12.)

13.     Before January 17, 2019, Maier's forthcoming promotion was widely announced

and discussed among HR personnel throughout the Illinois District. Division Manager Tim Bingham told Maier that Barre and Barr told "the whole district" that Maier would be promoted and congratulated Maier on her promotion the Monday after Maier was informed that UPS had instead decided to give the promotion to Paras. In addition, the HR supervisors who would be reporting to Maier as AHRM had been sending her their PTO requests because they knew she was being promoted. (Maier Dep. 89:7-90:7; Maier Dep. Ex. 1, at Maier 43; Pl. Ex. 1, Maier Decl. at ¶¶ 23, 33; Pl. Ex. 23, P's supplemental responses to Rog. 14.)

**After grilling Maier about whether she could work long hours with young children, UPS rescinds her promotion in favor of an objectively unqualified man with young children.**

14.     On January 14, 2019—her first day as Illinois HR District Director—Chelsea Allison held an all-staff meeting to meet her new team. At that meeting, she extensively discussed her husband's role and flexibility in allowing her to pursue her career—in particular, his role in helping their children with extracurricular activities like basketball and his willingness to relocate for Allison's new job on short notice. (Maier Dep. 240:18-242:24; Paras Dep. 67:10-71:10; Macchia Dep. 69:14-71:2; Allison Dep. 69:4-74:2, 105:12-20.) At this meeting, Paras talked about his four children and his dance business. (Maier Dep. 240:18-242:24; Paras Dep. 70:21-23.) Maier testified that Allison talked about "how her husband had stayed at home and allowed her to work so she could work her way through UPS." (Maier Dep. 240:18-242:24.) While acknowledging that, generally, she did praise her husband's flexibility and assistance with her career, Allison disagreed with Maier's recollection of the meeting, claiming that her husband was a "full-time" employee at "all times." (Allison Dep. 69:4-74:2.) ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████.███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████ (Allison Dep. 72:19-73:6, 250:5-9; Pl. Ex. 17, at UPS

4410-11, 4646.)

15.      On Thursday, January 17, 2019, Plaintiff showed up to work in the early morning

hours to work on the preload shift. (Maier Dep. 243:21-244:21; Macchia Dep. 75:11-17.) Around 11

a.m., after she had already worked a full day, she received an instant message from Chelsea Allison

asking if Maier had "time to talk" that day. (Maier Dep. 45:14-46:1; Pl. Ex. 26, Maier Dep. Ex. 1

(Maier 35), at Maier 35; Pl. Ex. 22, Stipulation; Pl. Ex. 1, Maier Decl. Pl. Ex. 1, ¶ 28.) Shortly

thereafter, Maier received a call from Ron Macchia, telling Maier she "was going to Addison to meet

with Chelsea to be promoted." (Maier Dep. 45:14-46:1, 62:4-8, 65:7-17; Pl. Ex. 26, Maier Dep. Ex. 1

(Maier 35), at Maier 35.) Maier expressed concerns to Macchia that she was dirty and disheveled after

working the presort shift from the early morning hours, and asked if she could have some time to

freshen up, but Macchia insisted that she go to Addison immediately. (Maier Dep. 62:17-23, 243:21-

244:21.) At the time she left her office and began driving to Addison, Maier did not know that anyone

else would be meeting with Allison—that information was shared with her only when she was already

on her way. (Maier Dep. 45:10-46:1, 62:21-64:3.) When she arrived at Addison, Maier waited and

worked from there for several hours. (Maier Dep. 64:14-22.) During that time, Interial instant

messaged Maier and told her "they were putting [her] last in the lineup because I was getting

promoted [and] he didn't want the other two supervisors to know this was the plan. He told me not

to be nervous because this job was mine." (Maier Dep. 65:7-17, 245:5-16; Pl. Ex. 26, Maier Dep. Ex.

1 (Maier 35) at Maier 36; Pl. Ex. 22, Stipulation) Paras went in first to talk with Allison and Interial

and stayed with them for about 40-45 minutes. (Paras Dep. 82:22-83:16; Pl. Ex. 1, Maier Decl. ¶ 29.)

16.     At the beginning of the meeting with Allison and Interial, Maier responded to Allison's invitation to discuss something "personal or professional about herself," by talking "about my children, how me and my husband were trying for a third but hadn't been successful yet." At that point, Chelsea began questioning Maier about whether she could work "long hours, working in the middle of the night" with her "small children." Maier responded to Allison that she "already had been doing that," that she already "worked in the middle of the night," that she already "worked long hours," and "already did the responsibilities of a manager and that it wasn't going to be a problem." Maier attempted to discuss some of her many credentials and accomplishments, including her expertise with Microsoft Access and her vast experience training and mentoring other UPS personnel, but Allison cut off her answers. Maier perceived that, after she mentioned her young children, Allison acted in "disingenuous" way that showed she "wasn't really listening to what [Maier] said," making clear to Maier that "it didn't really matter what [Maier] said, and that [Allison] had already made her mind up." ((Maier Dep. 45:10-46:1; 52:18-53:10, 62:4-64:3, 65:7-72:23, 104:6-19, 245:5-16; Allison Dep. 103:4-104:15; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35).) The meeting took about 10 or 15 minutes. (Maier Dep. 51:8-15.) Allison and Interial took no notes at the meeting, and UPS has no documentation of what occurred at the meeting with Maier or any of the HR supervisors. (Allison Dep. 107:20-108:22; Interial Dep. 84:20-85:24, 87:16-19, 90:10-14, 91:18-21.)

17.     Unlike Maier, Paras was told the day before he would be meeting with Allison, time he took advantage of to hone his talking points. Unlike Maier, Paras did not work the preload shift in the early morning hours of January 17, and did not have to travel; he showed up presentably at Addison, in a suit, at 9 a.m. Interial and Allison spent about triple the time with Paras (45 minutes) as they did with Maier (10-15 minutes). Paras was so nervous his leg was shaking. He talked about his four children, two of whom were young, his family responsibilities, and other outside

responsibilities—including his dance school. Nonetheless, unlike with Maier, Allison did not question Paras about whether he could handle working "long hours, working in the middle of the night" with his "small children." Unlike Maier, Allison allowed Paras to finish his answers without cutting them off. (Maier Dep. 51:8-15, 84:11-86:14; Paras Dep. 5:1-2, 8:21-23, 72:10-14, 76:13-83:16, 85:18-86:15, 90:7-17, 92:17-96:6; Interial Dep. 88:12-89:14, 93:15-94:9; Allison Dep. 99:5-100:17, 103:21-104:15; Maier Dep. Ex. 2 (Maier 149-50); Pl. Ex. 1, Maier Decl. ¶ 29.)

18.     UPS has extensive and formal policies and training materials for conducting interviews. (Pl. Ex. 25 (UPS 4590); Pl. Ex. 16 (UPS 4606); Pl. Ex. 15 (UPS 4478); Allison Dep. 43:1-51:1; Paras Dep. 48:10-58:18; Maier Dep. 245:18-246:19.) Allison, who testified she has done "hundreds of thousands" of interviews at UPS, is well aware of these policies.[1] (Allison Dep. 43:1-19.) UPS's interview policies and training materials specify the following:



---

[1]     At his deposition, Interial bizarrely denied that UPS offers interview training, which is one of many aspects of his deposition testimony that could support a jury's conclusion that he is a dissembler. (Interial Dep. 26:16-21.)

12



In addition, Allison testified to her understanding that UPS policy requires "consistency" and "proper questions" and "consistency in the interviewing process across the candidates"; to take into account "whatever's available from a document perspective … before making a final decision"; to have "documents or notes" to evaluate the candidates; and to use UPS's "interview training so that you're appropriate in the questions you ask." (Allison Dep. 43:1-51:1.) Allison and Interial followed none of these guidelines in their discussions with Maier and Paras, demonstrating that they did not intend these meetings to be interviews at the time. (*See* Statements of Fact 15-17, above.)

19.        After meeting with Paras and Maier, Interial and Allison attempted to reverse the decision to promote Maier, in favor of Paras, a man who they knew also had young children and

extensive non-UPS responsibilities, and who lacked the only required qualification for the AHRM position—a bachelor's degree. (Allison Dep. 116:21-117:4, 166:11-167:1; Interial Dep. 104:16-21; Maier Dep. 79:21-80:6, 126:17-129:13, 248:19-249:3; Interial Dep. Ex. 9 (UPS 3708); Interial Dep. Ex. 10 (UPS 3709); Def. Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483 ("Required must be specific to the business need of the job and **is absolute. The applicant either has it or does not**.").) During the evening of Thursday, January 17, Interial sent Allison a document reflecting two "scenarios" for backfilling his AHRM position: one if Sara Maier were promoted and the other if Angel Paras was promoted; the only substantive information on the document was education level, reflecting that Maier had her bachelor's degree and Paras did not. (Interial Dep. Ex. 9 (UPS 3708); Interial Dep. Ex. 10 (UPS 3709).)

20.    The next day, Interial and Allison spoke with the two other AHRMs about the third AHRM position, and UPS has offered contradictory accounts of what occurred during that conversation (or those conversations.) Macchia testified that he advocated for Maier's promotion, as he had on several prior occasions, as she was the "number one candidate in [his] eyes." (Macchia Dep. 63:1-64:24, 67:18-68:4, 79:23-84:14, 86:16-87:2.) Macchia also advised Allison and Interial that Maier's "kids had never caused any issues at work," that Maier "always got everything done," and is "the first to volunteer." (Maier Dep. 109:7-21, 110:9-111:4; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at Maier 42; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14.) Nugent, the other AHRM at the time, had no input on the decision and told Maier she was the better candidate. (Pl. Ex. 1, Maier Decl., at ¶ 34; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at 42-43; Pl. Ex. 23, Pl.'s supplemental rog responses, at No. 14.) This evidence conflicts with UPS's position before the EEOC, which was that Allison expressed her preference for Paras "and the others agreed." (Pl. Ex. 27, (UPS 34).)  Interial testified to something different: that Macchia and Nugent were indifferent to whether Maier or Paras would be promoted, but that he put his thumb on the scale for Paras based solely on the January 17

14

meeting. (Interial Dep. 110:23-112:18.) Interial also asserted that he was unaware of his predecessors'
choice (or at minimum, recommendation) of Maier, a lie he was caught on at his deposition. (Interial
Dep. 112:19-116:9; Interial Dep. Ex. 7 (UPS 3696); Interial Dep. Ex. 8 (UPS 3699); Interial Dep. Ex.
11 (UPS 3766); Interial Dep. Ex. 12 (UPS 3767).) Allison testified to a version of facts that conflicts
with both Interial and Macchia's sworn testimony. Unlike Interial, who asserted that Macchia and
Nugent were indifferent, and Macchia, who testified that he advocated for Maier's promotion,
Allison testified that UPS made the decision "collectively," based on Nugent and Macchia's "verbal
feedback" and "based on the advice of ... the team in Illinois," and that the "team," including Nugent
and Macchia, reached "full agreement" and "consensus" on the decision to promote Paras instead
of Maier. (Allison Dep. 111:23-112:14, 145:18-147:11, 245:19-246:9.)

**Maier was more qualified than Paras: both because she was the only candidate who met
the sole required qualification and because of her stellar performance and credentials that
exceeded his in every respect.**

21.     Paras testified clearly and frankly that he was nowhere close to getting his degree
when he met with Allison and Interial and certainly was not "scheduled to complete his bachelor's
degree . . . in May of 2019." Paras testified that, at the time he met with Allison and Interial, he had
more than 20 classes left to obtain his bachelor's degree, had a planned graduation date of 2023, and
told Allison and Interial merely that he "was in school." (As of his deposition, he still had not received
his bachelor's degree because of the "juggle between work and the kids' activities, just laziness on
my end sometimes" but has been employed as a manager, with a manager's salary, at UPS ever since
his promotion to AHRM in January 2019.) (Paras Dep. 5:1-2, 8:21-23, 72:10-14, 85:10-17, 90:7-17,
123:14-16.) Paras acknowledged as much when talking with Maier after their January 17 meetings,
explaining that he knew he wasn't getting promoted because he didn't have his bachelor's degree and
because he doesn't do the "extra stuff" that Maier did. (Maier Dep. 80:8-82:22, 248:2-18; Pl. Ex. 26,
Maier Dep. Ex. 1 (Maier 35), at Maier 39.)

22.     Throughout their time as HR supervisors (Maier's beginning in 2007 and Paras's in 2014), Paras never once had a stronger performance review than Maier. (Maier Dep. 25:10-28:3; Pl. Ex. 21, RTA Response Nos. 10, 15.) At UPS, performance reviews were one key metric by which potential candidates for promotion are evaluated during the succession planning process. (Allison Dep. 33:2-13; Barr Dep. 24:6-25:3; Macchia Dep. 17:19-19:20.) Maier and Paras's performance reviews during the months and years leading up to Paras's promotion to AHRM demonstrate unequivocally that UPS considered Maier the stronger-performing HR supervisor. In Q1 of 2018, Paras was failing all of his goals; in Q2 2018, he was meeting only one of his five goals, received a mix of "usually" and "always" for UPS's "living our values," and was advised by his manager to "finish your degree and focus on writing skills"; at the end of the year, Paras had satisfied only one of his five goals, and got a 0% in "concern frequency." (Paras Dep. 28:21-34:20, 38:2-41:2; Paras Dep. Ex. 1 (UPS 2506); Paras Dep. Ex. 2 (UPS 2524); Paras Dep. Ex. 3 (UPS 2584).) In contrast, Maier's performance reviews throughout the same period show that she was performing much better—meeting the majority of her goals throughout the time period, rated as "always" in every UPS "living our values" rating, receiving absolutely glowing feedback about her leadership, her schedule flexibility, and her willingness to take on extra projects, and finishing 2018 having met four of her five objective performance goals. (Macchia Dep. 32:18-52:7; Macchia Dep. Ex. 2 (UPS 3218), Macchia Dep. Ex. 3 (UPS 2497), Macchia Dep. Ex. 4 (UPS 2549), Macchia Dep. Ex. 5 (UPS 2670).)

23.     In addition to everything discussed above—the fact that only Maier satisfied the required qualification for the AHRM role, that she was already performing as lead supervisor, the fact that her performance reviews were consistently and objectively better than Paras's—Maier was better qualified for the AHRM in every other conceivable way as well. Maier had seven years more experience in the full-time supervisor role, having been promoted to HR supervisor in 2007, while Paras had been promoted in 2014 after an earlier demotion. (Maier Dep. 25:10-28:3; Pl. Ex. 21, RTA

Response Nos. 10, 11, 15; Paras Dep. 15:7-13.) Maier was "ready now" for promotion to AHRM for longer—having been recognized as ready for promotion in or around 2015, when Macchia took over her area, while Paras was first recognized as a Level 1 fit for promotion just before he was promoted. (Macchia Dep. 19:13-21:4; Pl. Ex. 26, Maier 35 (at Maier 44); Pl. Ex. 1, Maier Decl. at ¶ 19.) Maier had directly supervised and trained Paras for two years while she was an HR supervisor and he was an HR specialist, and Paras still came to her for help with Microsoft Access and advice about thorny issues. (Maier Dep. 100:17-101:3; Allison Dep. 192:5-20; Paras Dep. 15:14-17:10, 23:17-25:6; Pl. Ex. 21, RTA Response Nos. 12-14; Pl. Ex. 1, Maier Decl. at ¶ 13.) Notably, UPS has never suggested that Maier's actual work performance lagged or Paras's surged in advance of the decision to promote Paras—because Maier's performance was always stronger, she was rated as Ready Now or Level 1 fit for promotion throughout the time period, and she received "strong performance" ratings every year through 2019. (Macchia Dep. 32:18-52:7; Macchia Dep. Ex. 2 (UPS 3218), Macchia Dep. Ex. 3 (UPS 2497), Macchia Dep. Ex. 4 (UPS 2549), Macchia Dep. Ex. 5 (UPS 2670) Def's SOF No. 9; Pl. Ex. 21, RTA Response Nos. 15-30.) Finally, and critically, there is no dispute that the managers and senior leaders who worked with both Maier and Paras over the years understood and believed that Maier was a stronger candidate for AHRM, which is why they chose her over Paras for the position. (Barre Dep. 137:19-138:15, 139:15-140:10; Macchia Dep. 63:1-64:24, 67:18-68:4, 79:23-84:14, 86:16-87:2; G. Barr Dep. 63:11-71:18,91:23-95:15; Allison Dep. 65:4-69:1; G. Barr Dep. Ex. E (UPS 3686); G. Barr Dep. Ex. F, Pl. Ex. 9 (UPS 3688); Barr Dep. Ex. L (UPS 3483); Barr Dep. Ex. M (UPS 3484); Pl. Ex. 21, RTA Response Nos. 3-4; Pl. Ex. 1, Maier Decl. at ¶¶ 13, 19-20, 34.) Both Allison and Interial were aware of this at the time, but nonetheless decided to promote Paras over Maier. (Allison Dep. 79:1-83:9; Interial Dep. 112:19-116:9; Interial Dep. Ex. 7 (UPS 3696); Interial Dep. Ex. 8 (UPS 3699); Interial Dep. Ex. 11 (UPS 3766); Interial Dep. Ex. 12 (UPS 3767); Barr Dep. Ex. L (UPS 3483); Barr Dep. Ex. M (UPS 3484); Allison Dep. Ex. 5 (UPS 3490); Allison Dep. Ex. 16 (UPS 3485);

Allison Dep. Ex. 17 (UPS 3487).)

24.     At UPS, women typically take at least six weeks of maternity leave (which is all the paid leave UPS offers), while men almost never take more than a week of leave for the birth of a child. (Paras Dep. 20:2-21:3; Macchia Dep. 10:4-11:2; Interial Dep. 9:13-10:9; F. Barre Dep. 12:7-22; Rodriguez Dep. 8:6-23; Pl. Ex. 1, Maier Decl. ¶ 9.)

**UPS tells Maier that UPS denied her the promotion to AHRM because Allison thought she had "a lot going on right now"; Maier immediately and repeatedly complains that UPS discriminated against her based on sex.**

25.     On Friday, January 18, Maier received an email from Interial that would only be of relevance to her if she was being promoted to AHRM, which she took as a good sign. (Pl. Ex. 14, at UPS 4376); Pl. Ex. 1, Maier Decl. ¶ 31.) Later that day, she had a conversation with Interial where he specifically told her "you did great during the interview, don't worry about the interview. It was fine." (Maier Dep. 103:5-9; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at Maier 40.) That same day, Macchia told Maier to pack up her work station because he wasn't sure where her new office would be and to write up a biographical blurb that UPS could use to announce her promotion. (Pl. Ex. 1, Maier Decl. ¶ 31.) That afternoon, however, Maier received a call from Ron Macchia informing her that she had not been promoted to AHRM. Macchia told Maier that she was his first choice for the position, but that UPS had decided to promote someone else. During this conversation, Maier and Macchia discussed that she had gotten a bachelor's degree at UPS's request so that she could be promoted, but that Angel Paras did not have a degree. (Maier Dep. 103:13-105:2, 108:12-109:6; Macchia Dep. 85:17-88:6; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at Maier 40; Pl. Ex. 23, P's supplemental responses to Rog. 14.) Macchia called Interial to inform him of the fact that Paras did not have a degree and Interial responded that he and Allison already knew this. (Macchia Dep. 88:7-13.) Macchia called Maier back to inform her that the decision stood, and that Paras would be promoted even though he lacked a degree. Maier responded by challenging whether the decision was

because she was a woman, referencing the specific questions she had been asked about whether she could handle the job with her small children. Macchia responded that he told Allison and Interial that Maier's "kids had never caused any issues at work," that Maier "always got everything done," and is "the first to volunteer." He suggested that Maier call Interial to discuss the situation further. (Maier Dep. 109:7-21, 110:9-111:4, 133:22-134:23; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at Maier 42; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14.)

26.     Maier then called Interial, who told Maier "it wasn't the interview, that the interview was fine, that I was the right candidate," that "you're the best fit, [w]e all think you're the best fit" but that Paras had been selected because "Chelsea felt like you had *a lot going on right now*." (Maier Dep. 91:6-11; 105:8-107:19, 111:3-113:10; Macchia Dep. 100:22-101:19; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at 42-43; Pl. Ex. 23, Pl.'s supplemental rog responses, at No. 14.) Upon hearing this explanation of UPS's decision, Maier immediately challenged Interial's explanation and complained that UPS had discriminated against her based on her sex, by promoting an unqualified man (who also had young children) instead of her. (Maier Dep. 91:6-11; 111:6-112:24; 133:22-134:3; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at 42-43; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14.) Interial wrote off Maier's complaints of discrimination as "venting" and told Maier to "calm down." (Interial Dep. 119:4-120:16; Maier Dep. 111:20-113:4; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14.)

27.     Because the decision to promote Maier had already been made and documented in accordance with the detailed procedures UPS had set up for implementing VRP backfills, several senior level HR managers and executives—including Malcolm Berkley, Tamara Caldwell, Jon Robertson, Linda Nelson, and Marge Niedbalski—had to become involved to reverse the decision to promote Maier and instead elevate Paras, an objectively unqualified man, into the role. (Allison Dep. 79:20-81:7, 161:3-173:19; Rodriguez Dep. 18:23-19:2; Allison Dep. Ex. 5 (UPS 3490); Allison

Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707); Allison Dep. Ex. 16 (UPS 3485); Allison Dep. Ex. 17 (UPS 3487).) After Paras's promotion was announced, on January 23, 2019, at 8:30 a.m., Allison received an automated email connected with UPS's People Tracker system, instructing her that "[a]s a result of recent placement meetings after the … VRP, some people throughout the organization will be changing positions. You should begin having discussions with those individuals in your area who will have a change of some kind." The email listed Maier's name, along with Chlimoun—who, like Maier, had long been slated to receive a promotion as a result of the VRP. (Allison Dep. Ex. 17 (UPS 3487). The next afternoon, Interial emailed Allison with the first of several iterations of UPS's post-hoc attempt to justify choosing Paras over Maier, writing "I think this will give us a good start…" (Interial Dep. Ex. 11 (UPS 3766); Interial Dep. Ex. 12 (UPS 3677).) This initial narrative repeatedly stated that Maier had been recommended to fill the AHRM role, something that both Interial and Allison denied being aware of at their 2022 depositions. (Allison Dep. 79:1-83:9, Interial Dep. 112:19-116:9; Interial Dep. Ex. 12 (UPS 3677).) Subsequently, Allison emailed Tamara Caldwell an explanation of the situation that incorporated, and expanded upon, what Interial had sent her, and added another reference to her predecessors' recommendation that Maier be promoted to AHRM. (Allison Dep. Ex. 16 (UPS 3485).) This version included a statement that "Carlos and I determined the best fit for the position should be Angel Paras, not Sara Maier, as originally suggested from the previous director." (Allison Dep. Ex. 16 (UPS 3485).) Caldwell responded, emphasizing that the "outgoing DHRM made a recommendation," suggesting changes to the email, proposing that senior, regional HR managers Marge Niedbalski and Jon Robertson be informed of the situation, and adding that the email should mention that "Sara remains a valid candidate for future opportunities." (Allison Dep. Ex. 17 (UPS 3487).)

28.     Before sending the email to UPS's senior HR executives two days later, Allison made several major changes to her email purporting to justify why Maier's promotion should be

rescinded and given to Paras instead. (Allison Dep. 79:20-84:23, 162:18-163:15; Allison Dep. Ex. 5 (UPS 3490); Allison Dep Ex. 16 (UPS 3485).) Specifically, in attempting to convince her superiors to rescind Maier's promotion in favor of Paras, Allison added three sentences describing attributes Paras possessed that she asserted were "required" for the "AHRM role": "Angel was currently applying for Manager positions within UPS Internationally and within the Country as well. Angel is fluent in 3 languages. Angel has aspirations to eventually 'give back' to community of Guam by becoming an HR Leader in the territory." (Allison Dep. Ex. 5 (UPS 3490).) Allison knew that, contrary to what she wrote in her email, these were not actually requirements for the AHRM position, and that the only requirement was a bachelor's degree, which Maier possessed and Paras lacked. (Allison Dep. 116:21-117:4, 166:11-167:1; 171:15-173:19; Interial Dep. 104:16-21, 117:3-6; Paras Dep. 72:15-73:4 Maier Dep. 79:21-80:6, 126:17-129:13, 248:19-249:3; Allison Dep. Ex. 5 (UPS 3490), at 3491-92; Interial Dep. Ex. 9 (UPS 3708); Interial Dep. Ex. 10 (UPS 3709); Def. Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483 ("Required must be specific to the business need of the job and **is absolute. The applicant either has it or does not**.").) Allison also added other information in her email to Niedbalski and Robertson, including a specific statement demonstrating her awareness that the "outgoing DHRM" Greg Barr, recommended Maier for the AHRM position. (Allison Dep. Ex. 5 (UPS 3490), at 3492.) Allison also added a new, and different, version of Linda Nelson's purported instructions to her. (Allison Dep. Ex. 5 (UPS 3490), at 3492.) Further, Allison's email included a specific request that her superiors update UPS's "People Tracker" system to remove Maier's name as AHRM and substitute Paras instead, demonstrating that Allison's purpose in adding this information was to convince her superiors to let her reverse the decision to promote Maier and instead promote Paras. (Allison Dep. Ex. 5 (UPS 3490), at 3492.)

29.     In March 2019, Maier had a meeting with Macchia and Interial, where she complained that the decision to promote Paras over her was discriminatory, which Interial

characterized as "venting." (Maier Dep. 114:24-133:1; Interial Dep. 146:20-147:4, 147:18-21; Macchia Dep. 89:23-90:10; 102:21-103:14; Pl. Ex. 24, Maier Dep. Ex. 4 (MAIER 64), at MAIER_65-67; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14.) Among other things, Interial told Maier that she should have been more "proactive" in explaining at the January 17 meeting about why her kids would not present a problem with her schedule and Maier responded by noting that she was asked those questions but Paras wasn't. (Maier Dep. 120:14-121:8; Pl. Ex. 24, Maier Dep. Ex. 4 (MAIER 64), at MAIER 65, 69; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14; Paras Dep. Ex. 7 (Maier 149-50).) Interial stated that he had no negative comments about Maier's work, that he was "shocked" Maier wasn't promoted, and reiterated that he believed that Maier was the best candidate. (Interial Dep. 146:7-12; Macchia Dep. 99:13-16; Pl. Ex. 24, Maier Dep. Ex. 4 (MAIER 64), at MAIER 67; Pl. Ex. 1, Maier Decl. ¶ 30.) Interial stated that if another AHRM position came available that Maier would "be the next pick." (Pl. Ex. 24, Maier Dep. Ex. 4 (MAIER 64), at MAIER 67.)

30.     UPS had an "open door" anti-discrimination policy: when an employee feels they have been discriminated against, they may go to their manager or supervisor or any human resources manager to discuss their concern. (Allison Dep. 21:1-22:12; Paras Dep. 63:1-10; F. Barre Dep. 43:8-12; G. Barr Dep. 19:1-23.) This policy is formalized in UPS's Employee Reference Guide, which informs UPS employees: "If you believe you have been the subject of discrimination or harassment, or if you are aware of a situation that could constitute discrimination or harassment, immediately notify your supervisor, a Human Resources manager, or call the UPS help line. **The matter will be investigated in a confidential manner.**") (Allison Dep. 22:13-23:21; Paras Dep. 63:11-64:2; G. Barr Dep. 19:24-20:13; Macchia Dep. 59:4-22; F. Barre Dep. 44:16-22, 48:18-22; Macchia Dep. Ex. 8 (UPS 216)). Under UPS's policies, an HR investigation into discrimination allegations entails the following: (1) interviewing the reporter; (2) interviewing witnesses; (3) interviewing the subject; (4) reviewing any pertinent documents; (5) preparing a report that summarizes the allegations and

evidence; (6) making a determination as to whether the concern is substantiated or not. (Allison Dep. 23:22-25:13; Paras Dep. 36:11-37:19, 62:21-67:9; F. Barre Dep. 50:11:51:11; 52:11-21; 53:10-19; G. Barr Dep. 20:10-24:1; Macchia Dep. 60:9-20; Paras Dep. Ex. 6 (UPS 3390); Pl. Ex. 19 (Paras Investigation Docs); Pl. Ex. 17 (Allison investigation docs). But, even though Maier at least twice notified her supervisor (Macchia) and another Human Resources manager (Interial) that she believed she was the subject of discrimination, UPS never opened an investigation, as its policy required. (Maier Dep. 137:9-138:8; Interial Dep. 146:20-149:5; Macchia Dep. 89:23-90:10; 102:21-104:23.) Instead, Interial wrote Maier's complaints off as "venting" and moved on without opening an investigation. (Interial Dep. 149:6-150:9.)

**UPS takes further action against Maier after she complains of discrimination.**

31.     In May 2019, Allison was preparing for that year's major career development meeting (the annual meeting where, in 2018, UPS's high-level decision-makers chose Interial to fill Barre's role and Maier to fill Interial's AHRM position, *see* SAF 7, above.) Macchia prepared for Allison a bullet-pointed list of information about Maier to present at that meeting. (Allison Dep. 191:7-193:11; Macchia Dep. 106:5-118:3; Macchia Dep. Ex. 10 (UPS 3442); Macchia Dep. Ex. 11 (UPS 3443); Macchia Dep. Ex. 12 (UPS 3444).) The document contained descriptions of Maier's continued impressive work, pointing out, for example, that Maier "is considered one of the lead supervisors within her peers" and "is always willing to help out when needed." (Macchia Dep. Ex. 12 (UPS 3444).) The document noted Maier's long list of former direct reports, including Angel Paras and Mike Kish (her two purported competitors for the AHRM role), who "have been promoted while working for Sara." (Macchia Dep. 112:18-113:5; Allison Dep. 192:5-16; Macchia Dep. Ex. 12 (UPS 3444).) But, in addition to information about Maier's stellar work as HR supervisor, it also contained extremely personal information about Maier: such as the timing of her marriage vis a vis her pregnancy, and the fact that she was ***pregnant at the time***—a fact that Macchia thought would

be pertinent for Allison and UPS's other high-level HR executives to be aware of when discussing Maier's career trajectory. (Allison Dep. 191:7-193:11; Macchia Dep. 106:5-118:3; Macchia Dep. Ex. 10 (UPS 3442); Macchia Dep. Ex. 11 (UPS 3443); Macchia Dep. Ex. 12 (UPS 3444).)

32.     Around the same time, in May 2019, Maier learned her work location was being transferred to Jefferson Street in downtown Chicago; the transfer was implemented in June 2019, when she was around seven months pregnant and showing. (Maier Dep. 146:19-22; Pl. Ex. 11, (UPS 3822, 3823, 3824, 3834); Macchia Dep. 127:17-24; Pl. Ex. 1, Maier Decl. ¶ 40.) As a result of the transfer, Maier's round-trip commute more than tripled. (Maier Dep. 150:5-21; Pl. Ex. 1, Maier Decl. ¶¶ 35, 40.) The HR office location at Jefferson Street was a trailer that lacked running water or bathrooms and lacked any adequate private location for pumping breast milk. (Rodriguez Dep. 69:23-71:14; Maier Dep. 169:12-175:7; Macchia Dep. 128:2-16, 134:16-20; Pl. Ex. 1, Maier Decl. ¶¶ 40, 46.) Interial and Macchia were aware at the time that Jefferson Street was the only office Maier didn't want to work out of. (Maier Dep. 150:5-150:21; 152:16-154:8; Pl. Ex. 1, Maier Decl. at ¶ 35.) Macchia told Maier that she was being transferred to develop a struggling HR supervisor in the Jefferson Street office. (Maier Dep. 149:7-150:3, 151:1-3.) UPS's managers have offered different (and conflicting) explanations for Maier's transfer. (*See* Resp. to SOF 54-55; Interial Dep. 150:19-151:3, 153:16-156:5; Macchia Dep. 118:18-129:9; Allison Dep. 179:10-180:8.) There was another supervisor working with Maier at Bedford Park, Lynette Baker. Baker was not qualified to perform road tests, which was one of the critical functions performed by HR supervisors at that location; because Maier was transferred instead of Baker, Maier had to spend the time and effort to send members of her team to Bedford Park to perform the road tests. (Maier Dep. 151:21-152:4; Macchia Dep. 121:19-122:10; Interial Dep. 156:15-157:2; Pl. Ex. 1, Maier Decl. at ¶ 41.) When she arrived at Jefferson Street, and for many weeks thereafter, Maier did not have adequate furniture or working space, at a time when she was seven-plus months pregnant. (Pl. Ex. 11, UPS 3822, 3823, 3824, 3834.) In August, Allison visited

Jefferson Street and touched Maier's pregnant belly without her consent. (Maier Dep. 165:18-166:4; Allison Dep. 180:13-181:9.)

33.     After being assured that she would be promoted to AHRM, Maier intended to take six weeks of FMLA/maternity leave in 2019, less than she was legally entitled to, to ensure she would be present to help prepare for peak holiday season. (Ex. 1, Maier Decl. ¶¶ 23, 27.) But, after being denied the promotion to AHRM, Maier decided to take 12 weeks of leave. Macchia tried to dissuade her from taking her full leave and to encourage her to come back by UPS's "peak" period. (Maier Dep. 161:16-166:23; Ex. 1, Maier Decl. ¶ 38.) "Peak" is the period between October 1st and Christmas, during which UPS is particularly busy, necessitating seasonal hiring. (Macchia 133:10-134:3; Pl. Ex. 1, Maier Decl. ¶ 10.) Maier testified that Macchia "stopped and he looked at me and said, do you really want me to tell Chelsea that you're going to take all 12 weeks and you're not going to be here during peak?" and spoke "it in a way that made me feel like Chelsea would be upset at me, that I was doing something wrong for taking those 12 weeks." (Maier Dep. 161:22-163:17; Pl. Ex. 1, Maier Decl. ¶¶ 10, 38.) Macchia further attempted to dissuade Maier from taking her full FMLA leave by making vague assurances of lessening her workload if she returned earlier than she was entitled to under the law. (Maier Dep. 163:18-166:23.)

34.     On July 31, 2019, Maier filed an EEOC charge accusing UPS of sex discrimination, in relation to the decision to promote Paras over her for AHRM. (Maier Dep. 140:19-144:9; Maier Dep. Ex. 5.) Allison was immediately informed of the charge. (Allison Dep. 198:6-200:17; Pl. Ex. 20, UPS privilege log.) On August 23, 2019, Maier's maternity leave began. (Maier Dep. 161:6-9.) Shortly after Maier went on leave, Allison suddenly reached out to Matt Webb in UPS's legal department, responding to an email from weeks before, asking to discuss Maier's charge. (Pl. Ex. 6, UPS 3541.)

**UPS denies Maier reasonable nursing accommodations after her maternity leave.**

35.     Upon her return from maternity leave, Maier worked at least a week or two in the

Lockport facility, which did not have a designated lactation space. In contrast to her Bedford Park location where Maier had a private office, at Lockport Maier needed to "kick a division manager out of his office" to pump at his desk, who would then wait outside the office for her finish. Maier felt so uncomfortable with the situation that she felt compelled to leave the facility to pump in her car. (Ex. 1, Maier Decl. ¶¶ 14, 44-45; Maier Dep. 166:24-169:3.)

36.     Maier then returned to the Jefferson Park facility, to which she had been transferred just before her maternity leave. Like at Lockport, there was no designated lactation room. (Rodriguez Dep. 70:7-9.) Maier had previously attempted to pump for her first child at the Jefferson Street trailer in 2012, during which time a male UPS employee walked in on her pumping shirtless. This experience made her understandably apprehensive about pumping again at Jefferson Street. In 2019, Maier shared an office in that same trailer with Anthony Marinaro, whom she had to ask to stop working and leave every time she needed to pump. The walls in the trailer office were paper thin such that "everyone interviewing or being interviewed in the rest of the trailer could hear [her] pump and would know [she] was shirtless" (Ex. 1, Maier Decl. ¶ 46.) There still was no lock on the trailer office door when Maier returned from maternity leave. (Ex. 1, Maier Decl. ¶ 46; Macchia Dep. 134:16-20.) Accordingly, Macchia suggested Maier use his office or an office near his office in the automotive department flanked by windows, a "five, ten-minute walk" from her workspace, which would have necessitated forty-five minutes to hour-long breaks each time she needed to pump, making it harder to complete her assigned tasks and maintain productivity. (Ex. 1, Maier Decl. ¶ 46; Maier Dep. 169:12-175:7.)

**After Paras ███████████████████████ UPS transfers him to a different position, UPS refuses to consider Maier for the AHRM role and instead imports a non-complaining, non-HR manager near the end of her career.**

37.     After being denied the promotion to AHRM, and both before and after returning from maternity leave, Maier continued to perform outstandingly as an HR supervisor. Macchia

delivered glowing performance reviews for her 2019 performance, and confirmed that nothing happened in 2019 to change his view that Maier deserved to be an AHRM, because Maier, among other things: "continues to be a leader within the HR function," "is the SME [subject matter expert] among the HR supervisors," "continues to run the weekly HR call," "does an excellent job in staffing at the facilities she is responsible for," "is always willing to take new responsibilities if asked," "is often looked at as the go-to person when someone needs help with something in the district," amongst other praise. (Macchia Dep. 52:17-57:16; Macchia Dep. Ex. 6 (UPS 2680), Macchia Dep. Ex. 7 (UPS 2735).) Throughout 2019, Maier remained a Level 1 fit for promotion to AHRM, while Kish declined to Level 2, leaving Maier as the only Level 1 fit for promotion to AHRM in UPS's Illinois HR department. (Allison Dep. 193:12-197:17; Allison Dep. Ex. 24 (UPS 3446); Allison Dep. Ex. 25 (UPS 3447), at 3454, 3458; Pl. Ex. 21, RTA Resp. Nos. 23-30.) Allison confirmed at her deposition that, throughout 2019, she was personally aware of Maier's "strengths" and "capabilities," and was "very comfortable" with them. (Allison Dep. 181:12-186:23, 193:18-197:17, 198:6-200:17, 204:9-207:24; 260:10-261:18; Macchia Dep. 52:17-54:12, Macchia Dep. Ex. 6 (UPS 2680); Allison Dep. Ex. 18 (UPS 3494); Allison Dep. Ex. 19, Pl. Ex. 4 (UPS 3495); Allison Dep. Ex. 24 (UPS 3446); Allison Dep. Ex. 25 (UPS 3447), at UPS 3457; Allison Dep. Ex. 27 (UPS 3605); Allison Dep. Ex. 28 (UPS 3606), at UPS 3612; Allison Dep. Ex. 36 at Rog Response No. 4; Pl. Ex. 21, RTA Resp. Nos. 45-49.)

38.     In July 2019, within months of Paras being promoted to AHRM, ▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮ (Allison Dep. Ex. 31 & Pl. Ex. 5 (UPS 3540).) UPS's

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Pl. Ex. 19, at

UPS 317.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Paras Dep.

115:23-116:11; Paras Dep. Ex. 6 (UPS 3390.)) ████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████—until after Plaintiff's January 14, 2020, EEOC mediation and Plaintiff's January 30, 2020,

amended EEOC charge. (Pl. Ex. 1, Maier Decl. at ¶ 47; Maier Dep. Ex. 8; Pl. Ex. 20, UPS privilege

log.) Afterward, in consultation with their counsel, who were then involved in responding to

Plaintiff's EEOC charge—in consultation with Allison and other UPS HR managers (Jon Robertson

and Marge Niedbalski) who approved Paras's promotion, and Interial's replacement Jimmy

McClure—███████████████████████████████████████████████████████████████████

████████████████████████████████. Instead, UPS transferred him laterally to a different

manager role, a decision that was announced on February 11, 2020, when Allison sent a

communication to UPS's staff congratulating him on the new position and saying "we will miss you."

(Allison Dep. 211:13-228:24, 234:8-238:22; Paras Dep. 99:22-118:8; Allison Dep. Ex. 30 (UPS 3539);

Allison Dep. Ex. 31 & Pl. Ex. 5 (UPS 3540); Allison Dep. Ex. 32 (UPS 3536); Allison Dep. Ex. 35

(UPS 3531); Pl. Ex. 19; Pl. Ex. 20, privilege log.)

39. Thus, in early 2020, UPS knew that Paras's vacated AHRM position was going to

come open again. On January 14, 2020, Maier attended an EEOC mediation with UPS that did not

result in a settlement. (Pl. Ex. 1, Maier Decl. ¶ 47.) On January 24, a requisition was created for

Angel Paras's AHRM position, and on January 27, a UPS employee reached out to Allison and

Interial's successor Jimmy McClure, asking if the position should be "posted" via MCO—UPS's

process for competitive internal promotions. (Allison Dep. 229:6-230:6, Allison Dep. Ex. 33 (UPS

3530; Pl. Ex. 1, Maier Dec. ¶ 7.) McClure responded "not yet," and that he would let the employee

know "if/when to post." (Allison Dep. Ex. 33 (UPS 3530.) On January 30, 2020, Maier filed an

amended EEOC charge accusing UPS of retaliating against her. (Maier Dep. Ex. 8.) UPS decided

not to post the AHRM role via MCO, which would have given Maier an opportunity to compete for it. (Pl. Ex. 1, Maier Dec. ¶¶ 7, 48.) Instead, on February 11, 2020, UPS announced the selection of Gloria Macias—a non-EEOC-charge-filing, non-leave-taking manager with an adult child from outside the HR department, who was approaching retirement—until she herself took voluntary retirement later that year. (Allison Dep. 239:3-246:9, 259:16-261:18, Allison Dep. Ex. 35; Allison Dep. Ex. 36 at Rog Response No. 4; Pl. Ex. 21, RTA Resp. Nos. 45-49; Pl. Ex. 18 (UPS 716); Pl. Ex. 2 (UPS 1), May 7, 2020, position statement, at UPS 4.)

40.     Even though Maier—who by this point had given birth to her third child, had taken the full 12 weeks of FMLA leave she was entitled to, repeatedly complained of discrimination internally, filed two EEOC charges, and decided to continue pursuing her claims after EEOC mediation—remained a highly successful HR supervisor and the only local HR supervisor considered a Level 1 fit for promotion to Area HR Manager, UPS refused to inform her the position was coming available, consider her, or interview her for the role. (Maier Dep. 133:22-134:23, 140:19-144:9; Macchia Dep. 52:16-57:16, 89:23-90:10; Macchia Dep. Ex 6; Macchia Dep. Ex. 7; Paras Dep. 94:13-95:4; Interial Dep. 139:12-142:8, 149:11-14, 146:20-147:4, 147:18-21; Allison Dep. 181:12-186:23, 193:18-197:17, 198:6-200:17, 204:9-207:24; Maier Dep. Ex. 5 (EEOC charge); Allison Dep. Ex. 18 (UPS 3494); Allison Dep. Ex. 19 (UPS 3495), Pl. Ex. 4; Allison Dep. Ex. 24 (UPS 3446); Allison Dep. Ex. 25 (UPS 3447), at UPS 3457; Allison Dep. Ex. 27 (UPS 3605); Allison Dep. Ex. 28 (UPS 3606), at UPS 3612; Allison Dep. Ex. 36 at Rog Response No. 4; Pl. Ex. 21, RTA Resp. Nos. 45-49; Pl. Ex. 1, Maier Decl. ¶ 48.) UPS later represented, falsely, to the EEOC, that interviews were conducted for the AHRM position vacated by Paras and (gilding the lily) claimed that Macias had shown off her "breadth of perspective, ideas for driving the success of her team, and sharp organizational skills" at an interview that didn't actually occur. (Pl. Ex. 2, UPS 1 (position statement), at UPS 4; Allison Dep. 243:9-11.) Further, before the EEOC, UPS

29

specifically asserted that Maier was "one of the six individuals who were considered to fill the open Area HR Manager position"—of which there is zero documentary record—but, in UPS's sworn interrogatory responses before this Court, Allison asserted that only Macias was considered, before contradicting herself again at her deposition. (Allison Dep. 239:24-245:5; Allison Dep. Ex. 36, at No. 3; Allison Dep. Ex. 37; Pl. Ex. 2, UPS 1 (position statement), at UPS 4.) Allison acknowledged at her deposition that, ███████████████████████████████████████████, UPS counsel was involved in the decision to transfer Macias to the AHRM position rather than promoting Maier. (Allison Dep. 225:16-226:17, 259:16-260:9.)

Respectfully Submitted,

*s/  Matthew J. Singer*

Gail S. Eisenberg

LOFTUS & EISENBERG LTD.

161 N. Clark St., Suite 1600

Chicago, IL 60601

Phone: 312-899-6625

GEisenberg@LoftusandEisenberg.com

Matthew J. Singer

MATT SINGER LAW, LLC

77 W. Wacker Dr., Suite 4500

Chicago, Illinois 60601

Phone: 312-248-9123

Matt@MattSingerLaw.com