### IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

|  |  |
|---|---|
| **SARA MAIER,** | |
| Plaintiff, | |
| v. | Case No. 21-cv-3506 |
| **UNITED PARCEL SERVICE, INC.,** | Judge Jorge L. Alonso |
| Defendant. | |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

Plaintiff Sara Maier ("Maier" or "Plaintiff"), by and through its attorneys, in opposition to Defendant United Parcel Service, Inc.'s ("UPS" or "Defendant") Motion for Summary Judgment, hereby submits her Response to Defendant's Statement of Material Facts, as follows:

1.      Plaintiff Sara Maier ("Plaintiff") began working for UPS in 2003. At the beginning of the time period relevant to this motion, she had the title of Human Resources ("HR") Supervisor. (Deposition of Plaintiff Sara Maier ("Plf. Dep.") 20:22-21:3, attached hereto as **Exhibit A**.)

**Response:** Undisputed.

2.      During the relevant time period, HR Supervisors reported to Area Human Resource Managers ("AHRM"). Plaintiff reported to AHRM Ronald Macchia ("Macchia"). (Plf. Dep. 27:15-24, 31:3-18.)

**Response:** Plaintiff objects to the use of the undefined and vague term "relevant time period."

Plaintiff does not dispute that, between 2007 and 2020, HR supervisors reported to AHRMs.

(Maier Dep. 27:15-24.) Between 2015 and 2020, Maier reported to Ron Macchia. (Maier Dep. 31:3-

18; Macchia Dep. 20:5-20:24.)

3.      The other AHRM's in Plaintiff's district (Illinois) were Carlos Interial ("Interial") and Mike Nugent ("Nugent"). Macchia, Interial, and Nugent reported to Frank Barre ("Barre") (District HR Operations Manager for a portion of Illinois), who reported to Greg Barr ("Barr") (District HR Director for Illinois). (Deposition of Frank Barre[1] ("Barre Dep.") 14:19-15:20, 22:17- 20,

attached hereto as **Exhibit B**; Deposition of Ronald Macchia, Jr. ("Macchia Dep.") 21:18- 22:13, attached hereto as **Exhibit C**; Deposition of Carlos Interial ("Interial Dep.") 29:12-19, attached hereto as **Exhibit D**.)

**Response:** Plaintiff does not dispute that this is an accurate description of the organization as of 2018.

4.      UPS uses a talent management system to track employees' readiness for promotion. Until 2017, the system UPS designated employees who were ready for promotion to a particular level position as "ready now." (Plf. Dep. 96:13-20.)

**Response:** Undisputed.

5.      In 2017, UPS implemented the "My Talent Center" system, which uses fitness levels, based on skill sets and demonstrated abilities, to assess preparedness for promotion. The fitness levels range from 1 to 4, with a "Level 1 Fit" fit indicating the employee has the abilities, attributes and experiences to be highly effective in a particular role, with little to no development needed.[2] (Plf. Dep. 96:21-24; Deposition of Katherine Chelsea Allison ("Allison Dep.") 35:3-22, attached hereto as **Exhibit E**.)

**Response:** Undisputed.

6.      Being designated as "Level 1 Fit" (or previously "ready now") does not guarantee an employee will be promoted, because multiple people with the same designation can compete for the same position. (Plf. Dep. 97:6-21, 99:1-7.)

**Response:** Disputed. The cited testimony does not support the following proposition: "because multiple people with the same designation can compete for the same position."

Under UPS's policies, positions that became available as a result of individuals taking voluntary retirement (i.e. "VRP")—as Greg Barr and Frank Barre did—could be backfilled without competition or interviews, in what UPS refers to as "VRP backfill" "career development" moves. (Allison Dep. 42:17-24, 55:2-58:6; F. Barre Dep. 103:6-104:12, 107:3-7; Interial Dep. 23:16-24:9; Rodriguez Dep. 15:6-20; G. Barr Dep. Ex. H (UPS 3676).) In fact, UPS generally prefers to fill an open position via career development opportunity or promotion rather than formally solicit applications because of the decision makers' familiarity with capable internal candidates." (Ex. 2, UPS 1 (May 2020 position statement) at 4.) Specifically, UPS typically fills management positions,

2

including the AHRM position at issue in this case, via succession planning. (F. Barre Dep. 25:2-9, 36:24-38:16.) For example, UPS backfilled Greg Barr's position with Chelsea Allison without a competitive process or interviews. (Allison Dep. 42:17-24, 55:2-58:6.) UPS backfilled Frank Barre's position with Carlos Interial without a competitive process or interviews. (Allison Dep. 58:7-61:6, 63:23-64:13; Interial Dep. 43:7-43:22, 146:17-19; Barr Dep. Ex. E, UPS 3686; Barr Dep. Ex. F & Pl. Ex. 9 (UPS 3688)[1]; Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707).) UPS backfilled an HR supervisor position that came available as a result of Barr and Barre's retirements with Ramina (Ashtar) Chlimoun without a competitive process or interviews. (Interial Dep. 65:7-65:22; Allison Dep. 62:8-64:13; Barr Dep. Ex. E (UPS 3686); Barr Dep. Ex. F & Pl. Ex. 9 (UPS 3688); Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707).) UPS intended to and extensively documented its decision to backfill Interial's position with Sara Maier, the only Illinois HR supervisor who was a Level 1 fit for promotion to Area HR Manager and satisfied the sole required qualification for the position (a bachelor's degree). (Maier Dep. 17:1-18:15, 79:21-80:6, 126:17-129:13, 248:19-249:3; Paras Dep. 8:21-9:7, 72:10-14; Allison Dep. 166:11-167:1; G. Barr Dep. Ex. D, UPS 3684; G. Barr Dep. Ex. E, UPS 3686; G. Barr Dep. Ex. F & Pl. Ex. 9 (UPS 3688); Allison Dep. Ex. 3 (UPS 3483); Allison Dep. Ex. 4 (UPS 3484); Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10, (UPS 3707); Allison Dep. Ex. 25 (UPS 3447), at UPS 3453; Interial Dep. Ex. 7 (UPS 3696); Interial Dep. Ex. 8 (UPS 3699); Def's SJ Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483 ("Required must be specific to the business need of the job and **is absolute. The applicant either has it or does not**.").)

      In addition, after ███████████████████████████████████

---

[1]    Several key documents in this case are voluminous Excel spreadsheets. Plaintiff has submitted copies of key excel spreadsheets with certain immaterial columns hidden, to facilitate at-a-glance viewing. Plaintiff is also willing to submit electronic documents in whatever manner the Court wishes, to the extent the Court would like to view these documents in native format.

████████████████████████████████████████████████████ the

Area HR Manager position became available. (Allison Dep. 211:13-228:24; Allison Dep. Ex. 30

(UPS 3539); Allison Dep. Ex. 31 & Pl. Ex. 5 (UPS 3540); Allison Dep. Ex. 32 (UPS 3536); Paras

Dep. 99:22-118:8.) Even though Maier—who by this point had her third child, taken the full 12

weeks of FMLA leave she was entitled to, repeatedly complained of discrimination internally, filed

an EEOC charge, and participated in an EEOC mediation—remained a highly successful HR

supervisor and a Level 1 fit for promotion to Area HR Manager, UPS refused to inform her the

position was available, consider her, or interview her for the role. (Maier Dep. 133:22-134:23,

140:19-144:9; Macchia Dep. 52:16-57:16, 89:23-90:10; Macchia Dep. Ex 6; Macchia Dep. Ex. 7;

Paras Dep. 94:13-95:4; Interial Dep. 139:12-142:8, 149:11-14, 146:20-147:4, 147:18-21; Allison Dep.

181:12-186:23, 193:18-197:17, 198:6-200:17, 204:9-207:24; Maier Dep. Ex. 5 (EEOC charge); Allison

Dep. Ex. 18 (UPS 3494); Allison Dep. Ex. 19 (UPS 3495), Pl. Ex. 4; Allison Dep. Ex. 24 (UPS

3446); Allison Dep. Ex. 25 (UPS 3447), at UPS 3457; Allison Dep. Ex. 27 (UPS 3605); Allison Dep.

Ex. 28 (UPS 3606), at UPS 3612; Allison Dep. Ex. 36 at Rog Response No. 4; Pl. Ex. 21, RTA Resp.

Nos. 45-49; Pl. Ex. 1, Maier Decl. ¶ 48. Instead, without conducting any interviews, or documenting

its decision in any way, UPS moved Gloria Macias, a non-complaining, non-charge-filing, non-leave-

taking manager from outside the HR department, who was approaching retirement, into the role—

until she herself took voluntary retirement in 2020. (Allison Dep. 239:3-246:9, 259:16-261:18, Allison

Dep. Ex. 35; Allison Dep. Ex. 36 at Rog Response No. 4; Pl. Ex. 21, RTA Resp. Nos. 45-49; Pl. Ex.

18 (UPS 716).)

     7.     Managers meet regularly to discuss fitness levels and career planning for the employees reporting to them, both for the employees' development and to prepare for business needs. (Barre Dep. 19:18-20:19; Macchia Dep. 22:23-23:2; Deposition of Greg Barr ("Barr Dep.), 25:10-26:2, 30:21-31:6, attached hereto as **Exhibit F**.)

**Response:** Undisputed.

8.     As part of the ongoing career development process, employees are given opportunities to expand their skills, including taking on more responsibility and special projects, not only to prepare them for promotion, but also expand their scope of general experience in HR. (Barre Dep. 16:6-17:10; Allison Dep. 37:14-38:19.)

**Response:** Undisputed.

9.     During the relevant time period, Plaintiff was designated as "Level 1 Fit" for promotion to a next-level position (*i.e.*, AHRM). (Barr Dep. Ex. C; Barr Dep. 57:14-24.)

**Response:** Plaintiff does not dispute that she was designated a "Level 1 fit" throughout the

relevant time period, but adds that she also was considered a "ready now" candidate for promotion

to Area HR Manager before UPS changed its terminology in 2017. (Macchia Dep. 19:8-20:24,

81:18-83:5; F. Barre Dep. 77:12-15; Pl. Ex. 1, Maier Decl. at ¶ 19.)

10.     In 2019, UPS restructured its Human Resources department (the "HR Restructuring"). The HR Restructuring included the consolidation of various districts and resulted in job eliminations, including in the Illinois district where Plaintiff worked. (Allison Dep. 236:7- 12; Plf. Dep. 209:3-210:22; Interial Dep. 12:11-19.)

**Response:** Disputed. The cited testimony does not support UPS's assertions. Maier's cited testimony

addresses what occurred later, in 2020. (Maier Dep. 206:18-210:22.) Further, Maier specifically testified

that she was not aware of anyone who lost their jobs as a result of the 2020 restructuring. (Maier Dep.

209:9-11.) Interial and Allison's testimony referred only to the circumstances under which Interial was

transferred out of the Illinois HR department in August 2019, and did not discuss any "job

eliminations." (Allison Dep. 236:7-12; Interial Dep. 12:11-19.) As subsequent statements of fact make

clear, UPS is trying to mislead the Court and create the false impression that "consolidation of various

districts" and "job eliminations" occurred in early 2019—when Maier's already documented

promotion was rescinded in favor of Angel Paras, a man who also had young children and lacked a

bachelor's degree, the only required qualification for the position. But there is absolutely no evidence

supporting the proposition that an "HR restructuring" or "transformation" occurred in early 2019;

rather, positions became available as a result of Greg Barr and Frank Barre taking voluntary retirement

and were backfilled by UPS through "VRP backfill" "career development" moves, without interviews or any competitive process. (Allison Dep. 42:17-24, 55:2-61:6, 62:8-64:13 166:11-167:1; F. Barre Dep. 103:6-104:12, 107:3-7; Interial Dep. 23:16-24:9, 43:7-43:22, 65:7-65:22, 146:17-19; Rodriguez Dep. 15:6-20; Maier Dep. 79:21-80:6, 126:17-129:13, 248:19-249:3; Paras Dep. 8:21-9:7, 19:21-20:4, 72:10-14; G. Barr Dep. Ex. D (UPS 3684); G. Barr Dep. Ex. E (UPS 3686); G. Barr Dep. Ex. F & Pl. Ex. 9 (UPS 3688); G. Barr Dep. Ex. H (UPS 3676-79); Allison Dep. Ex. 3 (UPS 3483); Allison Dep. Ex. 4 (UPS 3484); Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707); Allison Dep. Ex. 25 (UPS 3447), at UPS 3457; Interial Dep. Ex. 7 (UPS 3696); Interial Dep. Ex. 8 (UPS 3699); Def's SJ Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483 ("Required must be specific to the business need of the job and **is absolute. The applicant either has it or does not**."); *see* Resp. to SOF No. 6.)

11.    In 2018, leading up to the HR Restructuring, UPS offered a Voluntary Retirement Program ("VRP") to qualifying employees to reduce the number of involuntary terminations that would result from restructuring. The VRP overlapped with the HR Restructuring, creating a dynamic situation that changed as the two processes played out. (G. Barr Dep. 46:17-21; F. Barre Dep. 55:22-53:20, 63:8-22, 67:14-68:2, 110:1-12.)

**Response:** Disputed. Greg Barr's testimony offers no support for the cited proposition, except to explain that he accepted VRP. Plaintiff objects to Frank Barre's testimony regarding the subsequent HR Restructuring(s) on grounds of lack of foundation, FED. R. EVID. 602, because while offering rambling answers at his deposition, Barre specifically and repeatedly explained that he had no personal knowledge of anything that occurred with respect to any subsequent HR restructuring, which is the topic that UPS offers his testimony to support. (F. Barre Dep. 62:11-64:8 ("I don't know, I wasn't involved in those discussions."; "I didn't know specifically where the HR organization or the HR structure was going in 2019"; "just generally speaking, I wasn't involved in any of those."); 67:14-68:2 ("So with consolidations, who was taking their VRP, I don't know, I can't answer that."); 110:1-12 ("there was a transformation that was going to occur with different phases, just didn't know the

phases.") Further, as explained above in Resp. to SOF No. 10, there is no evidence any "HR restructuring" at UPS occurred in early 2019, at the time Barr and Barre's positions, and others, were backfilled in accordance with the VRP. Moreover, the unsupported notion that the VRP backfill process that culminated in early 2019 was related to or connected with a subsequent HR restructuring that took place in August 2019 is fatally undermined by the fact that Interial was promoted to HR Operations Manager in January 2019, and then shipped off to a totally different role just months later. (Allison Dep. 236:7-12; Interial Dep. 12:11-13:17.)

In reality, the evidence establishes that the process to backfill the positions that became available when Barr and Barre took VRP was straightforward, not "dynamic," and had nothing to do with any subsequent restructurings of UPS's HR department. In May 2018, the AHRMs (Ron Macchia, Mike Nugent, and Carlos Interial), Frank Barre, and Greg Barr attended a "career development" meeting, at which Macchia advocated for Maier's promotion. (Macchia Dep. 60:21-65:10, 67:18-68:4.) Around this time, in accordance with her Career Development Plan, Maier received her bachelor's degree—which was the only required qualification for the AHRM position. (Macchia Dep. 25:23-29:1; Maier Dep. 17:1-18:15, 79:21-80:6, 126:17-129:13, 248:19-249:3; Pl. Ex. 1, Maier Decl. ¶ 23; Macchia Dep. Ex. 1 (Maier 45); Def. Ex. J, at UPS 4256; Allison Dep. 116:21-117:4, 166:11-167:1; Pl. Ex. 15, (UPS 4478), at UPS 4483 ("Required must be specific to the business need of the job and **is absolute. The applicant either has it or does not**.").) Subsequently, on May 31 and June 1, 2018, Greg Barr attended a "staff level" talent review meeting, attended by individuals at his level and above, and at which the three HR supervisors who were Level 1 fits for promotion to AHRM—Maier, Paras, and Mike Kish—were discussed. (G. Barr Dep. 48:6-60:18; G. Barr Dep. Ex. A (UPS 4091); G. Barr Dep. Ex. B (at UPS 4173-74, 4177-78, 4179-80); G. Barr Dep. Ex. C.) At the meeting, UPS's high-level HR staff determined that, upon Greg Barr and Frank Barre's retirements, Carlos Interial would fill Frank Barre's position and that Sara Maier would fill Carlos Interial's AHRM position. (G. Barr Dep. 63:11-

71:18; G. Barr Dep. Ex. D (UPS 3684); G. Barr Dep. Ex. E (UPS 3686); G. Barr Dep. Ex. F, Pl. Ex. 9 (UPS 3688)). In addition, around this time, in June 2018, Frank Barre and Greg Barr decided that a UPS employee named Ramina (Ashtar) Chlimoun would be promoted to HR supervisor to backfill a role that came available due to VRP; the determining factor was that Chlimoun had a bachelor's degree, which the other candidates (despite having more UPS experience) lacked. (G. Barr Dep. Ex. D (UPS 3684)).

Greg Barr communicated these decisions to his dotted-line boss—Regional Manager Pete Elroy—in June 2018, in an email thread with the subject line "VRP confidential." Elroy specifically asked Barr to "backfill for Carlos and have him as replacement for Frank." In response, Barr wrote that "Sara will replace Carlos as AHRM." Angel Paras, who was discussed with the UPS senior managers at the May 31-June 1 talent review meeting, was not mentioned anywhere on any documentation or communications regarding the VRP backfills and promotions, because Maier had been chosen over him for promotion. (G. Barr Dep. 63:11-71:18; G. Barr Dep. Ex. E (UPS 3686); G. Barr Dep. Ex. F, Pl. Ex. 9 (UPS 3688).)

These decisions, including the decision to promote Maier were reaffirmed again in August 2018, when UPS updated its procedures for backfilling positions that came open due to the VRP. (G. Barr Dep. 71:19-72:23, 73:2-76:21, 77:7-79:7, 79:15-82:20; Rodriguez Dep. 31:17-34:3; G. Barr Dep. Ex. G (UPS 3675); G. Barr Dep. Ex. H (UPS 3676); G. Barr Dep. Ex. I (UPS 3680), Pl. Ex. 7; G. Barr Dep. Ex. J (UPS 3681); G. Barr Dep. Ex. K, Pl. Ex. 8 (UPS 3683).) The spreadsheet reflecting UPS's decisions *specifically referenced* filling *Maier's specific* position as HR supervisor via "career development/VRP role to be backfilled." (G. Barr Dep. Ex. J (UPS 3681); G. Barr Dep. Ex. K, Pl. Ex. 8 (UPS 3683).)

These decisions were reaffirmed in late 2018 and early January 2019, when Frank Barre informed Marci Rodriguez—the person in charge of submitting VRP requisitions—that "Carlos

would be replacing Frank, and Sara would be replacing Carlos." (Rodriguez Dep. 22:14-23:6, 23:24-25:13.) Barre further instructed Rodriguez that requisitions for these promotions should be entered in UPS's system as "VRP backfills," *i.e.*, as promotions that would occur without going through "MCO," which is UPS's system for competitive internal job postings. (Rodriguez Dep. 15:6-15:20, 22:14-23:6, 23:24-25:13; Interial Dep. 23:16-24:9; Rodriguez Dep. Ex. 7 (UPS 4129); Pl. Ex. 13 (UPS 4127).) Based on Barre's instructions, Rodriguez created the requested VRP backfill requisitions, which were approved on January 9. (Rodriguez Dep. 36:6-44:21; Rodriguez Dep. Ex. 7 (UPS 4129); Rodriguez Dep. Ex. 8 (UPS 4142).) Barre instructed Rodriguez not to put names in any of the requisitions for the VRP backfills in the HR department, for good reason—HR personnel at UPS could view the requisitions and see the decisions before they were ready to be announced. (Rodriguez Dep. 36:3-44:21, 46:24-47:16; Rodriguez Dep. Ex. 2, Rodriguez Dep. Ex. 7; Rodriguez Dep. Ex. 8; Pl. Ex. 1, Maier Decl. at ¶ 25. A UPS employee at the region level reached out to Rodriguez to find out which individuals would be filling the HR Operations Manager and AHRM roles; Rodriguez informed the caller that Interial and Maier, respectively, had been selected. (Rodriguez Dep. 42:5-44:21.) No one had given Rodriguez—the person listed as the "primary recruiter" on the requisition—any indication whatsoever that the decisions were tentative or up for further discussion. (Rodriguez Dep. 42:5-44:21; Rodriguez Dep. Ex. 7 (UPS 4129).)

The decisions to promote Interial, Chlimoun, and Maier were also entered into People Tracker, which was UPS's system for documenting personnel moves such as promotions, demotions, and job moves. (Allison Dep. 157:9-23; Interial Dep. 125:22-127:3; Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707); Pl. Ex. 1, Maier Decl. ¶ 26.) Personnel moves are entered into "People Tracker" only after a successor is in place. (Paras Dep. 75:22-76:1; Pl. Ex. 1, Maier Decl. ¶ 26.)

These decisions—including Maier's promotion—were again reaffirmed on January 14, 2019.

On that date, Barre sent his replacement, Interial, copies of "salary impact sheets" showing the salaries that Maier and Chlimoun would receive upon their promotions. (Interial Dep. 63:22-67:11; Interial Dep. Ex. 7 (UPS 3696); Interial Dep. Ex. 8 (UPS 3699).) Salary impact sheets are prepared at UPS only when a promotion or salary change decision has already been made. (Interial Dep. 66:19-67:11; Paras Dep. 98:14-99:6; Rodriguez Dep. 45:16-46:16.) No salary impact sheet for Paras had been prepared at the time. (Interial Dep. 64:4-65:6; Interial Dep. Ex. 7 (UPS 3696).)

On that same date, Greg Barr sent to his replacement Chelsea Allison a phone list of the employees reporting up to her that listed Carlos Interial as HR Operations Manager, Sara Maier as Area Human Resources Manager, and Ramina Chlimoun as HR supervisor; the document listed Paras as an HR supervisor. (Barr Dep. 91:23-95:15; Allison Dep. 65:4-69:1; Barr Dep. Ex. L (UPS 3483); Barr Dep. Ex. M (UPS 3484).) Also on that same date, Barr and Barre exchanged emails with organizational charts and phone lists reflecting Interial, Maier, and Chlimoun's promotions—exactly as had been planned since June 2018. (G. Barr Dep. 95:16-101:10; G. Barr Dep. Ex. N (UPS 3671); G. Barr Dep. Ex. O (UPS 3673).) Phone lists and organizational charts were prepared at UPS by Marcy Rodriguez's administrator, who would input information from managers reflecting personnel moves that had already been made. (Rodriguez Dep. 15:21-17:1; F. Barre Dep. 130:20-131:12.)

The situation only became "dynamic" when Sara Maier—at a meeting her manager Macchia and Interial told her was to discuss her long-planned promotion to AHRM—responded to Allison's invitation to discuss something "personal or professional about herself," by talking "about [her] children, how [Maier] and [her] husband were trying for a third [child] but hadn't been successful yet." (Maier Dep. 45:10-46:1; 52:18-53:10, 62:4-64:3, 65:7-66:22, 245:5-16; Allison Dep. 103:4-17; Pl. Ex. 26, Maier Dep. Ex. 1 (MAIER 35).) At that point, Chelsea began peppering Maier with questions about whether she could work "long hours, working in the middle of the night" with her "small children," cutting off Maier's answers, acting in "disingenuous" way that showed she "wasn't really

listening to what [Maier] said," making clear to Maier that "it didn't really matter what [Maier] said, and that [Allison] had already made her mind up." (Maier Dep. 68:14-23, 70:5-72:23, 73:1-13, 104:6-19; Pl. Ex. 26, Maier Dep. Ex. 1 (MAIER 35).) In contrast, Paras—who also had young children and discussed his family responsibilities and outside commitments with Allison and Interial—was not asked whether he could handle the demanding manager schedule. (Maier Dep. Ex. 2 (Maier 149-50); Maier Dep. 84:11-86:14; Paras Dep. 85:18-86:15, 92:17-96:6.) After the meeting, Interial and Allison reversed the decision to promote Maier, in favor of Paras, a man who they knew also had young children and lacked the only required qualification for the AHRM position—a bachelor's degree. (Allison Dep. 116:21-117:4, 166:11-167:1; Interial Dep. 104:16-21; Maier Dep. 79:21-80:6, 126:17-129:13, 248:19-249:3; Interial Dep. Ex. 9 (UPS 3708); Interial Dep. Ex. 10 (UPS 3709); Def. Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483 ("Required must be specific to the business need of the job and **is absolute. The applicant either has it or does not**.").)

        Interial's contemporaneous explanation to Maier for the decision not to promote her was that Allison believed Maier had "too much going on right now" to take on a manager position. (Maier Dep. 91:6-11, 106:12-107:6, 111:6-112:24, 111:6-112:24; Pl. Ex. 26, Maier Dep. Ex. 1 (MAIER 35); Maier Dep. Ex. 3 (MAIER 125), at MAIER 126.) Because the decision to promote Maier had already been made and documented in accordance with the detailed procedures UPS had set up for implementing VRP backfills, several senior level HR executives—including Malcolm Berkley, Tamara Caldwell, Jon Robertson, Linda Nelson, and Marge Niedbalski—had to become involved to reverse the decision to promote Maier and instead elevate Paras, an objectively unqualified man, into the role. (Allison Dep. 79:20-81:7, 161:3-173:19; Rodriguez Dep. 18:23-19:2; Allison Dep. Ex. 5 (UPS 3490); Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707); Allison Dep. Ex. 16 (UPS 3485); Allison Dep. Ex. 17 (UPS 3487).)

        12.      In order to ensure that business needs were met and no serious gaps in management

occurred as a result of the VRP (which was not typical for UPS), UPS used succession planning tools to identify which employees could "backfill" not only positions being vacated by retiring employees, but also the "downline" positions vacated by persons who backfilled retiring employees. (Barre Dep. 57:4-58:5, 58:22-23, 62:14-21.)

**Response:** Undisputed.

13.     Barr and Barre each elected to retire in the VRP. (Barre Dep. 61:1-9; Barr Dep. 31:14-32:1.)

**Response:** Undisputed.

14.     Chelsea Allison ("Allison") was selected to replace Barr as District HR Director. (Allison Dep. 55:19-23.)

**Response:** Undisputed.

15.     Allison has been employed by UPS since 1999 and has four children. (Allison Dep. 14:11-17, 210:3-4; Plf. Dep. 83:2-4.)

**Response:** Undisputed.

16.     Interial was the only AHRM designated as "Level 1 Fit" for promotion to District HR Operations Manager, and he had previously performed the role on an interim basis. He was, therefore, selected to replace Barre. (Barre Dep. 68:17-69:20, 73:6-15; Barr Dep. Ex. C; Barr Dep. 58:20-59:9.)

**Response:** Plaintiff disputes the "therefore," which incorrectly implies that Interial was selected via

a different process than Maier, or that Interial and Maier were any differently situated. While it is

true that Interial was the only Level 1 fit for promotion to Area HR Operations Manager, Maier was

the only HR supervisor who was a Level 1 fit for promotion to AHRM *and who satisfied the only*

*required qualification for the position*—a bachelor's degree. (Allison Dep. 116:21-117:4, 166:11-167:1;

Interial Dep. 104:16-21; Maier Dep. 79:21-80:6, 126:17-129:13, 248:19-249:3; Interial Dep. Ex. 9

(UPS 3708); Interial Dep. Ex. 10 (UPS 3709); Allison Dep. Ex. 25 (UPS 3447), at UPS 3457; Def.

Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483 ("Required must be specific to the business

need of the job and **is absolute. The applicant either has it or does not**.")) Further, Maier and

Interial's promotion occurred via the exact same process and were tied together from June 2018,

when UPS's senior HR staff met to, among other things, determine who would fill Frank Barre's

position when he took VRP—and decided that Interial would fill Barre's HR Operations Manager

role and Maier would fill Interial's AHRM role. (G. Barr Dep. 48:6-60:18, 63:11-71:18; G. Barr Dep.

Ex. A (UPS 4091); G. Barr Dep. Ex. B (at UPS 4173-74, 4177-78, 4179-80); G. Barr Dep. Ex. C; G.

Barr Dep. Ex. D (UPS 3684); G. Barr Dep. Ex. E (UPS 3686); G. Barr Dep. Ex. F, Pl. Ex. 9 (UPS

3688)).) Interial and Maier's promotions were tied together when Frank Barre instructed Marci

Rodriguez in late 2018 that "Carlos would be replacing Frank, and Sara would be replacing Carlos."

(Rodriguez Dep. 22:14-23:6, 23:24-25:13.) Interial and Maier's promotions were documented

together in organizational charts and phone lists shared with Allison, Greg Barr, Frank Barre, and

Interial on January 14, 2019, and also documented together in People Tracker. ((Barr Dep. 91:23-

101:10; Allison Dep. 65:4-69:1, 157:9-23; Interial Dep. 125:22-127:3;  Barr Dep. Ex. L (UPS 3483);

Barr Dep. Ex. M (UPS 3484); G. Barr Dep. Ex. N (UPS 3671); G. Barr Dep. Ex. O (UPS 3673);

Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707).)

Further, Maier—like Interial—had been groomed for promotion, had served as "lead"

among her peers for years, filled in for the AHRMs when none of them were available, participated

in special trainings, and was charged with special projects. (Maier Dep. 211:16-213:8; Macchia Dep.

30:10-52:7; 67:2-17; Interial Dep. 54:19-56:15; Macchia Dep. Ex. 2 (UPS 3218); Macchia Dep. Ex. 3

(UPS 2497); Macchia Dep. Ex. 4 (UPS 2549); Macchia Dep. Ex. 5 (UPS 2670); Pl. Ex. 1, Maier Decl.

¶¶ 16-18.) In particular, in recognition of Maier's outstanding performance as HR Supervisor, and to

continue preparing her for promotion to AHRM, UPS's HR leadership in Illinois began assigning

her additional tasks as "lead supervisor," above and beyond the typical responsibilities of an HR

Supervisor. (Pl. Ex. 1, Maier Decl. ¶¶ 16-18; Maier Dep. 211:15-213:8; Pl. Ex. 14 (UPS 4373).)

Among other things, between 2016 and 2018, Maier was assigned and performed the following

additional tasks as lead supervisor: (1) running the weekly, regional human resources call for the HR

supervisors and other employees in the region (Pl. Ex. 1, Maier Decl. at ¶ 16; Maier Dep. 211:15-213:8; Interial Dep. 54:19-23; Macchia Dep. 30:10-31:11, 41:15-42:19, 47:7-48:1; Paras Dep. 21:17-23:3; Macchia Dep. Ex. 3 (UPS 2497); Macchia Dep. Ex. 4 (UPS 2549); Macchia Dep. Ex. 5 (UPS 2670); Pl. Ex. 14 (UPS 4373)); (2) serving as the lead instructor for "NSPT" and performing other important tasks relating to Integrad, UPS's training for new drivers (Pl. Ex. 1, Maier Decl. at ¶ 17; Macchia Dep. 31:13-32:12, 41:15-42:19, 47:7-48:1; Interial Dep. 54:24-56:8; Macchia Dep. Ex. 3 (UPS 2497); Macchia Dep. Ex. 4 (UPS 2549); Macchia Dep. Ex. 5 (UPS 2670); Pl. Ex. 14(UPS 4373), at 4382-84); (3) taking the lead on package/feeder queries (F. Barre Dep. 17:15-24; Pl. Ex. 14 (UPS 4373), at UPS 4373-74); (4) advising, teaching, and training other HR Supervisors (including Angel Paras) about Microsoft Access, including instructing them on how to perform advanced queries (Pl. Ex. 1, Maier Decl. at ¶ 18; Interial Dep. 56:12-15; Paras Dep. 24:1-11; Macchia Dep. 44:16-45:13, 47:7-48:1; Macchia Dep. Ex. 4 (UPS 2549); Macchia Dep. Ex. 5 (UPS 2670)); (5) serving as a mentor, advisor, and leader among the HR supervisors (Pl. Ex. 1, Maier Decl. at ¶¶ 8, 16-18; Macchia Dep. 37:19-38:7, 43:12-44:19, 47:7-48:1; Paras Dep. 23:17-25:6; Macchia Dep. Ex. 2 (UPS 3218); Macchia Dep. Ex. 3 (UPS 2497); Macchia Dep. Ex. 4 (UPS 2549); Macchia Dep. Ex 5 (UPS 2670); (6) filling in for the AHRMs in situations where none of the three were available. (Pl. Ex. 1, Maier Decl. at ¶24; Interial Dep. 54:24-56:8; Macchia Dep. 67:2-17; Pl. Ex. 12, (UPS 4114).)

Further, UPS's use of the word "therefore" to suggest that Interial's promotion was automatic because he was the only objectively qualified candidate for the position from within the Illinois District HR department, contrasts starkly with UPS's treatment of Maier—both for the initial AHRM opening, as described above, and the subsequent AHRM opening after UPS transferred Paras out of the role. Even though Maier—who by this point had her third child, taken the full 12 weeks of FMLA leave she was entitled to, repeatedly complained of discrimination internally, filed an EEOC charge, and participated in an EEOC mediation—remained a highly

successful HR supervisor and a Level 1 fit for promotion to Area HR Manager, UPS refused to inform her the position was available, consider her, or interview her for the role. (Maier Dep. 133:22-134:23, 140:19-144:9; Macchia Dep. 52:16-57:16, 89:23-90:10; Macchia Dep. Ex 6; Macchia Dep. Ex. 7; Paras Dep. 94:13-95:4; Interial Dep. 139:12-142:8, 149:11-14, 146:20-147:4, 147:18-21; Allison Dep. 181:12-186:23, 193:18-197:17, 198:6-200:17, 204:9-207:24; Maier Dep. Ex. 5 (EEOC charge); Allison Dep. Ex. 18 (UPS 3494); Allison Dep. Ex. 19 (UPS 3495), Pl. Ex. 4; Allison Dep. Ex. 24 (UPS 3446); Allison Dep. Ex. 25 (UPS 3447), at UPS 3457; Allison Dep. Ex. 27 (UPS 3605); Allison Dep. Ex. 28 (UPS 3606), at UPS 3612; Allison Dep. Ex. 36 at Rog Response No. 4; Pl. Ex. 21, RTA Resp. Nos. 45-49; Pl. Ex. 1, Maier Decl. ¶ 48.) Instead, without conducting any interviews or documenting the reasons for its decision in any way, UPS moved Gloria Macias, a manager from outside the HR department, who was approaching retirement, into the AHRM role—until she herself took voluntary retirement in 2020. (Allison Dep. 239:3-246:9, 259:16-261:18, Allison Dep. Ex. 35; Allison Dep. Ex. 36 at Rog Response No. 4; Pl. Ex. 21, RTA Resp. Nos. 45-49; Pl. Ex. 18 (UPS 716).)

17.     As part of the exercise of ensuring positions could be filled during the VRP and later HR Restructuring, Plaintiff was identified as the "Possible Backfill" for Interial. However, Barre and Barr did not know how the HR Restructuring would impact available roles after their departure in the VRP, and they understood the final decision regarding how to fill the AHRM position should not be made until Allison assumed her new role and weighed in. (Barre Dep. 77:19- 81:24, 88:3-92:19, 94:9-97:9, 105:13-106:11, 118:1-21, 136:5-127:18; Barre Dep. Exs. C-D; Barr Dep. 102:6-18.)

**Response:** Disputed. As a reminder, at summary judgment, the Court must view the facts in the light most favorable to Plaintiff, not make wild and unsupported inferences in favor of the moving party.

At the outset, Plaintiff notes that neither Greg Barr's deposition testimony nor exhibit C to Barre's deposition offers any support for the cited propositions.

Plaintiff was not merely identified as the "Possible Backfill" for Interial, as UPS asserts.

Rather, in an extensively documented, exhaustively documented series of communications, Interial, Maier, and Chlimoun were firmly, specifically, repeatedly identified as the individuals who would receive promotions via the VRP backfill/career development process. After the May 31 and June 1 talent review meeting, Frank Barre and Greg Barr engaged in an email exchange that explicitly reflected that Interial would replace Frank Barre as HR Operations Manager and that Sara Maier would replace Carlos Interial as AHRM. Barr asked Barre what training was necessary for Maier to "get ready to replace Carlos," and Barre responded that there were two trainings she needed to complete, and that "other than that, she is ready to go." Barr confirmed at his deposition that he shared the common-sense interpretation of this document, that "ready to go" meant "ready to promote." (G. Barr Dep. 63:11-18; G. Barr Dep. Ex. D (UPS 3684).) In the same email exchange, Barre suggested that Ramina Chlimoun be promoted to HR supervisor over two other qualified candidates "because of her degree," as she was the only candidate with a bachelor's degree. (G. Barr Dep. Ex. D (UPS 3684).)  Greg Barr communicated these decisions to his dotted-line boss— Regional Manager Pete Elroy—in June 2018, in an email thread with the subject line "VRP confidential." Elroy specifically asked Barr, in direct, non-conditional language to "backfill for Carlos and have him as replacement for Frank." In directing Barr to "backfill for Carlos," Elroy offered no suggestion that—as UPS now apparently claims—the AHRM position would later be opened up for non-qualified candidates like Angel Paras to compete, or that some future UPS leader would be allowed to "weigh in" and reverse the decision. In response to his manager's instruction, Barr wrote, in straightforward, direct, non-conditional language that "Sara will replace Carlos as AHRM." (G. Barr Dep. 63:11-71:18; G. Barr Dep. Ex. E (UPS 3686); G. Barr Dep. Ex. F, Pl. Ex. 9 (UPS 3688).)

These decisions, including the decision to promote Maier were reaffirmed again in August 2018, when UPS updated its procedures for backfilling positions that came open due to the VRP. The

spreadsheet reflecting UPS's decisions, and the requisitions that would need to be created to fill the open roles, *specifically referenced* filling *Maier's specific* position as HR supervisor via "career development/VRP role to be backfilled." Frank Barre responded to the Rodriguez's changes to the requisition spreadsheet, showing Maier's role becoming open as of early 2019, by praising Rodriguez for the "spot-on review of the data." (G. Barr Dep. 71:19-72:23, 73:2-76:21, 77:7-79:7, 79:15-82:20; Rodriguez Dep. 31:17-34:3; G. Barr Dep. Ex. G (UPS 3675); G. Barr Dep. Ex. H (UPS 3676); G. Barr Dep. Ex. I (UPS 3680), Pl. Ex. 7; G. Barr Dep. Ex. J (UPS 3681); G. Barr Dep. Ex. K (UPS 3683), Pl. Ex. 8.)

These decisions were again reaffirmed again in late 2018 and early January 2019, when Barre informed Rodriguez—the person in charge of submitting VRP requisitions—that "Carlos would be replacing Frank, and Sara would be replacing Carlos." As Barr had months before, Barre communicated these decisions in straightforward non-conditional language, because the decisions had already been made. (Rodriguez Dep. 22:14-23:6, 23:24-25:13.) Barre further instructed Rodriguez that requisitions for these promotions should be entered in UPS's system as "VRP backfills," *i.e.*, as promotions that would occur without going through "MCO," which is UPS's system for competitive internal job postings, because the decision had been made, and no competitive process or subsequent "weighing in" by other decision-makers was envisioned. (Rodriguez Dep. 15:6-15:20, 22:14-23:6, 23:24-25:13; Interial Dep. 23:16-24:9; Rodriguez Dep. Ex. 7 (UPS 4129); Pl. Ex. 13 (UPS 4127); Pl. Ex. 1, Maier Decl. ¶ 24.) Based on Barre's instructions, Rodriguez created the requested VRP backfill requisitions, which were approved on January 9. (Rodriguez Dep. 36:6-44:21; Rodriguez Dep. Ex. 7 (UPS 4129); Rodriguez Dep. Ex. 8 (UPS 4142).) Barre instructed Rodriguez not to put names in any of the requisitions for the VRP backfills in the HR department, for good reason—HR personnel at UPS could view the requisitions and see the decisions before they were ready to be announced. (Rodriguez Dep. 36:3-44:21, 46:24-47:16; Rodriguez Dep. Ex. 2, Rodriguez Dep. Ex. 7; Rodriguez

Dep. Ex. 8; Pl. Ex. 1, Maier Decl. at ¶ 25.) A UPS employee at the regional level reached out to Rodriguez to find out which individuals would be filling the HR Operations Manager and AHRM roles; Rodriguez informed the caller that Interial and Maier, respectively, had been selected. (Rodriguez Dep. 42:5-44:21.) No one had given Rodriguez—the person listed as the "primary recruiter" on the requisition—any indication whatsoever that the decisions were tentative or up for further discussion. (Rodriguez Dep. 42:5-44:21; Rodriguez Dep. Ex. 7 (UPS 4129).)

The decisions to promote Interial, Chlimoun, and Maier were also entered into People Tracker, which was UPS's system for documenting personnel moves such as promotions, demotions, and job moves. (Allison Dep. 157:9-23; Interial Dep. 125:22-127:3; Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707); Pl. Ex. 1, Maier Decl. ¶ 26.) Personnel moves are entered into "People Tracker" only after a successor is in place. (Paras Dep. 75:22-76:1; Pl. Ex. 1, Maier Decl. ¶ 26.)

These decisions—including Maier's promotion—were again reaffirmed on January 14, 2019. On that date, Barre sent his replacement, Interial, copies of "salary impact sheets" showing the salaries that Maier and Chlimoun would receive upon their promotions. (Interial Dep. 63:22-67:11; Interial Dep. Ex. 7 (UPS 3696); Interial Dep. Ex. 8 (UPS 3699).) Salary impact sheets are prepared at UPS only when a promotion or salary change decision has already been made. (Interial Dep. 66:19-67:11; Paras Dep. 98:14-99:6; Rodriguez Dep. 45:16-46:16.) No salary impact sheet for Paras had been prepared at the time. (Interial Dep. 64:4-65:6; Interial Dep. Ex. 7 (UPS 3696).)

On that same date, Greg Barr sent to his replacement Chelsea Allison a phone list of the employees reporting up to her that listed Carlos Interial as HR Operations Manager, Sara Maier as Area Human Resources Manager, and Ramina Chlimoun as HR supervisor; the document listed Paras as an HR supervisor. (Barr Dep. 91:23-95:15; Allison Dep. 65:4-69:1; Barr Dep. Ex. L (UPS 3483); Barr Dep. Ex. M (UPS 3484).) On that same date, Barr and Barre exchanged emails with

organizational charts and phone lists reflecting Interial, Maier, and Chlimoun's promotions—exactly as had been planned since June 2018. (G. Barr Dep. 95:16-101:10; G. Barr Dep. Ex. N (UPS 3671); G. Barr Dep. Ex. O (UPS 3673).) Phone lists and organizational charts were prepared at UPS by Rodriguez's administrator, who would input information from managers reflecting personnel moves that had already been made. (Rodriguez Dep. 15:21-17:1; F. Barre Dep. 130:20-131:12.)

Barre's purported "understanding" that the backfill decisions would not be made until Allison assumed her new role and "weighed in," is contradicted by all the above-described evidence. Moreover, Barre specifically testified that his "understanding" that Barr's successor would be allowed to "weigh in" on the backfill decisions extended to *all* the backfill positions, including *both* Maier and Interial's positions. (F. Barre Dep. 136:5-138:15 ("We should allow this person to weigh in on *these open jobs*."; "We're not going to make *the moves*"; "*all these moves*").) But Allison had no role in deciding that Interial would backfill Frank Barre's HR Operations Manager position or that Chlimoun would backfill a newly available HR supervisor position, and no interviews were conducted for either position—contradicting Barre's purported "understanding" that Barr's successor would be allowed to "weigh in on these open jobs." (Allison Dep. 58:7-61:6, 63:23-64:13; Interial Dep. 43:7-43:22, 65:7-65:22; 146:17-19; G. Barr Dep. Ex. E, UPS 3686; G. Barr Dep. Ex. F & Pl. Ex. 9 (UPS 3688); Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707).) Finally, although Frank Barre's testimony was scattered and rambling in many places, his memory was clear on a few specific items: He recommended that Sara Maier be promoted to AHRM, because she was the best person for the job, and even though Paras was also listed as "ready now," he believed Maier should be promoted over him. (Barre Dep. 137:19-138:15, 139:15-140:10.)

Moreover, the jury certainly is not required to—and likely will not—make the inference that UPS really intended to reverse 6 months of careful, exhaustively documented planning and open up *only* the AHRM position to conduct interviews for individuals who *lacked the required qualifications* for

the position. Especially problematic for UPS is the fact that it is undisputed that Allison had *no say*
on who would fill the HR operations manager position—the right-hand person for the HR Director,
who reported directly to her—and *no say* in who would fill the HR supervisor role vacated by the
newly promoted AHRM. (Allison Dep. 58:7-61:6, 62:8-23; Interial Dep. 43:7-43:22, 59:19-60:8; 65:7-
65:22; 146:17-19; Barr Dep. Ex. E, UPS 3686; Barr Dep. Ex. F & Pl. Ex. 9 (UPS 3688); Allison Dep.
Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707).) Notably, recognizing this issue
and attempting to get ahead of it, UPS falsely asserted before the EEOC that Allison "concurred
with the recommendation to select Interial for the HR Operations manager position," but Allison
acknowledged at her deposition that was not true. (Pl. Ex. 27, UPS Position Statement, at UPS 35;
Allison Dep. 58:7-61:6.) There is no basis for the Court, at summary judgment, to infer in UPS's
favor that, of all the various VRP backfill decisions, only the decision to promote Maier alone was
considered tentative, such that Allison was expected to "weigh in" only on that position.

In addition, there is no admissible evidence supporting the notion that the VRP backfill
decisions had anything to do with any subsequent HR restructuring, as UPS again attempts to
suggest. (*See Pl. Resp. to SOF* No. 11, *above*, and the evidence cited therein.)


18.     Marcia Rodriguez ("Rodriguez") (Employees Services Supervisor) submitted
requisitions to backfill positions, in connection with the corporate office's system of managing the
VRP and HR Restructuring. The information she used to generate requisitions came from Barre.
(Barre Dep. 111:13-113:23, 120:21-121:18; Deposition of Marcia Rodriguez ("Rodriguez Dep.")
10:23-11:7, attached hereto as **Exhibit G**.)

**Response:** Plaintiff again disputes that the VRP backfills had anything to do with any subsequent HR

restructuring, which occurred in August 2019 and in 2020. The cited testimony involves only the VRP

backfill process and has nothing to do with any HR restructuring. (*See Pl. Resp. to SOF* 11, *supra*, and

the evidence cited therein.)


19.     Rodriguez testified that in 2018, Barre initially told her to submit requisitions
identifying Interial as the candidate to backfill his role as District HR Operations Manager and

identifying Plaintiff as the candidate to backfill Interial's AHRM position. However, Barre then told Rodriguez to resubmit the requisitions with no candidates identified, which she did in early 2019. (Rodriguez Dep. at 22:18-23:3, 24:14-21; 38:20-40:8; Rodriguez Dep. Ex. 7.)

**Response:** Disputed. This statement of fact does not accurately state or paraphrase Rodriguez's testimony on point. Rodriguez testified that Barre stated unequivocally that "Carlos would be replacing Frank and Sara would be replacing Carlos"; she didn't testify that they were identified merely as "candidates." (Rodriguez Dep. 22:14-23:6.) Further, between Rodriguez's conversation with Barre and the time she resubmitted the requisitions with "no candidates identified," nothing "changed about who was going to take on the roles that needed to be backfilled due to VRP." (Rodriguez Dep. 22:14-23:18). Further, the reason that the requisitions were submitted with "no candidate identified" was not that the decisions were tentative, but because HR personnel at UPS could view the requisitions and see the decisions before they were ready to be announced. (Rodriguez Dep. 36:3-44:21, 46:24-47:16; Rodriguez Dep. Ex. 2, Rodriguez Dep. Ex. 7; Rodriguez Dep. Ex. 8; Pl. Ex. 1, Maier Decl. ¶ 25.)

20.    [a] On or about January 9, 2019, Rodriguez received a call from a representative of UPS's Corporate HR Organizational Development Group, [b] asking if candidates had been identified to fill the two positions for which she had submitted requisitions. [c] Rodriguez did not know why he was asking, but responded that the information she had was that Plaintiff was the candidate for AHRM and Interial was the candidate for District HR Operations Manager. (Rodriguez Dep. 43:7-44:14.)

**Response:** Disputed. This statement of fact does not accurately state or paraphrase Rodriguez's testimony on point. Rodriguez testified that [a] she did not recall who was calling, except that it was someone from the region; [b] the conversation involved not "candidates" but a request "for the names of the employees who were going to fill the District HR Operations Manager role and the Area Human Resources Manager role"; [c] she "provided the names she had been given by Frank Barre": Carlos Interial and Sara Maier; her testimony did not reference anything about "candidates." Further, UPS excluded from its citation Rodriguez's immediate clarifications that she

had been given "no reason to believe that those decisions were still up for debate" and that no one gave her any indication that anyone else was being considered for the roles. (Rodriguez Dep. 43:7-44:21.) In sum, the cited evidence supports the proposition that, at the time of Rodriguez's conversation with a regional HR employee, UPS had already selected Interial and Maier to backfill the HR Operations Manager and AHRM positions and includes no support for the proposition that they were merely "candidates" for the roles.

21.    Rodriguez had no first-hand knowledge regarding whether Plaintiff had been selected for promotion. She knew only what Barre told her in connection with preparing requisitions. (Rodriguez Dep. 44:7-10, 46:24-47:6; 55:19-56:7, 15:12-17.)

**Response:** Plaintiff objects that whether Rodriguez had "first-hand knowledge" is immaterial for the purpose of summary judgment. Frank Barre's unequivocal statement—indisputably made by UPS's employee on a matter within the scope of his employment relationship—that "Carlos would be replacing Frank and Sara would be replacing Carlos" is admissible evidence against UPS. (Rodriguez Dep. 22:14-23:6.) *See* Fed. R. Evid. 801(d)(2)(D). Barre's unequivocal statement is especially trustworthy and compelling given the voluminous documentation dating from June 2018 corroborating that "Sara will replace Carlos as AHRM." (*See Pl. Resp. to SOF* 17, above, and the evidence cited therein.) Further, Rodriguez was listed as the "primary recruiter" on the relevant VRP backfill requisitions, which would support a jury's inference that she was a person with first-hand knowledge of the process of deciding who would fill the positions. (Rodriguez Dep. Ex. 7 (UPS 4129).)

22.    The identification of Plaintiff as the candidate to fill the AHRM position was also recorded in a "People Tracker" program, which was used only during the VRP and overlapping HR Restructuring to track actual and possible personnel moves because there were "so many moving parts." Not all personnel moves noted in People Tracker ultimately occurred. (Barre Dep. 149:8-152:20, 154:1-160:20, 162:6-163:23; Barre Dep. Exs. N, O; Interial Dep. 125:22-126:127:3; Allison Dep. Ex. 17, p. 1.)

**Response:** Disputed. Although it is not at all clear for what purpose UPS is offering Allison Dep. Ex. 17,

or how it supports any proposition in this statement of fact, Plaintiff objects that it is hearsay—and no possible exception applies—if offered by Defendant to prove the truth of any matters asserted therein. Plaintiff again disputes that there was any "overlapping HR Restructuring" occurring at the same time as VRP; an assertion for which UPS has provided no admissible evidence. (*See Pl. Resp. to SOF* 11, above, and the evidence cited therein.) Frank Barre's rambling testimony about "People Tracker" being used to track "potential" moves—rather than actual personnel moves, as indicted by the use of the past tense "promoted" in the "disposition" column of Barre Dep. Ex. O (UPS 3707), Pl. Ex. 10—is both implausible and directly contradicted by the testimony of other HR personnel at UPS. (Interial Dep. 124:3-129:13 (People Tracker is "used to track the moves"); Allison Dep. 156:20-157:23 ("People Tracker is -- I've only heard it referred to as something that the transformation office would use if there's *movements that have occurred* per the transformation office."; "Q. Is it how UPS documents the, you know, personnel decisions? MR. CHURCH: Object to form. THE WITNESS: It's how the transformation office would keep track of movements. Q. And when you say "movements," what do you mean? A. Demotions, terminations, lateral moves, promotions."); Paras Dep. 75:22-76:1 (People Tracker is updated *"[o]nce a successor is in place"*); Pl. Ex. 1, Maier Decl. ¶ 26.) UPS has offered no evidence of any particular personnel move—besides Maier's—that was entered into People Tracker and then not implemented, notwithstanding Barre's rambling testimony about something that may or may not have happened in "'91'" or "'95," when Barre testified that People Tracker wasn't even used. (F. Barre Dep. 162:6-23.)

23.   On or about January 14, 2019, Allison transferred to the Illinois district to replace Barr as District HR Director. (Allison Dep. 17:5-21, 18:14-20, 55:5-23.)

**Response:** Undisputed.

24.   Allison was not told that Plaintiff had been identified as the possible backfill for the AHRM position as part of the VRP. Instead, she was presented with the requisition prepared by Rodriguez, which stated no candidate had been identified. (Allison Dep. Ex. 17, p. 2; Allison Dep. 79:1-10, 81:16-8, 86:14-87:1, 154:22-155:3, 164:19-23, 176:12-19; Barr Dep. 102:1-5; Barre

Dep. 165:22-166:8.)

**Response:** Disputed. Plaintiff objects to UPS's use of Allison Dep. Exhibit 17 to prove the truth of the matters stated therein; the document is hearsay for which no exception applies, if offered by UPS. In any event, Allison Dep. Ex. 17 (UPS 3487), an email written by Allison, *directly contradicts* the assertion made in this statement of fact, because it specifically describes Allison's contemporaneous knowledge that Maier's promotion was "originally suggested by the previous director," and repeatedly refers to his "recommendation" to promote Maier. Indeed, this was understood by the recipient of the email, Tamara Caldwell, who read Allison's lengthy email and responded by writing that the "outgoing DHRM made a recommendation." (Allison Dep. 167:2-169:12, Allison Dep. Ex. 2 (UPS 4040); Allison Dep. Ex. 17 (UPS 3487).) A different email Allison sent a few days later was even more specific about her knowledge of Barr's recommendation, saying: "***The outgoing DHRM made a recommendation*** for the open Area HR Manager position and open Full Time Supervisor position and I was advised by Linda Nelson to make my own hiring decisions for the HR Department, before selecting said candidates." (Allison Dep. Ex. 5 (UPS 3490), at 3492.) Further, this statement of fact is also directly contradicted by the fact that, on the day she became Illinois District HR Director, Allison received from her predecessor Barr a phone list that listed Maier as AHRM, Interial as HR Operations Manager, Chlimoun as HR supervisor, and Paras as HR Supervisor. (Barr Dep. 91:23-95:15; Allison Dep. 64:21-69:1; Barr Dep. Ex. L (UPS 3483); Barr Dep. Ex. M (UPS 3484).) With respect to the phone list, Allison testified at her deposition that "she saw the email." (Allison Dep. 68:24-69:1.)

In addition, on January 14, 2019, the date that Allison took over the Illinois District HR Director position, numerous documents—including salary impact sheets that were prepared only upon a change in salary, an organizational chart, and a phone list—confirming Maier's promotion to Area HR Manager were circulated among Interial, Barre, and Barr, the incoming and outgoing HR managers in the Illinois district. (Interial Dep. 63:22-67:11; Paras Dep. 98:14-99:6; Rodriguez Dep. 15:21-17:1, 45:16-46:16; G.

Barr Dep. 95:16-101:10; F. Barre Dep. 130:20-131:12; Interial Dep. Ex. 7 (UPS 3696); Interial Dep. Ex. 8 (UPS 3699).)

Further, both Carlos Interial and Ron Macchia informed Maier, before her January 17, 2019, meeting with Allison, that Maier was going to be promoted to AHRM at, or shortly after, the meeting with Allison. (Maier Dep. 45:10-46:1, 62:4-8, 62:21-22, 63:3-9, 65:7-17, 245:5-16; Pl. Ex. 26, Maier Dep. Ex. 1 (MAIER 35), at MAIER 35-36; Maier Dep. Ex. 6 (Maier 64); Pl. Ex. 24, (UPS 4396).) Further, Maier's promotion was widely announced and discussed among HR personnel throughout the Illinois District: Division Manager Tim Bingham told Maier that Barre and Barr told "the whole district" that Maier would be promoted and congratulated Maier on her promotion the Monday after Maier was informed that UPS had instead decided to give the promotion to Paras; in addition, the HR supervisors who would be reporting to Maier as AHRM had been sending her their PTO requests because they knew she was being promoted. (Maier Dep. 89:7-90:7; Maier Dep. Ex. 1, at Maier 43; Pl. Ex. 1, Maier Decl. at ¶¶ 23, 31, 33: Pl. Ex. 23; Pl's supplemental responses to Rog. 14.). Given this evidence, a jury would be hard-pressed to conclude that Chelsea Allison—the incoming Illinois District Director—was the only person in the whole district out of the loop about the fact that UPS had already decided to promote Sara Maier to AHRM.

Based on this record—contemporaneous documents prepared by and shared with Allison, and various additional documents confirming that all the other incoming and outgoing HR managers were aware of Sara Maier's impending promotion—a reasonable jury would likely reject Allison's assertion that she lacked knowledge that Maier had, at minimum, been identified as the top candidate for the AHRM role. UPS's request that the Court adopt, at summary judgment, *Allison's completely*

*implausible story, contradicted by the evidence UPS itself relies on*, must be rejected.[2]

25. Allison's District Manager, Linda Nelson, emphasized to her the importance of selecting the right candidate for the AHRM position, so Allison decided to interview three candidates that were provided to her by the other AHRMs. (Allison Dep. Ex. 17, p. 1; Allison Dep. 87:2-88:4; Interial Dep. 34:14-35:1, 78:21-24.)

**Response:** Disputed. Plaintiff objects to UPS's use of Linda Nelson's purported statements, which are hearsay for which no exception applies, if offered by UPS. Plaintiff also objects to this statement of fact on grounds that Linda Nelson was not disclosed by UPS as a witness with relevant knowledge, and now is being presented as a key person who influenced one of the promotion decisions challenged in this lawsuit.

Once again, the evidence does not support the cited proposition. The email cited by UPS sent by Allison on January 25 itself mentions *two* positions—the manager position initially given to Maier and then provided to Paras, and the supervisor position given to Chlimoun—and says that Nelson discussed "the importance of selecting the right candidate to fill ***these positions.***" (Allison Dep. Ex. 17 (UPS 3485), (emphasis added).) In a subsequent email sent three days later, on January 28, Allison told a more specific and different version of the story, asserting that "the outgoing DHRM made a recommendation for the open Area HR Manager position ***and open Full Time Supervisor position*** and I was advised by Linda Nelson to make my own hiring decisions for the HR Department, ***before selecting said candidates***."  (Allison Dep. Ex. 5 (UPS 3490), at 3492.) This contradicts UPS's statement that Nelson discussed only the AHRM position, and that

---

[2]     This theme—that the Court should adopt *in UPS's favor* an implausible or, frankly, unbelievable view of the evidence—pervades UPS's summary judgment submissions. UPS's submissions disrespect the Court and Maier, by relying on purported statements of fact that it knows are either disputed or unsupported, in a doomed attempt to avoid a trial in this case. "This approach to summary judgment is [] both costly and wasteful." *Malin v. Hospira, Inc.*, 762 F.3d 552, 564-65 (7th Cir. 2014).

distinction is material, *because Allison admitted that she played no role in Chlimoun's promotion to supervisor and it is undisputed that no interviews were conducted for that position* (and Interial's, as well). (Allison Dep. 58:7-61:6, 63:23-64:13; Interial Dep. 43:7-43:22, 65:7-65:22; 146:17-19; Barr Dep. Ex. E, UPS 3686; Barr Dep. Ex. F & Pl. Ex. 9 (UPS 3688); Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707).) A reasonable jury could (and probably would) infer that the story about Linda Nelson was a lie, where UPS admits that it generally, and Allison specifically, did nothing post-June 2018 to ensure that "the right candidate" filled the open HR supervisor role. (*See* Allison Dep. Ex. 17 (UPS 3485); (G. Barr Dep. Ex. D (UPS 3684) (choosing Ramina Chlimoun in June 2018 to backfill the HR supervisor role "because of her degree").

Days after sending the initial email regarding Nelson's purported instructions, Allison sent another email with a different version of the story, Allison made further changes and alterations to the purported explanation for the decision. She added a section with a different version of Nelson's purported instructions to her, identified herself as the decision-maker after previously asserting it was a joint decision of hers and Interial's, and added three sentences about Paras's fluency in 3 languages, desire to work for UPS internationally, and his aspirations to "give back to" Guam by working for UPS there—which Allison claimed were "all" required" for the "AHRM role." (Allison Dep. Ex. 5 (UPS 3490), at 3491-92.)

In her deposition, Allison testified to something totally different from the various stories about Nelson's involvement she wrote in January 2019, which itself is evidence of pretext, *see, e.g., Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 726 (7th Cir. 2005), and different from what UPS asserts in its statement of fact. At her deposition, Allison testified that Nelson, the head of the entire Illinois District, told her "to *slow down and take time* to ensure that I understand who are the candidates to be considered for the HR Manager role before moving forward with a final

27

decision." (Allison Dep. 87:2-88:6 (emphasis added)) But, despite this purported instruction from the top of the district, Allison did not slow down or take her time; instead, she elected not to review any of UPS' voluminous performance review and succession planning documentation—all of which showed that Maier was a stronger performer than Paras, and the only Level 1 fit candidate who satisfied the sole required criterion (a bachelor's degree) for the Area HR Manager role—and instead claimed to make a decision purely based off one-time meetings with Paras and Maier. (Maier Dep. 17:1-18:15, 79:21-80:6, 126:17-129:13, 248:19-249:3; Paras Dep. 8:21-9:7, 28:21-39:12, 72:10-14; Allison Dep. 112:24-122:17, 130:6-137:20, 166:11-167:1; Macchia Dep. 32:18-52:7; Macchia Dep. Ex. 2 (UPS 3218); G. Barr Dep. Ex. D (UPS 3684); G. Barr Dep. Ex. E, UPS 3686; G. Barr Dep. Ex. F & Pl. Ex. 9 (UPS 3688); Allison Dep. Ex. 3 (UPS 3483); Allison Dep. Ex. 4 (UPS 3484); Allison Dep. Ex. 6 (UPS 2617); Allison Dep. Ex. 7 (UPS 2497); Allison Dep. Ex. 8 (UPS 306), Pl. Ex. 3[3] (UPS 306); Allison Dep. Ex. 9 (UPS 4056), at UPS 4066-69, Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10, (UPS 3707); Allison Dep. Ex. 25 (UPS 3447), at UPS 3453; Interial Dep. Ex. 7 (UPS 3696); Interial Dep. Ex. 8 (UPS 3699); Def's SJ Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483 ("Required must be specific to the business need of the job and **is absolute. The applicant either has it or does not**."); Pl. Ex. 21, RTA Responses Nos. 7-22.) In light of Allison doing exactly the opposite of what she claimed in 2022 that Linda Nelson told her to do, which contradicted her explanation from 2019 (when she claimed Nelson offered different input, about two positions rather than one), a jury could easily conclude that Allison's various stories are lies, and a pretext for discrimination.

26.     On January 17, 2019, Allison interviewed three candidates for AHRM: Plaintiff, Mike Kish ("Kish"), and Angel Paras ("Paras"). All three candidates were Level 1 fits. Interial was present for the interviews. (*Id.*; Allison Dep. 76:9-13, 88:9-18; Interial Dep. 112:5-9.)

---

[3]     Plaintiff's Exhibit 3 includes the performance ratings for Paras and Maier through the end of 2018; the other information has been hidden.

**Response:** Plaintiff disputes that these meetings were interviews. Both Interial and Macchia told

Maier that she was meeting with Allison to discuss Maier's promotion to AHRM. (Maier Dep. 45:10-

46:1, 62:4-8, 62:21-22, 63:3-9, 65:7-17, 245:5-16; Pl. Ex. 26, Maier Dep.  Ex. 1 (MAIER 35), at

MAIER 35-36; Pl. Ex. 24, Maier Dep. Ex. 6 (MAIER 64); Pl. Ex. 24, (UPS 4396).) And the

circumstances surrounding the meetings disclaim the suggestion that these meetings were interviews.

(*See Pl. Resp. to SOF* 15-17, *supra*, and the evidence cited therein.)

On Thursday, January 17, 2019, Plaintiff showed up to work in the early morning hours to

work on the preload shift. (Maier Dep. 243:21-244:21; Macchia Dep. 75:11-17.) Around 11 a.m.,

after she had already worked a full day, she received an instant message from Chelsea Allison asking

if Maier had "time to talk" that day. (Maier Dep. 45:14-46:1; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35),

at Maier 35; Pl. Ex. 22, Stipulation; Pl. Ex. 1, Maier Decl. Pl. Ex. 1, ¶ 28.) Shortly thereafter, Maier

received a call from Ron Macchia, telling Maier she "was going to Addison to meet with Chelsea to

be promoted." (Maier Dep. 45:14-46:1, 62:4-8, 65:7-17; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at

Maier 35.) Maier expressed concerns to Macchia that she was dirty and disheveled after working the

presort shift from the early morning hours, and asked if she could have some time to freshen up, but

Macchia insisted that she go to Addison immediately. (Maier Dep. 62:17-23, 243:21-244:21.) At the

time she left her office and began driving to Addison, Maier did not know that anyone else would be

meeting with Allison—that information was shared with her only when she was already on her way.

(Maier Dep. 45:10-46:1, 62:21-64:3.) When she arrived at Addison, Maier waited and worked from

there for several hours. (Maier Dep. 64:14-22.) During that time, Interial instant messaged Maier and

told her "they were putting me last in the lineup because I was getting promoted [and] he didn't

want the other two supervisors to know this was the plan. He told me not to be nervous because

this job was mine." (Maier Dep. 65:7-17, 245:5-16; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35) at Maier

36; Pl. Ex. 22, Stipulation.)

Maier's understanding—that the decision had already been made to promote her—was, as discussed, consistent with the voluminous record, which demonstrates that, dating back to June 2018, UPS had decided that "Sara will replace Carlos as AHRM," after Frank Barre took VRP. (Barr Dep. 91:23-101:10; Allison Dep. 65:4-69:1, Interial Dep. 125:22-127:3;157:9-23; Rodriguez Dep. 22:14-23:6, 23:24-25:13; Barr Dep. Ex. D (UPS 3684); G. Barr Dep. Ex. E (UPS 3686); G. Barr Dep. Ex. F, Pl. Ex. 9 (UPS 3688); Barr Dep. Ex. L (UPS 3483); Barr Dep. Ex. M (UPS 3484); G. Barr Dep. Ex. N (UPS 3671); G. Barr Dep. Ex. O (UPS 3673); Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707); *See Pl. Resp. to SOF* 17, *supra*, and the evidence cited therein.)

Another strong indication that the January 17 meetings were not intended to be interviews is that they complied with none of the requirements or recommendations for interviews under UPS policy. UPS has extensive and formal policies and training materials for conducting interviews. (Pl. Ex. 25 (UPS 4590); Pl. Ex. 16 (UPS 4606); Pl. Ex. 15 (UPS 4478); Allison Dep. 43:1-51:1; Paras Dep. 48:10-58:18; Maier Dep. 245:18-246:19.) Allison, who testified she has done "hundreds of thousands" of interviews at UPS, is well aware of these policies.[4] (Allison Dep. 43:1-19.) UPS's interview policies and training materials specify the following:



---

[4] At his deposition, Interial bizarrely denied that UPS offers interview training, which is one of many aspects of his deposition testimony that could support a jury's conclusion that he is a dissembler. (Interial Dep. 26:16-21.)



In addition, Allison testified to her understanding that UPS policy requires "consistency" and "proper questions" and "consistency in the interviewing process across the candidates"; to take into account "whatever's available from a document perspective … before making a final decision"; to have "documents or notes" to evaluate the candidates; and to use UPS's "interview training so that you're appropriate in the questions you ask." (Allison Dep. 43:1-51:1.) Allison and Interial followed none of these guidelines in their discussions with Maier and Paras, demonstrating that they did not intend these meetings to be interviews at the time.

Plaintiff does not dispute that Kish and Paras were, at the time, considered "Level 1" fits for a potential promotion to AHRM, but neither had the sole required qualification to actually be promoted to the AHRM position—a bachelor's degree. (Maier Dep. 79:21-80:6, 126:17-129:13, 248:19-249:3; Allison Dep. 166:11-167:1; Paras Dep. 8:21-9:7, 28:21-39:12, 72:10-14; Def's SJ Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483 ("Required must be specific to the business need of the job and **is absolute. The applicant either has it or does not**.").)

Plaintiff does not dispute that Interial was present for the meetings, and that UPS has identified him as a decision-maker. (Allison Dep. Ex. 16 (UPS 3485).)

27.     Interial contacted the candidates' managers about setting up interviews. Kish was managed by Interial, Paras was managed by Nugent, and Plaintiff was managed by Macchia. (Interial Dep. 79:3-14.)

**Response:** Plaintiff disputes the first sentence of Statement No. 27. Allison contacted Maier directly to set up their meeting, via instant message, asking if Maier had time to "chat with her later." Shortly after, Macchia reached out to Maier to tell her she "was going to Addison to be promoted." (Maier Dep. 45:14-46:1; Pl. Ex. 1, Maier Decl. ¶ 28.)

Plaintiff disputes that the meetings on January 17 were intended to be interviews, for the reasons, and based on the evidence, described in Plaintiff's Response to Paragraph 26, above.[5]

28.     During the interviews, Allison asked each candidate to speak about themselves and whether they were prepared to take on additional responsibilities and travel if promoted. (Plf. Dep. 52:14-54:15; Allison Dep. 99:5-100:12, 103:5-106:8; Interial Dep. 92:24-93:4, 94:15-22, 165:3-6.)

**Response:** Disputed. Allison asked Maier, but not Paras, about whether she could handle long hours, late nights, and travel with her "small children." (Maier Dep. 70:5-72:23, 104:6-19; Allison Dep. 99:5-100:17, 103:21-104:15; Interial Dep. 88:12-89:14, 93:15-94:9; Paras Dep. 84:16-86:15;  Pl. Ex. 26,

---

[5]     Out of respect for the Court's time, and to avoid unnecessary waste of paper, Plaintiff incorporates her response to Paragraph 26 by reference, rather than copying and pasting the full response each time UPS's statement of fact refers to "interviews."

Maier Dep. Ex. 1 (MAIER 35) at MAIER 37-38; Paras Dep. Ex. 7 (Maier 149-50).) Maier responded

to Allison that she "already had been doing that," that she already "worked in the middle of the

night," that she already "worked long hours," and "already did the responsibilities of a manager and

that it wasn't going to be a problem." (Maier Dep. 70:5-19.) In contrast, Allison did not question or

express any concern about Paras's ability to handle the long hours required of a manager. (Paras

Dep. 86:8-12; Allison Dep. 100:4-12.) Allison cut off Maier's answers and refused to listen; in

contrast to Paras, whom Allison allowed to fully answer all of her questions. (Maier Dep. 68:14-23,

73:1-13; Paras Dep. 86:13-15; Allison Dep. 100:13-17; Pl. Ex. 26, Maier Dep. Ex. 1 (MAIER 35), at

MAIER 37.)

Plaintiff disputes that the meetings on January 17 were intended to be interviews, for the

reasons, and based on the evidence, described in Plaintiff's Response to Paragraph 26, above.


29.     Paras has four children, who he first mentioned to Allison when she met with her
new team, and then again during his interview. He brought up his family responsibilities in the
context of work-life balance during his interview. (Deposition of Angelito Paras ("Paras Dep.")
70:12-23, 84:16-21, 85:18-86:12, attached hereto as **Exhibit I**.)

**Response:** Plaintiff disputes that the meetings on January 17 were intended to be interviews, for

the reasons, and based on the evidence, described in Plaintiff's Response to Paragraph 26, above.

30.     During her interview, Plaintiff offered that she had two children and confirmed she
was prepared to take on additional responsibilities and travel. (Plf. Dep. 53:2-22, 70:5-19; Interial Dep.
93:15-94:2.)

**Response:** Plaintiff objects to the misleading and incomplete description of Plaintiff's testimony

regarding her January 17 meeting with Chelsea Allison.

At the beginning of the meeting with Allison and Interial, Maier responded to Allison's

invitation to discuss something "personal or professional" about herself, by talking "about my

children, how me and my husband were trying for a third but hadn't been successful yet." At that

point, Chelsea began questioning Maier about whether she could work "long hours, working in the

middle of the night" with her "small children." Maier responded to Allison that she "already had

been doing that," that she already "worked in the middle of the night," that she already "worked

long hours," and "already did the responsibilities of a manager and that it wasn't going to be a

problem." Maier attempted to discuss some of her many credentials and accomplishments,

including her expertise with Microsoft Access and her vast experience training and mentoring other

UPS personnel, but Allison cut off her answers. Maier perceived that, after she mentioned her

young children, Allison acted in "disingenuous" way that showed she "wasn't really listening to

what [Maier] said," making clear to Maier that "it didn't really matter what [Maier] said, and that

[Allison] had already made her mind up." ((Maier Dep. 45:10-46:1; 52:18-53:10, 62:4-64:3, 65:7-

72:23, 104:6-19, 245:5-16; Allison Dep. 103:4-104:15; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35)).) The

meeting took about 10 or 15 minutes. (Maier Dep. 51:8-15.)

Plaintiff disputes that the meetings on January 17 were intended to be interviews for the

reasons and based on the evidence described in Plaintiff's Response to Paragraph 26, above.

31.     Allison's perception of Plaintiff was that she seemed irritated that she had to
interview. (Allison Dep. 106:16-18.)

**Response:** Disputed. UPS, again, mischaracterizes the testimony. Allison testified simply in

response to a question about how Maier "physically presented" in the January 17 meeting that Maier

"seemed irritated"; the gloss that Maier seemed irritated "that she had to interview" was invented by

UPS's counsel. Plaintiff further objects that this is not a material fact for the purposes of summary

judgment. UPS has never contended that it made any decision based on how Plaintiff "physically

presented" at the January 17 meeting with Allison.

32.     After her interview, Plaintiff wrote in a text to Kish that Allison "knows nothing
and is obviously going to be a horrible hr manager" and "she's a joke." (Plf. Dep. Ex. 3, pp. 3-4.)

**Response:** Plaintiff objects that this is not a material fact for summary judgment or relevant to any

issue in the case. Further, Plaintiff objects that this statement of fact is designed to mislead the Court, by implying that Plaintiff sent this text to Kish *before she learned that her promotion had been rescinded and that Paras*—who lacked the sole required qualification for the position—had been promoted instead. A review of the entire text exchange confirms that Maier accused Allison of being a "horrible hr manager" only after she was told "I'm the right candidate just not right now but [sic] I seem to have a lot Going [sic] on in my life right now." The text exchange also refers to Maier's family "feel[ing] bad for her," that she "can't eat or sleep or stop crying," that "I have to keep going in and looking at those people," and that "today was a hard day to see Angel all smiles taking that promotion." Kish responds by agreeing with Maier, explaining that Paras "does not know nearly what we do," that he "cannot see himself asking for [Paras's] guidance," and asking "don't you think she would take degree first plus experience?" (Maier Dep. Ex. 3 (Maier 125).) The notion that summary judgment should be granted *in UPS's favor*, based on this frank and very understandable text exchange with Maier's co-worker, under the circumstances presented here, is ridiculous and offensive.

Plaintiff disputes that the meetings on January 17 were intended to be interviews, for the reasons, and based on the evidence, described in Plaintiff's Response to Paragraph 26, above.

33.     Plaintiff informed Interial that she thought she'd "bombed" her interview with Allison. (Plf. Dep. 73:14-19.)

**Response:** Plaintiff objects to UPS's misleading citation, which cuts off Maier's explanation for why she felt she "bombed": "It was because [Allison] kept interrupting me. And when I left that, quote, interview, I didn't have a good feeling. I didn't feel like she listened to me. She seemed very disingenuous like she didn't -- wasn't really listening to what I said. And I -- and I felt like when I left there, it didn't really matter what I said, and that she had already made her mind up." (Maier Dep. 73:1-19.)

In any event, Interial disagreed that Maier "bombed" the purported interview. He specifically told Maier: "[Y]ou did great during the interview, don't worry about the interview. It was fine." (Maier Dep. 103:5-9; Pl. Ex. 26, Maier Dep. Ex. 1 (MAIER 35), at MAIER 40.) When, on January 18, 2019, Interial explained why Paras had been selected as AHRM instead of Maier, Interial again told Maier "it wasn't the interview, that the interview was fine, that [Maier] was the right candidate," that "you're the best fit, [w]e all think you're the best fit" but that Paras had been selected because "Chelsea felt like [Maier] had a lot going on right now." (Maier Dep. 91:6-11; 105:8-107:19, 111:3-113:10; Macchia Dep. 100:22-101:19; Pl. Ex. 26, Maier Dep. Ex. 1 (MAIER 35), at MAIER 42-43; Pl. Ex. 23, Pl.'s supplemental rog responses, at No. 14.)

Plaintiff disputes that the meetings on January 17 were intended to be interviews, for the reasons, and based on the evidence, described in Plaintiff's Response to Paragraph 26, above.

34.     Plaintiff then spoke with Rodriguez, who told Plaintiff she had been identified as the recommended candidate, although Rodriguez did not actually know how the decision was being made. (Rodriguez Dep. 64:10-65:9.)

**Response:** Disputed. Maier was not merely the "recommended candidate." Rodriguez testified that Barre stated unequivocally that "Carlos would be replacing Frank and Sara would be replacing Carlos." (Rodriguez Dep. 22:14-23:6.) In reality, UPS had already decided to backfill Frank Barre's HR Operations Manager position with Carlos Interial; to backfill Interial's AHRM position with Sara Maier; and to backfill a supervisor position with Chlimoun. (Rodriguez Dep. 22:14-23:6, 23:24-25:13; *see Pl. Resp. to SOF* 17, *supra*, and the evidence cited therein.)

35.     Allison asked the AHRMs for their opinions. Macchia and Nugent said they would be fine with either Plaintiff or Paras being promoted, and Interial expressed a preference for Paras. (Interial Dep. 108:6-110:3, 110:23-111:2.)

**Response:** Disputed. Macchia advocated for Maier's promotion, as he had on several prior occasions, as she was the "number one candidate in [his] eyes." (Macchia Dep. 63:1-64:24, 67:18-68:4, 79:23-84:14, 86:16-87:2.) Nugent, the other AHRM at the time, had no input on the decision

36

and told Maier she was the better candidate. (Pl. Ex. 1, Maier Decl. ¶ 34; Pl. Ex. 26, Maier Dep. Ex. 1 (MAIER 35), at MAIER 42-43; Pl. Ex. 23, Pl.'s supplemental rog responses, at No. 14.)

Further, Allison herself testified to a version of facts that conflicts with both Interial and Macchia's sworn testimony. Unlike Interial, who asserted that Macchia and Nugent were indifferent, and Macchia, who testified that he advocated for Maier's promotion, Allison testified that UPS made the decision "collectively," based on Nugent and Macchia's "verbal feedback" and "based on the advice of … the team in Illinois," and that the "team," including Nugent and Macchia, reached "full agreement" and "consensus" on the decision to promote Paras instead of Maier. (Allison Dep. 111:23-112:14, 145:18-147:11, 245:19-246:9.) UPS's refusal to cite Allison's testimony on this critical point, regarding how the decision to promote Paras was made, speaks volumes: a jury could (and likely would) conclude that Allison's testimony—which squarely contradicts that of other UPS witnesses—is a lie, a pretext for discrimination.

Further, UPS's current story contradicts what it represented to the EEOC, when it asserted that, on a "brief conference call" with Allison, Interial, and the AHRMs, "Ms. Allison expressed to the group that, based on the interviews she conducted, she believed that Mr. Paras was the better candidate for the position, and the others agreed." (Allison Dep. Ex. 13, at UPS 36.) Once again, UPS is asking the Court to enter summary judgment in its favor based on facts that its witnesses and agents can't even agree upon.

36.     Interial and Allison agreed that Paras' interview performance was better, and Allison selected Paras for promotion to AHRM. They articulated the decision as follows:

After completing all three interviews, Angel Paras seemed to be the best choice to become the next AHRM. Angel was calm and collected during the interview. Angel did a good job of conveying his drive to succeed and to also train and educate his workforce to be able to take the next steps within the company. Angel was not content with the status quo, while at the same time communicating that sometimes failure is required to improve oneself. Angel is scheduled to complete his Bachelors' Degree in Business Administration in May of 2019. Angel is dedicated to self-improvement and is open to constructive criticism. All of these attributes will be required to in the AHRM role.

(Allison Dep. Ex. 17, p. 2; Interial Dep. Exs. 11-12; Interial Dep. 113:22-114:10; 145:18-146:1.)

**Response:** Disputed. This was not, and conflicts with, UPS's initial articulation of its decision. Initially, Interial told Maier "it wasn't the interview, that the interview was fine," that Maier "was the right candidate," that "you're the best fit, [w]e all think you're the best fit" but that Paras had been selected because "Chelsea felt like [Maier] had a lot going on right now." (Maier Dep. 91:6-11; 105:8-107:19, 111:3-113:10; Pl. Ex. 26, Maier Dep. Ex. 1 (MAIER 35), at MAIER 42-43; Pl. Ex. 23, Pl.'s supplemental rog responses, at No. 14.) Upon hearing this explanation of UPS's decision, Maier immediately challenged Interial's explanation and complained that UPS had discriminated against her based on her sex, by promoting an unqualified man (who also had young children) instead of her. (Maier Dep. 111:6-112:24; 133:22-134:3; Pl. Ex. 26, Maier Dep. Ex. 1 (MAIER 35), at MAIER 42-43; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14.)

Subsequently, on January 23, 2019, at 8:30 a.m., Allison received an automated email connected with UPS's People Tracker system, instructing her that "[a]s a result of recent placement meetings after the … VRP, some people throughout the organization will be changing positions. You should begin having discussions with those individuals in your area who will have a change of some kind." The email listed Maier's name, along with Chlimoun—who, like Maier, had long been slated to receive a promotion as a result of the VRP. (Allison Dep. Ex. 17 (UPS 3487); *see also See Pl. Resp. to SOF* 17, *supra*, and the evidence cited therein.)) The next afternoon, Interial emailed Allison with the first of several iterations of UPS's post-hoc attempt to justify choosing Paras over Maier, writing "I think this will give us a good start…" (Interial Dep. Ex. 11 (UPS 3766); Interial Dep. Ex. 12 (UPS 3677).) This initial narrative repeatedly referred to the fact that Maier had been recommended to fill the AHRM role, something that both Interial and Allison implausibly denied being aware of at their 2022 depositions, and something that a jury could easily conclude that Interial and Allison were lying about. (Allison Dep. 79:1-83:9, Interial Dep. 112:19-116:9; Interial Dep. Ex. 12 (UPS 3677).)

Subsequently, Allison emailed Tamara Caldwell an explanation of the situation that incorporated, and expanded upon, what Interial had sent her, and added another reference to her predecessors' recommendation that Maier be promoted to AHRM. (Allison Dep. Ex. 16 (UPS 3485).) This version included a statement that "Carlos and I determined the best fit for the position should be Angel Paras, not Sara Maier, as originally suggested from the previous director." (Allison Dep. Ex. 16 (UPS 3485).) Caldwell responded, emphasizing that the "outgoing DHRM made a recommendation," suggesting changes to the email, proposing that senior HR executives Marge Niedbalski and Jon Robertson be informed of the situation, and adding that the email should mention that "Sara remains a valid candidate for future opportunities." (Allison Dep. Ex. 17 (UPS 3487).) Before sending the email to UPS's senior HR executives two days later, Allison made further changes and alterations to the purported explanation for the decision. She added a section with a different version of Linda Nelson's purported instructions to her, identified herself as the decision-maker after previously asserting it was a joint decision of hers and Interial's, and added three sentences about Paras's fluency in 3 languages, desire to work for UPS internationally, and his aspirations to "give back to" Guam by working for UPS there—which Allison claimed were "all" required" in the "AHRM role." (Allison Dep. Ex. 5 (UPS 3490), at 3491-92.)

Substantively, the explanation of the decision in these emails contains no legitimate business justification for setting aside the decision to promote Maier in favor of her objectively unqualified and less successful male counterpart. In fact, the explanation contains numerous provable lies. First, Paras was not "scheduled to complete his bachelor's degree . . . in May of 2019." Paras testified that, at the time he met with Allison and Interial, he had more than 20 classes left to obtain his bachelor's degree, had a planned graduation date of 2023, and told Allison and Interial merely that he "was in school." (As of his deposition, he still had not received his bachelor's degree because of the "juggle between work and the kids' activities, just laziness on my end sometimes" but has been employed as a manager

at UPS ever since his promotion to AHRM in January 2019.).) (Paras Dep. 5:1-2, 8:21-23, 72:10-14, 85:10-17, 90:7-17, 123:14-16.) Contrary to the statement that Paras was "cool and collected," Paras acknowledged that he was nervous and that Allison and Interial would have noticed him shaking his leg. (Paras Dep. 83:1-19.) Similarly, UPS's reliance on Paras's purported ability "train and educate his workforce to be able to take the next steps within the company" as a justification for his promotion over Maier is particularly inappropriate when an undisputed strength of Maier's performance as HR supervisor was her leadership in developing talent that worked for her and ensuring their promotions to higher level positions. In fact, Paras himself—as well as Mike Kish, the other man who met with Allison—who reported to Maier for years after his earlier demotion, and then was promoted based on the skills she developed, was himself a beneficiary of Maier's success "train[ing] and educat[ing] [her] workforce to be able to take the next steps within the company. (Ex. 1, Maier Decl. ¶¶ 8, 13; Maier Dep. 100:17-101:3; Allison Dep. 192:5-20; Paras Dep. 5:11-17:10, UPS Ex. I; Allison Dep. Ex. 23 (UPS 3444).) Further, Allison's claim that the pablum mentioned in her emails—including Paras's fluency in 3 languages, desire to work for UPS internationally, and wanting to "give back to Guam"— were "all" "required" in the "AHRM role," was completely false, as Allison knew at the time she wrote the emails. In reality, the sole requirement for the AHRM position at UPS was a bachelor's degree, something UPS knew at the time that Maier possessed and Paras didn't. (Allison Dep. 116:21-117:4, 166:11-167:1; 171:15-173:19; Interial Dep. 104:16-21, 117:3-6; Paras Dep. 72:15-73:4 Maier Dep. 79:21-80:6, 126:17-129:13, 248:19-249:3; Allison Dep. Ex. 5 (UPS 3490), at 3491-92; Interial Dep. Ex. 9 (UPS 3708); Interial Dep. Ex. 10 (UPS 3709); Def. Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483 ("Required must be specific to the business need of the job and **is absolute. The applicant either has it or does not**.").)

     37.     Allison later added for "color" that Paras is fluent in three languages and was applying for management positions at UPS internationally. (Allison Dep. Ex. 5, p. 2; Allison Dep. 172:1-12.)

**Response:** Disputed. UPS mischaracterizes the nature and extent of the changes Allison made to her email. Allison made several major changes to her email purporting to justify why Maier's promotion should be rescinded and given to Paras instead, between her January 25 email to Tamara Caldwell in UPS's transformation office (Allison Dep. 162:18-163:15; Allison Dep Ex. 16 (UPS 3485)), and her January 28 email to her direct and dotted line supervisors Marge Niedbalski and Jon Robertson (Allison Dep. 79:20-84:23; Allison Dep. Ex. 5 (UPS 3490).) Specifically, in attempting to convince her superiors to rescind Maier's promotion in favor of Paras, Allison added three sentences describing attributes Paras possessed that she asserted were "required" for the "AHRM role": "Angel was currently applying for Manager positions within UPS Internationally and within the Country as well. Angel is fluent in 3 languages. Angel has aspirations to eventually 'give back' to community of Guam by becoming an HR Leader in the territory." (Allison Dep. Ex. 5 (UPS 3490).) Allison knew that, contrary to what she wrote in her email, these were not actually requirements for the AHRM position, and that the only requirement was a bachelor's degree, which Maier possessed and Paras lacked. (Allison Dep. 116:21-117:4, 166:11-167:1; 171:15-173:19; Interial Dep. 104:16-21, 117:3-6; Paras Dep. 72:15-73:4 Maier Dep. 79:21-80:6, 126:17-129:13, 248:19-249:3; Allison Dep. Ex. 5 (UPS 3490), at 3491-92; Interial Dep. Ex. 9 (UPS 3708); Interial Dep. Ex. 10 (UPS 3709); Def. Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483 ("Required must be specific to the business need of the job and **is absolute. The applicant either has it or does not**.").) Allison also added other information in her email to Niedbalski and Robertson, including a specific statement demonstrating her awareness that the "outgoing DHRM" Greg Barr, recommended Maier for the AHRM position. (Allison Dep. Ex. 5 (UPS 3490), at 3492.) Allison also added a new, and different, version of Linda Nelson's purported instructions to her. (Allison Dep. Ex. 5 (UPS 3490), at 3492.) Further, Allison's email included a specific request that her superiors update UPS's "People Tracker" system to remove Maier's name as AHRM and substitute

Paras instead, demonstrating that Allison's purpose in adding this information was not for "color," but instead to convince her superiors to let her reverse the decision to promote Maier and instead promote Paras. (Allison Dep. Ex. 5 (UPS 3490), at 3492.)

38.     Like Plaintiff, Paras was an HR Supervisor who had previously been identified as "Level 1 fit" for promotion to AHRM. (Barr Dep. Ex. C, Barr Dep. 57:14-58:19; Interial Dep. 33:20-34:4.)

**Response:** Undisputed.

39.     Paras had worked for UPS since 2002 in various roles, including HR Interviewer, HR Recruiter, District Employment Services Specialist, HR Specialist, as well as Preload Supervisor, Supervisor Driver, and Hub Supervisor. (Paras' Employee History Profile, attached hereto as **Exhibit I**.)

**Response:** Plaintiff disputes the implication that his employment at UPS was always on an upward trajectory; as Paras acknowledged at his deposition, and UPS's offered exhibit confirms, Paras was demoted from HR specialist to part-time supervisor. (Paras Dep. 15:7-13, UPS Ex. I.)

40.     After learning she was not selected for the AHRM position, Plaintiff questioned the decision to Macchia, noting that Paras does not have a Bachelor's degree, while she does. (Macchia Dep. at 85:17-88:13.)

**Response:** Plaintiff notes that this statement is obviously not a complete description of her discussions with Macchia on the matter—*see* Pl. Statement of Additional Facts ¶¶ 26, 29, and the evidence cited therein and Pl.'s Response to Paragraph 43, below—but does not dispute the truth of this statement.

41.     Although a degree is generally preferred, it was not listed as a requirement on the requisition to fill the AHRM position and is only a suggested requirement for the position. (Barre Dep. 20:20-23:23, 25:10-16; Macchia Dep. 29:2-7; Barr Dep. 42:4-43:12; Rodriguez Dep. Ex. 7; AHRM Job Description, attached hereto as **Exhibit J**, a p. 3 (fine print at bottom)).

**Response:** Plaintiff disputes this offensive and outrageous statement, which directly contradicts the

documentary evidence cited in support of it and the testimony of Allison, whom UPS asserts was the primary decision-maker in the case. The AHRM job description says in plain English "Bachelors Degree – required – required." (Def. Ex. J, at UPS 4256.) Notably, the job description itself contains a different, "preferred," qualification, contradicting UPS's absurd argument that the Court should hold as a matter of law that "required" means "preferred" and grant UPS summary judgment on that basis. (Def. Ex. J, at UPS 4256.) Further, contrary to UPS's assertion, the purported "fine print" says nothing about "required" meaning anything other than "required." As UPS's interviewer training policy—which Allison testified she reviewed numerous times—makes clear, a "required" qualification "is absolute." The applicant either has it or does not." The same document emphasizes that an interviewer "need[s]" to "keep in mind" the relevant "qualifications" such as a "specific degree" and requires interviewers "to distinguish between 'preferred' versus 'required' educational requirements." (Allison Dep. 44:20-46:5; Pl. Ex. 15, (UPS 4478), at UPS 4481, 4484; Pl. Ex. 16 (UPS 4606) (Slide 1: "Job Posting or other job specific requirements — Does the person meet the basic and preferred qualifications for the position?"). In any event, Allison testified directly that a bachelor's degree was a requirement for the AHRM position and made clear her understanding that "required" means "required," not whatever UPS's counsel wants that word to mean. (Allison Dep. 166:11-167:1; Maier Dep. 79:21-80:6, 126:17-129:13, 248:19-249:3.)

This statement of "fact," like many others propounded by UPS, is an outrage; a waste of the Court's time; disrespectful to the plaintiff and the bar; and justifies summary denial of UPS's motion, which should never have been filed. *See Malin,* 762 F.3d at 564-65.

42.    Paras had an Associate's degree and was working toward his Bachelor's degree at the time of his interview. Allison and Interial believed he was close to completing it. (Paras Dep. 8:21-23, 72:4-14; Allison Dep. Ex. 17, p. 2; Interial Dep. 104:16-105:3.)

**Response:** Disputed. Plaintiff objects to UPS's use of Allison Dep. Ex. 17 to prove the truth of Allison's purported belief that Paras was "close to completing" his degree, as that document is

hearsay for which no exception is applicable, if offered by UPS. Paras testified clearly and frankly

that he was nowhere close to getting his degree when he met with Allison and Interial, and certainly

was not "scheduled to complete his bachelor's degree . . . in May of 2019." Paras testified that, at

the time he met with Allison and Interial, he had more than 20 classes left to obtain his bachelor's

degree, had a planned graduation date of 2023, and told Allison and Interial merely that he "was in

school." As of his deposition in 2022, Paras still had not received his bachelor's degree because of

the "juggle between work and the kids' activities, just laziness on my end sometimes" but has been

employed as a manager at UPS ever since his promotion to AHRM in January 2019.).) (Paras Dep.

5:1-2, 8:21-23, 72:10-14, 85:10-17, 90:7-17, 123:14-16.) A reasonable jury could, and likely would,

conclude that Allison's statement to her superiors that Paras was "scheduled to complete" his

bachelor's degree of May 2019—when Paras had more than 20 classes remaining, and a scheduled

graduation date four years later—was just another unbelievable lie, in a series of unbelievable lies.

(Allison Dep. Ex. 5 (UPS 3490.)

Plaintiff again disputes that the meetings on January 17 were intended to be interviews, for

the reasons, and based on the evidence, described in Plaintiff's Response to Paragraph 26, above.

43.     When Plaintiff spoke with Macchia, she also asked him if she was not selected for
the AHRM position because she has children. (Plf. Dep. 103:21-104:7.)

**Response:** Disputed. Plaintiff objects to UPS's tactic of cutting off Maier's testimony mid-answer,

in hopes of avoiding the portion of the answer where Plaintiff references the fact that she

complained to Macchia about being passed over for the position because she is a woman. (Maier

Dep. 103:21-105:3.) At her deposition, Maier emphasized that she was positive that, in speaking

with Macchia and Interial immediately after UPS chose Paras over her for the AHRM position, she

complained that she was passed over because she was a woman. (Maier Dep. 133:24-134:23.)

44.     Plaintiff feels Allison interrupted her during her interview after she mentioned
having children, and Plaintiff perceived that as "going into the stereotype" of a woman being a

"primary caregiver." (Plf. Dep. 103:21-104:19.)

**Response:** Plaintiff disputes that she merely "felt" that Allison was interrupting her after she mentioned her young children during the meeting on January 17; rather, Allison actually did repeatedly interrupt her and cut off her answers. Plaintiff disputes that her belief that Allison acted based on stereotypes is solely based on Allison's repeated interruptions during their short meeting. Rather, Allison asked only her—not a Paras, a similarly situated (although objectively unqualified) man with young children and loads of family and non-UPS responsibilities—about whether she could work "long hours, working in the middle of the night" with her "small children." (Maier Dep. 68:14-23, 70:5-72:23, 73:1-19, 104:6-19; Pl. Ex. 26, Maier Dep. Ex. 1 (MAIER 35).) In contrast, Paras—who also had young children and discussed his family responsibilities and outside activities when meeting with Allison and Interial—was not asked whether about whether he could handle the schedule of a manager with small children at home. (Maier Dep. Ex. 2 (Maier 149-50); Maier Dep. 84:11-86:14; Paras Dep. 85:18-86:15, 92:17-96:6; Paras Dep. Ex. 7 (Maier 149-50).) Further, UPS's initial articulation of the decision to promote Paras was simply that Maier had "too much going on" to be promoted to AHRM, which strongly supports Maier's position that UPS based its decision on stereotypes about a woman's caregiving responsibilities, versus a man's. (Maier Dep. 91:6-11, 106:12-107:6, 111:6-112:24, 111:6-112:24, Pl. Ex. 26, Maier Dep. Ex. 1 (MAIER 35); Maier Dep. Ex. 3 (Maier 125), at 126.) Finally, Plaintiff emphasizes that all of the evidence she has amassed about UPS reversing its long-standing decision to promote her; the fact that she, and not Paras, satisfied the only required qualifications for the AHRM position; the mass of evidence that she was the most qualified candidate for the AHRM role, based on any possible criteria; and other evidence, all supports her belief that UPS discriminated against her in awarding the promotion to Paras, instead of her. (*See generally* Plaintiff's Statement of Additional Facts.)

Plaintiff again disputes that the meetings on January 17 were intended to be interviews, for

the reasons, and based on the evidence, described in Plaintiff's Response to Paragraph 26, above.

45. In March 2020, Plaintiff met with Interial and Macchia to discuss the promotion decision. Interial, who had been present for the interviews, told Plaintiff she would continue to be a candidate for promotion. (Plf. Dep. 114:13-18; Interial Dep. 140:13-141:8.)

**Response:** The meeting occurred in March 2019, not March 2020. (Interial Dep. Ex. 18 (UPS 1092).) Maier did much more than "discuss the promotion" at this meeting; as both Interial and Macchia acknowledged, Maier complained at the March 2019 meeting that the promotion decision was discriminatory. (Interial Dep. 146:20-147:4, 147:18-21; Macchia Dep. 89:23-90:10; 102:21-103:14).

Plaintiff again disputes that the meetings on January 17 were intended to be interviews, for the reasons, and based on the evidence, described in Plaintiff's Response to Paragraph 26, above.

Plaintiff does not dispute that Interial told her that she would continue to be a candidate for promotion.

46. Interial also told Plaintiff he had a similar experience where he expected to be promoted but was not due to a consolidation. (Plf. Dep. 130:4-17; Interial Dep. 51:1-9, 122:22-123:2.)

**Response:** Plaintiff does not dispute that Interial complained about a situation where he didn't receive a promotion, but disputes that Interial's situation was a "similar experience" to Maier's. Not being promoted "due to a consolidation" is a different experience in kind, from being a woman who has a promotion stripped from her—in favor of an unqualified man who also has young children—because she is told she has "too much going on right now" to be promoted. (Allison Dep. 116:21-117:4, 166:11-167:1; Interial Dep. 104:16-21; Maier Dep. 79:21-80:6, 91:6-11, 106:12-107:6, 111:6-112:24, 111:6-112:24, 126:17-129:13, 248:19-249:3; Interial Dep. Ex. 9 (UPS 3708); Interial Dep. Ex. 10 (UPS 3709); Pl. Ex. 26, Maier Dep. Ex. 1 (MAIER 35); Maier Dep. Ex. 3 (Maier 125), at 126; Def. Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483 ("Required must be specific to the business need of the job and **is absolute. The applicant either has it or does not**.").)

47.     During this conversation, Plaintiff noted again that Paras did not have a Bachelor's degree, mentioned the extra assignments she had been given, questioned how Allison could make her decision based on one conversation, and suggested she was not promoted because she was a woman with children. (Interial Dep. 146:20-147:21, 149:6-21; Macchia Dep. 95:17-96:13, 97:23-98:13.)

**Response:** Plaintiff does not dispute that these issues were discussed, but disputes that this is a fair or comprehensive summary of what was discussed at the March 2019 meeting. At the meeting, Maier complained that the decision to promote Paras over her was discriminatory, which Interial characterized as "venting." (Maier Dep. 114:24-133:1; Interial Dep. 146:20-147:4, 147:18-21; Macchia Dep. 89:23-90:10; 102:21-103:14; Pl. Ex. 24, Maier Dep. Ex. 4 (MAIER 64), at MAIER_65-67; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14.) Among other things, Interial told Maier that she should have been more "proactive" in explaining at the January 17 meeting about why her kids would not present a problem with her schedule and Maier responded by noting that she was asked those questions but Paras wasn't. (Maier Dep. 120:14-121:8; Pl. Ex. 24, Maier Dep. Ex. 4 (MAIER 64), at MAIER 65, 69; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14; Paras Dep. Ex. 7 (Maier 149-50).) Interial stated that he had no negative comments about Maier's work, that he was "shocked" Maier wasn't promoted, and reiterated that he believed that Maier was the best candidate. (Interial Dep. 146:7-12; Macchia Dep. 99:13-16; Pl. Ex. 24, Maier Dep. Ex. 4 (MAIER 64), at MAIER 67; Pl. Ex. 1, Maier Decl. ¶ 30.) Interial stated that if another AHRM position came available that Maier would "be the next pick." (Pl. Ex. 24, Maier Dep. Ex. 4 (MAIER 64), at MAIER 67.)

48.     Plaintiff believes it was a "horrible decision" for Allison to base her decision on the interview, instead of listening to other managers' opinions and "do[ing] her research and look[ing] at performance reviews." (Plf. Dep. 47:21-48:21, 91:6-92:14, 93:9-14.)

**Response:** Plaintiff objects to UPS's improper practice of "selectively quoting deposition language it likes and ignoring deposition language it does not like," that it employs throughout its summary judgment submissions. *Malin*, 762 F.3d at 564. Plaintiff objects that Plaintiff's "subjective beliefs"

about the reasons for the decisions at issue are not material for purposes of summary judgment; a jury must decide based on the evidence of record, not simply the information within plaintiff's personal knowledge, whether UPS discriminated or retaliated against Maier. *See id.* Plaintiff objects to UPS's repeated and improper use of deposition testimony based on objected-to hypothetical questions. (Maier Dep. 47:21-48:21.) Plaintiff objects to UPS's practice of misleadingly citing deposition snippets, to avoid citing testimony that contradicts the conclusion UPS wants the Court to draw. (*See, e.g.*, Maier Dep. 48:22-49:5).

Maier sat for a full day deposition and testified candidly and extensively on the issues she has personal knowledge about; she explained at length the reasons for her subjective, lay-person's belief that UPS had discriminated against her. (*See* Maier Dep. 40:3-40:24, 48:22-49:9, 103:21-104:24, 133:22-134:23, 200:3-12.) In addition, her counsel took seven depositions and amassed a documentary record of thousands of pages, much of which is now before the Court. As exhaustively demonstrated throughout her Rule 56.1 submissions, Plaintiff, through her counsel, has amassed a wide array of evidence from which a jury could conclude that UPS discriminated or retaliated against her. *See generally*, Plaintiff's Statement of Additional Facts.

49.    Plaintiff testified that if anyone concluded Paras was the best candidate for AHRM "they're either lying or they didn't do their research or homework." (Plf. Dep. 79:6-19.)

**Response:** Plaintiff objects to UPS's improper practice of "selectively quoting deposition language it likes and ignoring deposition language it does not like," that it employs throughout its summary judgment submissions. *Malin*, 762 F.3d at 564. Plaintiff objects that Plaintiff's "subjective beliefs" about the reasons for the decisions at issue are not material for purposes of summary judgment; a jury must decide based on the evidence of record, not simply the information within plaintiff's personal knowledge, whether UPS discriminated or retaliated against Maier. *See id.* Plaintiff objects to UPS's use of an answer to an objected-to hypothetical question.

Maier sat for a full day deposition and testified candidly and extensively on the issues she has personal knowledge about; she explained at length the reasons for her subjective, lay-person's belief that UPS had discriminated against her. (*See* Maier Dep. 40:3-40:24, 48:22-49:9, 103:21-104:24, 133:22-134:23, 200:3-12.) Maier also specifically, and at length, testified as to the basis for her subjective belief that UPS's managers were lying—including in the testimony immediately preceding and following her answer to the hypothetical question UPS asked her that UPS highlights in this particular snippet. (Maier Dep. 75:5-82:22, 93:17-94:15, 121:9-122:8, 124:6-124:17, 137:9-22.)  In addition, Maier's counsel took seven depositions and amassed a documentary record of thousands of pages, much of which is now before the Court. As exhaustively demonstrated throughout her Rule 56.1 submissions, Maier, through her counsel, has amassed a wide array of evidence from which a jury could conclude that UPS discriminated or retaliated against Maier, and that UPS's decision-makers were lying. *See generally*, Plaintiff's Statement of Additional Facts.

50.     Plaintiff testified that "[Allison] didn't do her homework. And if she would have, I know for sure she would have picked me." Plaintiff believes any other decision would make Allison a "horrible manager" and "a joke." (Plf. Dep. 94:17-96:8.)

**Response:** Plaintiff objects to UPS's improper practice of "selectively quoting deposition language it likes and ignoring deposition language it does not like," that it employs throughout its summary judgment submissions. *Malin*, 762 F.3d at 564. Plaintiff objects that Plaintiff's "subjective beliefs" about the reasons for the decisions at issue are not material for purposes of summary judgment; a jury must decide based on the evidence of record, not simply the information within plaintiff's personal knowledge, whether UPS discriminated or retaliated against Maier. *See id.* Plaintiff objects that Maier's subjective beliefs about why Allison "was going to be a horrible manager"—which was the question UPS asked and Maier was answering—is irrelevant and immaterial to any possible issue in this case. Plaintiff objects to UPS's using Maier's testimony in response to a question about why Maier believed Allison "was going to be a horrible manager," make arguments about the basis

for Maier's discrimination and retaliation claims.

Maier sat for a full day deposition and testified candidly and extensively on the issues she has personal knowledge about; she explained at length the reasons for her subjective, lay-person's belief that UPS had discriminated against her. (*See* Maier Dep. 40:3-40:24, 48:22-49:9, 103:21-104:24, 133:22-134:23, 200:3-12.) Maier also specifically, and at length, testified as to the basis for her subjective belief that UPS's managers were lying—including in the testimony immediately preceding her answer to the question UPS asked her about why Allison was a horrible manager that UPS highlights in this particular snippet. (Maier Dep. 75:5-82:22, 93:17-94:15, 121:9-122:8, 124:6-124:17, 137:9-22.) In addition, her counsel took seven depositions and amassed a documentary record of thousands of pages, much of which is now before the Court. As exhaustively demonstrated throughout her Rule 56.1 submissions, Maier, through her counsel, has amassed a wide array of evidence from which a jury could conclude that UPS discriminated or retaliated against Maier, and that UPS's decision-makers were lying. *See generally*, Plaintiff's Statement of Additional Facts.

51.     Plaintiff does not know what criteria Allision used for her decision, but Plaintiff believes she was the only candidate qualified for AHRM because she was the only candidate with a Bachelor's degree and she believes the degree was the "only requirement" for the position. (Plf. Dep. 79:21-80:6.)

**Response:** Plaintiff objects that her "subjective beliefs" about the criteria Allison used for her decision are not material for purposes of summary judgment; a jury must decide based on the evidence of record, not simply the information within plaintiff's personal knowledge, whether UPS discriminated or retaliated against Maier. *See Malin*, 762 F.3d at 564. The reality (not Plaintiff's mere "belie[f]", *as admitted by Allison at her deposition*, is that the only requirement for the AHRM position was a bachelor's degree, and that Maier was the only candidate who possessed that credential. (Allison Dep. 116:21-117:4, 166:11-167:1; Interial Dep. 104:16-21; Maier Dep. 79:21-80:6, 126:17-

129:13, 248:19-249:3; Interial Dep. Ex. 9 (UPS 3708); Interial Dep. Ex. 10 (UPS 3709); Def. Ex. J, at UPS 4256; Pl. Ex. 15 (UPS 4478), at UPS 4483 ("Required must be specific to the business need of the job and **is absolute. The applicant either has it or does not**.").)

52.     Plaintiff contends that Allison, and no one else at UPS, discriminated against her. (Plf. Dep. 40:10-14.)

**Response:** Disputed. In the cited deposition testimony, Plaintiff accuses Chelsea Allison, Carlos Interial, and Ron Macchia of discriminating against her. (Maier Dep. 40:10-12.)

Again, it is an outrage that UPS is seeking summary judgment by misrepresenting Maier's straightforward deposition testimony and hoping that neither the opposing party, nor the Court, will take the time to review a four-line snippet of deposition testimony. *Malin*, 762 F.3d at 564.

53.     Plaintiff never attempted to speak with Allison about her decision. (Plf. Dep. 113:24-114:7.)

**Response:** Plaintiff objects to this statement on grounds of relevance and materiality. UPS had an "open door" policy: when an employee feels they have been discriminated against, they may go to their manager or supervisor or any human resources manager to discuss their concern. (Allison Dep. 21:1-22:12; Paras Dep. 63:1-10; F. Barre Dep. 43:8-12; G. Barr Dep. 19:1-23; Macchia Dep. Ex. 8 (UPS 216) ("If you believe you have been the subject of discrimination or harassment, or if you are aware of a situation that could constitute discrimination or harassment, immediately notify your supervisor, a Human Resources manager, or call the UPS help line. The matter will be investigated in a confidential manner."). Both as a matter of UPS policy, and common sense, Maier had no responsibility or reason to confront Allison directly about the decision to promote Paras over her. (Maier Dep. 113:15-114:12.)

54.     At about the same time that Plaintiff was not selected for the AHRM position, Interial decided to balance the workloads of HR Supervisors between the small Bedford Park facility where Plaintiff had been working (where she was one of two HR Supervisors) with that of a larger facility (Jefferson Street) that had only one HR Supervisor. (Interial Dep. 150:21-152:8; Macchia Dep.

118:18-121:2; Plf. Dep. 147:18-148:9, 149:19-23; Plf. Dep. 203:5-204:10; Plf. Dep. Ex. 10, p. 18 at Nov. 21, 2019, 2:20-2:21 PM.)

**Response:** Disputed.

UPS's witnesses offered conflicting testimony on the basic fact of who made the decision to transfer Maier to Jefferson Street, and, in fact, Interial himself made contradictory statements at his deposition. Interial initially asserted that the decision was "mainly" his, but later reversed himself and said that Macchia was the actual decision-maker with respect to Maier herself being transferred to Jefferson Street. (Interial Dep. 150:19-151:3, 153:16-156:5.) Macchia pointed the finger at Interial and said the decision was entirely his. (Macchia Dep. 118:18-129:9.) Allison acknowledged that she was involved along with Interial and Macchia but asserted that Interial was the decision-maker. (Allison Dep. 179:10-180:8.) A jury could easily conclude from UPS's managers' contradictory stories and finger-pointing about more than tripling the commute of its seven-month pregnant employee, who accused them of sex discrimination, and sending her to the only office they knew she did not want to work in, located in a trailer without a bathroom, running water, a private lactation accommodation within close proximity to her work space, or adequate furniture, that they are lying to cover up their retaliatory purposes. (Maier Dep. 103:21-105:3, 111:6-112:24, 133:24-134:23, 137:9-138:8, 150:2-156:21, 165:13-17; Macchia Dep. 118:18-129:9; Interial Dep. 146:20-147:4, 147:18-21, 149:6-150:9; Pl. Ex. 23, Pl.'s supplemental rog responses, at No. 14; Pl. Ex. 11, (UPS 3822, 3823, 3824, 3834); Pl. Ex. 1, Maier Decl. ¶¶ 35, 40, 46.)

Further, UPS's witnesses offered conflicting testimony as to the reasons for Maier's transfer to Jefferson Street. Interial testified that Maier was transferred to rebalance the workload among the HR supervisors, with the effect of taking work off Angel Paras's plate, but Macchia testified that Maier was sent to Jefferson Street because it was a "challenging building" and she was such a good supervisor— which was generally consistent with Maier's testimony that Macchia told her she was being sent to Jefferson Street to develop a poor-performing male HR representative. (Interial Dep. 151:4-153:15; Macchia Dep.

119:5-121:17; Maier Dep. 149:7-150:3, 151:1-3.) (Also, it takes real chutzpah to assert, as UPS does, that Maier's fantastic work as a supervisor and unique ability to "train and educate [her] workforce," *cf.* Allison Dep. Ex. 5 (UPS 3490), justified more than tripling her commute and shipping her, seven months pregnant, to a trailer that lacked running water or adequate furniture or a private office for breast pumping, but twice refusing to promote her to a manager position to which she had been selected for, and for which she met the only required qualification for and was a Level 1 fit.)

Further, as both Interial and Macchia acknowledged at their depositions, there is zero paper record or support for the notion that there was actually a problem with the "workload balance" among HR supervisors, or any record of why Maier—rather than her colleague Lynette Baker—was chosen to go to Jefferson Street, where UPS's managers knew she didn't want to be. (Macchia Dep. 118:8-121:24, 124:23-128:16; Interial Dep. 152:20-153:15; Maier Dep. 103:21-105:3, 111:6-112:24, 133:24-134:23, 137:9-138:8, 150:2-156:21, 165:13-17.) For the entirety of Maier's lengthy memory as an HR supervisor, UPS always had one HR supervisor at Jefferson Street until Maier was transferred there while seven months pregnant, after internally complaining of discrimination. (Pl. Ex. 1, Maier Decl. ¶ 41.) UPS has cited no evidence that this purported "rebalancing" affected any HR supervisors other than Maier. (Macchia Dep. 122:13-124:15[6].)

Further undermining UPS's contention that Maier's transfer to Jefferson Street was made for efficiency purposes is the fact that the remaining HR supervisor at Bedford Park—Lynette Baker—was not qualified to perform road tests, which was one of the critical functions performed by HR supervisors at that location, forcing Maier to spend the time and effort to send members of her team to Bedford Park to perform the road tests. (Maier Dep. 151:21-152:4; Macchia Dep. 121:19-122:10; Interial Dep. 156:15-157:2; Pl. Ex. 1, Maier Decl. at ¶ 41.)

---

[6]     Karen German, whom Macchia mentioned while struggling to identify anyone besides Maier affected by UPS's purported "workload rebalancing" took VRP and was out of the organization by January 2019. (G. Barr Ex. F, Pl. Ex. 9 (UPS 3688); G. Barr Ex. M (UPS 3484).)

Finally, Plaintiff disputes that the decision was made "about the same time that Plaintiff was not selected for the AHRM position"—Interial testified that the final decision was made "around the timeline you mentioned," in or around June 2019, and the decision was not shared with Maier until immediately before it occurred, when she was approximately seven months pregnant. (Interial Dep. 150:13-158:3.) Maier was informed of the impending transfer in April or May. (Pl. Ex. 1, Maier Decl. ¶¶ 39-40.) In any event, Plaintiff complained to Macchia and Interial that the AHRM decision was discriminatory immediately after it was made, so either timeline can support a retaliation claim. (Maier Dep. 103:21-105:3; 133:24-134:23.)

55.     To achieve that balance, in or about May of 2019, Plaintiff transferred to the Jefferson Street location, where she had previously worked. (Plf. Dep. 146:19-22; Macchia Dep. at 124:23-125:5; Plf. Dep. 31:9-13.)

**Response:** Plaintiff disputes that Maier alone was transferred, while seven months pregnant, against her repeatedly stated preferences, to a work location in a trailer lacking running water and bathrooms, that more than tripled her commute, after she repeatedly complained of discrimination, to "achieve" a "balance." UPS's witnesses offered conflicting testimony on the basic fact of who made the decision to transfer Maier to Jefferson Street, and, in fact, Interial himself made contradictory statements at his deposition. Interial initially asserted that the decision was "mainly" his, but later reversed himself and said that Macchia was the actual decision-maker with respect to Maier being transferred to Jefferson Street. (Interial Dep. 150:19-151:3, 153:16-156:5.) Macchia pointed the finger at Interial and said the decision was entirely his. (Macchia Dep. 118:18-129:9.) Allison acknowledged that she was involved along with Interial and Macchia, but asserted that Interial was the decision-maker. (Allison Dep. 179:10-180:8.) A jury could easily conclude from UPS's managers' contradictory stories and finger-pointing about more than tripling the commute of its seven-month pregnant employee, who accused them of sex discrimination, and sending her to the only office they knew she did not want to

work in, located in a trailer without a bathroom, running water, a private lactation accommodation within close proximity to her work space, or adequate furniture, that they are lying to cover up their retaliatory purposes. (Maier Dep. 103:21-105:3, 111:6-112:24, 133:24-134:23, 137:9-138:8, 150:2-156:21, 165:13-17; Macchia Dep. 118:18-129:9; Interial Dep. 146:20-147:4, 147:18-21, 149:6-150:9; Pl. Ex. 23, Pl.'s supplemental rog responses, at No. 14; Pl. Ex. 11, UPS 3822, 3823, 3824, 3834); Pl. Ex. 1, Maier Decl. ¶¶ 35, 40, 46.)

Further, UPS's witnesses offered conflicting testimony as to the reasons for Maier's transfer to Jefferson Street. Interial testified that Maier was transferred to rebalance the workload among the HR supervisors, with the effect of taking work off Angel Paras's plate, but Macchia testified that Maier was sent to Jefferson Street because it was a "challenging building" and she was such a good supervisor—which was consistent with Maier's testimony that Macchia told her she was being sent to Jefferson Street to develop a poor-performing male HR representative. (Interial Dep. 151:4-153:15; Macchia Dep. 119:5-121:17; Maier Dep. 149:7-150:3, 151:1-3.) (Also, it takes real chutzpah to assert, as UPS does, that Maier's fantastic work as a supervisor and unique ability to "train and educate [her] workforce," *cf.* Allison Dep. Ex. 5 (UPS 3490), justified more than tripling her commute and shipping her, seven months pregnant, to a trailer that lacked running water or adequate furniture, but twice refusing to promote her to a manager position for which she had been selected, met the only required qualification, and was a Level 1 fit.)

Further, as both Interial and Macchia acknowledged at their depositions, there is zero paper record or support for the notion that there was actually a problem with the "workload balance" among HR supervisors, or any record of why Maier—rather than her colleague Lynette Baker—was chosen to go to Jefferson Street, where UPS's managers knew she didn't want to be. (Macchia Dep. 118:8-121:24, 124:23-128:16; Interial Dep. 152:20-153:15; Maier Dep. 103:21-105:3, 111:6-112:24, 133:24-134:23, 137:9-138:8, 150:2-156:21, 165:13-17.) UPS has cited no evidence that this purported "rebalancing" affected any HR supervisors other than Maier. (Macchia Dep. 122:13-124:15.)

Further undermining UPS's contention that Maier's transfer to Jefferson Street was made for efficiency or "balance" purposes is the fact that the remaining HR supervisor at Bedford Park—Lynette Baker—was not qualified to perform road tests, which was one of the critical functions performed by HR supervisors at that location, forcing Maier to spend the time and effort to send members of her team to Bedford Park to perform the road tests. (Maier Dep. 151:21-152:4; Macchia Dep. 121:19-122:10; Interial Dep. 156:15-157:2; Pl. Ex. 1, Maier Decl. ¶ 41.)

Plaintiff does not dispute that she had previously worked at Jefferson Street but had worked at Bedford Park since 2013, including in 2015 when she pumped breast milk in her private, locked office for her daughter. (Maier Dep. 31:8-15; Pl. Ex. 1, Maier Decl. ¶ 14.)

56. Plaintiff's pay, title and responsibilities did not change, but her commute became longer, so Macchia told her to keep her normal home schedule, arrive at work when she could, and leave when she needed to. (Plf. Dep. 146:23-147:9, 150:17-151:3.)

**Response:** Plaintiff does not dispute that Macchia told her to keep her normal home schedule, but disputes that she was actually allowed to do so. In reality, her commuting time added substantially to her total work hours after she was transferred to Jefferson Street. (Maier Dep. 150:11-21, 204:23-205:1 Pl. Ex. 1, Maier Decl. ¶ 39.)

57. Macchia later told Plaintiff he was looking at her hours to see if her schedule made sense, but he never changed her schedule. (Plf. Dep. 156:22-158:19.)

**Response:** Plaintiff does not dispute that Macchia never formally changed her work schedule. Macchia did, however, begin scrutinizing her work hours and backtracking from his promise that she could arrive and leave at Jefferson Street when she wanted. Moreover, as a result of her transfer to Jefferson Street, Maier's total hours dedicated to work (including commuting time) substantially increased. (Maier Dep. 156:22-157:21; Pl. Ex. 1, Maier Decl. ¶ 39.)

58. Some HR personnel, including Plaintiff, worked out of a multi-office trailer at the Jefferson Street facility. (Macchia Dep. 128:17-5.)

**Response:** Undisputed.

59. No one replaced Plaintiff at the Bedford Park facility. (Macchia Dep. 123:22-23.)

**Response:** Undisputed.

60. Plaintiff had her first and second child in 2012 and 2015, respectively, while employed by UPS, took the full amount of FMLA available for both births, was not dissuaded from doing so, and returned to her position at the end of each leave. (Plf. Dep. 37:8-39:9.)

**Response:** Undisputed.

61. Plaintiff had her third child in August 2019 and took her full twelve weeks of FMLA leave from August 23, 2019 to November 14, 2019. (Plf. Dep. 161:6-15.)

**Response:** Undisputed.

62. Plaintiff claims UPS attempted to dissuade her from taking twelve weeks of leave because Macchia asked her if he she wanted him to tell Allison that she was taking the full twelve weeks, and he later offered to relieve her of road tests and other travel if she wanted to come back after six weeks as she had originally planned. (Plf. Dep. 161:16-165:4.)

**Response:** Disputed. UPS's statement does not accurately state, summarize, or paraphrase Maier's

testimony on point. Maier testified, among other things, that in the conversation where she

informed Macchia that she would take twelve full weeks of leave instead of the six she planned to

take if she had been promoted, Macchia "stopped and he looked at me and said, do you really want

me to tell Chelsea that you're going to take all 12 weeks and you're not going to be here during

peak?" and spoke "it in a way that made me feel like Chelsea would be upset at me, that I

was doing something wrong for taking those 12 weeks." (Maier Dep. 161:22-163:17; Pl. Ex. 1,

Maier Decl. ¶¶ 10, 27, 38.) Macchia further attempted to dissuade Maier from taking her full FMLA

leave by making vague assurances of lessening her workload if she returned earlier than she was

entitled to under the law. (Maier Dep. 163:18-166:23.)

63. When Plaintiff returned to work after FMLA leave in 2019, she worked for a week or two in Lockport, where she was offered the facility's only private office in order to pump breastmilk. (Plf. Dep. 166:24-169:3.)

**Response:** Plaintiff disputes that the above accurately reflects her testimony. Maier was unsure but

believed that she worked out of the Lockport facility "at least a week or two," which did not have a designated lactation space. Instead, Maier "had to kick a division manager out of his office" to pump at his desk, who would then wait outside the office for her to finish. Maier further disputes UPS's characterization of the office as "private," given the windows throughout. Maier felt so uncomfortable with the situation that she felt compelled to leave the facility to pump in her car. (Maier Dep. 166:24-169:3; Pl. Ex. 1, Maier Decl. ¶ 45.)

64. When Plaintiff returned to Jefferson Street, she noted that her shared office in the HR trailer did not lock, so Macchia told her to request a lock (which UPS provided). In addition, Plaintiff's office mate agreed to leave when she needed privacy, and Macchia offered the use of his office inside the building or a nearby empty office for pumping. (Macchia Dep. 134:12-138:6; Plf. Dep. 169:12-16, 170:14-175:7.)

**Response:** Plaintiff disputes that the above accurately reflects her testimony regarding the challenges she faced in attempting to pump milk for her newborn upon returning to Jefferson Street or that the trailer office provided "privacy." (Maier Dep. 169:12-175:7.) Rodriguez testified "there was no private space to pump in" at the Jefferson Street facility. (Rodriguez Dep. 70:7-9.) Tellingly, UPS carves out Maier testimony detailing the lack of privacy in the shared office trailer at the Jefferson Street facility both when she pumped for her first child and during her most recent attempt. (Maier Dep. 169:17-170:13.) Maier explained that she had previously attempted to pump in the Jefferson Street trailer in 2012, during which time a male UPS employee walked in on her pumping shirtless. (Pl. Ex. 1, Maier Decl. ¶ 46.) This experience made her understandably apprehensive about pumping again at the Jefferson Street facility. In 2019, Maier shared an office in that same trailer with Anthony Marinaro whom she had to ask to stop working and leave every time she needed to pump, and that the walls were so thin, everyone interviewing or being interviewed in the rest of the trailer could hear her pump and would know [she] was shirtless, (Pl. Ex. 1, Maier Decl. ¶ 46.) Macchia testified that there still was no lock on the trailer office door when Maier returned from maternity leave. (Macchia Dep. 134:16-20.)  Accordingly, Macchia

suggested Maier use his office or an office near his office in the automotive department flanked by windows a "five, ten-minute walk" form her workspace, which would have necessitated forty-five minutes to hour-long breaks each time she needed to pump, making it harder to complete her assigned tasks and maintain productivity. (Pl. Ex. 1, Maier Decl. ¶ 46.) Accordingly, Maier disputes any suggestion that the automotive department office spaces were close to her work area.

65.     Plaintiff also spoke with Rodriguez, who helped Plaintiff find another empty office on a different floor of the building. (Plf. Dep. 176:5-22.)

**Response:** Disputed. Plaintiff testified that *she* found empty space on the third floor of the building and that Rodriguez helped her with the locks. (Maier Dep. 175:16-177:2.) Maier further disputes any suggestion that the third-floor space was close to her work area or readily available. (Ex. 1, Maier Decl. ¶ 46.)

66.     In January 2020, Paras was removed from the AHRM position, and his position needed to be filled. (Plf. Dep. 178:4-7; Allison Dep. 228:17-24.)

**Response:** Plaintiff disputes that Paras was removed from the AHRM position in January 2020. Paras's removal from the AHRM role was announced on February 11, 2020, simultaneously with the announcement that Gloria Macias would succeed him in the role. This occurred less than a month after Maier participated in mediation of her EEOC charge, and within two weeks of her amending her charge to allege retaliation. (Allison Dep. Ex. 35; Maier Dep. Ex. 8; Pl. Ex. 1, Maier Decl. ¶¶ 47, 48.)

67.     Allison decided to rotate Business Manager Gloria Macias ("Macias") into the position, as a lateral move, rather than promote someone into the role. (Allison Dep. Ex. 36 at Interrogatory Response No. 3.)

**Response:** Plaintiff disputes the assertion that Gloria Macias "rotated" into the position, which is not supported by the cited evidence. Plaintiff disputes that Allison made the decision herself, because she testified that she spoke with counsel regarding the decision to move Macias into the AHRM role, at the same time she was consulting at length with UPS attorneys in hopes of getting

Plaintiff's EEOC charges dismissed. (Allison Dep. 259:16-260:9; Allison Dep. Ex. 26, Pl. Ex. 20 (privilege log).) Further, Allison's current story contradicts what UPS represented to the EEOC, which is that Macias was chosen in a competitive process, involving five other candidates (including Maier), and wowed Allison at an interview Allison now acknowledges never occurred. (Pl. Ex. 2, UPS 1 (position statement), at UPS 4; Allison Dep. 243:9-11.)

Finally, Plaintiff objects to UPS's use of an interrogatory response that Allison (who herself verified the interrogatory responses under penalty of perjury) affirmatively contradicted at her deposition. (Allison Dep. 239:24-243:8; Allison Dep. Ex. 36; Allison Dep. Ex. 37.)

68.     Macias had worked for UPS since 1987 in various management positions, including in HR, and has a degree in Business Administration. (Macias biography, attached hereto as **Exhibit K**.)

**Response:** Disputed. Plaintiff objects to the use of the cited document, which has not been authenticated by UPS, and contains facial, obvious, inaccuracies. *See* Fed. R. Evid. 806(6)(E). For example, the document shows that Chelsea Allison was Macias's manager since 1999, which obviously is not true: Macias reported to a different manager, in a non-human resources position, before she was transferred laterally to fill Paras's AHRM role. (Allison Dep. 239:3-9, 244:1-7; Pl. Ex. 21, RTA Responses, No. 47.)  Moreover, there is no support in the cited document for the proposition that Macias ever had a position in HR, besides the Area HR Manager position UPS handed her to avoid promoting Sara Maier shortly after she participated in an EEOC mediation and amended her charge against UPS, who remained a Level 1 fit for promotion and whose "strengths" and "capabilities," Allison was "very comfortable" with at the time. (Allison Dep. 181:12-186:23, 193:18-197:17, 198:6-200:17, 204:9-207:24; 260:10-261:18; Allison Dep. Ex. 18 (UPS 3494); Allison Dep. Ex. 19, Pl. Ex. 4 (UPS 3495); Allison Dep. Ex. 24 (UPS 3446); Allison Dep. Ex. 25 (UPS 3447), at UPS 3457; Allison Dep. Ex. 27 (UPS 3605); Allison Dep. Ex. 28 (UPS 3606), at UPS 3612; Allison Dep. Ex. 35; Allison Dep. Ex. 36 at Rog Response No. 4; Pl. Ex. 21,

RTA Resp. Nos. 45-49; Maier Dep. Ex. 8; Pl. Ex. 1, Maier Decl. ¶¶ 47, 48.)) Instead, without

conducting any interviews, or documenting its decision in any way, UPS moved Gloria Macias, a

manager from outside the HR department, who was approaching retirement, into the AHRM

role—until she herself took voluntary retirement in 2020. (Allison Dep. 239:3-246:9, 259:16-261:18,

Allison Dep. Ex. 35; Allison Dep. Ex. 36 at Rog Response No. 4; Pl. Ex. 21, RTA Resp. Nos. 45-

49; Pl. Ex. 18 (UPS 716).)

      69.     Macias' manager had previously reached out to Allison to ask about career development opportunities for persons working under him, including Macias, to rotate into roles working under Allison. (Allison Dep. 243:12-244:14.)

**Response:** Disputed. Plaintiff objects that the purported conversation between Allison and

Macias's manager—offered for the truth of the matter asserted, that the manager was asking about

"career development opportunities" for Macias and other employees—is hearsay, for which no

exception applies. Further, Allison's testimony about the purported reasons for Macias's promotion

completely contradicts what UPS represented to the EEOC. In seeking dismissal of Maier's EEOC

charge, UPS asserted to the EEOC that Macias was interviewed, and that, specifically, in the

interview Macias showed off her "breadth of perspective, ideas for driving the success of her team,

and sharp organizational skills." (Pl. Ex. 2, UPS 1 (position statement), at UPS 4.) But, at her

deposition, Allison acknowledged that Macias was never interviewed for the role. (Allison Dep.

243:9-11.) Further, before the EEOC, UPS specifically asserted that Maier was "one of the six

individuals who were considered to fill the open Area HR Manager position," but, in her sworn

interrogatory responses before this Court, Allison asserted that only Macias was considered, before

contradicting herself again at her deposition. (Allison Dep. 239:24-245:5; Allison Dep. Ex. 36, at

No. 3; Allison Dep. Ex. 37; Pl. Ex. 2, UPS 1 (position statement), at UPS 4.) Further, UPS asserted

before the EEOC, and has now abandoned, numerous purported justifications for Macias's

selection—such as her degree and length of service—for the obvious strategic reason that these

same factors would have justified Maier's promotion over Paras. (Pl. Ex. 2, UPS 1 (position statement), at UPS 4.) Still further, Allison acknowledged that UPS's counsel was involved in the decision to move Macias, instead of promoting Maier, at a time when Allison was working extensively with UPS's attorneys in trying to get Maier's EEOC charge dismissed in the days after the unsuccessful EEOC mediation. (Allison Dep. 259:16-260:9; Allison Dep. Ex. 26, Pl. Ex. 20 (privilege log).)

In any event, a manager calling at an unspecified time, about purported "career development opportunities" for several employees including Macias, does not even satisfy UPS's burden of articulating a legitimate justification for passing over Maier, absent some articulation of *why such a call was a sufficient to convince Allison to move Macias into the role instead of promoting Maier,* who was a Level 1 fit for promotion and whose "strengths" and "capabilities," Allison was "very comfortable" with at the time. The conclusion UPS wants the Court to make as a matter of law— that Allison placed Macias in the role over Maier, the only qualified internal candidate, because her manager "previously reached out" regarding career development opportunities for multiple employees—is particularly suspect given that, when determining who would fill the AHRM role in 2019, Allison refused to credit Maier's prior selection by senior HR managers who knew her work. (Allison Dep. 181:12-186:23, 193:18-197:17, 198:6-200:17, 204:9-207:24; 260:10-261:18 Allison Dep.; Allison Dep. Ex. 18 (UPS 3494); Allison Dep. Ex. 19, Pl. Ex. 4 (UPS 3495); Allison Dep. Ex. 24 (UPS 3446); Allison Dep. Ex. 25 (UPS 3447), at UPS 3457; Allison Dep. Ex. 27 (UPS 3605); Allison Dep. Ex. 28 (UPS 3606), at UPS 3612; Allison Dep. Ex. 36 at Rog Response No. 4; Pl. Ex. 21, RTA Resp. Nos. 45-49.) And, in any event, a jury could conclude that the "rotation" justification makes no sense, where Macias was on the verge of retirement and thus her "career development" would not have benefited from a lateral move to a different department months before she left the company. (Pl. Ex. 18 (UPS 716).)

A reasonable jury could, and likely would, conclude that UPS's incoherent, shockingly thin, and contradictory explanations for its decision to move Macias into the AHRM role Maier remained a Level 1 fit for were lies and pretexts for retaliation.

70.    Macias left UPS in or about January 2021, after the AHRM role was eliminated in the HR Restructuring. (Plf. Dep. 182:7-17.)

**Response:** Disputed. Macias took voluntary retirement in 2020. (Pl. Ex. 18 (UPS 716).) Allison testified that a UPS employee named Sue Sladek was serving as an AHRM in 2021. (Allison Dep. 249:9-19.) In any event, even if the AHRM title was eliminated at some point, UPS (obviously) has continued to employ human resources managers who perform the tasks of the AHRM—they have not eliminated its human resources department, as UPS's summary judgment submissions seem to imply. (Maier Dep. 206:18-207:3, 208:17-209:2, 210:11-15; Paras Dep. 118:16-119:14; Allison Dep. 14:23-17:1; 24:18-25:2.)

71.    Plaintiff is still employed by UPS. (Plf. Dep. 209:19-22.)

**Response:** Undisputed.

72.    When Allison made her decision regarding the AHRM promotion, Plaintiff had not divulged to Allison or anyone who provided input to Allison that Plaintiff was pregnant. (Plf. Dep. 50-1-8, 143:21-144:4; Allison Dep. 178:20-24; Interial Dep. 136:9-18; Macchia Dep. 91:19-92:2.)

**Response:** Disputed. Plaintiff testified that she told numerous people at UPS that she was pregnant, that UPS's managers knew she was trying to become pregnant, but acknowledged she wasn't sure whether she told her manager, Macchia, about her pregnancy before or after the January 17 meeting with Allison and Interial. (Maier Dep. 50:1-20, 135:6-136:10.) Macchia did not have a specific recollection of when he learned that Maier was pregnant and did not firmly deny knowing she was pregnant before the January 17 meeting. (Macchia Dep. 91:20-92:2.) As Macchia's bullet-pointed list of notes he provided to Allison, to prepare her to present regarding Maier for a critical career development/talent review meeting in 2019 demonstrates, Macchia was both aware of intimate

details about Maier's marriage and pregnancies, and felt it was appropriate to share those details with Allison, to be discussed with UPS's leadership when evaluating Maier's suitability for promotion. (Allison Dep. 191:7-193:11; Macchia Dep. 106:5-118:3; Macchia Dep. Ex. 10 (UPS 3442); Macchia Dep. Ex. 11 (UPS 3443); Macchia Dep. Ex. 12 (UPS 3444).) Further, both Paras and Macchia acknowledged that Maier informed them of the two miscarriages she suffered shortly before her third, successful pregnancy. (Paras Dep. 81:23-82:16; Macchia Dep. 68:13-69:2.) Construing the evidence, and drawing all inferences in favor of Plaintiff, as the Court must at this stage, a reasonable jury could conclude that UPS's decision-makers were aware of Maier's pregnancy—and *certainly* were aware of her intent to become pregnant—at the time she met with Allison and Interial on January 17, 2019. (Maier Dep. 50:1-20, 53:2-10.)

73.     On July 31, 2019, Plaintiff filed a Charge with the Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination, claiming UPS was aware of her pregnancy when she was not selected for promotion. (Plf. Dep. Ex. 5.)

**Response:** Plaintiff objects to the mischaracterization of the cited document, which speaks for itself. Contrary to UPS's counsel's gloss, Plaintiff's pro se EEOC charge does not assign a time to when UPS was aware of her pregnancy. (Maier Dep. 143:9-144:4; Maier Dep. Ex. 5.)

74.     Plaintiff amended her Charge on January 31, 2020 to allege that UPS retaliated against her by attempting to dissuade her from take twelve weeks of maternity leave, transferring her to Jefferson Street, and "scrutinizing" her hours. (Plf. Dep. Ex. 8.)

**Response:** Plaintiff notes that she signed her amended charge on January 30, 2020.

75.     Plaintiff amended her Charge again on or about March 5, 2020 to allege UPS retaliated and continued to discriminate against her by not selecting her to the AHRM position vacated by Paras in 2020. (Plf. Dep. Ex. 9.)

**Response:** Undisputed.

76.     The AHRM role was eliminated in 2020 as part of a company-wide HR Transformation. (Plf. Dep. 182:7-18, 206:18-23.)

**Response:** Disputed. Allison testified that a UPS employee named Sue Sladek was serving as an

AHRM in 2021. (Allison Dep. 249:9-19.) In any event, even if the AHRM title was eliminated at some point, UPS (obviously) has continued to employ human resources managers who perform the tasks of the AHRM—they have not eliminated its human resources department, as UPS's summary judgment submissions ridiculously imply. (Maier Dep. 206:18-207:3, 208:17-209:2, 210:11-15; Paras Dep. 118:16-119:14; Allison Dep. 14:23-17:1; 24:18-25:2; Pl. Ex. 1, Maier Decl. ¶ 50.)

Respectfully Submitted,

*s/ Matthew J. Singer*

Gail S. Eisenberg
LOFTUS & EISENBERG LTD.
161 N. Clark St., Suite 1600
Chicago, IL 60601
Phone: 312-899-6625
GEisenberg@LoftusandEisenberg.com

Matthew J. Singer
MATT SINGER LAW, LLC
77 W. Wacker Dr., Suite 4500
Chicago, Illinois 60601
Phone: 312-248-9123
Matt@MattSingerLaw.com