**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SARA MAIER,

                Plaintiff,

    v.

UNITED PARCEL SERVICE, INC.,

                Defendant.

Case No.  21-cv-3506

Judge Jorge L. Alonso

**DEFENDANT'S RESPONSE TO
<u>PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS</u>**

Pursuant to Local Rule 56.1(e), Defendant United Parcel Service, Inc. ("UPS") submits this response to the Statement of Additional Material Facts filed by Plaintiff Sara Maier ("Plaintiff").[1] UPS responds to each of Plaintiff's numbered paragraphs as follows:

**1.    a.[2]    Plaintiff Sara Maier began working for UPS in 2003. (Maier Dep. 20:5-21:6.) In 2007, UPS promoted her to Human Resources ("HR") Supervisor. (Maier Dep. 25:10-28:3; Pl. Ex. 1, Maier Decl. ¶ 6.)**

**    b.    Between 2015 and 2020, she reported to Area Human Resources Manager ("AHRM") Ron Macchia. (Maier Dep. 31:8-18; Macchia Dep. 20:5-21:4.)**

---

[1] To the extent facts are undisputed herein, they are undisputed solely for the purpose of Defendant's motion for summary judgment [Dkt. No. 60]. Defendant expressly reserves the right to dispute and contest any and all facts asserted by Plaintiff herein and in any other brief, complaint, motion, or other pleading in this case. Defendant expressly objects to any reliance upon facts asserted by Plaintiff in her Response to Defendant's Statement of Material Facts ("DSOF"), in Plaintiff's Statement of Additional Facts ("PSOAF"), in Plaintiff's Response to Defendant's Motion for Summary Judgment, and in any briefing related to Defendant's Motion for Summary Judgement for any and all purposes other than a ruling on Defendant's Motion for Summary Judgment. [Dkts. 75, 76, 77].

[2] Plaintiff violates LR 56.1(d)(1) and (5), which limit her to stating 40 "concise" paragraphs of additional facts, by setting forth 40 long paragraphs that each combine numerous distinct facts, repeat facts, and/or incorporate by reference her response to UPS's Statement of Material Facts. In addition to being significantly overlength, this tactic makes it difficult for UPS to isolate and meaningfully respond to each separate fact Plaintiff contends is material to her claims, and effectively impossible for UPS to reference any specific fact or UPS's response (and corresponding record support) in its reply brief. As such, UPS has broken Plaintiff's facts out into lettered sub-parts for purposes of this response.

**c.      At or around the time Macchia became Maier's supervisor, Macchia recognized Maier as the top HR Supervisor reporting to him, and Maier had already been identified as a "ready now" candidate—at the time, UPS's parlance for an employee ready for a promotion to the next level—for promotion to AHRM, should an opportunity become available. (Macchia Dep. 19:13-21:4; Allison Dep. 33:16-34:3; Interial Dep. 17:10-23; Pl. Ex. 1, Maier Decl. ¶ 19.) Maier had received "strong performance" overall performance ratings for years before Macchia's arrival as her supervisor. (Pl. Ex. 21, Def.'s Request to Admit ("RTA") Response Nos. 16-19.)**

**d.      Beginning in 2015, every year at UPS's annual career development/talent review/succession planning meeting, Macchia would speak with his fellow AHRMs—Carlos Interial and Mike Nugent—HR Operations Manager Frank Barre, and District HR Director Greg Barr, regarding Maier's outstanding performance and describe her readiness for promotion. (Macchia Dep. 19:8- 25:22.)**

<u>**RESPONSE:**</u>

a.      Undisputed.

b.      Undisputed.

c.      Undisputed, but missing context. Macchia was one of three AHRM's in the Illinois district who managed HR Supervisors. (Interial Dep. 29:17-19; Barre Dep. 15:12-20.) Each AHRM identified their "top" direct reports who were "Level 1 Fit" (aka "ready now") for promotion to the "recommended position" of AHRM. (Interial Dep. 33:20-35:1; Interial Dep. Ex. 2; Allison Dep. Ex. 9 at 004062, 004066, 004068). AHRM Macchia identified Plaintiff. AHRM Carlos Interial identified Mike Kish, and AHMR Mike Nugent identified Angel Paras. (Interial Dep. 33:20-35:1.)

2

    d.  Undisputed, but missing context. All HR Supervisors who were either ready for promotion, interested in a career move, or "struggling" were discussed at these annual meetings. Macchia was obligated to speak about his direct reports, including Plaintiff. (Barr Dep. 25:4-26:2, 27:20-28:4; Macchia Dep. 24:22-25:22

**2.  a.  In recognition of Maier's outstanding performance as HR Supervisor, and to continue preparing her for promotion to AHRM, UPS's HR leadership in Illinois began assigning her additional tasks as "lead supervisor," above and beyond the typical responsibilities of an HR Supervisor. (Pl. Ex. 1, Maier Decl. ¶¶ 16-18; Maier Dep. 211:15-213:8; Pl. Ex. 14 (UPS 4373).)**

**    b.  Among other things, between 2016 and 2018, Maier was assigned and performed the following additional tasks as lead supervisor: (1) running the weekly, regional human resources call for the HR supervisors and other employees in the region (Pl. Ex. 1, Maier Decl. at ¶ 16; Maier Dep. 211:15-213:8; Interial Dep. 54:19-23; Macchia Dep. 30:10-31:11, 41:15-42:19, 47:7-48:1; Paras Dep. 21:17-23:3; Macchia Dep. Ex. 3 (UPS 2497); Macchia Dep. Ex. 4 (UPS 2549); Macchia Dep. Ex. 5 (UPS 2670); Pl. Ex. 14 (UPS 4373)); (2) serving as the lead instructor for "NSPT" and performing other important tasks relating to Integrad, UPS's training for new drivers (Pl. Ex. 1, Maier Decl. at ¶ 17; Macchia Dep. 31:13-32:12, 41:15-42:19, 47:7-48:1; Interial Dep. 54:24-56:8; Macchia Dep. Ex. 3 (UPS 2497); Macchia Dep. Ex. 4 (UPS 2549); Macchia Dep. Ex. 5 (UPS 2670); Pl. Ex. 14(UPS 4373), at 4382-84); (3) taking the lead on package/feeder queries (F. Barre Dep. 17:15-24; Pl. Ex. 14 (UPS 4373), at UPS 4373-74); (4) advising, teaching, and training other HR Supervisors (including Angel Paras) about Microsoft Access, including instructing them on how to perform advanced queries (Pl. Ex. 1, Maier Decl. at ¶ 18; Interial Dep. 56:12-15; Paras Dep.**

**24:1-11; Macchia Dep. 44:16-45:13, 47:7-48:1; Macchia Dep. Ex. 4 (UPS 2549); Macchia**

**Dep. Ex. 5 (UPS 2670)); (5) serving as a mentor, advisor, and leader among the HR**

**supervisors (Pl. Ex. 1, Maier Decl. at ¶¶ 8, 16-18; Macchia Dep. 37:19-38:7, 43:12-44:19,**

**47:7-48:1; Paras Dep. 23:17-25:6; Macchia Dep. Ex. 2 (UPS 3218); Macchia Dep. Ex. 3 (UPS**

**2497); Macchia Dep. Ex. 4 (UPS 2549); Macchia Dep. Ex 5 (UPS 2670); (6) filling in for the**

**AHRMs in situations where none of the three were available. (Pl. Ex. 1, Maier Decl. at ¶24;**

**Interial Dep. 54:24-56:8; Macchia Dep. 67:2-17; Pl. Ex. 12, (UPS 4114).)**

  **RESPONSE:**

   a. Undisputed that Plaintiff was assigned additional tasks as part of her career

development. Undisputed for purposes of this motion only that Plaintiff was assigned the tasks she

describes. Disputed to the extent Plaintiff implies, without evidence, that she was unique in this

regard. Furthermore, the record does not support that Plaintiff was assigned additional tasks

specifically or solely to prepare her for promotion to AHRM. Barre testified that:

  A. … We rotated [special projects] through the HR supervisor
    group. And, typically, it was individuals that needed more
    experience, had the experience, felt that they could lead a
    project. So there [were] many variables why people were
    selected. It was either development, or depending on the
    project, who best fit it.

  Q. When you say development, that would be preparation for
    promotion?

  A. No, experience just in HR, in general, and certainly as you
    have more experience, it does position you. So we don't
    go in saying, here, we want you to do this to get yourself
    ready for promotion, it's really gained experience.

(Barre Dep. 16:18-17:10.)

  Finally, UPS disputes Plaintiff's characterization of herself as "lead supervisor." Plaintiff

and other HR Supervisors were considered leaders among their peers. (*See* Def. Exh. M, Allison

Dep. Exh. 9 at 004067 ("Sara is looked at as *one of the leaders* within the HR Supervisors") (emphasis added). Undisputed that Macchia considered Plaintiff one of *his* lead supervisors. (Macchia Dep. 66:14-67:13.)

b.     Undisputed for purposes of this motion only, except to the extent Plaintiff calls herself "lead supervisor." In addition, to the extent Plaintiff suggests the specific tasks she performed are material to this motion, UPS notes that no record has been developed regarding the number and type of additional tasks assigned to other HR Supervisors, and Plaintiff's sole "evidence" that other HR Supervisors were not given comparable assignment is her own declaration. However, Plaintiff has no personal knowledge regarding what assignments other HR Supervisors were given by their managers. *See* response to SAF 2(a), *supra*.

**3.     a.     Maier successfully performed her additional lead supervisor responsibilities, along with her regular HR supervisor duties, which Macchia recognized while delivering her glowing performance reviews with "strong performance" overall ratings between 2016 and 2019. (Macchia Dep. 32:18-52:7; Macchia Dep. Ex. 2 (UPS 3218), Macchia Dep. Ex. 3 (UPS 2497), Macchia Dep. Ex. 4 (UPS 2549), Macchia Dep. Ex. 5 (UPS 2670); F. Barre Dep. 17:15-24, 137:19-139:24.)**

**RESPONSE:**

Undisputed for purposes of this motion only, except to the extent Plaintiff calls herself "lead supervisor."  *See* response to SAF 2(a), *supra*.

**4.     a.     There was only one required qualification for the AHRM position: a bachelor's degree. (Maier Dep. 79:21-80:6, 126:17-129:13, 248:19-249:3; Allison Dep. 166:11-167:1; Def's SJ Ex. J, at UPS 4256; Pl. Ex. 15 (UPS 4478), at UPS 4483.)**

      **b.**      **At UPS, "required" qualifications mean "required"; the requirement is "absolute." A candidate for a position "either has" the required qualification "or does not." (Allison Dep. 44:20-46:5, 166:11-167:1; Pl. Ex. 15, (UPS 4478, at 4483.)**

      **c.**      **AHRM positions in Illinois were rarely available. (Paras Dep. 71:11-24; F. Barre Dep. 25:2-5; G. Barr Dep. 44:1-10.)**

      **d.**      **In the rare event an AHRM position came available, UPS filled it through its succession planning process. (F. Barre Dep. 25:2-9.)**

      **e.**      **To ensure that Maier was positioned to be promoted to AHRM when an opportunity came available, Maier's career development plan—one aspect of UPS's extensive and formal career development and succession planning process— instructed her to obtain her bachelor's degree. (Macchia Dep. 25:23-29:1; Maier Dep. 17:1-18:15, 79:21-80:6, 126:17-129:13, 248:19-249:3; Allison Dep. 36:22-38:19; Macchia Dep. Ex. 1 (Maier 45); Def. Ex. J, at UPS 4256; Allison Dep. 116:21-117:4, 166:11-167:1; Pl. Ex. 15, (UPS 4478), at UPS 4483.)**

      **f.**      **Nugent counseled Paras to finish his bachelor's degree as a part of his career development, advice he ignored without consequence. (Paras Dep. 5:1-2, 8:21-23, 32:3-33:7, 72:10-14, 85:10-17, 90:7-17, 123:14-16; Paras Dep Ex. 2, UPS 2524.)**

      **g.**      **Macchia told Maier she would be promoted to AHRM in early 2019 if she completed her bachelor's degree. (Pl. Ex. 1, Maier Decl. ¶ 23.)**

      **h.**      **Based on UPS's instructions that obtaining her bachelor's degree was necessary for her advancement to AHRM, Maier took her final class and completed her bachelor's degree in business administration in 2018. (Maier Dep. 17:1-18:15, 79:21-80:6, 126:17-129:13, 248:19-249:3; Allison Dep. 116:21-117:4, 166:11-167:1; Pl. Ex. 1, Maier Decl.**

**¶ 23; Interial Dep. Ex. 10 (UPS 3709); Def. Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483.)**

**RESPONSE:**

a.      Disputed. While there is no dispute that the Job Description for AHRM uses the word "required" next to the educational component of a Bachelor's degree (Def. Ex. J at 004256), the document also states that the information contained therein "should only be used as a guideline or recommendation for the content of and qualifications for this position." (*Id.* at fine print.) Furthermore, UPS's witnesses testified that a degree is preferred, not required, and although degrees are encouraged as part of career development discussions, employees have been promoted without a degree. In fact, Frank Barre (the District HR Operations Manager to whom AHRMs reported) attained his position without a Bachelor's degree. (Barre Dep. 13:3-11, 20:20-23:23, 25:10-16; Macchia Dep. 29:2-7; Barr Dep. 42:4-43:12; Interial Dep. at 117:7-10; Rodriguez Dep. at 27:4-8; *see also* Plf. Dep. at 127:10-128:10.)

b.      Undisputed only that Plaintiff has accurately quoted a few words from a PowerPoint slide used during training at UPS. The slide, which is part of a high-level discussion regarding job interviews, speaks for itself. (*See* Plf. Ex. 15.) Undisputed that Allison acknowledged during her deposition that the Job Description for ARHM uses the word "required" when listing a Bachelor's degree. However, *see* response to SAF 4(a), *supra.*

c.      Undisputed.

d.      Undisputed for purposes of this motion only.

e.      Undisputed only that Macchia encouraged Plaintiff to complete her degree as part of her career development. (Macchia Dep. 28:4-29:1.) The cited career development plan is for general development toward promotion, not promotion to AHRM as Plaintiff states. It is

described as a "Development Plan for Current or Other/Future Position." (Macchia Dep. Ex. 1 at MAIER000045; Macchia Dep. 27:12-29:1.) The details of the plan were input by Plaintiff, and she was encouraged to include an educational component. (Macchia Dep. Ex. 1 at MAIER000046.)

f.     Undisputed that Nugent encouraged Paras to complete his degree as part of his career development. The remainder of Plaintiff's SAF 4(f) is argument, not a statement of fact.

g.     Disputed as conflicting with Plaintiff's own contemporaneous writing. Plaintiff wrote on January 19, 2019, that she had been advised to complete her degree so she could be "**considered**" for promotion. (Plf. Dep. Ex. 11 at MAIER000501) (emphasis added).

h.     Undisputed only that Plaintiff completed her degree in 2018. As to the remainder of SAF 4(h), see UPS's responses to SAF 4(a), (e) and (g), *supra*.

**5.     a.     UPS has an extensive and formal process for evaluating its current employees (at a supervisor level and above) for advancement, which UPS employees alternately refer to as "succession planning," "talent review," or "career development" processes. (Allison Dep. 25:14- 36:15; G. Barr Dep. 24:6-31:6; Interial Dep. 14:21-21:24; Macchia Dep. 17:19-19:20, 24:22-25:7; F. Barre Dep. 36:24-38:16.)**

**b.     Most HR management positions at UPS were filled via the succession planning process. (F. Barre Dep. 36:24-38:16.)**

**c.     Performance reviews were one key metric by which potential candidates for promotion were evaluated during the succession planning process. (Allison Dep. 33:2-13; Barr Dep. 24:6-25:3; Macchia Dep. 17:19-19:20.)**

**d.     UPS's HR leadership generally "prefers to fill an open position via a career development opportunity or promotion rather than formally solicit applications**

because of the decision makers' familiarity with capable internal candidates." (Pl. Ex. 2, UPS May 7, 2020, EEOC Position Statement.)

**RESPONSE:**

        a.      Undisputed that UPS has routine processes in place for career development (including talent reviews) and engages in succession planning. Disputed that the succession planning exercise that took place in 2018/2019 was part of UPS's routine processes, given that the overlapping Voluntary Retirement Program and large-scale HR restructuring that followed on its heels was an unusual situation that created a unique need for succession planning. (Barr Dep. 94:23-95:9; Barre Dep. 58:16-23, 61:1-63:64:3, 90:2-91:14, 99:2-100:19, 105:1-106:11, 120:21-121:18, 162:6-163:23.)

        b.      Undisputed for purposes of this motion only.

        c.      Undisputed that performance evaluations were a metric used by employees' direct managers in determining whether to identify them as Level 1 Fit for promotion, and that fitness levels were then considered in succession planning. To the extent Plaintiff implies that performance evaluations were discussed or considered during succession planning, disputed. (*See* Interial Dep. 111:17-112:9.)

        d.      Undisputed for purposes of this motion only.

**6.**    **a.**    **In early 2018, UPS offered certain senior employees the opportunity to participate in what UPS called the Voluntary Retirement Program ("VRP").**

        **b.**    **Under UPS's policies, positions that became available because of individuals taking VRP—as Greg Barr and Frank Barre did—could be backfilled without competition or interviews, in what UPS refers to as "VRP backfill" "career development" moves made via the aforementioned succession planning process. (Allison Dep. 42:17-24,**

55:2-58:6; F. Barre Dep. 103:6-104:12, 107:3-7; Interial Dep. 23:16-24:9; Rodriguez Dep. 15:6-20; G. Barr Dep. Ex. H (UPS 3676).)

        c.        For example, UPS backfilled Greg Barr's position with Chelsea Allison without a competitive process or interviews. (Allison Dep. 42:17-24, 55:2-58:6.)

        d.        UPS backfilled Frank Barre's position with Carlos Interial without a competitive process or interviews. (Allison Dep. 58:7-61:6, 63:23-64:13; Interial Dep. 43:7-43:22, 146:17-19; Barr Dep. Ex. E, UPS 3686; Barr Dep. Ex. F & Pl. Ex. 9 (UPS 3688); Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707).)

        e.        UPS backfilled an HR supervisor position that came available as a result of VRP with Ramina (Ashtar) Chlimoun without a competitive process or interviews. (Interial Dep. 65:7-65:22; Allison Dep. 62:8-64:13; Barr Dep. Ex. E (UPS 3686); Barr Dep. Ex. F & Pl. Ex. 9 (UPS 3688); Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707).)

        f.        Allison had no say on who would fill the HR operations manager position—the right-hand person for the HR Director, who reported directly to her—and no say in who would fill the HR supervisor role vacated by the newly promoted AHRM. (Allison Dep. 58:7-61:6, 62:8-23; Interial Dep. 43:7-43:22, 59:19-60:8; 65:7-65:22; 146:17-19; Barr Dep. Ex. E, UPS 3686; Barr Dep. Ex. F & Pl. Ex. 9 (UPS 3688); Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707).)

        g.        UPS falsely asserted before the EEOC that Allison "concurred with the recommendation to select Interial for the HR Operations manager position," which Allison acknowledged at her deposition was not true. (Pl. Ex. 27, UPS Position Statement, at UPS 35; Allison Dep. 58:7-61:6.)

**RESPONSE:**

      a.      Undisputed.

      b.      Undisputed.

      c.      Undisputed that Allison did not interview for her position. As to whether the process was "competitive," Allison testified that she does not know anything about how the decision was made. (Allison Dep. 55:19-56:21.)

      d.      Undisputed, but missing context. The record establishes Interial was the only "Level 1 Fit" candidate for the position at issue. (Barre Dep. 72:17-73:15; Barr Dep. Ex. C at Page ID#1409.)

      e.      Undisputed.

      f.      Undisputed that Allision was not the decision-maker with respect to filling the HR Operations Manager and HR Supervisor positions.

      g.      This statement constitutes argument. There is no dispute that Allison did not make the decision to promote Interial, and no dispute that she agreed with the choice.

**7.      a.      In May 2018, the AHRMs (Ron Macchia, Mike Nugent, and Carlos Interial), Frank Barre, and Greg Barr attended a "career development" meeting, at which Macchia advocated for Maier's promotion. (Macchia Dep. 60:21-65:10, 67:18-68:4.)**

      **b.      Subsequently, on May 31 and June 1, 2018, Greg Barr attended a "staff level" talent review meeting, attended by individuals at his level and above, and at which the three HR supervisors who were then considered Level 1 fits for promotion to AHRM— Maier, Paras, and Mike Kish—were discussed. (G. Barr Dep. 48:6-60:18; G. Barr Dep. Ex. A (UPS 4091); G. Barr Dep. Ex. B (at UPS 4173-74, 4177-78, 4179-80); G. Barr Dep. Ex. C.)**

c.      At the meeting, UPS's high-level HR staff determined that, upon Greg Barr and Frank Barre's retirements, Carlos Interial would fill Frank Barre's position and that Sara Maier would fill Carlos Interial's AHRM position. (G. Barr Dep. 63:11-71:18; G. Barr Dep. Ex. D (UPS 3684); G. Barr Dep. Ex. E (UPS 3686); G. Barr Dep. Ex. F, Pl. Ex. 9 (UPS 3688)).

d.      In addition, around this time, in June 2018, Frank Barre and Greg Barr decided that a UPS employee named Ramina (Ashtar) Chlimoun would be promoted to HR supervisor to backfill Maier's role; the determining factor was that Chlimoun had a bachelor's degree, which the other candidates (despite having more UPS experience) lacked. (G. Barr Dep. Ex. D (UPS 3684)).

**RESPONSE:**

a.      Undisputed that, in the cited testimony, Macchia said he attended the May 2018 career development meeting with Nugent, Interial, Barre and Barr, where they each "put up [their] candidates that [they] felt were a 'ready now' candidate or a Level 1 fit" for promotion. Disputed to the extent Plaintiff suggests Macchia advocated for her promotion to AHRM, as no record evidence supports that inference. All HR Supervisors were discussed during these annual to semi-annual meetings, which were not focused on a particular promotion, but on who was ready for promotion, was struggling, or wanted a career move in general. (Interial Dep. 30:5-31:20; Barr Dep. 25:10-26:1; Barre Dep. 35:21-36:23.)  The purpose was to identify a "promotable pool" and persons ready to take on more responsibility in general. (Barr Dep. 30:21-31:6.) Macchia presented Plaintiff as Fit Level 1/"ready now," Interial presented Mike Kish as Fit Level 1/"ready now," and Nike Nugent presented Angel Paras as Fit Level 1/"ready now." (Interial Dep. 33:20-35:1.) Plaintiff, Paras and Kish were not evaluated in comparison to each other. (*Id.* at 36:3-15.)

      b.      Undisputed.

      c.      Disputed as mischaracterizing the evidence. As the document Plaintiff cites states, Interial and Plaintiff were identified as "Possible Backfill/s." (Plf. Ex. 9; Barr Dep. 69:10-12.) Barre explained that identifying possible backfills was an exercise to ensure no "gaping holes" existed in UPS's ability to continue business operations as the VRP and subsequent restructuring played out across the country. Specifically, when asked why the notes on the document Plaintiff cites say she would replace Interial, Barre explained:

    Q.     It does say Sara will replace Carlos as [AHRM]?

    A.     Correct. It states that, but once again, I just take it back to possible backfills. I don't remember the exact thought process behind this, but what I do recall is it -- you know, [UPS corporate] didn't want a list of names, just, okay, do you have a possible backfill.

         They were trying to determine, okay, was there some -- this is corporate I'm speaking about, when they merge all this data together, was there going to be some gaping holes in one particular district, building, function. So this wasn't -- this was an unusual document, it was rolling up to the transformation[3] team and corporate so they would get some sense that … there's no possible backfill [so] the district could be in trouble.

         So this wasn't a document that was put in place to say, okay, these are the people going in there, it's just to determine across the country were there going to be some gaping holes by who took these VRPs.

    Q.     Right, because corporate doesn't want a hole that results as a -- because of a VRP?

    A.     Correct. … They just want to make sure the business could still run.

                      * * *

         … So, it wasn't asking for, is this the person, but they just wanted to ensure that, okay, is there a name in there

---

[3] UPS calls restructuring a "transformation."

> so if this all occurs do they feel comfortable there's
> enough people to run the business.

(Barre Dep. 95:17-97:9.) Plaintiff cites no evidence that conflicts with Barre's explanation of the

succession planning exercise. Furthermore, the retiring did not know if the AHRM position would

actually exist and need to be filled after they retired (because of the restructuring) and understood

that, if it did, Allison would need to make the decision. (Barre Dep. 105:13-106:11, 118:1-21.

136:5-138:15.)

        d.     Disputed as incomplete. Barre testified as follows:

> Q.     And you state that you would select Ramina because of
> her degree; correct?
>
> A.     Yes.
>
> Q.     And that's even though she had the least experience as
> UPS?
>
> A.     Yes.
>
> Q.     Why was the degree important?
>
> A.     You know what, I don't remember the specific one that
> Ramina brought, but Ramina was -- I believe she was an
> intern that was brought on that had previous experience
> in HR, had a degree. I'm not quite sure if it was HR
> related, but … that's not typical of UPS. … [I]t was
> becoming difficult to attract candidates to UPS, and so
> we started using interns. And … Ramina brought a lot to
> the table as an external candidate. I don't remember
> specifically what it was.
>
> Q.     At this point she was an internal candidate?
>
> A.     Yeah, she was already a UPS employee…

(Barre Dep. 86:17-87:14.)

        **8.**     **Greg Barr communicated these decisions to his dotted-line boss, Regional**

**Manager Pete Elroy, in June 2018, in an email thread with the subject line "VRP**

**confidential." Elroy specifically asked Barr to "backfill for Carlos and have him as**

replacement for Frank [Barre]." In response, Barr wrote that "Sara will replace Carlos as AHRM." Angel Paras, who was discussed with the UPS senior managers at the May 31-June 1 talent review meeting, was not mentioned anywhere on the documentation or communications regarding the VRP backfills and promotions, because he had not been selected for promotion. (G. Barr Dep. 63:11-71:18; G. Barr Dep. Ex. E (UPS 3686); G. Barr Dep. Ex. F, Pl. Ex. 9 (UPS 3688).)

**RESPONSE:**

Undisputed that Barr sent the cited email. Disputed that it communicated promotional decisions that had been made, as opposed to identifying possible backfills to ensure business continuity. *See* response to SAF 7(c), *supra*. In addition, the incoming District HR Director manager (Allison) would have to weigh in before the decision to fill the AHRM position could be made. (Barre Dep. 105:13-106:11, 118:1-21. 136:5-138:15.) Allison did not assume her role until January 14, 2019. (Allison Dep. 17:5-21, 18:14-20, 55:5-23.)

9.    a.    These decisions, including the decision to promote Maier, were reaffirmed again in August 2018, when UPS updated its procedures for backfilling positions that came open due to the VRP. (G. Barr Dep. Ex. K (UPS 3683), Pl. Ex. 8.)

b.    The spreadsheet reflecting UPS's decisions specifically referenced filling Maier's specific position as HR supervisor via "career development/VRP role to be backfilled." (G. Barr Dep. 71:19-72:23, 73:2-76:21, 77:7-79:7, 79:15-82:20; Rodriguez Dep. 31:17-34:3; G. Barr Dep. Ex. G (UPS 3675); G. Barr Dep. Ex. H (UPS 3676); G. Barr Dep. Ex. I (UPS 3680), Pl. Ex. 7; G. Barr Dep. Ex. J (UPS 3681); G. Barr Dep. Ex. J (UPS 3681); G. Barr Dep. Ex. K, Pl. Ex. 8 (UPS 3683).)

**RESPONSE:**

      a.    Disputed, because Plaintiff's claim that "decisions" had been made as of August 2018 contradicts the testimony of the persons with knowledge regarding the same. *See* responses to SAFs 7(c) and 8, *supra*.

      b.    Disputed, because Plaintiff's claim that "decisions" had been made contradicts the testimony of the persons with knowledge regarding the same. *See* responses to SAFs 7(c) and 8, *supra*. Undisputed that Plaintiff accurately quotes the document.

**10.    a.    These decisions were again reaffirmed again in late 2018 and early January 2019, when Frank Barre informed Marci Rodriguez—the person in charge of submitting VRP requisitions—that "Carlos would be replacing Frank, and Sara would be replacing Carlos." (Rodriguez Dep. 22:14-23:6, 23:24-25:13.)**

      **b.    Barre further instructed Rodriguez that requisitions for these promotions should be entered in UPS's system as "VRP backfills," i.e., as promotions that would occur without going through "MCO," which is UPS's system for competitive internal job postings. (Rodriguez Dep. 15:6-15:20, 22:14-23:6, 23:24-25:13; Interial Dep. 23:16-24:9; Rodriguez Dep. Ex. 7 (UPS 4129); Pl. Ex. 13 (UPS 4127); Pl. Ex. 1, Maier Decl., at ¶¶ 7, 24.)**

      **c.    Based on Barre's instructions, Rodriguez created the requested VRP backfill requisitions, which were approved on January 9. (Rodriguez Dep. 36:6-44:21; Rodriguez Dep. Ex. 7 (UPS 4129); Rodriguez Dep. Ex. 8 (UPS 4142).)**

      **d.    Barre instructed Rodriguez not to put names in any of the requisitions for the VRP backfills in the HR department, for good reason—HR personnel at UPS could view the requisitions and see the decisions before they were ready to be announced.**

(Rodriguez Dep. 36:3-44:21, 46:24- 47:16; Rodriguez Dep. Ex. 2, Rodriguez Dep. Ex. 7;
Rodriguez Dep. Ex. 8; Pl. Ex. 1, Maier Decl. at ¶ 25).

       **e.**       **When a UPS employee at the regional level reached out to Rodriguez
to find out which individuals would be filling the HR Operations Manager and AHRM roles,
Rodriguez informed the caller that Interial and Maier, respectively, had been selected.
(Rodriguez Dep. 42:5-44:21.)**

       **f.**       **No one had given Rodriguez—the person listed as the "primary
recruiter" on the requisition—any indication whatsoever that the decisions were tentative or
up for further discussion. (Rodriguez Dep. 42:5- 44:21; Rodriguez Dep. Ex. 7 (UPS 4129).)**

       **RESPONSE:**

       a.       Undisputed that Plaintiff accurately quotes Rodriguez's testimony about her
recollection of a conversation with Barre. Disputed that Rodriguez's testimony is evidence that
any "decisions" were made and reaffirmed. Rodriguez lacks personal knowledge on this issue, as
she was not privy to the succession planning process and received only second-hand information
about it. She testified:

> Q.     So, is it safe to say that as of January 14th, 2019, you
> believed Sara Maier was being promoted to the Area
> Human Resources Manager role?
>
> A.     I don't know about the specific date, but **from what I
> had been told, I thought she was filling the role**.

(Rodriguez Dep. 46:24-47:6) (emphasis added).

> Q.     So, if someone was going to take the retirement and that
> job would be backfilled, that would be a VRP job change
> promotion?
>
> A.     Yes, I mean the reqs that were submitted for VRP were
> submitted as VRP backfills.
>
> Q.     So, how was that succession planning accomplished?

> A. **I'm not sure how that happened. All I was told was, you know, these are the positions of the people who are retiring, submit requisitions stating "VRP backfill."**

(*Id.* 15:6-17) (emphasis added).

> Q. Did you tell [Plaintiff] that she had been inputted as the recommended candidate?
>
> A. Yes.
>
> Q. Did you mention that the managers and [Allison] were going to discuss before making a decision?
>
> A. **No. I was not aware what transpired** prior to her meeting with [Allison].

(*Id.* 65:2-9) (emphasis added). *See also* responses to SAFs 7(c) and 8, *supra*.

b.     Undisputed, except to extent Plaintiff implies that only positions posted to MCO may be competitive. (*See* Barre Dep. 106:13-107:7.)

c.     Undisputed.

d.     Undisputed that Rodriguez was instructed to submit requisitions without candidates identified and that certain HR personnel could view requisitions. As to Plaintiff's statement that the requisitions were submitted without candidates listed for the purpose of preventing HR personnel from learning about promotions before they were announced, Plaintiff lacks personal knowledge, making her affidavit on this issue inadmissible under Fed. R. Civ. P. 56(e). In addition, Plaintiff's speculation runs directly counter to the testimony of Barre (the person *with* knowledge) that no decision regarding the AHRM position would be made until Allison transferred to Illinois and weighed in. (Barre Dep. 136:5-137:8; *see also* Allison Dep. Ex. 16 at 003485, explaining that the requisitions were "TBD" because "no determination had been made").

e.     Undisputed.

f.     Undisputed that no one spoke with Rodriguez about the decision-making

process. Plaintiff's use of the term "tentative decision" is not supported by the record. *See* responses to SAFs 7(c) and 8, *supra*.

**11.     The decisions to promote Interial, Chlimoun, and Maier were also entered into People Tracker, which was UPS's system for documenting personnel moves such as promotions, demotions, and job moves. (Allison Dep. 157:9-23; Interial Dep. 125:22-127:3; Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707); Pl. Ex. 1, Maier Decl. ¶ 26.) Personnel moves are entered into "People Tracker" only when they occur, once a successor is in place. (Paras Dep. 75:22-76:1; Interial Dep. 124:3-129:13; Allison Dep. 156:20-157:23; Pl. Ex. 1, Maier Decl. ¶ 26.)**

**RESPONSE:**

Undisputed that the names were entered into People Tracker, and that the system was used for tracking personnel moves during the VRP. Plaintiff's statement that the use of People Tracker was to document only moves that had occurred is disputed as not supported by her citations and contradicting the testimony of the only person with knowledge regarding the same. Plaintiff's citations are to persons who were not responsible for tracking moves and potential moves in People Tracker during the VRP, including herself and Paras (who competed for the promotion at issue), Allison, who testified that she does not use People Tracker and has only heard of it as something UPS's transformation office uses (Allison Dep. 157:9-13, 176:16-17), and Interial, who testified that the system is used by UPS corporate and he does not have access to it (Interial Dep. 125:22-127:3, 128:24-129:7).

Barre, the person responsible for entering information into People Tracker during the VRP, testified as follows:

A.      … [When the t]ransformation was happening, and I was
        the one responsible for all the moves, not just in HR, I

was responsible for tracking everything for corporate. …
**This people tracker was what corporate used to track
what was, potentially, going to happen in the districts**.

\* \* \*

Q.     So moves would be entered into the people tracker once
they were approved?

A.     You know, it was a combination of that. … **It wasn't
just if it happened. It was, like, okay, here's who we
speculate's going to go into jobs**, so you can just kind
of do some planning.

(Barre Dep. 150:2-24 (emphasis added); *see also id.* at 151:12-13 ("I was the one responsible for

filling that thing out.")

Barre, the only other person with knowledge of the VRP succession planning process aside

from Barr, testified that "Promoted" would have been entered into People Tracker for a potential

promotion because:

A.      … This was what was recommended to happen, but it
needed to have discussion, and it could be at various
levels [at UPS] to determine whether [the promotion]
was going to happen or not. … [O]ther people had to
weigh in on what was going to happen because there
[were] so many moving parts with this transformation.
… [I]t was just an antiquated system to track it. Where
I'm going with it was depending on your level at UPS,
you knew more about what was going on with
transformation than maybe other people.

Like, for example, Greg [Barr] and I did not know, when
we left sometime in January that the Illinois district was
going to combine with the Central Plains district
sometime -- I think it was in Q2. People [at UPS] knew
that. … [W]e didn't want to put people in the jobs that
necessarily may not exist in three months …

So, I just want to be clear that, you know, **just 'cause
something says [promoted] on this document, doesn't
mean it happened**. It was more for other people [who]
needed to know what was planned and they could say
we're not doing that. …

20

Q.      … [I]s it a fair reading of this [People Tracker] document that as of the date of this document that the district anticipated Sara Maier would be promoted from HR supervisor to area human resources manager effective February 1st, 2019?

[A.]    No, it's just a recommendation that if things were to proceed, that's who was recommended. … **Was this the final say that Sara was going to that job? Absolutely not**.

(Barre Dep. 154:1-6, 156:14-159:9 (emphasis added); *id*. at 162:6-164:10.)

12.    **a.      These decisions—including Maier's promotion—were again reaffirmed on January 14, 2019, Allison's first day as Illinois District HR Director. (Allison Dep. 55:5-10.) On that date, Barre sent his replacement, Interial, copies of "salary impact sheets" showing the salaries that Maier and Chlimoun would receive upon their promotions. (Interial Dep. 63:22-67:11; Interial Dep. Ex. 7 (UPS 3696); Interial Dep. Ex. 8 (UPS 3699).)**

**b.      Salary impact sheets are prepared at UPS only when a promotion or salary change decision has already been made. (Interial Dep. 66:19-67:11; Paras Dep. 98:14-99:6; Rodriguez Dep. 45:16-46:16.)**

**c.      No salary impact sheet for Paras had been prepared at the time. (Interial Dep. 64:4-65:6; Interial Dep. Ex. 7 (UPS 3696).)**

**d.      On that same date, Greg Barr sent to his replacement Chelsea Allison a phone list of the employees reporting up to her that listed Carlos Interial as HR Operations Manager, Sara Maier as Area Human Resources Manager, and Ramina Chlimoun as HR supervisor; the document listed Paras as an HR supervisor. (Barr Dep. 91:23-95:15; Allison Dep. 65:4-69:1; Barr Dep. Ex. L (UPS 3483); Barr Dep. Ex. M (UPS 3484).) Also on that same date, Barr and Barre exchanged emails with organizational charts and phone lists reflecting Interial, Maier, and Chlimoun's promotions—exactly as had been planned since**

21

June 2018. (G. Barr Dep. 95:16-101:10; G. Barr Dep. Ex. N (UPS 3671); G. Barr Dep. Ex. O (UPS 3673).) Phone lists and organizational charts were prepared at UPS by Marcy Rodriguez's administrator, who would input information from managers reflecting personnel moves that had already been made. (Rodriguez Dep. 15:21-17:1; F. Barre Dep. 130:20-131:12.)

**RESPONSE:**

a.      Undisputed that Barre sent Interial salary impact sheets on January 14, 2019, showing the salaries they would receive "if" they were promoted after he retired. (Barre Dep. at 147:21-149:5.) Plaintiff's citations do not support her argument that a decision had been made or was "reaffirmed." *See* responses to SAFs 7(c), 8, and 11, *supra*.

b.      Disputed as not supported by the record. Plaintiff offers no evidence to suggest persons whose testimony she cites on the issue of salary impact sheets have any personal knowledge regarding the same. Barre, the only person who prepared such documents (Barre Dep. 147:8-13), testified as follows:

> Q.      So you mentioned you were the only one who did compensation. So did you create the salary impact sheet?
>
> A.      Yes.
>
> Q.      Okay. And what was the purpose of those salary impact sheets?
>
> A.      It was to determine what the person's salary would be if they went into that position.
>
> Q.      Would you create them for every potential applicant for promotion?
>
> A.      Not all, but there was many that I created … people wanted to be ready, should they be able to go ahead and promote, because there's many factors with it, getting it approved, all that. So people always wanted to be ready, so it wasn't uncommon to have all these salary sheets.

> But it necessarily didn't always happen.

(Barre Dep. 145:6-24.)

> Q. And those sheets that you would create [as] a preemptive salary worksheet, would you have created them for multiple candidates then?
>
> [A.] Occasionally I would do that, yes, but not always.

(*Id.* 146:15-20.)

      c.     Undisputed.

      d.     Undisputed that the described phone list and organizational chart were circulated, and that they were prepared by Rodriguez's administrative assistant. Plaintiff's statement that phone lists and organizational charts can reflect only moves that have already been made is disputed as not supported by the evidence Plaintiff cites. Specifically, in the cited testimony, Rodriguez said as follows:

> Q. And UPS certainly does not revise its organizational charts or phone lists based on potential promotions, right?
>
> A. That, **I'm not sure**, because, again, [my admin] handled that. So she would be the one to make the updates if a manager told her.

(Rodriguez Dep. 16:21-16:2) (emphasis added). Similarly, in the testimony Plaintiff cites by Barre, he stated:

> Q. And UPS wouldn't prepare revise phone lists for potential promotions; is that right?
>
> A. **I don't know**.
>
> Q. Have you ever received a phone list that had been updated with potential promotees in it before?
>
> A. You know, I really didn't -- **I don't know**…

(Barre Dep. 131:21-132:4) (emphasis added). Barr, whose testimony Plaintiff does not cite, stated:

Q.      In your experience, do you usually receive -- do you recall receiving a phone list that was showing people's potential moves in the future in your time at UPS?

A.      No, but this obviously was a little bit of a unique situation … with the retirement … that mass of people leaving. That was not typical, especially the number of people who left our department at the same time.

(Barr Dep. 94:23-95:9.) *See also* responses to SAFs 7(c), 8, and 11, *supra*.

**13.      Before January 17, 2019, Maier's forthcoming promotion was widely announced and discussed among HR personnel throughout the Illinois District. Division Manager Tim Bingham told Maier that Barre and Barr told "the whole district" that Maier would be promoted and congratulated Maier on her promotion the Monday after Maier was informed that UPS had instead decided to give the promotion to Paras. In addition, the HR supervisors who would be reporting to Maier as AHRM had been sending her their PTO requests because they knew she was being promoted. (Maier Dep. 89:7-90:7; Maier Dep. Ex. 1, at Maier 43; Pl. Ex. 1, Maier Decl. at ¶¶ 23, 33; Pl. Ex. 23, P's supplemental responses to Rog. 14.)**

**RESPONSE:**

Disputed as unsupported by any admissible evidence. Plaintiff's statement about what a third party (Bingham) purportedly told her Barr and Barre said is inadmissible hearsay. *See* F.R.E. 801(c), 802. In addition, Plaintiff's attempt to attribute the hearsay statement to Barre and Barr conflicts with the admissible evidence. *See* responses to SAFs 7(c) and 8, *supra*.

**14.      a.      On January 14, 2019—her first day as Illinois HR District Director—Chelsea Allison held an all-staff meeting to meet her new team. At that meeting, she extensively discussed her husband's role and flexibility in allowing her to pursue her career—in particular, his role in helping their children with extracurricular activities like**

24

basketball and his willingness to relocate for Allison's new job on short notice. (Maier Dep. 240:18-242:24; Paras Dep. 67:10-71:10; Macchia Dep. 69:14-71:2; Allison Dep. 69:4-74:2, 105:12-20.)

      b.     At this meeting, Paras talked about his four children and his dance business. (Maier Dep. 240:18-242:24; Paras Dep. 70:21-23.)

      c.     Maier testified that Allison talked about "how her husband had stayed at home and allowed her to work so she could work her way through UPS." (Maier Dep. 240:18-242:24.) While acknowledging that, generally, she did praise her husband's flexibility and assistance with her career, Allison disagreed with Maier's recollection of the meeting, claiming that her husband was a "full-time" employee at "all times." (Allison Dep. 69:4-74:2.)

      d.     [REDACTED] (Allison Dep. 72:19-73:6, 250:5-9; Pl. Ex. 17, at UPS 4410-11, 4646.)

**RESPONSE:**

      a.     Undisputed for purposes of this motion only, although the testimony Plaintiff cites (other than her own) does not suggest Allison's mention of her family was more than brief.

      b.     Undisputed.

      c.     Undisputed that Plaintiff and Allison each so testified.

      d.     This statement of "fact" is argument (not contained in Plaintiff's brief) regarding the purported implausibility of Allison's statement that her husband was employed on a full-time basis. Plaintiff's argument is not supported by the evidence she cites. Specifically, Plaintiff argues that what Allison allegedly said about her husband's employment status leading

25

up to January 14, 2019 cannot be true because Allison hired him to work for UPS for a single three-week period in October and November of 2021, *nearly three years later*. (*See* Plf. Ex. 17.) What Plaintiff's husband did for three weeks in 2021 is not evidence of his employment status leading up to January 2019.

**15.     a.     On Thursday, January 17, 2019, Plaintiff showed up to work in the early morning hours to work on the preload shift. (Maier Dep. 243:21-244:21; Macchia Dep. 75:11-17.)**

**b.     Around 11 a.m., after she had already worked a full day, she received an instant message from Chelsea Allison asking if Maier had "time to talk" that day. (Maier Dep. 45:14-46:1; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at Maier 35; Pl. Ex. 22, Stipulation; Pl. Ex. 1, Maier Decl. Pl. Ex. 1, ¶ 28.)**

**c.     Shortly thereafter, Maier received a call from Ron Macchia, telling Maier she "was going to Addison to meet with Chelsea to be promoted." (Maier Dep. 45:14-46:1, 62:4-8, 65:7-17; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at Maier 35.)**

**d.     Maier expressed concerns to Macchia that she was dirty and disheveled after working the presort shift from the early morning hours, and asked if she could have some time to freshen up, but Macchia insisted that she go to Addison immediately. (Maier Dep. 62:17-23, 243:21-244:21.)**

**e.     At the time she left her office and began driving to Addison, Maier did not know that anyone else would be meeting with Allison—that information was shared with her only when she was already on her way. (Maier Dep. 45:10-46:1, 62:21-64:3.)**

**f.     When she arrived at Addison, Maier waited and worked from there for several hours. (Maier Dep. 64:14-22.) During that time, Interial instant messaged Maier and**

**told her "they were putting [her] last in the lineup because I was getting promoted [and] he didn't want the other two supervisors to know this was the plan. He told me not to be nervous because this job was mine." (Maier Dep. 65:7-17, 245:5-16; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35) at Maier 36; Pl. Ex. 22, Stipulation)**

> **g.      Paras went in first to talk with Allison and Interial and stayed with them for about 40-45 minutes. (Paras Dep. 82:22-83:16; Pl. Ex. 1, Maier Decl. ¶ 29.)**

**RESPONSE:**

a.      Undisputed for purposes of this motion only.

b.      Undisputed that Plaintiff so testified, *but see* UPS's response to SAF 15(e), *infra*.

c.      Undisputed for purposes of this motion only. However, Macchia did not speak with Allision—the decision-maker—prior to the interviews. (Macchia Dep. 72:1-73:1.)

d.      Undisputed for purposes of this motion only. Macchia does not recall this conversation. (Macchia Dep. 76:2-20.)

e.      Disputed. Paras testified as follows:

> Q.      Do you recall calling Sara Maier before the meeting with Chelsea Allison that day?
>
> A.      Yeah, we spoke on Wednesday. So, like, anything else, we wanted to know who were the people who were getting interviewed, knowing that I was one of -- I already knew I was one of the interviews. So me and Sara were pretty close, so we talked. We're like, well, sounds like -- She found out -- she told me she found out Mike Kish was the other interviewee. So there was three of us who were coming in on Thursday to do the interview.
>
> Q.      And that conversation was on Thursday, January 17th, 2019?
>
> A.      Wednesday. It was Wednesday. Once they told us who was going -- so once they announced -- like, when Mike

Nugent told me hey, you're going in for an interview on Thursday, we all spoke – me and Sara spoke that Wednesday.

(Paras Dep. at 78:4-22.)

Q.    During the Wednesday phone call with Sara, did Sara specifically say the word "interview" during the call?

A.    Yes.

Q.    And Sara specifically acknowledged that she was told that she was interviewing with Chelsea on Thursday, correct?

A.    Yes.

Q.    And then you talked about your plans to work at Addison on Thursday, the day of the interview, right?

A.    Yes.

(Paras Dep. at 123:14-124:3.)

Confirming Paras' recollection, Plaintiff wrote to a friend on January 19, 2019, that "a new director [arrived] on Tuesday and she told the manager[s] she wanted to talk to the top supervisor from each area. So we all went there to meet her on Thursday." (Plf. Dep. Ex. 11 at MAIER000501.)

f.    Disputed as conflicting with Plaintiff's own contemporaneous writing. On January 19, 2019, Plaintiff wrote that Interial told her she would interview last "because [Allison] was **likely** going to promote [her] after" the interview. (Plf. Dep. Ex. 11 at MAIER000499) (emphasis added).

g.    Undisputed for purposes of this motion only. Paras believes his interview was about 45 minutes based only on what someone told him later; he did not time anything or pay attention to how long the interviews were. (Paras Dep. 83:14-16, 87:25-88:9.)

16.     a.     At the beginning of the meeting with Allison and Interial, Maier responded to Allison's invitation to discuss something "personal or professional about herself," by talking "about my children, how me and my husband were trying for a third but hadn't been successful yet."

b.     At that point, Chelsea began questioning Maier about whether she could work "long hours, working in the middle of the night" with her "small children." Maier responded to Allison that she "already had been doing that," that she already "worked in the middle of the night," that she already "worked long hours," and "already did the responsibilities of a manager and that it wasn't going to be a problem."

c.     Maier attempted to discuss some of her many credentials and accomplishments, including her expertise with Microsoft Access and her vast experience training and mentoring other UPS personnel, but Allison cut off her answers.

d.     Maier perceived that, after she mentioned her young children, Allison acted in "disingenuous" way that showed she "wasn't really listening to what [Maier] said," making clear to Maier that "it didn't really matter what [Maier] said, and that [Allison] had already made her mind up." ((Maier Dep. 45:10-46:1; 52:18-53:10, 62:4-64:3, 65:7-72:23, 104:6-19, 245:5-16; Allison Dep. 103:4-104:15; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35).)

e.     The meeting took about 10 or 15 minutes. (Maier Dep. 51:8-15.)

f.     Allison and Interial took no notes at the meeting, and UPS has no documentation of what occurred at the meeting with Maier or any of the HR supervisors. (Allison Dep. 107:20-108:22; Interial Dep. 84:20-85:24, 87:16-19, 90:10-14, 91:18-21.)

**RESPONSE:**

a.     Undisputed that Plaintiff so testified. Neither Allison nor Interial can recall

29

whether or not Plaintiff mentioned trying to have another child. (Allison Dep. 104:2-8; Interial Dep. 93:18-94:5.)

      b.    Undisputed that Allison asked Plaintiff (as she did Paras and Kish) about her schedule and ability to take on additional responsibilities and, for purposes of this motion only, undisputed that Allison asked about Plaintiff's ability to work during the night with her children. (Allison Dep. 104:16-105:1.) Plaintiff's suggestion that this was part of a series of "questioning" about her children (which she describes as "grilling" in the header at p. 9 of Plaintiff's SAF) is disputed as lacking record support. Plaintiff has identified only a single question Allison asked regarding her children:

> She questioned me about my current work schedule. I told her UPS has always been flexible but as a new manager I was not expecting that same flexibility. I told her that my husband and I had already worked it out. She asked me if I felt I could work all hours of the night w/my kids - I told her I do it already.

(Plf. Dep. Ex. 1 at p. 4.) During her deposition, Plaintiff claimed Allison asked "a few questions" on this topic, but she could not identify any. (Plf. Dep. 70:5-72:23.)

      c.    Undisputed that Plaintiff discussed her accomplishments. As to whether Allison "cut off" Plaintiff's answers, it is undisputed that Plaintiff claims that to be the case. However, in her contemporaneous notes made regarding the interview, Plaintiff identified only one instance in which Allison did not give her the opportunity to finish answering a question. (Plf. Dep. Ex. 1 at p. 4.)

      d.    UPS is not in a position to dispute what Plaintiff personally believed may have been in Allison's mind. Plaintiff's speculation regarding Allison's state of mind is not evidence. As to her own state of mind, Allison testified that she perceived Plaintiff to be irritated that she had to interview. (Allison Dep. 106:16-18.) As such, it is undisputed that neither party felt

the interview went well.

        e.        Undisputed for purposes of this motion only.

        f.        Undisputed. However, disputed to the extent Plaintiff implies notes should have been made. UPS's Interviewer's Workshop training materials state "UPS does not require or recommend making notes during an interview and notes made during an interview are not to be retained as business records. (Ex. M at 004578.)

**17.    a.    Unlike Maier, Paras was told the day before he would be meeting with Allison, time he took advantage of to hone his talking points. Unlike Maier, Paras did not work the preload shift in the early morning hours of January 17, and did not have to travel; he showed up presentably at Addison, in a suit, at 9 a.m.**

**b.    Interial and Allison spent about triple the time with Paras (45 minutes) as they did with Maier (10-15 minutes).**

**c.    Paras was so nervous his leg was shaking. He talked about his four children, two of whom were young, his family responsibilities, and other outside responsibilities—including his dance school.**

**d.    Nonetheless, unlike with Maier, Allison did not question Paras about whether he could handle working "long hours, working in the middle of the night" with his "small children."**

**e.    Unlike Maier, Allison allowed Paras to finish his answers without cutting them off. (Maier Dep. 51:8-15, 84:11-86:14; Paras Dep. 5:1-2, 8:21-23, 72:10-14, 76:13-83:16, 85:18-86:15, 90:7-17, 92:17-96:6; Interial Dep. 88:12-89:14, 93:15-94:9; Allison Dep. 99:5-100:17, 103:21-104:15; Maier Dep. Ex. 2 (Maier 149-50); Pl. Ex. 1, Maier Decl. ¶ 29.)**

**RESPONSE:**

        a.      Undisputed, except as to Plaintiff's use of the introductory phrase "[u]nlike Maier." *See* response to SAF 15(e), *supra*.

        b.      Undisputed for purposes of this motion only. For context, the third candidate (Mike Kish, who has no children) also had a shorter interview than Paras' interview. (Paras Dep. 87:9-23.) Plaintiff believes Kish's interview lasted about 15 minutes, like hers. (Plf. Dep. Ex. 1 at p. 2; Plf. Dep. 83:13-15.)

        c.      Undisputed.

        d.      Undisputed that Allison did not "question Paras" about whether he could handle working long hours with his children, because Paras raised the issue himself. He testified as follows:

> Q.      [Allison] didn't ask you about whether your family responsibilities would interfere with your schedule as a manager?
>
> A.      No, she did not. **<u>I brought it up</u>**. She knew -- So I talked a lot in that interview because I started -- So I brought up my own family. I told her about what responsibilities I had with them. And then, you know, at that point I also tied it in to work-life balance.

(Paras Dep. at 85:18-86:2) (emphasis added).

        e.      Undisputed that Paras does not recall Allison cutting off his answers to questions. (Paras Dep. 86:13-15.) As to whether this was "unlike" Plaintiff, *see* response to SAF 16(c), *supra*.

        **18.      a.      UPS has extensive and formal policies and training materials for conducting interviews. (Pl. Ex. 25 (UPS 4590); Pl. Ex. 16 (UPS 4606); Pl. Ex. 15 (UPS 4478);**

**Allison Dep. 43:1-51:1; Paras Dep. 48:10-58:18; Maier Dep. 245:18-246:19.) Allison, who testified she has done "hundreds of thousands" of interviews at UPS, is well aware of these policies.[4] (Allison Dep. 43:1-19.)**

> **b.      UPS's interview policies and training materials specify the following:**

[REDACTED]

> **c.      In addition, Allison testified to her understanding that UPS policy requires "consistency" and "proper questions" and "consistency in the interviewing process across the candidates"; to take into account "whatever's available from a document perspective ... before making a final decision"; to have "documents or notes" to evaluate the candidates; and to use UPS's "interview training so that you're appropriate in the questions you ask." (Allison Dep. 43:1-51:1.)**

> **d.      Allison and Interial followed none of these guidelines in their discussions with Maier and Paras, demonstrating that they did not intend these meetings to be interviews at the time. (*See* Statements of Fact 15-17, above.)**

**RESPONSE:**

> a.      Undisputed that Allison is an experienced interviewer and is familiar with UPS's practices and training materials. As to the purported "extensive and formal policies and training materials for conducting interviews," disputed to the extent Plaintiff attempts to mischaracterize the evidence. UPS has a series of high-level, bullet-point PowerPoint slides it uses when training managers on the issue of interviewing and hiring (which Allison identified in her deposition), two of which Plaintiff has submitted in opposition to UPS's motion for summary judgment. (*See* Plf. Exs. 15 and 16.) No other training materials and no "formal policies" have

---

[4] At his deposition, Interial bizarrely denied that UPS offers interview training, which is one of many aspects of his deposition testimony that could support a jury's conclusion that he is a dissembler.  (Interial Dep. 26:16-21.)

been identified. As to formal policies, Allison testified as follows:

> Q.    Does UPS have any policies with regard to how interviews are conducted
>
> A.    Just with a fair and ethical approach, and there is an ask for at least three candidates to be considered, but it's not always possible.
>
> Q.    Beside there being a fair and ethical approach and at least three candidates, are there any other policies with regard to how interviews are conducted?
>
> A.    No, not that I'm aware of.

(Allison Dep. at 44:3-12.) Barr confirmed that the interview process at UPS is not structured and is "up to the individual" conducting the interview. (Barr Dep. 36:3-37:9.)

Finally, Plaintiff mischaracterizes Interial's testimony in her footnote 3. Interial did not "deny" that UPS offers interview training, but rather stated that he could recall the details during his deposition. He testified as follows:

> Q.    Does UPS train its employees who are conducting interviews on how to interview?
>
> A.    There is training.
>
> * * *
>
> Q.    Does UPS offer any training more specific than 'we don't discriminate' that you're aware of?
>
> A.    Not that I'm aware of. I mean, there's training, but at this point in time, I couldn't tell you anything specific or, you know, recite what specific training there is.

(Interial Dep. at 25:23-26:21.)

   b.    Undisputed that Plaintiff accurately quotes from the PowerPoint presentation.

   c.    Disputed as mischaracterizing Allison's testimony. When discussing interviewer training, Allison testified the "policy" is "we should ensure that there's some

34

consistency" and take documentation into account as possible. (Allison Dep. at 46:2-24.) With regard to "proper" questions, Allison described the training as "pretty general," but as advising the interviewer not to "ask[] a question that would be inappropriate." (*Id.* at 49:1-4.) As to making notes, Allison testified:

> Q. Did this training say anything -- I think you mentioned documentation. What did the training say about documentation?
>
> A. Yeah, I don't recall any specifics about documentation in training.

(*Id.* at 49:9-13.) Allison acknowledged that making notes would be helpful to a manager who had to interview "10 or 15 people." (*Id.* at 49:14-51:1.) However, UPS's Interviewer's Workshop training materials state "UPS does not require or recommend making notes during an interview and notes made during an interview are not to be retained as business records. (Ex. ____ at 004578.)

d. This statement of "fact" constitutes pure argument. Plaintiff's vague reference to SAFs 15-17 identifies no factual support for the alleged failure to follow any guideline.

**19. a. After meeting with Paras and Maier, Interial and Allison attempted to reverse the decision to promote Maier, in favor of Paras, a man who they knew also had young children and extensive non-UPS responsibilities, and who lacked the only required qualification for the AHRM position—a bachelor's degree. (Allison Dep. 116:21-117:4, 166:11-167:1; Interial Dep. 104:16-21; Maier Dep. 79:21-80:6, 126:17-129:13, 248:19-249:3; Interial Dep. Ex. 9 (UPS 3708); Interial Dep. Ex. 10 (UPS 3709); Def. Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483 ("Required must be specific to the business need of the job and is absolute. The applicant either has it or does not.").)**

**b.      During the evening of Thursday, January 17, Interial sent Allison a document reflecting two "scenarios" for backfilling his AHRM position: one if Sara Maier were promoted and the other if Angel Paras was promoted; the only substantive information on the document was education level, reflecting that Maier had her bachelor's degree and Paras did not. (Interial Dep. Ex. 9 (UPS 3708); Interial Dep. Ex. 10 (UPS 3709).)**

**RESPONSE:**

a.      This "fact" constitutes argument and is not supported by the record. In making this argument, Plaintiff improperly assumes as a "fact" an ultimate issue in this case—*i.e.*, her contention that she was selected for promotion—in order to characterize Paras' selection as the "reversal" of that purported decision. The only witnesses with personal knowledge of the VRP succession planning process have testified that, while Plaintiff was identified as the "possible" AHRM backfill, no promotional decision was actually made during that process. (Barr Dep. 69:10-12, 102:12-22; Barre Dep. 136:5-137:18; *see also* responses to SAFs 7(c), 8, and 11, *supra*.) As to Paras' lack of degree, the undisputed evidence is that UPS will promote a person who has not yet obtained a degree. *See* response to SAF 4(a), *supra*. Furthermore, Allison believed Paras was about to complete his degree, and UPS's "Career Profile" data indicated the same. (Allison Dep. Ex. 5 at 003491; Allison Dep. Ex. 9 at 004068.)

b.      Admitted that Interial sent Allison the cited document. As to what "substantive" information it contained, disputed, as the document speaks for itself.

**20.      The next day, Interial and Allison spoke with the two other AHRMs about the third AHRM position, and UPS has offered contradictory accounts of what occurred during that conversation (or those conversations.) Macchia testified that he advocated for Maier's promotion, as he had on several prior occasions, as she was the "number one candidate in**

[his] eyes." (Macchia Dep. 63:1-64:24, 67:18-68:4, 79:23-84:14, 86:16-87:2.) **Macchia** also advised Allison and Interial that Maier's "kids had never caused any issues at work," that Maier "always got everything done," and is "the first to volunteer." (Maier Dep. 109:7-21, 110:9-111:4; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at Maier 42; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14.) Nugent, the other AHRM at the time, had no input on the decision and told Maier she was the better candidate. (Pl. Ex. 1, Maier Decl., at ¶ 34; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at 42-43; Pl. Ex. 23, Pl.'s supplemental rog responses, at No. 14.) This evidence conflicts with UPS's position before the EEOC, which was that Allison expressed her preference for Paras "and the others agreed." (Pl. Ex. 27, (UPS 34).) Interial testified to something different: that Macchia and Nugent were indifferent to whether Maier or Paras would be promoted, but that he put his thumb on the scale for Paras based solely on the January 17 meeting. (Interial Dep. 110:23-112:18.) Interial also asserted that he was unaware of his predecessors' choice (or at minimum, recommendation) of Maier, a lie he was caught on at his deposition. (Interial Dep. 112:19-116:9; Interial Dep. Ex. 7 (UPS 3696); Interial Dep. Ex. 8 (UPS 3699); Interial Dep. Ex. 11 (UPS 3766); Interial Dep. Ex. 12 (UPS 3767).) Allison testified to a version of facts that conflicts with both Interial and Macchia's sworn testimony. Unlike Interial, who asserted that Macchia and Nugent were indifferent, and Macchia, who testified that he advocated for Maier's promotion, Allison testified that UPS made the decision "collectively," based on Nugent and Macchia's "verbal feedback" and "based on the advice of ... the team in Illinois," and that the "team," including Nugent and Macchia, reached "full agreement" and "consensus" on the decision to promote Paras instead of Maier. (Allison Dep. 111:23-112:14, 145:18-147:11, 245:19-246:9.)

**RESPONSE:**

UPS does not dispute the witnesses' testimony, which speaks for itself. UPS objects to Plaintiff's testimony regarding what Macchia purportedly said to Allison as inadmissible hearsay. *See* F.R.E. 801(c), 802. UPS also objects to Plaintiff's argumentative characterization of the process of managers engaging in discussions and expressing varying opinions before ultimately reaching a consensus as "contradictory accounts" and getting caught in a "lie."

**21.     a.     Paras testified clearly and frankly that he was nowhere close to getting his degree when he met with Allison and Interial and certainly was not "scheduled to complete his bachelor's degree . . . in May of 2019." Paras testified that, at the time he met with Allison and Interial, he had more than 20 classes left to obtain his bachelor's degree, had a planned graduation date of 2023, and told Allison and Interial merely that he "was in school." (As of his deposition, he still had not received his bachelor's degree because of the "juggle between work and the kids' activities, just laziness on my end sometimes" but has been employed as a manager, with a manager's salary, at UPS ever since his promotion to AHRM in January 2019.) (Paras Dep. 5:1-2, 8:21-23, 72:10-14, 85:10-17, 90:7-17, 123:14-16.)**

**b.     Paras acknowledged as much when talking with Maier after their January 17 meetings, explaining that he knew he wasn't getting promoted because he didn't have his bachelor's degree and because he doesn't do the "extra stuff" that Maier did. (Maier Dep. 80:8-82:22, 248:2-18; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at Maier 39.)**

**RESPONSE:**

a.     Undisputed.

b.     Undisputed only that Plaintiff so testified, but her testimony is inadmissible hearsay that conflicts with Paras' own testimony. *See* F.R.E. 801(c), 802. Paras testified that he

spoke during his interview about his accomplishments and the specific tasks he took on, and he felt "excited" afterwards, like he had "highlighted [him]self very well." (Paras Dep. 86:16-87:8.) When Plaintiff asked Paras about how his interview went, he "just kind of made [his answer] very vague." (*Id.* at 88:13-18.)

**22.    Throughout their time as HR supervisors (Maier's beginning in 2007 and Paras's in 2014), Paras never once had a stronger performance review than Maier. (Maier Dep. 25:10-28:3; Pl. Ex. 21, RTA Response Nos. 10, 15.) At UPS, performance reviews were one key metric by which potential candidates for promotion are evaluated during the succession planning process. (Allison Dep. 33:2-13; Barr Dep. 24:6-25:3; Macchia Dep. 17:19-19:20.) Maier and Paras's performance reviews during the months and years leading up to Paras's promotion to AHRM demonstrate unequivocally that UPS considered Maier the stronger-performing HR supervisor. In Q1 of 2018, Paras was failing all of his goals; in Q2 2018, he was meeting only one of his five goals, received a mix of "usually" and "always" for UPS's "living our values," and was advised by his manager to "finish your degree and focus on writing skills"; at the end of the year, Paras had satisfied only one of his five goals, and got a 0% in "concern frequency." (Paras Dep. 28:21-34:20, 38:2-41:2; Paras Dep. Ex. 1 (UPS 2506); Paras Dep. Ex. 2 (UPS 2524); Paras Dep. Ex. 3 (UPS 2584).) In contrast, Maier's performance reviews throughout the same period show that she was performing much better—meeting the majority of her goals throughout the time period, rated as "always" in every UPS "living our values" rating, receiving absolutely glowing feedback about her leadership, her schedule flexibility, and her willingness to take on extra projects, and finishing 2018 having met four of her five objective performance goals. (Macchia Dep. 32:18-**

**52:7; Macchia Dep. Ex. 2 (UPS 3218), Macchia Dep. Ex. 3 (UPS 2497), Macchia Dep. Ex. 4 (UPS 2549), Macchia Dep. Ex. 5 (UPS 2670).)**

 **RESPONSE:**

 Undisputed that performance evaluations are one metric considered in assessing an employee's readiness for promotion. Plaintiff cites to RFA No. 15 for the fact that Plaintiff "never once had a stronger performance review" than Paras. What RFA says (and UPS does not dispute) is that Plaintiff never had a "better overall performance rating" than Plaintiff. (Plf. Ex. 21 at 15.) Plaintiff cites no evidence to suggest Paras ever had a worse "overall rating" than she did. Plaintiff's attempt to second-guess how Paras' manager assessed the quarterly components that led to Paras' overall ratings of "strong performance" is argument and lacks any foundational context. (*See* Paras Dep. Ex. 2 at 002527; Paras Dep. Ex. 3 at 002587, 002589.)

 More importantly, this fact is immaterial. It is undisputed that Paras and Plaintiff were both identified as "Level 1" fit (aka, "ready now") for promotion to AHRM. (Allison Dep. Ex. 9 at 004066, 004068.) This means UPS determined they both had "the abilities, experiences and attributes to be highly effective in [a new] role; few major skills or leadership gaps; [and] require[d] little to no development." (Plf. Ex. 21 at RFA No. 29.)  Plaintiff cites no evidence to suggest the underlying data used to make fitness assessments must be reviewed or reassessed by an interviewer prior to selecting between Level 1 fit candidates. Here, Interial testified performance evaluations were not considered and did not need to be considered:

> Q. The performance reviews weren't considered as part of the decision as to whom to promote to Area HR Manager, where they?
>
> A. No. All three candidates were "ready now" candidates. So, I mean, no, there was nothing to look at performance reviews. If there was an issue with performance reviews, they wouldn't have been there as a "ready now" candidate.

(Interial Dep. 111:17-112:9.)

23.    a.    **In addition to everything discussed above—the fact that only Maier satisfied the required qualification for the AHRM role, that she was already performing as lead supervisor, the fact that her performance reviews were consistently and objectively better than Paras's - Maier was better qualified for the AHRM in every other conceivable way as well.**

b.    **Maier had seven years more experience in the full-time supervisor role, having been promoted to HR supervisor in 2007, while Paras had been promoted in 2014 after an earlier demotion. (Maier Dep. 25:10-28:3; Pl. Ex. 21, RTA Response Nos. 10, 11, 15; Paras Dep. 15:7-13.)**

c.    **Maier was "ready now" for promotion to AHRM for longer—having been recognized as ready for promotion in or around 2015, when Macchia took over her area, while Paras was first recognized as a Level 1 fit for promotion just before he was promoted. (Macchia Dep. 19:13-21:4; Pl. Ex. 26, Maier 35 (at Maier 44); Pl. Ex. 1, Maier Decl. at ¶ 19.)**

d.    **Maier had directly supervised and trained Paras for two years while she was an HR supervisor and he was an HR specialist, and Paras still came to her for help with Microsoft Access and advice about thorny issues. (Maier Dep. 100:17-101:3; Allison Dep. 192:5-20; Paras Dep. 15:14-17:10, 23:17-25:6; Pl. Ex. 21, RTA Response Nos. 12-14; Pl. Ex. 1, Maier Decl. at ¶ 13.)**

e.    **Notably, UPS has never suggested that Maier's actual work performance lagged or Paras's surged in advance of the decision to promote Paras—because Maier's performance was always stronger, she was rated as Ready Now or Level 1 fit for**

41

promotion throughout the time period, and she received "strong performance" ratings every year through 2019. (Macchia Dep. 32:18-52:7; Macchia Dep. Ex. 2 (UPS 3218), Macchia Dep. Ex. 3 (UPS 2497), Macchia Dep. Ex. 4 (UPS 2549), Macchia Dep. Ex. 5 (UPS 2670) Def's SOF No. 9; Pl. Ex. 21, RTA Response Nos. 15-30.)

f.     Finally, and critically, there is no dispute that the managers and senior leaders who worked with both Maier and Paras over the years understood and believed that Maier was a stronger candidate for AHRM, which is why they chose her over Paras for the position. (Barre Dep. 137:19-138:15, 139:15-140:10; Macchia Dep. 63:1-64:24, 67:18-68:4, 79:23-84:14, 86:16-87:2; G. Barr Dep. 63:11-71:18,91:23-95:15; Allison Dep. 65:4-69:1; G. Barr Dep. Ex. E (UPS 3686); G. Barr Dep. Ex. F, Pl. Ex. 9 (UPS 3688); Barr Dep. Ex. L (UPS 3483); Barr Dep. Ex. M (UPS 3484); Pl. Ex. 21, RTA Response Nos. 3-4; Pl. Ex. 1, Maier Decl. at ¶¶ 13, 19-20, 34.)

g.     Both Allison and Interial were aware of this at the time, but nonetheless decided to promote Paras over Maier. (Allison Dep. 79:1-83:9; Interial Dep. 112:19-116:9; Interial Dep. Ex. 7 (UPS 3696); Interial Dep. Ex. 8 (UPS 3699); Interial Dep. Ex. 11 (UPS 3766); Interial Dep. Ex. 12 (UPS 3767); Barr Dep. Ex. L (UPS 3483); Barr Dep. Ex. M (UPS 3484); Allison Dep. Ex. 5 (UPS 3490); Allison Dep. Ex. 16 (UPS 3485); Allison Dep. Ex. 17 (UPS 3487).)

**RESPONSE:**

a.     This statement constitutes pure argument.

b.     Undisputed, but immaterial. The undisputed evidence is that a longer tenure

does not suggest a superior qualification.[5] (Barre Dep. 140:20-141:8.)

c.     Undisputed, but immaterial. The undisputed evidence is that how long someone was designated "ready now" was not a factor in selection for promotion. (Barr Dep. 43:14-24; Barre Dep. 31:15-19.)

d.     Undisputed that Plaintiff had previously been Paras' manager for approximately two years (2011-2012). (Plf. Ex. 21 at RFA No. 12.) Undisputed that Paras asked Plaintiff for help with Microsoft Access (just as she came to him for help with Microsoft Excel). (Paras Dep. 23:12-22.) Disputed as lacking record support that Paras asked Plaintiff for "advice about thorny issues." In his cited testimony, Paras stated only that he would ask Plaintiff questions about New Service Provider Training ("NSPT"), *i.e.*, new driver training. (Paras Dep. 24:1-11.) As Plaintiff states above at SAF 2(b)(1), she was serving as the lead instructor for NSPT during this time period.

e.     Undisputed that UPS does not contend that Plaintiff's performance "lagged" or that Paras' "surged." Plaintiff's statement of "fact" that her performance was "always stronger" than Paras' performance, is argument that is not supported by the record. *See* response to SAF 22, *supra*.

f.     Undisputed only that certain managers - none of whom was the decisionmaker for the AHRM position—believed Plaintiff was a strong (or, in some cases, the strongest) candidate. Plaintiff cites no evidence that Allision—*the decision-maker*—believed Plaintiff was the stronger candidate. To the contrary, she believed Paras was the stronger candidate. (Allison Dep. Ex. 17, p. 2.) The only other person present during the interviews (Interial), agreed.

---

[5] In addition, note that Paras' demotion—which Plaintiff references without context—was the result of a consolidation of regions, not due to performance issues or misconduct. (Paras Dep. 15:7-13.) He was offered a new role and accepted it. (*Id.*)

He testified:

> Q.    Did you have any input on the decision of whether to promote Angel Paras or Sara Maier?
>
> A.    I was not the decision-maker, but I expressed my opinion.
>
> Q.    And what was your opinion?
>
> A.    My opinion, based on the interviews, was that Angel was at that particular time a stronger candidate.

(Interial Dep. 110:19-111:5.) Disputed as contradicting the testimony of all persons with knowledge of the SAF backfill process that anyone "chose [Plaintiff] over Paras for the position." *See* response to SAFs 7(c), 8 and 11, *supra*.

        g.    Undisputed that Allison decided to promote Paras and that Interial supported her decision. Disputed that Allison or Interial were aware that Plaintiff had been "chose[n] over Paras," as no such decision had been made. *See* response to SAFs 7(c), 8 and 11, *supra*. In addition, Interial testified that he received no recommendation regarding how to fill the AHRM position:

> Q.    Did you consider the recommendations of your predecessor?
>
> [A.]   Yeah, I had no -- I was not privy to any input from my -- the predecessors, I guess, whoever you're referencing there, no.

(Interial Dep. 112:19-24.) Allison cannot recall any discussion at all on the topic:

> Q.    … So, therefore, you have no recollection one way or another if you ever talked to Greg Barr about who should fill the Area HR Manager position?
>
> A.    I don't recall any discussion about who should fill the Area HR Manager.
>
> Q.    How about with Frank Barre? … Did you have any discussions with him about who should fill the Area HR Manager position?

A. No, I don't recall any discussion about that.

(Allison Dep. 86:15-87:1.) Barr confirmed that he did not recommend to Allison that Plaintiff be promoted. (Barr Dep. 102:1-5.) Barre likewise does not recall conveying any recommendation. (Barre Dep. 143:10-12, 165:22-166:8.)

**24. At UPS, women typically take at least six weeks of maternity leave (which is all the paid leave UPS offers), while men almost never take more than a week of leave for the birth of a child. (Paras Dep. 20:2-21:3; Macchia Dep. 10:4-11:2; Interial Dep. 9:13-10:9; F. Barre Dep. 12:7-22; Rodriguez Dep. 8:6-23; Pl. Ex. 1, Maier Decl. ¶ 9.)**

**<u>RESPONSE:</u>**

Disputed as unsupported by Plaintiff's record citations. In the cited testimony, the witnesses discussed their own personal experiences and none opined as to what is "typical" at UPS.

**25. a. On Friday, January 18, Maier received an email from Interial that would only be of relevance to her if she was being promoted to AHRM, which she took as a good sign. (Pl. Ex. 14, at UPS 4376; Pl. Ex. 1, Maier Decl. ¶ 31.)**

**b. Later that day, she had a conversation with Interial where he specifically told her "you did great during the interview, don't worry about the interview. It was fine." (Maier Dep. 103:5-9; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at Maier 40.)**

**c. That same day, Macchia told Maier to pack up her work station because he wasn't sure where her new office would be and to write up a biographical blurb that UPS could use to announce her promotion. (Pl. Ex. 1, Maier Decl. ¶ 31.)**

**d. That afternoon, however, Maier received a call from Ron Macchia informing her that she had not been promoted to AHRM.**

     e.       Macchia told Maier that she was his first choice for the position, but that UPS had decided to promote someone else.

     f.       During this conversation, Maier and Macchia discussed that she had gotten a bachelor's degree at UPS's request so that she could be promoted, but that Angel Paras did not have a degree. (Maier Dep. 103:13-105:2, 108:12-109:6; Macchia Dep. 85:17-88:6; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at Maier 40; Pl. Ex. 23, P's supplemental responses to Rog. 14.)

     g.       Macchia called Interial to inform him of the fact that Paras did not have a degree and Interial responded that he and Allison already knew this. (Macchia Dep. 88:7-13.) Macchia called Maier back to inform her that the decision stood, and that Paras would be promoted even though he lacked a degree.

     h.       Maier responded by challenging whether the decision was because she was a woman, referencing the specific questions she had been asked about whether she could handle the job with her small children. Macchia responded that he told Allison and Interial that Maier's "kids had never caused any issues at work," that Maier "always got everything done," and is "the first to volunteer." He suggested that Maier call Interial to discuss the situation further. (Maier Dep. 109:7-21, 110:9-111:4, 133:22-134:23; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at Maier 42; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14.)

**RESPONSE:**

     a.       Plaintiff's statement of "fact" about why she was included on an email is disputed as speculation and not based on her personal knowledge.

     b.       Undisputed. However, Plaintiff fails to note that Interial qualified his statement by telling her that "if [she] didn't get this opportunity that there would be other chances"

and that he had been passed up for promotion before. (Plf. Dep. Ex. 1 at p 6.)

      c.    Disputed by Plaintiff's own contemporaneous writing. In her handwritten notes, Plaintiff stated that, after speaking with Interial:

> **I went to my manager [Macchia] to see if he knew anything and he stated he didn't**. [Macchia] stated he didn't even know that the other [supervisors] were going to meet w/[Allison]. … I reached out to Marcia Rodriguez who was often privy to this info. She stated that the managers had their pick (me) and [Allison] had hers. She stated that they were going to discuss and make a decision. I went to [Macchia] @ this time. **I told him I was leaving for the day and asked that he contact [Interial] and let me know. I told [Macchia] I didn't want to be caught off guard by hearing someone else got the promo. [Within] about an hour, [Macchia] called me on my cell to tell me he was sorry but they promo[ted] another** but he wouldn't tell me who.

(Plf. Dep. Ex. 1 at pp. 6-7) (emphasis added).

      d.    Undisputed.

      e.    Undisputed.

      f.    Undisputed.

      g.    Undisputed.

      h.    Undisputed for purposes of this motion only. Macchia recalls little about the details of their conversation, although he believes the first time Plaintiff mentioned her children may have been during a later sit-down meeting. (Macchia Dep. 78:14-79:3, 84:16-87:10, 89:23-91:18.)

    **26.**    **a.**    **Maier then called Interial, who told Maier "it wasn't the interview, that the interview was fine, that I was the right candidate," that "you're the best fit, [w]e all think you're the best fit" but that Paras had been selected because "Chelsea felt like you had *a lot going on right now*." (Maier Dep. 91:6-11; 105:8-107:19, 111:3-113:10; Macchia Dep. 100:22-**

101:19; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at 42-43; Pl. Ex. 23, Pl.'s supplemental rog responses, at No. 14.)

b.    Upon hearing this explanation of UPS's decision, Maier immediately challenged Interial's explanation and complained that UPS had discriminated against her based on her sex, by promoting an unqualified man (who also had young children) instead of her. (Maier Dep. 91:6-11; 111:6-112:24; 133:22-134:3; Pl. Ex. 26, Maier Dep. Ex. 1 (Maier 35), at 42-43; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14.)

c.    Interial wrote off Maier's complaints of discrimination as "venting" and told Maier to "calm down." (Interial Dep. 119:4-120:16; Maier Dep. 111:20-113:4; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14.)

**RESPONSE:**

a.    Undisputed for purposes of this motion only, although Interial does not recall saying this. (Interial Dep. 121:10-15.)

b.    Undisputed for purposes of this motion only, although Interial recalls Plaintiff first raising her gender during a meeting that took place on March 20, 2019. (Interial Dep. 1212:22-3 at 146:20-147:4.)

c.    Undisputed that Interial understood Plaintiff to be venting. Undisputed for purposes of this motion only that Interial told Plaintiff (as she testified in her deposition) to "take the weekend [to] calm down" so they could talk the following week, because Plaintiff was "hysterical," "crying hysterically," and "trying to gather [her]self" while speaking with Interial. (Plf. Dep. at 106:1-107:19.)

27.    a.    Because the decision to promote Maier had already been made and documented in accordance with the detailed procedures UPS had set up for implementing

VRP backfills, several senior level HR managers and executives—including Malcolm Berkley, Tamara Caldwell, Jon Robertson, Linda Nelson, and Marge Niedbalski—had to become involved to reverse the decision to promote Maier and instead elevate Paras, an objectively unqualified man, into the role. (Allison Dep. 79:20-81:7, 161:3-173:19; Rodriguez Dep. 18:23-19:2; Allison Dep. Ex. 5 (UPS 3490); Allison Dep. Ex. 14 (UPS 3706); Allison Dep. Ex. 15 & Pl. Ex. 10 (UPS 3707); Allison Dep. Ex. 16 (UPS 3485); Allison Dep. Ex. 17 (UPS 3487).)

      b.     After Paras's promotion was announced, on January 23, 2019, at 8:30 a.m., Allison received an automated email connected with UPS's People Tracker system, instructing her that "[a]s a result of recent placement meetings after the … VRP, some people throughout the organization will be changing positions. You should begin having discussions with those individuals in your area who will have a change of some kind." The email listed Maier's name, along with Chlimoun—who, like Maier, had long been slated to receive a promotion as a result of the VRP. (Allison Dep. Ex. 17 (UPS 3487).

      c.     The next afternoon, Interial emailed Allison with the first of several iterations of UPS's post-hoc attempt to justify choosing Paras over Maier, writing "I think this will give us a good start…" (Interial Dep. Ex. 11 (UPS 3766); Interial Dep. Ex. 12 (UPS 3677).) This initial narrative repeatedly stated that Maier had been recommended to fill the AHRM role, something that both Interial and Allison denied being aware of at their 2022 depositions. (Allison Dep. 79:1-83:9, Interial Dep. 112:19-116:9; Interial Dep. Ex. 12 (UPS 3677).)

      d.     Subsequently, Allison emailed Tamara Caldwell an explanation of the situation that incorporated, and expanded upon, what Interial had sent her, and added

**another reference to her predecessors' recommendation that Maier be promoted to AHRM. (Allison Dep. Ex. 16 (UPS 3485).) This version included a statement that "Carlos and I determined the best fit for the position should be Angel Paras, not Sara Maier, as originally suggested from the previous director." (Allison Dep. Ex. 16 (UPS 3485).) Caldwell responded, emphasizing that the "outgoing DHRM made a recommendation," suggesting changes to the email, proposing that senior, regional HR managers Marge Niedbalski and Jon Robertson be informed of the situation, and adding that the email should mention that "Sara remains a valid candidate for future opportunities." (Allison Dep. Ex. 17 (UPS 3487).)**

    <u>**RESPONSE:**</u>

        a.      Undisputed only that Malcolm Berkley, Tamara Caldwell, Jon Robertson, Linda Nelson, and Marge Niedbalski, were informed of Allison's decision and the need to update the information in People Tracker, as the cited evidence shows. As noted above, People Tracker was used by USP's transformation office for the purposes of tracking moves and potential moves, and Rodriguez erroneously told the transformation office that Plaintiff had been selected for promotion. *See* SAFs 10 and 11, *supra*. The remainder of this "fact" constitutes argument, which has been addressed above and is unsupported by the record. *See, e.g.*, responses to SAFs 7(c) and 8, *supra*.

        b.      Undisputed, except as to Plaintiff's characterization of herself as having been "slated to receive a promotion." *See* response to SAF 27(a), *supra*.

        c.      Undisputed that Interial emailed the document at issue to Allison. As to Plaintiff's recommendation by outgoing managers, Interial testified that he learned of it only when questioning Rodriguez about her part in the process. (Interial Dep. 114:2-115:15.) Plaintiff cites no evidence to suggest Interial learned this information *before* Paras was promoted. Thus,

Plaintiff's suggestion that the document he prepared somehow conflicts with his and Allison's deposition testimony regarding what they knew when the decision was made to promote Paras is unsupported.

        d.      Undisputed.

**28.    a.      Before sending the email to UPS's senior HR executives two days later, Allison made several major changes to her email purporting to justify why Maier's promotion should be rescinded and given to Paras instead. (Allison Dep. 79:20-84:23, 162:18-163:15; Allison Dep. Ex. 5 (UPS 3490); Allison Dep Ex. 16 (UPS 3485).)**

**      b.      Specifically, in attempting to convince her superiors to rescind Maier's promotion in favor of Paras, Allison added three sentences describing attributes Paras possessed that she asserted were "required" for the "AHRM role": "Angel was currently applying for Manager positions within UPS Internationally and within the Country as well. Angel is fluent in 3 languages. Angel has aspirations to eventually 'give back' to community of Guam by becoming an HR Leader in the territory." (Allison Dep. Ex. 5 (UPS 3490).) Allison knew that, contrary to what she wrote in her email, these were not actually requirements for the AHRM position, and that the only requirement was a bachelor's degree, which Maier possessed and Paras lacked. (Allison Dep. 116:21-117:4, 166:11-167:1; 171:15-173:19; Interial Dep. 104:16-21, 117:3-6; Paras Dep. 72:15-73:4 Maier Dep. 79:21-80:6, 126:17-129:13, 248:19-249:3; Allison Dep. Ex. 5 (UPS 3490), at 3491-92; Interial Dep. Ex. 9 (UPS 3708); Interial Dep. Ex. 10 (UPS 3709); Def. Ex. J, at UPS 4256; Pl. Ex. 15, (UPS 4478), at UPS 4483 ("Required must be specific to the business need of the job and is absolute. The applicant either has it or does not.").)**

      c.      **Allison also added other information in her email to Niedbalski and Robertson, including a specific statement demonstrating her awareness that the "outgoing DHRM" Greg Barr, recommended Maier for the AHRM position. (Allison Dep. Ex. 5 (UPS 3490), at 3492.)**

      d.      **Allison also added a new, and different, version of Linda Nelson's purported instructions to her. (Allison Dep. Ex. 5 (UPS 3490), at 3492.)**

      e.      **Further, Allison's email included a specific request that her superiors update UPS's "People Tracker" system to remove Maier's name as AHRM and substitute Paras instead, demonstrating that Allison's purpose in adding this information was to convince her superiors to let her reverse the decision to promote Maier and instead promote Paras. (Allison Dep. Ex. 5 (UPS 3490), at 3492.)**

      **RESPONSE:**

      a.      Admitted only that Allison supplemented the information she had previously provided regarding why she selected Paras for promotion. The remainder of this "fact" constitutes pure argument. And, as addressed repeatedly above, Plaintiff was never promoted meaning there was no promotion to "rescind." *See* responses to SAFs 7(c), 8, and 11, *supra*.

      b.      Undisputed that Allison added the quoted material to add "color" to her explanation of why she selected Paras for promotion and placed it in the middle of a paragraph that ends with a sentence stating Paras' attributes were required for the AHRM position. (*See* Allision Dep. Ex. 172:1-12.) Allison admitted in her deposition that the inserted material was not required (Allison Dep. 172:13-173:19), *i.e.*, she should not have placed it before the final sentence of the paragraph. And, as addressed repeatedly above, Plaintiff was never promoted meaning there was no promotion to "convince" anyone to "rescind." *See* responses to SAFs 7(c), 8, and 11, *supra*.

c.     Undisputed that Allison referenced a recommendation by the "outgoing DHRM" in emails she drafted *after* selecting Paras for promotion. Plaintiff cites no evidence to suggest Allison was aware of the recommendation prior to selecting Paras.

d.     Disputed as unsupported, as Plaintiff identifies no "different version" of her conversation with Nelson.

e.     Admitted that Allison requested that People Tracker be updated. The remainder of this "fact" constitutes pure argument.

**29.     a.     In March 2019, Maier had a meeting with Macchia and Interial, where she complained that the decision to promote Paras over her was discriminatory, which Interial characterized as "venting." (Maier Dep. 114:24-133:1; Interial Dep. 146:20-147:4, 147:18-21; Macchia Dep. 89:23-90:10; 102:21-103:14; Pl. Ex. 24, Maier Dep. Ex. 4 (MAIER 64), at MAIER_65-67; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14.)**

**b.     Among other things, Interial told Maier that she should have been more "proactive" in explaining at the January 17 meeting about why her kids would not present a problem with her schedule and Maier responded by noting that she was asked those questions but Paras wasn't. (Maier Dep. 120:14-121:8; Pl. Ex. 24, Maier Dep. Ex. 4 (MAIER 64), at MAIER 65, 69; Pl. Ex. 23, Pl.'s supplemental responses to Rog. 14; Paras Dep. Ex. 7 (Maier 149-50).)  Interial stated that he had no negative comments about Maier's work, that he was "shocked" Maier wasn't promoted, and reiterated that he believed that Maier was the best candidate. (Interial Dep. 146:7-12; Macchia Dep. 99:13-16; Pl. Ex. 24, Maier Dep. Ex. 4 (MAIER 64), at MAIER 67; Pl. Ex. 1, Maier Decl. ¶ 30.) Interial stated that if another AHRM position came available that Maier would "be the next pick." (Pl. Ex. 24, Maier Dep. Ex. 4 (MAIER 64), at MAIER 67.)**

**RESPONSE:**

      a.     Undisputed.

      b.     Undisputed for purposes of this motion only.

**30.    a.    UPS had an "open door" anti-discrimination policy: when an employee feels they have been discriminated against, they may go to their manager or supervisor or any human resources manager to discuss their concern. (Allison Dep. 21:1-22:12; Paras Dep. 63:1-10; F. Barre Dep. 43:8-12; G. Barr Dep. 19:1-23.) This policy is formalized in UPS's Employee Reference Guide, which informs UPS employees: "If you believe you have been the subject of discrimination or harassment, or if you are aware of a situation that could constitute discrimination or harassment, immediately notify your supervisor, a Human Resources manager, or call the UPS help line. The matter will be investigated in a confidential manner.") (Allison Dep. 22:13-23:21; Paras Dep. 63:11-64:2; G. Barr Dep. 19:24-20:13; Macchia Dep. 59:4-22; F. Barre Dep. 44:16-22, 48:18-22; Macchia Dep. Ex. 8 (UPS 216)). Under UPS's policies, an HR investigation into discrimination allegations entails the following: (1) interviewing the reporter; (2) interviewing witnesses; (3) interviewing the subject; (4) reviewing any pertinent documents; (5) preparing a report that summarizes the allegations and evidence; (6) making a determination as to whether the concern is substantiated or not. (Allison Dep. 23:22-25:13; Paras Dep. 36:11-37:19, 62:21-67:9; F. Barre Dep. 50:11:51:11; 52:11-21; 53:10-19; G. Barr Dep. 20:10-24:1; Macchia Dep. 60:9-20; Paras Dep. Ex. 6 (UPS 3390); Pl. Ex. 19 (Paras Investigation Docs); Pl. Ex. 17 (Allison investigation docs).**

      **b.    But, even though Maier at least twice notified her supervisor (Macchia) and another Human Resources manager (Interial) that she believed she was the subject of**

discrimination, UPS never opened an investigation, as its policy required. (Maier Dep. 137:9-138:8; Interial Dep. 146:20-149:5; Macchia Dep. 89:23-90:10; 102:21-104:23.) Instead, Interial wrote Maier's complaints off as "venting" and moved on without opening an investigation. (Interial Dep. 149:6-150:9.)

**RESPONSE:**

a. Undisputed.

b. Undisputed that no investigation was conducted, but disputed that an investigation was required. Interial was personally privy to the decision Plaintiff questioned as possibly relating to her gender and had no need to conduct an investigation to determine what he already knew, *i.e.*, that her speculation was unfounded. (Interial Dep. 149:6-22; Barre Dep. 45:10-46:6.)

31.   a.   In May 2019, Allison was preparing for that year's major career development meeting (the annual meeting where, in 2018, UPS's high-level decision-makers chose Interial to fill Barre's role and Maier to fill Interial's AHRM position, see SAF 7, above.)

b.   Macchia prepared for Allison a bullet-pointed list of information about Maier to present at that meeting. (Allison Dep. 191:7-193:11; Macchia Dep. 106:5-118:3; Macchia Dep. Ex. 10 (UPS 3442); Macchia Dep. Ex. 11 (UPS 3443); Macchia Dep. Ex. 12 (UPS 3444).)

c.   The document contained descriptions of Maier's continued impressive work, pointing out, for example, that Maier "is considered one of the lead supervisors within her peers" and "is always willing to help out when needed." (Macchia Dep. Ex. 12 (UPS 3444).) The document noted Maier's long list of former direct reports, including Angel Paras

and Mike Kish (her two purported competitors for the AHRM role), who "have been promoted while working for Sara." (Macchia Dep. 112:18-113:5; Allison Dep. 192:5-16; Macchia Dep. Ex. 12 (UPS 3444).) But, in addition to information about Maier's stellar work as HR supervisor, it also contained extremely personal information about Maier: such as the timing of her marriage vis a vis her pregnancy, and the fact that she was *pregnant at the time*—a fact that Macchia thought would be pertinent for Allison and UPS's other high-level HR executives to be aware of when discussing Maier's career trajectory. (Allison Dep. 191:7-193:11; Macchia Dep. 106:5-118:3; Macchia Dep. Ex. 10 (UPS 3442); Macchia Dep. Ex. 11 (UPS 3443); Macchia Dep. Ex. 12 (UPS 3444).)

**RESPONSE:**

a.    Undisputed that the referenced bullet-point list was prepared for a career development meeting. The remainder of his "fact" constitutes argument that, as discussed above, contradicts the record. *See* response to SAFs 7 and 8, *supra*.

b.    Undisputed only that Macchia participated in preparing the bullet point list. The undisputed evidence is that he and Plaintiff worked together to create it and it was *Plaintiff* who put the personal information "in there to speak a little bit about herself." (Macchia Dep. 110:4-116:23.)

c.    The document speaks for itself and its authenticity is undisputed. UPS objects to Plaintiff's attempts to editorialize it, which are not "facts."

**32.    a.    Around the same time, in May 2019, Maier learned her work location was being transferred to Jefferson Street in downtown Chicago; the transfer was implemented in June 2019, when she was around seven months pregnant and showing.**

(Maier Dep. 146:19-22; Pl. Ex. 11, (UPS 3822, 3823, 3824, 3834); Macchia Dep. 127:17-24; Pl. Ex. 1, Maier Decl. ¶ 40.)

        b.      As a result of the transfer, Maier's round-trip commute more than tripled. (Maier Dep. 150:5-21; Pl. Ex. 1, Maier Decl. ¶¶ 35, 40.)

        c.      The HR office location at Jefferson Street was a trailer that lacked running water or bathrooms and lacked any adequate private location for pumping breast milk. (Rodriguez Dep. 69:23-71:14; Maier Dep. 169:12-175:7; Macchia Dep. 128:2-16, 134:16-20; Pl. Ex. 1, Maier Decl. ¶¶ 40, 46.)

        d.      Interial and Macchia were aware at the time that Jefferson Street was the only office Maier didn't want to work out of. (Maier Dep. 150:5-150:21; 152:16-154:8; Pl. Ex. 1, Maier Decl. at ¶ 35.)

        e.      Macchia told Maier that she was being transferred to develop a struggling HR supervisor in the Jefferson Street office. (Maier Dep. 149:7-150:3, 151:1-3.) UPS's managers have offered different (and conflicting) explanations for Maier's transfer. (*See* Resp. to SOF 54-55; Interial Dep. 150:19-151:3, 153:16-156:5; Macchia Dep. 118:18-129:9; Allison Dep. 179:10-180:8.)

        f.      There was another supervisor working with Maier at Bedford Park, Lynette Baker. Baker was not qualified to perform road tests, which was one of the critical functions performed by HR supervisors at that location; because Maier was transferred instead of Baker, Maier had to spend the time and effort to send members of her team to Bedford Park to perform the road tests. (Maier Dep. 151:21-152:4; Macchia Dep. 121:19-122:10; Interial Dep. 156:15-157:2; Pl. Ex. 1, Maier Decl. at ¶ 41.)

      g.      **When she arrived at Jefferson Street, and for many weeks thereafter, Maier did not have adequate furniture or working space, at a time when she was seven-plus months pregnant. (Pl. Ex. 11, UPS 3822, 3823, 3824, 3834.)**

      h.      **In August, Allison visited Jefferson Street and touched Maier's pregnant belly without her consent. (Maier Dep. 165:18-166:4; Allison Dep. 180:13-181:9.)**

**RESPONSE:**

      a.      Undisputed. However, Plaintiff testified that she is certain the decision to transfer her to Jefferson Street was made at about the same time she was not selected for promotion, *i.e.*, in January 2019, before she announced her pregnancy. (Plf. Dep. 203:5-204:10.)

      b.      Undisputed for purposes of this motion only.

      c.      Undisputed that the HR office at Jefferson Street was in a trailer, that the trailer had no bathroom, and the trailer's only water source was a cooler.[6] (Macchia Dep. 128:1-16.) Disputed that the trailer (which had four offices in it) lacked an "adequate" location for pumping breast milk. UPS arranged for a lock to be placed on Plaintiff's office door and for her officemate to leave when she needed privacy. (Macchia Dep. 134:12-138:6; Plf. Dep. 171:18-172:8.)

      d.      Undisputed for purposes of this motion only that Interial and Macchia knew Jefferson Street was the "only" office Plaintiff did not want to work out of. However, Plaintiff testified that she made them aware of this only shortly before she was transferred in May 2019. (Plf. Dep. 152:10-154:8.) Plaintiff is certain the decision to transfer her to Jefferson Street was made at about the same time she was not selected for promotion, *i.e.*, in January 2019, before she informed Interial and Macchia that she did not want to work there. (Plf. Dep. 203:5-204:10; *see*

---

[6] Note that Plaintiff does not suggest running water and a bathroom were unavailable to her, just that they were not located in the trailer itself.

*also* Plf. Ex. 11 at MAIER000487 claiming Interial and Macchia "knew they were going to move [her] to Jeff street at the same time [she] didn't get the promotion").

e.      UPS objects to Plaintiff's incorporation by reference of 4.5 pages of her response to UPS's Statement of Material Facts (much of which constitutes argument) as the purported record citation to support this "fact." *See* L.R. 56.1(d)(2) (the court may disregard a fact that is not supported by a citation to "specific evidentiary material"). As for the specific deposition testimony Plaintiff cites herein, it evidences no "different" or "conflicting" explanations. Interial and Macchia both testified that Interial made a decision to rebalance workloads by moving an HR Supervisor to Bedford Park. (Interial Dep. 150:21-152:8; Macchia Dep. 118:18-119:17.) Interial told Macchia that Plaintiff "would be good to send" because a "strong candidate" was needed at that facility. (Macchia Dep. 119:5-120:11.) Macchia interpreted that to mean Interial decided Plaintiff should be transferred and "didn't question it." (Macchia Dep. 119:18-120:15.) Interial, however, considered it Macchia's role to decide which of his HR Supervisors to transfer. (Interial Dep. 153:16-1544:23.) Consistent with the need for a strong candidate at Jefferson Street, Macchia told Plaintiff he needed her to help "develop another supervisor who wasn't doing so well" at that facility. (Plf. Dep. 149:19-150:4.) Allison was not involved in the decision. (Allison Dep. 179:10-15.)

f.      Undisputed for purposes of this motion only. Assuming as true that Baker was not certified to perform road tests when Plaintiff first transferred to Jefferson Street, she was at least in the process of becoming certified. (Macchia Dep. 122:4-12.)

g.      Undisputed that Plaintiff's office needed to be set up when she transferred to Jefferson Street. As to Plaintiff's characterization of the office furniture not being "adequate," the evidence Plaintiff cites shows she did not want a readily-available desk because it was small,

so she located another desk that she preferred, but it took time for it to be moved. (Plf. Ex. 11 at 003824-25.)

        h.      Undisputed for purposes of this motion only.

**33.    a.    After being assured that she would be promoted to AHRM, Maier intended to take six weeks of FMLA/maternity leave in 2019, less than she was legally entitled to, to ensure she would be present to help prepare for peak holiday season. (Ex. 1, Maier Decl. ¶¶ 23, 27.) But, after being denied the promotion to AHRM, Maier decided to take 12 weeks of leave.**

**    b.    Macchia tried to dissuade her from taking her full leave and to encourage her to come back by UPS's "peak" period. (Maier Dep. 161:16-166:23; Ex. 1, Maier Decl. ¶ 38.)**

**    c.    "Peak" is the period between October 1st and Christmas, during which UPS is particularly busy, necessitating seasonal hiring. (Macchia 133:10- 134:3; Pl. Ex. 1, Maier Decl. ¶ 10.)**

**    d.    Maier testified that Macchia "stopped and he looked at me and said, do you really want me to tell Chelsea that you're going to take all 12 weeks and you're not going to be here during peak?" and spoke "it in a way that made me feel like Chelsea would be upset at me, that I was doing something wrong for taking those 12 weeks." (Maier Dep. 161:22-163:17; Pl. Ex. 1, Maier Decl. ¶¶ 10, 38.)**

**    e.    Macchia further attempted to dissuade Maier from taking her full FMLA leave by making vague assurances of lessening her workload if she returned earlier than she was entitled to under the law. (Maier Dep. 163:18-166:23.)**

**RESPONSE:**

a.    UPS is not in a position to dispute how much leave Plaintiff intended to take and at what point her intent changed. As to whether Plaintiff had been "assured" the AHRM job, this statement is disputed by her own contemporaneous writings. *See* response to SAFs 4(g), 15(f), and 25(c), *supra*.

b.    Disputed as speculation regarding Macchia's state of mind. Plaintiff's cited testimony regarding her conversation with Macchia about FMLA leave is as follow:

> Q.    Who -- who at UPS attempted to dissuade you from taking this leave?
>
> A.    So [Macchia] and I had been in a meeting. And originally, I wasn't going to take all 12 weeks of FMLA leave because I thought I was getting promoted, and I was just going to take six weeks.
>
> So we were a meeting and I had mentioned to the operations [people] … hey, take care of these things because I'm going to be leaving in August and I won't be back before peak hits. You know, I just wanted them to be prepare for that.
>
> So, when we left that meeting … [Macchia] and I were having a conversation about this. And he was like, you're going to take all 12 weeks?
>
> And I was like, yes, I'm going to take all 12 weeks. I know originally I wasn't going to, but I'm going to take all 12 weeks now.
>
> And we had a short conversation about it. And then he -- he stopped and he looked at me and said, do you really want me to tell [Allison] that you're not going to be here during peak?
>
> I said, yes…And that was basically the end of that conversation.
>
> Q.    Okay.
>
> A.    But he put in in a way that made me feel like [Allison] would be upset at me, and I that I was doing something

wrong for taking those twelve weeks.

Q.      Did you ever have any other conversations with Mr.
Macchia in which he attempted to dissuade you from
taking FMLA leave?

A.      Now, I know -- I don't know if it was during that
conversation or if it was a separate conversation, but he
tried to persuade me not to take all 12 weeks. He said
things like hey, you can work from your desk, they won't
make you get up from your desk. Since you're on your
peak, you don't have to do road tests, you don't have to
go anywhere. You know, just -- you know, if you want
to come back in six weeks, I'll make it as seamless as I
can for you.

(Plf. Dep. 161:22-164:8.) Plaintiff responded that she intended to take all 12 weeks. (*Id.* 1645:9-10.) Plaintiff places this conversation (or conversations) with Macchia in July or August 2019 (*i.e.*, after her transfer to Jefferson Street), contrary to the statement in her declaration in opposition to summary judgment that it took place in March or April 2019 (*i.e.*, before her transfer to Jefferson House). (*Compare id.* at 166:15-23 *with* Plf. Ex. 1 ¶ 38.) UPS objects to Plaintiff's attempt to bolster her testimony regarding her conversation(s) with Macchia by asserting new and materially different allegations going to Macchia's state of mind and the date of their conversation in her declaration.

        c.      Undisputed.

        d.      *See* response to SAF 33(b), *supra*.

        e.      *See* response to SAF 33(b), *supra*.

**34.    a.      On July 31, 2019, Maier filed an EEOC charge accusing UPS of sex discrimination, in relation to the decision to promote Paras over her for AHRM. (Maier Dep. 140:19-144:9; Maier Dep. Ex. 5.) Allison was immediately informed of the charge. (Allison Dep. 198:6-200:17; Pl. Ex. 20, UPS privilege log.)**

**b.      On August 23, 2019, Maier's maternity leave began. (Maier Dep. 161:6-9.) Shortly after Maier went on leave, Allison suddenly reached out to Matt Webb in UPS's legal department, responding to an email from weeks before, asking to discuss Maier's charge. (Pl. Ex. 6, UPS 3541.)**

**RESPONSE:**

a.      Undisputed that Plaintiff filed an EEOC Charge on July 31, 2019. The Charge was narrower, however, than Plaintiff suggests. In it, she claimed UPS discriminated against her based on her "sex, female (pregnancy)." (Plf. Dep. Ex. 5.) Her sole allegation was that "[UPS] was aware of [her] pregnancy" when she was not selected for the AHRM position on January 18, 2019. That statement, made oath to the EEOC, was untrue. On January 19, 2019, when Plaintiff contacted a friend for advice about her non-promotion, Plaintiff stated "[t]hey don't know it but I'm pregnant right now and i feel i wasn't chosen because i expressed that desire." (Plf. Dep. Ex. 11 at MAIER000501.) The following day she asked her friend if she should still have a planned meeting with Interial and Macchia after having decided to contact the EEOC, and "[d]o I tell i'm pregnant?" (*Id.* at MAIER000497-98.)

As to what Allison was informed of and when, Plaintiff cites a privilege log that indicates she received emails beginning on August 6, 2019, regarding an employment matter involving Plaintiff. (Plf. Ex. 20 at p. 1.) The content of those emails is, obviously, privileged.

b.      Undisputed, except as to Plaintiff's characterization of Allison's email as "sudden" and her speculation that its timing is somehow related to the date on which her leave commenced, for which she offers no evidence.

**35.      a.      Upon her return from maternity leave, Maier worked at least a week or two in the Lockport facility, which did not have a designated lactation space. In contrast**

to her Bedford Park location where Maier had a private office, at Lockport Maier needed to "kick a division manager out of his office" to pump at his desk, who would then wait outside the office for her finish.

        **b.**      **Maier felt so uncomfortable with the situation that she felt compelled to leave the facility to pump in her car. (Ex. 1, Maier Decl. ¶¶ 14, 44-45; Maier Dep. 166:24-169:3.)**

      <u>**RESPONSE:**</u>

        a.      Undisputed, that the Lockport facility had no designated lactation space, because it had no private offices at all. The division manager's office that UPS arranged for Plaintiff to use was the only private office space at the facility. (Plf. Dep. 168:21-169:3.)

        b.      UPS is not in a position to dispute how Plaintiff felt, but notes that she did not notify UPS that she felt uncomfortable. (Plf. Dep. 168:2-20.)

    **36.**    **a.**      **Maier then returned to the Jefferson Park facility, to which she had been transferred just before her maternity leave. Like at Lockport, there was no designated lactation room. (Rodriguez Dep. 70:7-9.)**

        **b.**      **Maier had previously attempted to pump for her first child at the Jefferson Street trailer in 2012, during which time a male UPS employee walked in on her pumping shirtless. This experience made her understandably apprehensive about pumping again at Jefferson Street.**

        **c.**      **In 2019, Maier shared an office in that same trailer with Anthony Marinaro, whom she had to ask to stop working and leave every time she needed to pump. The walls in the trailer office were paper thin such that "everyone interviewing or being**

interviewed in the rest of the trailer could hear [her] pump and would know [she] was shirtless" (Ex. 1, Maier Decl. ¶ 46.)

        **d.     There still was no lock on the trailer office door when Maier returned from maternity leave. (Ex. 1, Maier Decl. ¶ 46; Macchia Dep. 134:16-20.)**

        **e.     Accordingly, Macchia suggested Maier use his office or an office near his office in the automotive department flanked by windows, a "five, ten-minute walk" from her workspace, which would have necessitated forty-five minutes to hour-long breaks each time she needed to pump, making it harder to complete her assigned tasks and maintain productivity. (Ex. 1, Maier Decl. ¶ 46; Maier Dep. 169:12-175:7.)**

    <u>**RESPONSE:**</u>

        a.     Undisputed.

        b.     Undisputed for purposes of this motion only.

        c.     Undisputed that Plaintiff shared an office with Anthony Marinaro, who would leave the office when she needed to pump. As to what anyone else heard or thought, disputed as speculation regarding which Plaintiff has no personal knowledge. UPS objects to Plaintiff's attempt to bolster her deposition testimony on this issue via her declaration. (*See* Plf. Ex. 1 at ¶ 46.)

        d.     Undisputed that no lock was on Plaintiff's office door on the day she returned from maternity leave; however, when UPS learned she was breastfeeding, Macchia arranged for a lock. (Plf. Dep. 171:18-172:8; Macchia Dep. 134:12-135:4.)

        e.     Undisputed that Macchia offered Plaintiff the use of his office (that he only sometimes worked out of) or one of several other private offices near his that were rarely used, and that Plaintiff would have needed to walk to them. (Macchia Dep. 135:5-137:8.) As for the

office being "flanked by windows," the undisputed testimony is that the windows had blinds. (*Id.* 138:16-23.) UPS has no knowledge of how much time the process of pumping took Plaintiff.

37. **After being denied the promotion to AHRM, and both before and after returning from maternity leave, Maier continued to perform outstandingly as an HR supervisor. Macchia delivered glowing performance reviews for her 2019 performance, and confirmed that nothing happened in 2019 to change his view that Maier deserved to be an AHRM, because Maier, among other things: "continues to be a leader within the HR function," "is the SME [subject matter expert] among the HR supervisors," "continues to run the weekly HR call," "does an excellent job in staffing at the facilities she is responsible for," "is always willing to take new responsibilities if asked," "is often looked at as the go-to person when someone needs help with something in the district," amongst other praise. (Macchia Dep. 52:17-57:16; Macchia Dep. Ex. 6 (UPS 2680), Macchia Dep. Ex. 7 (UPS 2735).) Throughout 2019, Maier remained a Level 1 fit for promotion to AHRM, while Kish declined to Level 2, leaving Maier as the only Level 1 fit for promotion to AHRM in UPS's Illinois HR department. (Allison Dep. 193:12-197:17; Allison Dep. Ex. 24 (UPS 3446); Allison Dep. Ex. 25 (UPS 3447), at 3454, 3458; Pl. Ex. 21, RTA Resp. Nos. 23-30.) Allison confirmed at her deposition that, throughout 2019, she was personally aware of Maier's "strengths" and "capabilities," and was "very comfortable" with them. (Allison Dep. 181:12-186:23, 193:18-197:17, 198:6-200:17, 204:9-207:24; 260:10-261:18; Macchia Dep. 52:17-54:12, Macchia Dep. Ex. 6 (UPS 2680); Allison Dep. Ex. 18 (UPS 3494); Allison Dep. Ex. 19, Pl. Ex. 4 (UPS 3495); Allison Dep. Ex. 24 (UPS 3446); Allison Dep. Ex. 25 (UPS 3447), at UPS 3457; Allison Dep. Ex. 27 (UPS 3605); Allison Dep. Ex. 28 (UPS 3606), at UPS 3612; Allison Dep. Ex. 36 at Rog Response No. 4; Pl. Ex. 21, RTA Resp. Nos. 45-49.)**

66

**RESPONSE:**

Undisputed, except as to Plaintiff's editorialization of the evidence.

**38.      a.      In July 2019, within months of Paras being promoted to AHRM, [REDACTED] (Allison Dep. Ex. 31 & Pl. Ex. 5 (UPS 3540).) UPS's [REDACTED] (Pl. Ex. 19, at UPS 317.) [REDACTED] (Paras Dep. 115:23-116:11; Paras Dep. Ex. 6 (UPS 3390.)) [REDACTED] —until after Plaintiff's January 14, 2020, EEOC mediation and Plaintiff's January 30, 2020, amended EEOC charge. (Pl. Ex. 1, Maier Decl. at ¶ 47; Maier Dep. Ex. 8; Pl. Ex. 20, UPS privilege log.) Afterward, in consultation with their counsel, who were then involved in responding to Plaintiff's EEOC charge—in consultation with Allison and other UPS HR managers (Jon Robertson and Marge Niedbalski) who approved Paras's promotion, and Interial's replacement Jimmy McClure—[REDACTED]. Instead, UPS transferred him laterally to a different manager role, a decision that was announced on February 11, 2020, when Allison sent a communication to UPS's staff congratulating him on the new position and saying "we will miss you." (Allison Dep. 211:13-228:24, 234:8-238:22; Paras Dep. 99:22-118:8; Allison Dep. Ex. 30 (UPS 3539); Allison Dep. Ex. 31 & Pl. Ex. 5 (UPS 3540); Allison Dep. Ex. 32 (UPS 3536); Allison Dep. Ex. 35 (UPS 3531); Pl. Ex. 19; Pl. Ex. 20, privilege log.)**

**RESPONSE:**

This fact is immaterial, as it has no relationship to the reason Paras was selected for promotion in January 2019, the reason Macias was chosen to replace Paras, Plaintiff's transfer to Jefferson Street, or Plaintiff's allegations regarding lactation accommodations. Notwithstanding, it is undisputed that Paras was found to have engaged in conduct that was not professional following an investigation into allegations of sexual harassment that were made *after* his selection

for promotion, and that Paras was transferred to a different role in February 2020 as a result.[7] Disputed to the extent Plaintiff attempts to editorialize the evidence or imply some relationship to her EEOC Charge, which is speculation for which she provides no record support. Plaintiff's suggestion that UPS's consultation with counsel implies something untoward is inappropriate.

**39.     a.     Thus, in early 2020, UPS knew that Paras's vacated AHRM position was going to come open again.**

**b,     On January 14, 2020, Maier attended an EEOC mediation with UPS that did not result in a settlement. (Pl. Ex. 1, Maier Decl. ¶ 47.)**

**c.     On January 24, a requisition was created for Angel Paras's AHRM position, and on January 27, a UPS employee reached out to Allison and Interial's successor Jimmy McClure, asking if the position should be "posted" via MCO—UPS's process for competitive internal promotions. (Allison Dep. 229:6-230:6, Allison Dep. Ex. 33 (UPS 3530; Pl. Ex. 1, Maier Dec. ¶ 7.) McClure responded "not yet," and that he would let the employee know "if/when to post." (Allison Dep. Ex. 33 (UPS 3530.)**

**d.     On January 30, 2020, Maier filed an amended EEOC charge accusing UPS of retaliating against her. (Maier Dep. Ex. 8.)**

**e.     UPS decided not to post the AHRM role via MCO, which would have given Maier an opportunity to compete for it. (Pl. Ex. 1, Maier Dec. ¶¶ 7, 48.) Instead, on February 11, 2020, UPS announced the selection of Gloria Macias—a non-EEOC-charge-filing, non-leave-taking manager with an adult child from outside the HR department, who**

---

[7] Plaintiff's characterization of Paras as a "documented, repeat-offending sexual harasser" is not only unsupported by the record, but borders on defamatory. UPS's investigation found Paras "conducted himself in a manner that was not professional workplace conduct," but fell far short of substantiating sexual harassment. With respect to one allegation, UPS found the evidence "open to interpretation." (Plf. Ex. 19 at 003537.) With respect to the other, the employee who made the complaint asserted that *her sister* (a temporary employee) said Paras had harassed her, but when the sister was interviewed, she did not substantiate that allegation. (*Id.* at 003538.)

was approaching retirement—until she herself took voluntary retirement later that year. **(Allison Dep. 239:3-246:9, 259:16-261:18, Allison Dep. Ex. 35; Allison Dep. Ex. 36 at Rog Response No. 4; Pl. Ex. 21, RTA Resp. Nos. 45-49; Pl. Ex. 18 (UPS 716); Pl. Ex. 2 (UPS 1), May 7, 2020, position statement, at UPS 4.)**

**RESPONSE:**

a.        Plaintiff's reference to "early 2020" is vague and Plaintiff cites no evidence regarding when the decision was made to transfer Paras to a different role.

b.        Undisputed.

c.        Disputed that a requisition was created on January 27, 2020. The document Plaintiff cites indicates the requisition was approved as of that date. (Allison Dep. Ex. 33.) Plaintiff cites no evidence regarding when it was created. Otherwise, undisputed.

d.        Undisputed, except to note that the Charge was filed on January *31*, 2020. (Plf. Dep. Ex. 8.)

e.        Undisputed only that UPS decided to replace Paras with a career development transfer (Macias), rather than through the MCO process. Plaintiff offers no evidence that Macias had not filed any EEOC charge, no evidence that Macias had not taken leave, and no evidence of the age of Macias' daughter (or other family caregiving responsibilities). As to Macias being "outside the HR department," while her role immediate preceding transfer was not in HR, she had previously worked in HR. (Rodriguez Dep. 72:16-22.) In addition, Macias was the Integrad Site Manager. (Allison Dep. 239:3-5.) As Plaintiff notes, Human Resources personnel work on Integrad matters. (*See* SAF 2(b)(2), *supra*, in which Plaintiff contends one of the tasks she performed allegedly to prepare her to become AHRM was to "serv[e] as the lead instructor for "NSPT" and performing other important tasks relating to Integrad.") As to whether Macias was

"approaching retirement," Plaintiff admits Macias retired when her AHRM position was eliminated during the restructuring. (Plf. Dep. 182:7-17.) There is no evidence to suggest Macias planned to retire before her position was eliminated.

      40.    **Even though Maier—who by this point had given birth to her third child, had taken the full 12 weeks of FMLA leave she was entitled to, repeatedly complained of discrimination internally, filed two EEOC charges, and decided to continue pursuing her claims after EEOC mediation—remained a highly successful HR supervisor and the only local HR supervisor considered a Level 1 fit for promotion to Area HR Manager, UPS refused to inform her the position was coming available, consider her, or interview her for the role. (Maier Dep. 133:22- 134:23, 140:19-144:9; Macchia Dep. 52:16-57:16, 89:23-90:10; Macchia Dep. Ex 6; Macchia Dep. Ex. 7; Paras Dep. 94:13-95:4; Interial Dep. 139:12-142:8, 149:11-14, 146:20-147:4, 147:18-21; Allison Dep. 181:12-186:23, 193:18-197:17, 198:6- 200:17, 204:9-207:24; Maier Dep. Ex. 5 (EEOC charge); Allison Dep. Ex. 18 (UPS 3494); Allison Dep. Ex. 19 (UPS 3495), Pl. Ex. 4; Allison Dep. Ex. 24 (UPS 3446); Allison Dep. Ex. 25 (UPS 3447), at UPS 3457; Allison Dep. Ex. 27 (UPS 3605); Allison Dep. Ex. 28 (UPS 3606), at UPS 3612; Allison Dep. Ex. 36 at Rog Response No. 4; Pl. Ex. 21, RTA Resp. Nos. 45-49; Pl. Ex. 1, Maier Decl. ¶ 48.) UPS later represented, falsely, to the EEOC, that interviews were conducted for the AHRM position vacated by Paras and (gilding the lily) claimed that Macias had shown off her "breadth of perspective, ideas for driving the success of her team, and sharp organizational skills" at an interview that didn't actually occur. (Pl. Ex. 2, UPS 1 (position statement), at UPS 4; Allison Dep. 243:9-11.) Further, before the EEOC, UPS specifically asserted that Maier was "one of the six individuals who were considered to fill the open Area HR Manager position"—of which there is zero documentary record—but, in**

**UPS's sworn interrogatory responses before this Court, Allison asserted that only Macias was considered, before contradicting herself again at her deposition. (Allison Dep. 239:24-245:5; Allison Dep. Ex. 36, at No. 3; Allison Dep. Ex. 37; Pl. Ex. 2, UPS 1 (position statement), at UPS 4.) Allison acknowledged at her deposition that, [REDACTED], UPS counsel was involved in the decision to transfer Macias to the AHRM position rather than promoting Maier. (Allison Dep. 225:16-226:17, 259:16-260:9.)**

      **<u>RESPONSE:</u>**

      Disputed that UPS did not consider Plaintiff for the Area HR Manager position. (*See* Allison Dep. 239: 24-235:3; Pl. Ex. 2, UPS 1 (position statement)). UPS did consider multiple candidates for the Area HR Manager position as stated by Allison at her deposition and in UPS's EEOC position statement. *See id*. UPS will be amending its Response to Interrogatory Number 4 consistent with this fact. Disputed also that UPS "falsely" represented anything to the EEOC. Otherwise, undisputed.


Dated: August 31, 2023              Respectfully submitted,

                                   */s/ Colette L. Kopon*
                                    —————————————————

                                    Colette L. Kopon (6318262)
                                    ckopon@littler.com
                                    Yara Mroueh (6324386)
                                    ymroueh@littler.com
                                    LITTLER MENDELSON, P.C.
                                    321 North Clark Street
                                    Suite 1100
                                    Chicago, IL 60654
                                    Telephone:   312.372.5520
                                    Facsimile:    312.372.7880

                                    *Counsel for United Parcel Service, Inc.*

## **CERTIFICATE OF SERVICE**

Colette L. Kopon, an attorney, hereby certifies that on August 31, 2023, she caused a copy of ***Defendant's Response to Plaintiff's Statement of Additional Material Facts*** to be electronically filed with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following counsels of record for Plaintiff.

Gail S. Eisenberg
LOFTUS & EISENBERG LTD.
161 N. Clark St., Suite 1600
Chicago, IL 60601
Gail@LoftusandEisenberg.com

Matthew J. Singer
MATT SINGER LAW, LLC
77 W. Wacker Dr., Suite 4500
Chicago, Illinois 60601
Matt@MattSingerLaw.com

*/s/ Colette L. Kopon*
Colette L. Kopon