**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SARA MAIER,

                     Plaintiff,

    v.

UNITED PARCEL SERVICE, INC.,

                     Defendant.

Case No. 21-cv-03506

Judge Jorge L. Alonso

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant United Parcel Service, Inc.'s ("Defendant" or "UPS")

motion for summary judgment. For the reasons that follow, Defendant's motion for summary

judgment is denied in part and granted in part.

## BACKGROUND[1]

Plaintiff Sara Maier ("Plaintiff") alleges claims for retaliation and sex discrimination

under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*., and the

Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101, *et seq*., retaliation under the Family

---

[1] Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment (ECF No. 62) shall be referred to herein as "DSF," while Plaintiff Sara Maier's Statement of Additional Material Facts (ECF Nos. 73, 76) shall be cited to herein as "PSAF." Plaintiff's responses to DSF shall be referred to herein as "PRDSF." (ECF Nos. 74, 77.) Defendant's responses to PSAF shall be referred to herein as "DRPSAF." (ECF No. 84.) The length of this Opinion is due, in large part, to the parties' choice to incorporate their statements of fact and responses thereto—spanning over 180 pages in total—in lieu of including concise fact sections in their briefs.

Medical Leave Act ("FMLA"), 29 U.S.C. § 260/1, *et seq*., and failure to accommodate under the Nursing Mothers in the Workplace Act ("NMWA"), 820 ILCS 260/15. Plaintiff asserts that Defendant violated the IHRA and Title VII by failing to promote her because of her sex and retaliated against her for filing a charge with the Equal Employment Opportunity Commission ("EEOC"). Defendant now moves for summary judgment in its favor on all claims.

## I. Evidentiary Issues

The Court first addresses Defendant's request to strike portions of Plaintiff's declaration and all of her responses to DSF and to deem DSF admitted. Defendant makes its request in its reply brief (ECF No. 83), and so Plaintiff has not had an opportunity to respond to any of Defendant's arguments.

Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment and states that motions to strike are disfavored. The Court enforces Local Rule 56.1 strictly. *See FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005) ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules."). At the summary judgment stage, a party cannot rely on allegations; he or it must put forth evidence. Fed. R. Civ. P. 56(c)(1)(A); *see also Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the 'put up or shut up' moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial."). Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Curtis v. Costco*

*Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

Additionally, a response to a statement of facts "may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." L.R. 56.1(e)(2). Nor may a response "assert legal arguments except to make an objection, including objections based on admissibility, materiality, or absence of evidentiary support." *Id*. The court may disregard responses that violate this rule in whole or in part. *Curtis*, 807 F.3d at 219 ("[D]istrict courts are not required to 'wade through improper denials and legal argument in search of a genuinely disputed fact.'" (quoting *Bordelon v. Chi. Sch. Reform Bd.,* 233 F.3d 524, 529 (7th Cir. 2000))).

In accordance with the law set forth above, the Court will not consider Plaintiff's—or Defendant's, for that matter—asserted facts that are not supported by deposition testimony, documents, affidavits, or other evidence admissible for summary judgment purposes. Where any such facts are material to the Court's analysis, the Court notes them within this Opinion. Furthermore, many of Plaintiff's responses to Defendant's statement of facts improperly set forth new facts and assert legal arguments—in many instances, for three, four, or five pages. The Court will not consider these improper portions of Plaintiff's responses.

Defendant raises two issues with Plaintiff's declaration. First, Defendant argues that it purports to state facts that contradict her prior deposition testimony. For the most part, the Court disagrees. However, the Court discusses below one instance where the Court agrees that Plaintiff's affidavit directly contradicts her prior deposition testimony on a material fact. Second,

Defendant argues that Plaintiff includes statements not based in her personal knowledge. Where Plaintiff states facts in her declaration that are outside her personal knowledge, the Court disregards them. *See* Fed. R. Civ. P. 56(c)(4) (a "declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

## II.    Factual Background

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed by the parties unless otherwise noted.

Plaintiff Sara Maier began working for Defendant UPS in 2003. (PSAF ¶ 1.) In 2007, Defendant promoted her to Human Resources ("HR") Supervisor. (*Id*.) Between 2015 and 2020, Plaintiff reported to Area HR Manager ("AHRM") Ron Macchia ("Macchia"). Macchia was one of three AHRMs in the Illinois district who managed HR Supervisors. (DSF ¶ 3.) The other AHRMs were Carlos Interial ("Interial") and Mike Nugent ("Nugent"). (*Id*.) Macchia, Interial, and Nugent all reported to Frank Barre ("Barre"), District HR Operations Manager for a portion of Illinois, who in turn reported to Greg Barr ("Barr"), District HR Director for Illinois. (*Id*.)

### The January 2019 Promotion Decision

Defendant uses a talent management system to track employees' readiness for promotion. (*Id*. ¶ 4.) Until 2017, Defendant designated employees who were ready for promotion to a particular level position as "ready now." (*Id*.) In 2017, Defendant implemented the "My Talent Center" system, which uses fitness levels, based on skill sets and demonstrated abilities, to assess preparedness for promotion. (*Id*. ¶ 5.) The fitness levels range from 1 to 4, with a "Level 1 Fit"

indicating the employee has the abilities, attributes, and experiences to be highly effective in a particular role, with little to no development needed. (*Id*.) Managers sometimes still refer to "Level 1 Fit" as "ready now." *(Id*.) Being designated as "Level 1 Fit" does not guarantee an employee will be promoted. (*Id*. ¶ 6.)

At some time before Macchia became Plaintiff's supervisor in 2015, Plaintiff was designated as a "ready now" candidate for promotion to AHRM, should an opportunity become available. (PSAF ¶ 1.) When Defendant changed its system in 2017, Plaintiff was designated as "Level 1 Fit" for promotion to AHRM. (DSF ¶ 9.) There is no apparent material difference between the two terms—Plaintiff was continuously considered either "ready now" or "Level 1 Fit" for promotion to AHRM since 2015 and during all times relevant to this motion. Additionally, around the time Macchia became Plaintiff's supervisor, Macchia recognized Plaintiff as the top HR Supervisor reporting to him. (PSAF ¶ 1.) Interial identified Mike Kish as the top HR Supervisor reporting to him, and Nugent identified Angel Paras. (DRPSAF ¶ 1.)

Between 2016 and 2018, Plaintiff was assigned additional tasks that were beyond the typical responsibilities of an HR Supervisor and which, from Plaintiff's perspective, she was assigned in order to prepare her for promotion to AHRM. (PSAF ¶ 2.) Defendant contends that there is no evidence that Plaintiff was unique in being assigned these tasks and offers conflicting evidence suggesting that such tasks were not assigned in order to prepare Plaintiff for promotion. It is undisputed that Plaintiff successfully performed the additional responsibilities, along with her regular HR supervisor duties, and that Macchia gave her high performance reviews with "strong performance" overall ratings between 2016 and 2019. (*Id.* ¶ 3.)

In 2018, Defendant offered a Voluntary Retirement Program ("VRP") to qualifying employees. (DSF ¶ 11.) In order to ensure that business needs were met and no serious gaps in

management occurred as a result of the VRP, Defendant used succession planning tools to identify which employees could "backfill" not only positions being vacated by retiring employees, but also the "downline" positions vacated by persons who backfilled retiring employees. (*Id.* ¶ 12.) Barr and Barre each elected to retire in the VRP. (*Id.* ¶ 13.) Chelsea Allison ("Allison") was selected to replace Barr as District HR Director. (*Id.* ¶ 14.) Interial was selected to replace Barre as District HR Operations Manager because Interial was the only AHRM designated as "Level 1 Fit" for promotion to that position and he had previously performed the role on an interim basis. (*Id.* ¶ 16.) This case centers on what unfolded next with respect to who would succeed Interial as AHRM.

AHRM positions in Illinois were rarely available. (PSAF ¶ 4.) When an AHRM position became available, Defendant filled it—like most HR management positions—through its succession planning process. (*Id.*; *Id.* ¶ 5.) Defendant's HR leadership generally "prefers to fill an open position via a career development opportunity or promotion rather than formally solicit applications because of the decision makers' familiarity with capable internal candidates." (*Id.* ¶ 5.) Positions that became available because of individuals taking VRP could be backfilled without competition or interviews. (*Id.* ¶ 6.) For example, Defendant backfilled Barr's position with Allison and Barre's position with Interial without interviews. (*Id.*)

In May 2018, Macchia, Nugent, Interial, Barre, and Barr held a "career development" meeting where each "put up [their] candidates that [they] felt were a 'ready now' candidate" for promotion (the "May 2018 Meeting"). (*Id.* ¶ 7; DRPSAF ¶ 7.) Macchia identified Plaintiff as a "ready now" candidate for promotion. (PSAF ¶ 7.) Subsequently, on May 31 and June 1, 2018, Barr attended a talent review meeting, attended by individuals at his level and above, at which the three individuals who were then considered Level 1 Fits for promotion to AHRM—Plaintiff,

Paras, and Kish—were discussed. (*Id.* ¶ 7.) Also around that time, Barre identified Ramina

Chlimoun ("Chlimoun") and two others as candidates for promotion to the soon-to-be available

HR Supervisor position and stated he "would select [Chlimoun] . . . because of her [bachelor's]

degree" even though she had "the least UPS experience." (*Id.*) Chlimoun was, ultimately,

selected for promotion to HR Supervisor.

Although it is undisputed that Plaintiff was at least identified as the recommended

backfill for the AHRM position (*Id.*; DRPSAF ¶ 7), the parties submit conflicting evidence as to

the finality of that decision. Defendant points to Barre's testimony that he and Barr expected

Allison to "weigh in" on the final decision of who would fill the AHRM position, and Barr's

testimony that he never promoted Plaintiff to that position. (DSF ¶ 17.) Subsequent to the talent

review meeting, Barr emailed a spreadsheet to his superior, Regional Manager Pete Elroy, that

lists Plaintiff in a column titled "Possible Backfill/s" but that also states, in a column titled

"Notes," "Sara will replace Carlos as AHRM." (PSAF ¶ 7.) Plaintiff contends the unconditional

language (i.e. "will") shows Plaintiff was definitively chosen, whereas Defendant points to the

conditional word "possible." Then in June 2018 Barr emailed Barre and asked what training is

required "for Sara to get ready to replace Carlos?" to which Barre replied, "Sara will need

training on Responding to Employee Concerns and adjudication decisional BG's. Other than

that, she is ready to go." (*Id.*) Both parties contend this email supports their respective positions.

In August 2018, Marci Rodriguez ("Rodrigeuz"), Defendant's Employees Services

Supervisor, emailed a spreadsheet to Barre, among others, which referenced Plaintiff's specific

position as HR Supervisor as a "career development/VRP role to be backfilled." (*Id.* ¶ 9.) Barre

replied to Rodriguez, "Thanks for the spot-on data during the review and updating the file."

(PRDSF ¶ 17.) Sometime in late 2018—the parties do not specify when—Barre instructed

Rodriguez to submit requisitions for VRP backfills. (DSF ¶¶ 18–19.) During that conversation, Barre told Rodriguez that he did not know who would replace Barr, but that Interial would be replacing Barre and Plaintiff would be replacing Interial. (*Id.* ¶ 19.) Rodriguez submitted both the AHRM requisition and District HR Operations Manager requisition on or around December 18, 2018. (*Id.*) Then in early January, at Barre's instruction, Rodriguez resubmitted the requisitions with no candidates identified, which were approved on January 9 (the "January Requisition"). (PSAF ¶ 10.) When a UPS employee at the regional level reached out to Rodriguez that same day to find out which individuals would be filling the HR Operations Manager and AHRM roles, Rodriguez informed the caller that Interial and Plaintiff, respectively, had been selected. (*Id.*) At that time, Rodriguez had no reason to believe those decisions were up for debate or that anyone else was being considered for those roles. (*Id.*)

It is undisputed that Plaintiff's name was entered into People Tracker, which was Defendant's system for tracking personnel moves during the VRP. (*Id.* ¶ 11.) Plaintiff was noted in People Tracker with the "Disposition" of "Promoted" and a "Job Change Date" of "02/01/2019." The parties and record are not clear as to when that first occurred.[2] Interial and Chlimoun's names were also entered into People Tracker. (*Id.*) Barre, who was the only person responsible for entering information into People Tracker during the VRP, testified that despite the use of the past-tense "Promoted," People Tracker was used to track "potential" moves and that other people had to weigh in on what was going to happen. (DRPSAF ¶ 11.) Barre testified

---

[2] On January 29, 2019 (after Allison decided to promote Paras over Plaintiff), Barre sent an email to Interial and Rodriguez, attaching a spreadsheet that he described as "the Feb 01 moves in People Tracker." (DSF ¶ 22.) In the row listing Plaintiff's name, under a column titled "Disposition," is the word "Promoted." (DSF ¶ 22.) In the same row, under a column titled "Job Change Date," is "02/01/2019." (*Id.*) However, it appears to be undisputed that Plaintiff's name was entered into People Tracker, along with the "Disposition" of "Promoted," at some time before Allison made the promotion decision.

that there were other instances where someone was listed in People Tracker as "Promoted" but did not receive the promotion, but he could not identify any specific person. (PRDSF ¶ 22.)

On January 14, 2019, Barre emailed to Interial copies of "salary impact sheets" showing Plaintiff's and Chlimoun's "previous" and "new" salaries. (PSAF ¶ 12.) Barre testified that he did not recall why he sent the salary impact sheets to Interial other than to show Interial, "If this happens, here's what it would be." (DRPSAF ¶ 12.) Interial, however, testified that salary impact statements were used "whenever there is a change in salary." (PSAF ¶ 12.) No salary impact sheet had been prepared for Paras at that time.

Also on January 14, 2019, Allison transferred to the Illinois district to replace Barr as District HR Director. (DSF ¶ 23.) She held an all-staff meeting that day to meet her new team. (PSAF ¶ 14.) At that meeting, she extensively discussed her husband's role and flexibility in allowing her to pursue her career—in particular, his role in helping their children with extracurricular activities like basketball and his willingness to relocate for Allison's new job on short notice. (*Id*.) Paras spoke about his four children and his dance business. (*Id*.)

The parties submit conflicting evidence as to when Allison learned that Barr recommended Plaintiff as Interial's replacement as AHRM—before or after the decision to promote Paras, not Plaintiff, to AHRM. Allison testified that she cannot recall, and neither Barr nor Barre could recall informing Allison. (DSF ¶ 24.) Barre further testified that he "did talk to [Allison], but you know what, she was trying to find out what was going on in the district, what is in the people tracker, what was going on, because she was going to be responsible for that." (*Id*.) On January 14, Barr sent to Allison a phone list that listed Interial as HR Operations Manager, Plaintiff as AHRM, Chlimoun as HR Supervisor, and Paras as HR Supervisor, which Allison testified that she saw. (*Id.* ¶ 23.) Rodriguez's administrative assistant updated phone lists

only upon request and based on information from managers, who would "let her know of any changes." (*Id.*)

Defendant nonetheless contends that Allison was not informed that Plaintiff was the recommended AHRM backfill candidate and only received the January Requisition on which no candidate names were identified. (*Id.* ¶ 24.) Defendant relies upon an email dated January 25, 2019 (after the relevant promotion decision occurred) from Allison to Tammy Caldwell, Director of HR, cc'ing Interial ("January 25 Email"). The January 25 Email forwards to Caldwell and Interial an automated message connected with the People Tracker system that Allison received two days prior that states, "As a result of recent placement meetings after the [VRP], some people throughout the organization will be changing positions. You should begin having discussions with those individuals in your area who will have a change of some kind: . . . CHLIMOUN, ASHTAR[,] MAIER, SARA."

The January 25 Email also includes six paragraphs written by Allison, which state, among other things,

Hello,

I have received two Job Change Discussions for Illinois that are going to create an issue with our HR headcount. As the incoming HR Director of Illinois, I was presented with two approved HR backfill requisitions with TBD on them. One for a Manager and one for a Supervisor position. After discussing with Linda Nelson the importance of selecting the right candidate to fill these positions, I took the opportunity to interview three level 1 candidates provided to me by our Talent Manager. After the interviews, Carlos and I determined the best fit for the position should be Angel Paras not Sara Maier as originally suggested from the previous Director. Angel (Manager) has been promoted and so has Ashtar Chlimon (Supervisor). I was unaware that additionally these Requisitions were going to be dictated through a VRP Job Change Promotion as well.

Below are additional details, bullet points regarding this scenario."

(*Id.*)

10

Among the list of bullet points Allison included, "The Illinois District also submitted the requisition to backfill Carlos Interial's position (AHRM). Sara Maier had been recommended to fill this position. Again, the submitted requisition did not have a specific name listed. It also had 'TBD' listed. The reason for listing 'TBD' is that all HR personnel has view to [*sic*] requisitions in Automated Employment (AE) and the recommended names had not been approved to this point." (*Id.*)[3]

The parties present conflicting evidence as to what unfolded over the next few days. It is undisputed that on Thursday, January 17, 2019, Allison and Interial together met with Plaintiff, Paras, and Kish individually regarding the AHRM position. Defendant contends that Allison decided to interview the three candidates that were provided to her by the other AHRMs. (*Id.* ¶ 25.) In support of this, Defendant submits Allison's testimony and her January 25 Email, as well as Interial's testimony that Allison "asked me to set up the meetings and bring in the top three candidates, and that's about the length of any discussion." (*Id.*)[4]

---

[3] Plaintiff argues that Allison's email is inadmissible hearsay and otherwise shows that Allison did know Plaintiff had been recommended to fill the AHRM position. Defendant does not respond to this argument. Whether Allison knew that Plaintiff was the recommended candidate before making the promotion decision is not discussed in the January 25 Email. It appears to the Court that here, Defendant relies on Allison's January 25 Email to show that before making the promotion decision, Allison "was presented with two approved HR backfill requisitions with TBD on them." If offered for this purpose, Allison's statement in the form provided is inadmissible hearsay—an out of court statement offered for the truth of the matter asserted—for which Defendant identifies no exception. Fed. R. Evid. 801; 802. However, Allison can testify at trial as to what documents she received and when she received them, and this testimony would, by all appearances, be admissible. *Pleasant v. Specialized Loan Servicing, LLC*, No. 17 C 7741, 2022 WL 18860979, at *1 (N.D. Ill. May 17, 2022) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016))).

[4] Defendant also submits Allison's testimony and the January 25 Email to show that Allison's District Manager, Linda Nelson, emphasized to Allison at some point before January 17 the importance of selecting the right candidate for the AHRM position. Plaintiff objects that Allison's statements about what Nelson said to Allison are inadmissible hearsay and that Nelson

Plaintiff submits evidence that she did not know about the meeting until shortly beforehand the same day and that she did not know it was a competitive interview. Plaintiff also contends that this and other evidence permit the inference that Allison and Interial did not intend the meetings to be interviews when they were scheduled. It is undisputed that on Thursday, January 17, 2019, Plaintiff arrived to work in the early morning hours to work on the preload shift. (PSAF ¶ 15.) Around 11 a.m., after having worked a full shift, Plaintiff received an instant message from Allison asking if Plaintiff had "time to talk" that day. (*Id*.) Shortly thereafter, Plaintiff received a call from Macchia to tell Plaintiff she "was going to Addison to meet with [Allison] to be promoted." (*Id*.) Plaintiff expressed concerns to Macchia that she was dirty and disheveled after working the preload shift from the early morning hours and asked if she could have some time to freshen up, but Macchia insisted that she go to Addison immediately. (*Id*.)

There is conflicting evidence as to when Plaintiff learned that Paras and Kish were also meeting with Allison. Plaintiff submits that that information was first shared with her when she was on her way to Addison. (*Id*.) Paras, however, testified that he and Plaintiff discussed their upcoming "interviews" over the phone the day before, including that Kish was the third interviewee. (DRPSAF ¶ 15.)

After arriving at Addison, Plaintiff waited and worked for several hours. (*Id*.) During that time, Interial instant messaged Plaintiff and told her "they were putting [her] last in the lineup because [she] was getting promoted [and] he didn't want the other two supervisors to know this was the plan." (PSAF ¶ 15.) He told Plaintiff "not to be nervous because this job was" hers. (*Id.*)

---

was not disclosed as a witness by Defendant even though she is now being presented as a key person who influenced one of the promotion decisions at issue in this case. Defendant does not respond to this argument. Accordingly, the Court finds that the evidence of Nelson's statements to Allison are inadmissible hearsay for which Defendant identifies no exception. Fed. R. Evid. 801; 802.

Defendant, in turn, submits Plaintiff's handwritten notes dated January 19, 2019, in which Plaintiff wrote that Interial told her she would interview last because Allison "was *likely* going to promote" Plaintiff. (DRPSAF ¶ 15 (emphasis added).)

At the beginning of Plaintiff's meeting with Allison and Interial, Plaintiff responded to Allison's invitation to discuss something "personal or professional about herself," by talking "about [her] children, how [she] and [her] husband were trying for a third but hadn't been successful yet." (PSAF ¶ 16.) Neither Allison nor Interial can recall whether or not Plaintiff mentioned trying to have another child. (DRPSAF ¶ 16.) At that point, Allison questioned Plaintiff about whether she could work "long hours, working in the middle of the night" with her "small children." (PSAF ¶ 16.) Plaintiff responded that she "already had been doing that," that she already "worked in the middle of the night," that she already "worked long hours," and "already had the responsibilities of a manager and that wasn't going to be a problem." (*Id*.) Plaintiff then attempted to discuss some of her credentials and experience, but Allison cut off her answer. (*Id*.) Plaintiff perceived that, after she mentioned her young children, Allison acted in a "disingenuous" way that showed she "wasn't really listening to what [Plaintiff] said[.]" (*Id*.) Allison's perception of Plaintiff was that she "seemed irritated." (DSF ¶ 31.) The meeting took about 10 or 15 minutes, and there are no contemporaneous notes or documentation of what occurred during the meeting. (*Id*.) At some point thereafter—the record is not clear as to when—Plaintiff told Interial that she thought she had "bombed" the interview. (*Id*. ¶ 33.) Plaintiff testified that she said that "because [Allison] kept interrupting" her and because Plaintiff perceived that Allison "wasn't really listening." (PRDSF ¶ 33.)

With respect to Paras, he knew the day before that he would be interviewing for the AHRM position with Allison. (PSAF ¶ 17.) He took advantage of the advance notice to hone his

talking points and dress in a suit. (*Id*.) Unlike Plaintiff, Paras did not work the preload shift in the early morning hours of January 17 but rather arrived directly at Addison at 9 a.m. (*Id*.) Of the three candidates Paras went in first to speak with Allison and Interial, (*Id*. ¶ 15), and he was nervous enough that he shook his leg during the meeting. (*Id*. ¶ 17.) Paras, like Plaintiff, talked about his four children—two of whom are young— and family responsibilities, as well as other outside responsibilities, including his dance school. (*Id*.) Unlike Plaintiff, however, Allison did not question Paras about whether he could handle working "long hours, working in the middle of the night" with his "small children." (*Id*.) Paras' interview lasted 45 minutes, during which Allison allowed Paras to finish his answers without cutting them off. (*Id*.)

Later that evening, Interial sent Allison a document reflecting two "scenarios" for backfilling the AHRM position: one if Plaintiff were promoted and the other if Paras were promoted. (*Id*. ¶ 19.) The document indicated that Plaintiff had a bachelor's degree and Paras was a college senior. (*Id*.)

The next day, Friday, January 18, Plaintiff received an email from Interial that she perceived would only be of relevance to her if she was being promoted. (*Id*. ¶ 25.) Later that day, Interial told Plaintiff over the phone that she "did great during the interview," "don't worry about the interview," and if she "didn't get this opportunity that there would [be] other chances." (*Id*. ¶ 15; DRPSAF ¶ 15.)

At some point on Friday, January 18, Interial and Allison had a call with Nugent and Macchia about the AHRM position. (DSF ¶ 34; PSAF ¶ 20.) Allison asked the three AHRMs for their opinions. (DSF ¶ 34.) The evidence of what transpired during the call is disjointed and, to some extent, conflicting. Macchia testified that he advocated for Plaintiff's promotion over Paras. (PSAF ¶ 20.) Interial testified, however, that both Macchia and Nugent said they thought

14

Plaintiff or Paras would be fine. (DSF ¶ 35.) Interial expressed his opinion that Paras was "at that particular time a stronger candidate . . . [c]oming out of the interviews." (*Id*.) Interial also testified that he was unaware of any "recommendation" from his "predecessors" regarding who would fill the AHRM position (PSAF ¶ 20), in response to which Plaintiff points to communications to Interial prior to the interviews that would permit the opposite inference. *Supra*. The parties do not offer Nugent's testimony. Allison testified that they made the decision "collectively," based on Interial, Nugent, and Macchia's "verbal feedback" and "based on the advice of … the team in Illinois," which reached "full agreement" and "consensus" on the decision to promote Paras. (PSAF ¶ 20.) Defendant represented to the EEOC that "on a brief conference call" Allison "expressed to the group that, based on the interviews she conducted, she believed that Mr. Paras was the better candidate for the position, and the others agreed." (*Id*.)

Later that afternoon, Plaintiff received a call from Macchia informing her that she had not been promoted to AHRM. (*Id*. ¶ 25.) Macchia told her that she was his first choice for the position, but that Defendant had decided to promote someone else. (*Id*.) Macchia and Plaintiff discussed that she had gotten a bachelor's degree at Defendant's request so that she could be promoted, but that Paras did not have a degree. (*Id*.) Macchia called Interial to inform him that Paras did not have a degree and Interial responded that he and Allison already knew this. (*Id*.) Macchia called Plaintiff back to inform her that the decision stood, and that Paras would be promoted even though he lacked a degree. (*Id*.) Plaintiff responded by challenging whether the decision was because she was a woman, referencing the specific question she had been asked about whether she could handle the job with her small children. (*Id*.) Macchia responded that he told Allison and Interial that Plaintiff's "kids had never caused any issues at work," that Plaintiff

15

"always got everything done," and is "the first to volunteer." (*Id.*)[5] Macchia suggested that Plaintiff call Interial to discuss the situation further. (*Id.*)

Plaintiff then called Interial, who told Plaintiff the interview was "fine," that she was the "best fit" and the "right candidate," but that Allison felt Plaintiff "had a lot going on right now." (PSAF ¶ 26.) Plaintiff immediately challenged Interial's explanation and complained that Defendant had discriminated against her based on her sex by promoting a less qualified man who also had young children instead of her. (*Id.*) Interial understood Plaintiff to be "venting," and told Plaintiff to "calm down." (*Id.*)

The parties submit conflicting evidence regarding Defendant's stated reason for promoting Paras over Plaintiff. Defendant contends that Interial and Allison agreed that Paras distinguished himself during the interview and Allison selected Paras for promotion, relying on one of the bullet points in Allison's January 25 Email:

> After completing all three interviews, Angel Paras seemed to be the best choice to become the next AHRM. Angel was calm and collected during the interview. Angel did a good job of conveying his drive to succeed and to also train and educate his workforce to be able to take the next steps within the company. Angel was not content with the status quo, while at the same time communicating that sometimes failure is required to improve oneself. Angel is scheduled to complete his Bachelors' degree in Business Administration in May of 2019. Angel is dedicated to self-improvement and is open to constructive criticism. All of these attributes will be required to [sic] in the AHRM role.

(DSF ¶ 36.)

Plaintiff contends that this after-the-fact representation conflicts with the explanation offered by Interial over the phone on January 18.

---

[5] Defendant does not dispute this for the purposes of summary judgment only, but objects that Macchia's statements to Allison are inadmissible hearsay. Plaintiff contends that Macchia's statements are admissible as non-hearsay statements of a party-opponent. Fed. R. Evid. 801(d)(2). The Court agrees.

The parties also offer conflicting evidence as to the requirements for the AHRM position. Plaintiff submits that there was only one "required" qualification, pointing to the AHRM Job Description's "Education" section, which states: "Bachelors Degree [*sic*] – Required – Required." (PSAF ¶ 4.) Plaintiff further points to an internal "Interviewer's Workshop" training slide deck that states, "'Required' must be specific to the business need of the job and is absolute. The applicant either has it or they do not." (*Id.*) As previously noted, Barre identified Chlimoun as the preferred candidate to fill the soon-to-be-open HR Supervisor position, even though she had the least experience, because she had a bachelor's degree.

Defendant, on the other hand, points out that the AHRM Job Description also states that it "should only be used as a guideline or recommendation for the content of and qualifications for this position." (DRPSAF ¶ 4.) Defendant submits additional testimony by its own employees that a degree is preferred, not required, and that Barre attained his position without a bachelor's degree. (*Id.*)

Macchia encouraged Plaintiff to complete her bachelor's degree as part of her career development plan, and Nugent did the same for Paras. (PSAF ¶ 4.) Plaintiff declares that Macchia told her she would "be promoted in early 2019" as long as she completed the degree. (*Id.*) Defendant contends this declaration conflicts with a message Plaintiff wrote on January 19, 2019: "[T]hey told me to finish my degree so I could be *considered* for the promotion." (DRPSAF ¶ 4 (emphasis added).) It is undisputed that Plaintiff completed her bachelor's degree in business administration in July 2018.

It is undisputed that Paras did not have a bachelor's degree at the time he was selected for promotion to AHRM. Defendant contends that Allison's statements in the January 25 Email show that Allison believed Paras was scheduled to complete his degree in May 2019, although

there is little in the record that would explain why Allison held this belief. Paras testified that he was nowhere close to getting his degree at the time of his interview and that he was not "scheduled to complete his bachelor's degree . . . in May of 2019." (PSAF ¶ 21.) At the time of his interview, he had more than 20 classes left and a planned graduation date of 2023, and he told Allison and Interial only that he "was in school." (*Id*.)

It is undisputed that Paras never had a stronger performance review than Plaintiff. (*Id.* ¶ 22.) Plaintiff had seven years more experience than Paras in the full-time supervisor role. (*Id*.) She had been "ready now" for promotion to AHRM since 2015, while Paras was first recognized as a Level 1 Fit for promotion shortly before he was promoted. (*Id*.) Plaintiff had directly supervised and trained Paras for two years while she was an HR Supervisor and he was an HR Specialist. (*Id*.) Defendant has never suggested that Plaintiff's work performance "lagged" or that Paras' "surged" in advance of the decision to promote Paras. (*Id*.) Although Defendant does not dispute these facts, it submits evidence that they were not factors in the promotion decision. (DRPSAF ¶ 22.)

The parties next submit contradictory evidence as to whether Allison and Interial followed Defendant's policies for interviewing. Allison testified that she has done "hundreds of thousands" of interviews at UPS and is familiar with UPS's practices and training materials. (PSAF ¶ 18.) Allison testified that the "proper way to do interviews" at UPS is "that there's appropriate questions; that, you know, we have policies at UPS, you know; that you know, we should ensure that there's some consistency with the interviewing process across the candidates and to take, you know, multiple, you know, whatever's available from a document perspective, you know, take what's possible into consideration before making a final decision." (*Id*.) Interial

testified that he does not recall any specific interview training other than "we don't discriminate." (*Id.*)

Plaintiff submits two slide decks used for training Defendant's managers on interviewing and hiring that state, among other things,

- "Before beginning the application review you need to keep the following in mind:…. Are there advertised qualifications such as a specific degree or work experience?"
- "Does the job applied for require a degree or other certification(s)? If so does the applicant meet those requirements? Be sure to distinguish 'preferred' versus 'required' educational requirements.... 'Required' must be specific to the business need of the job and is an absolute. The applicant either has it or they do not."
- "Interviewer questions can be the source of liability for alleged discrimination either because they are directed only at members of a protected group or because they give the impression that protected characteristics or discriminatory factors are being considered."
- "There are no acceptable inquiries concerning pregnancy, future child-bearing plans, or the number/ages of an applicant's children," although such questions can be acceptable only if "*the question is asked of both sexes*." (emphasis in the original).
- "A general inquiry about whether any commitments or responsibilities would preclude the applicant from meeting required work/travel schedules is not unlawful, again, *provided the question is asked of both sexes*." (emphasis in the original).
- An interviewer should "Look objectively at each candidate—Avoid any stereotype assumptions—Give each candidate the same chance to show he/she is qualified for the job. A candidate should leave the interview feeling that you have evaluated him or her fairly based on job-related criteria."
- Interviewers should "avoid directing particular questions only to candidates of one gender."
- Interviewers should avoid losing "sight of the job requirements" and hiring "a candidate who is better than others but is not fully qualified for the job."
- "Separate questions/standards for women relating to marriage, working spouses and similar matters can create exposure and are unacceptable."
- "What about candidates who get jobs because they hit it off with the interviewer but do not satisfactorily perform the job? ….If the interviewer maintains objectivity, follows a systematic format, and focuses on the job requirements and qualifications when conducting the interview, this mistake should not occur."

(PSAF ¶ 18.)

Defendant submits Barr's testimony that Defendant's interview process is not structured and is 'up to the individual' conducting the interview, and Allison's testimony that Defendant has no interviewing policies other than a fair and ethical approach. (DRPSAF ¶ 18.)

After Paras' promotion was announced, on January 23, 2019, Allison received the automated email connected with the People Tracker system described above. Allison forwarded that email as part of the January 25 Email to Caldwell. Caldwell responded, stating that the "outgoing DHRM made a recommendation," suggesting changes to the email, proposing that senior, regional HR managers Marge Niedbalski and Jon Robertson be informed of the situation, and adding that the email should mention that Plaintiff "remains a valid candidate for future opportunities." (*Id.*) Several senior level HR managers and executives, including Malcolm Berkley, Caldwell, Robertson, Nelson, and Niedbalski, were informed of Allison's decision and the need to update the information in People Tracker. (*Id.*)

Allison sent a revised version of her January 25 Email to senior HR executives three days later (the "January 28 Email"). Allison added several sentences to the end of her bullet point regarding why she selected Paras for promotion:

> Angel was currently applying for Manager positions within UPS Internationally and within the Country [*sic*] as well. Angel is fluent in 3 languages. Angel has aspirations to eventually 'give back' to the community of Guam by becoming an HR Leader in the territory. All of these attributes will be required to [*sic*] in the AHRM role.

(PSAF ¶ 28.) Allison admitted in her deposition that the attributes she described were not required for the AHRM position and stated that she added them for "color." (DRPSAF ¶ 28.) Allison also added,

> The outgoing DHRM [Barr] made a recommendation for the open Area HR Manager position and open Full Time Supervisor position and I was advised by Linda Nelson to make my own hiring decisions for the HR Department, before selecting said candidates. After conducting interviews, I ultimately made a decision

> to fill the Manager position with whom Carlos and I agreed was the best for UPS and the Illinois district. . . . Carlos Interial and I . . . were unaware that this had been documented in the People Tracker, we were only aware that there were two approved requisitions with TBD on them.

(PSAF ¶ 28.) Allison requested that People Tracker "be updated to reflect the names I selected." (*Id.*) Allison also added, at Caldwell's suggestion, that Plaintiff "remains a valid candidate for future opportunities." (*Id.*)

In March 2019, Plaintiff had a meeting with Interial and Macchia, where she complained that the decision to promote Paras over her was discriminatory, which Interial characterized as "venting." (*Id.* ¶ 29.) Among other things, Interial told Plaintiff that she should have been more "proactive" in explaining at the January 17 meeting about why her children would not present a problem with her schedule. (*Id.*) Plaintiff responded by noting that she was asked those questions, but Paras was not. (*Id.*) Interial stated that he had no negative comments about Plaintiff's work, that he was "shocked" Plaintiff was not promoted, and reiterated that he believed that Plaintiff was the best candidate. (*Id.*) Interial stated that if another AHRM position came available that Plaintiff would "be the next pick." (*Id.*)

Defendant had an "open door" anti-discrimination policy: when an employee felt they had been discriminated against, they could go to their manager or supervisor or any HR manager to discuss their concern. (*Id.* ¶ 30.) This policy is formalized in Defendant's Employee Reference Guide, which informs UPS employees, "The matter will be investigated in a confidential manner." (*Id.*) Per Defendant's policies, an HR investigation into discrimination allegations entails (1) interviewing the reporter; (2) interviewing witnesses; (3) interviewing the subject; (4) reviewing any pertinent documents; (5) preparing a report that summarizes the allegations and evidence; (6) making a determination as to whether the concern is substantiated or not. (*Id.*) Plaintiff at least twice informed Macchia, her supervisor, and Interial, another HR manager, that

21

she believed she was the subject of discrimination, but Defendant never opened an investigation. (*Id.*) Defendant maintains that because Interial was personally privy to the employment decision he had no need to conduct an investigation. (DRPSAF ¶ 30.) Plaintiff contends that Allison, Interial, and Macchia discriminated against her. (PRDSF ¶ 52.)[6]

In May 2019, in preparation for the annual career development meeting with UPS' HR executives, Macchia and Plaintiff prepared for Allison a bullet-pointed list of information about Plaintiff for Macchia to present at the meeting. (PSAF ¶ 31.) The document contained positive information about Plaintiff's work, a list of Plaintiff's direct reports (including Paras and Kish) who had been promoted while working for Plaintiff, and personal information about Plaintiff, such as the fact that she was pregnant at the time of her marriage. (*Id.*)

### The May/June 2019 Transfer to Jefferson Street

Also around May 2019, Plaintiff learned that her work location was being transferred from Bedford Park to Jefferson Street in downtown Chicago. (PSAF ¶ 32.) The transfer was implemented in June 2019, when she was around seven months pregnant and showing. (*Id.*) As a result of the transfer, Plaintiff's round-trip commute more than tripled. (*Id.*) The HR office location at Jefferson Street was a trailer that lacked running water or bathrooms. (*Id.*) The trailer's only water source was a cooler. (DRPSAF ¶ 32.) The trailer had four offices in it. (*Id.*) Interial and Macchia were aware at the time that Jefferson Street was the only office Plaintiff did not want to work out of. (PSAF ¶ 32.) Plaintiff's pay, title, and responsibilities did not change. (DSF ¶ 56.) Because Plaintiff's commute became longer, Macchia told her to keep her normal

---

[6] Defendant's position that Plaintiff contends no one at UPS discriminated against her other than Allison is not supported by the evidence.

home schedule, arrive at work when she could, and leave when she needed to. (*Id*.) Plaintiff disputes that she was actually allowed to do so. (PRDSF ¶ 56.)

Interial testified that when he was AHRM, he "always" felt that the workload was not balanced correctly between facilities. (DSF ¶ 54.) When he was promoted to HR Operations Manager around January 2019, he "had an opportunity to rebalance the work," which included moving one of the two HR Supervisors in Bedford Park (Plaintiff and Lynette Baker) to Jefferson Street, which was a larger facility and where there was only one HR Supervisor. (*Id*.) Interial testified that he "left it up to the managers how they wanted to make the moves." (*Id*.) Ultimately, he signed off on the decision that Macchia made to transfer Plaintiff. (*Id*.) He does not recall when. (*Id*.)

Macchia testified that soon after Interial was promoted, Interial suggested that Plaintiff "would be good to send to Jefferson Street because of, you know, she's – Jefferson Street's a challenging building and you want your better sups at your better buildings." (*Id*.) Macchia did not "question" Interial's suggestion. (*Id*.) Allison testified that the decision was "mentioned" to her, but she "left the decision and the moves up to Carlos to manage." (*Id*.) There is no paper record documenting a workload balance problem among HR Supervisors or the rationale for transferring Plaintiff. (*Id*.) Plaintiff testified that Nugent told her that Interial and Macchia started talking about moving Plaintiff to Jefferson Street in January 2019, at about the same time she did not get the AHRM position. (DRPSAF ¶ 32.)

Plaintiff testified that Macchia told her she was being transferred to Jefferson Street to "help develop another HR Supervisor who wasn't doing so well." (*Id*.) In Plaintiff's memory, there was only ever one HR Supervisor at Jefferson Street. (*Id*.) At the time Plaintiff was transferred, one of the tasks HR Supervisors had to perform at Bedford Park was road tests,

which Plaintiff was qualified to do while Baker was not. (PRDSF ¶ 54.) Plaintiff continued managing this responsibility from Jefferson Street by sending her employees to Bedford Park to perform the road tests. (*Id*.) When Plaintiff arrived at Jefferson Street, Plaintiff's office space was not set up. (PSAF ¶ 32.) Additionally, the desk available to Plaintiff was small and it took several weeks for a larger one to be moved in. (*Id*.)

During the time Plaintiff believed she was going to be promoted to AHRM, she intended to only take six weeks of FMLA/maternity leave in 2019 to ensure she would be present to help prepare for peak holiday season. (*Id*. ¶ 33.) Peak holiday season is the period between October 1st and Christmas, during which Defendant is particularly busy, necessitating seasonal hiring. (*Id*.) Plaintiff testified that in July or August 2019 she was in a meeting with Macchia and people from operations and she mentioned they should be prepared for when she went on leave in August and that she would not be back before the peak season hit. (DRPSAF ¶ 33.)[7] When they left the meeting, Macchia said, "You're going to take all 12 weeks?" (*Id*.) Plaintiff replied yes, she originally was not going to but now she would. (*Id*.) Macchia "stopped and looked at [Plaintiff] and said, do you really want me to tell [Allison] that you're not going to be here during peak?" (*Id*.) Plaintiff said yes. (*Id*.) Plaintiff perceived that from the way Macchia framed his questions, Allison would be upset with her and that Plaintiff was "doing something wrong for taking those twelve weeks." (*Id*.) Plaintiff also testified that she could not recall precisely when,

---

[7] Defendant argues that Plaintiff's declaration that the meeting took place in March or April 2019 contradicts her previous testimony that she could not recall when the meeting took place but that it was probably in July or August 2019. The Court agrees. *LaFary v. Rogers Grp., Inc.*, 591 F.3d 903, 908 (7th Cir. 2010) ("Moreover, this declaration came after a deposition in which LaFary admitted that she did not know when DeMartin or the other decision-makers learned that she was pregnant. A plaintiff cannot defeat a motion for summary judgment by 'contradict[ing] deposition testimony with later-filed contradictory affidavits.'" (quoting *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005))).

but Macchia "tried to persuade [her] not to take all 12 weeks" by saying "things like hey, you can work from your desk, they won't make you get up from your desk. Since you're on your peak, you don't have to do road tests, you don't have to go anywhere. . . . [I]f you want to come back in six weeks, I'll make it as seamless as I can for you." (*Id.*) Plaintiff responded that she intended to take all 12 weeks. (*Id.*)

On July 31, 2019, Plaintiff filed an EEOC charge ("EEOC Charge") accusing Defendant of sex discrimination in relation to the decision to promote Paras over her for AHRM. (PSAF ¶ 34.) The EEOC Charge states, in pertinent part, "Respondent [UPS] was aware of my pregnancy. On or about January 18, 2019, I was informed I was not selected for a promotion. I believe that I have been discriminated against because of my sex, female (pregnancy), in violation of Title VII of the Civil Rights Act of 1964, as amended." (*Id.*) On August 6, 2019, Allison received an email from Defendant's legal department with the subject matter "UPS New Employment Matter/Sara Maier," although the content of the email is redacted as privileged. (*Id.*) On August 23, 2019, Plaintiff's maternity leave began. (*Id.*) Shortly after Plaintiff went on leave, Allison reached out to Defendant's legal department, responding to an email from weeks before, asking to discuss Plaintiff's Charge. (*Id.*)

Upon Plaintiff's return from maternity leave, Plaintiff worked at least a week or two in the Lockport facility, which did not have a designated lactation space. (*Id.* ¶ 35.) In contrast to the Bedford Park location where Plaintiff had a private office, at Lockport Plaintiff needed to "kick a division manager out of his office" to pump at his desk, who would then wait outside the office for her to finish. (*Id.*) The division manager's office was the only private office space at that facility. (*Id.*) Plaintiff felt so uncomfortable with the situation that she felt compelled to

*leave the facility to pump in her car.* (*Id.*) Plaintiff did not notify Defendant that she felt

uncomfortable. (DRPSAF ¶ 35.)

Plaintiff then returned to the Jefferson Street facility. (PSAF ¶ 36.) Like at Lockport,

there was no designated lactation room. (*Id.*) Plaintiff had previously attempted to pump for her

first child at the Jefferson Street trailer in 2012, during which time a male UPS employee walked

in on her pumping shirtless. (*Id.*) This experience made her apprehensive about pumping again at

Jefferson Street. (*Id.*) In 2019, Plaintiff shared an office in that same trailer with Anthony

Marinaro, whom she had to ask to stop working and leave each time she needed to pump. (*Id.*)

There was no lock on the office door. (*Id.*) Macchia told Plaintiff to request a lock, which

Defendant then provided. (DSF ¶ 64.) The walls in the trailer office were paper thin so Plaintiff

worried that "everyone interviewing or being interviewed in the rest of the trailer could hear

[her] pump and would know [she] was shirtless." (PSAF ¶ 36.) Macchia suggested Plaintiff use

his office or an office near his in the automotive department flanked by windows, a "five, ten-

minute" walk from her workspace, which would have necessitated forty-five minutes to hour-

long breaks each time she needed to pump, making it harder to complete her assigned tasks and

maintain productivity. (*Id.*) Macchia testified that those offices were only sometimes used and

that the windows had blinds. (DRPSAF ¶ 36.) Plaintiff found an empty space on the third floor

of the building. (PRDSF ¶ 64.)

## The January/February 2020 Promotion Decision

Macchia gave Plaintiff highly positive performance reviews for her 2019 performance

and confirmed that nothing happened in 2019 to change his view that Plaintiff deserved to be an

AHRM. (PSAF ¶ 37.) Throughout 2019, Plaintiff remained a Level 1 Fit for promotion to

AHRM, while Kish declined to Level 2, leaving Plaintiff as the only Level 1 Fit for promotion to

AHRM in Defendant's Illinois HR department. (*Id*.) Allison testified that, throughout 2019, she was personally aware of Plaintiff's "strengths" and "capabilities," and was "very comfortable" with them. (*Id*.)

In July 2019, within months of Paras being promoted to AHRM, he was accused of misconduct by two of his subordinates. (*Id*.) In early October 2019, Defendant's HR investigators concluded, among other things, that Paras "conducted himself in a manner that was not professional workplace conduct" in both instances and recommended a demotion or "loss of Merit increase." (*Id*.) As a result Paras was transferred laterally to a different manager role, a decision that Allison announced on February 11, 2020. (*Id*.)

On January 14, 2020, Plaintiff attended an EEOC mediation with Defendant that did not result in a settlement. (*Id*. ¶ 39.) On January 24, a requisition was approved for Paras's vacated AHRM position, and on January 27, a UPS employee reached out to Allison and Interial's successor Jimmy McClure, asking if the position should be "posted" via MCO—Defendant's process for competitive internal promotions. (*Id*.) McClure responded, "not yet," and that he would let the employee know "if/when to post." (*Id*.) On January 31, 2020, Plaintiff filed an amended EEOC charge ("Amended EEOC Charge") accusing Defendant of retaliating against her. (*Id*.) The Amended EEOC Charge alleged, among other things, that Defendant had "retaliated and continued to discriminate against Plaintiff due to her sex and pregnancy status by, among other things:

- Attempting to dissuade [Plaintiff] from taking 12 weeks of maternity leave in violation of FMLA;
- Transferring Plaintiff to the Jefferson Street facility, a far-from-home facility her supervisor knew would be uniquely problematic for [Plaintiff] as a pregnant woman and young mother. Among other things, HR at Jefferson Street is located in a trailer that lacked running water or a private place to pump milk;
- Scrutinizing Maier's in-office work hours."

27

(*Id.*)

Defendant decided not to post the AHRM role via MCO, which would have given Plaintiff an opportunity to compete for it. (*Id.*) Instead, on February 11, 2020, Defendant announced the selection of Gloria Macias, a manager from outside the HR department. (*Id.*) Allison made the decision with the advice of UPS counsel. (*Id.* ¶ 40.) Macias took voluntary retirement later that year when her AHRM position was eliminated during HR restructuring. (*Id.*)

Defendant represented to the EEOC that Plaintiff was "one of the six individuals who were considered to fill the open [AHRM] position." (*Id.*) In Defendant's sworn interrogatories in this case, which Allison verified under penalty of perjury, Defendant indicated that only Macias was considered. (*Id.*) Allison testified, however, that Macias was not the only one she considered. (*Id.*) There is no documentation of which individuals other than Macias were considered. (*Id.*)

Defendant represented to the EEOC that Macias was selected as the "most qualified candidate for the position" because she was a "strong performer and came highly recommended as a then-Manager in UPS's Integrad operations." (*Id.*) Defendant stated, among other things,

> Her other superior qualifications were thirty-two (32) years of experience with UPS, including extensive HR, operations, and managerial experience, and a Master's degree in Business Administration . . . as well as organizational skills. [Plaintiff], on the other hand, had only fifteen (15) years of experience with UPS, a Bachelor's degree, experience as a supervisor, not a manager, as well as organizational skills in need of improvement. Additionally, when interviewed, [Macias's] breadth of perspective, ideas for driving the success of her team, and sharp organizational skills, all of which are critical qualities for the role, were evident.

(*Id.*) Contrary to Defendant's representations, Allison testified that she did not interview Macias. (*Id.*) Allison testified that Macias's manager had reached out to Allison at some

point after was Allison transferred to discuss development opportunities for Macias and others. (DSF ¶ 69.)

Plaintiff is still employed by UPS. (*Id.* ¶ 71.)

## LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). In other words, failure to support any essential element of a claim renders all other facts immaterial. *Id.* at 323. "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

### I.  Discrimination Based on Sex (Counts I and IV)

The parties agree that Plaintiff's IHRA discrimination and retaliation claims are analyzed under the same framework as Plaintiff's Title VII discrimination and retaliation claims. *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) ("Illinois courts apply the federal Title VII framework to IHRA claims."). The Court accordingly proceeds with its analysis under Title VII.

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII, as amended by the Pregnancy Discrimination Act, defines "because of sex" to "include . . . on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . ." 42 U.S.C. § 2000e(k).

The parties agree that, "[i]n order to establish a prima facie case in a failure-to-promote context, the plaintiff must show that 1) [s]he belongs to a protected class, 2) [s]he applied for and was qualified for the position sought, 3) [s]he was rejected for that position and 4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff." *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003). Here, Plaintiff contends that she (1) is a woman who (2) sought and was qualified for the AHRM position that became available in 2019, but (3) was denied the position, (4) in favor of Paras, a man, who was "not better qualified than she was." *Id*. Only the fourth factor appears to be in dispute. At bottom, in an employment discrimination case, the "legal standard . . . is simply whether the evidence

30

would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Defendant urges the Court to utilize the burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973), which a "plaintiff may choose" in order "[t]o clarify and to simplify her task" of establishing causation. *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020). But Plaintiff does not proceed under the *McDonnell Douglas* framework, relying instead on circumstantial evidence that, she argues, supports an inference of discrimination. The Seventh Circuit has "identified three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." 953 F.3d at 929 (internal quotation marks omitted) (citing *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). "All evidence," whether direct or circumstantial, "belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 766.

Plaintiff offers each of the three types of circumstantial evidence identified by the Seventh Circuit: 1) evidence of ambiguous statements Allison and Interial made during and/or after the January 17, 2019 interview; 2) evidence that Paras—a man—was promoted to the AHRM position even though he, unlike Plaintiff, did not have bachelor's degree; and 3) evidence that Defendant's stated reasons for promoting Paras over Plaintiff—that Paras distinguished himself during the interview—are dishonest. When evaluated as a whole, there is sufficient evidence that "would permit a reasonable jury to infer 'an overall likelihood of discrimination'

that merits a trial, not summary judgment." *Joll*, 953 F.3d at 929 (quoting *Ortiz*, 834 F.3d at 763).

First, evidence of Allison's ambiguous questions and conduct during the January 17, 2019 interview "does not require, but certainly permits, an inference that the decision-makers were indulging sex-role stereotypes as they approached the decisions." *Id*. at 930.[8] During the interview, after Plaintiff spoke about her two young children and mentioned that she was trying for a third, Allison cut Plaintiff off from responding about her qualifications and then asked whether Plaintiff could work "long hours, working in the middle of the night" with her "small children." The "telling twist," *id*., is that although Paras undisputedly also has small children and spoke about them and his dance business in his interview, there is no evidence that he was questioned about his ability to work long hours and in the middle of the night with his small children, or that he was cut off from speaking about his qualifications. Plaintiff's interview lasted only 15 minutes in comparison to Paras' interview, which lasted 45 minutes.

"Basing an employment decision on an employer's notions of how women do or ought to behave—the employer's sex-role stereotypes—is discrimination 'because of sex.'" *Id*. (citing *Hively v. Ivy Tech Comm. Coll. of Ind.*, 853 F.3d 339, 345–47 (7th Cir. 2017)). "The notion that a woman is or ought to be dedicated to family above work is one long-standing such stereotype." *Id*. (citing *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 731 (2003)); *see also Hibbs*, 538

---

[8] As for the identity of the decision-maker, the record permits the reasonable inference that Allison, Interial, Macchia, Nugen, Barr, and Barre all weighed in on and influenced the promotion decision, with Allison as the most active partner. There is conflicting evidence on this point: according to Defendant the final decision was made by Allison. But Barr and Barre took active roles in selecting and identifying Plaintiff as the recommended candidate over the course of six months, and Barre only testified that he and Barr expected Allison to "weigh in" on the decision. Interial sat in on the interviews with Allison, and afterwards, Allison solicited the opinions of Interial, Macchia, and Nugent.

U.S. at 731 (2003) (recognizing "pervasive sex-role stereotype that caring for family members is women's work"); *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971); *Lust v. Sealy, Inc.*, 383 F.3d 580, 583 (7th Cir. 2004); *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 45 (1st Cir. 2009). A jury could find that Allison's question, when asked only of Plaintiff and not of a similarly situated male, reflected such stereotyping. *Joll*, 953 F.3d at 931 (listing cases). It is certainly possible to infer that Allison and Interial thought Paras "distinguished" himself in the interview because there was no underlying notion that he, unlike Plaintiff, would be dedicated to his small children above his work. *See Hibbs*, 538 U.S. at 736 ("Stereotypes about women's domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men.").

Defendant argues that the Seventh Circuit does not recognize a "gender plus" or "caregiver" theory of discrimination. But the cases Defendant cites do not support such a proposition and are otherwise distinguishable from this case. In *Coffman v. Indianapolis Fire Department*, the court declined to decide whether it recognizes "sex plus height" as a vehicle for a Title VII discrimination suit. 578 F.3d 559, 564 (7th Cir. 2009). And in *Palomares v. Second Federal Savings and Loan Association of Chicago*, the district court found that the male plaintiff, who was the primary caregiver to his son, failed to allege the "essential element of a 'gender plus' claim"—that a man and a woman were treated differently. No. 10-CV-6124, 2011 WL 760088, at *3 (N.D. Ill. Feb. 25, 2011).

There is additional undisputed evidence of ambiguous statements and conduct that would permit an inference of sex-role stereotyping. When Macchia informed Plaintiff that she was not promoted, Plaintiff responded by challenging whether the decision was because she was a woman, referencing the specific question she had been asked about whether she could handle the

job with her small children. Macchia responded that he told Allison and Interial that Plaintiff's "kids had never caused any issues at work," that Plaintiff "always got everything done," and is "the first to volunteer." Macchia's statements support the inference that Plaintiffs' children, and the concern that Plaintiff's dedication to them would interfere with Plaintiff's ability to perform at work, were a part of the decision-making process.

It is particularly telling that Interial shortly thereafter told Plaintiff the interview was "fine," that she was the "best fit" and the "right candidate," but that Allison felt Plaintiff "had a lot going on right now." "After all, the essence of employment discrimination is penalizing a worker not for something she did but for something she simply is." *Chadwick*, 561 F.3d at 47. There is no evidence that Paras was told he had "a lot going on" outside of UPS despite also speaking about his children and side business during his interview. A reasonable jury could infer from Interial's explanation that Plaintiff was not denied the promotion because of her interview performance but because Allison assumed that as a woman with two small children, trying for a third, Plaintiff "would not give her all to her job." *Id*; *see also Hunt v. City of Markham*, 219 F.3d 649, 652 (7th Cir. 2000) (finding discrimination can be inferred where the decision-makers' comments were communicated by "the decision makers themselves, or those who provide input into the decision … (1) around the time of, and (2) in reference to, the adverse employment action complained of" (citing cases)).

In fact, Plaintiff immediately challenged Interial's explanation and complained to him that Defendant had discriminated against her based on her sex by promoting a less qualified man who also had young children instead of her. Interial understood Plaintiff to be "venting," and told Plaintiff to "calm down." Plaintiff argues that these are disparaging words when aimed at a woman who is speaking out. *Cf. Joll*, 953 F.3d at 931 (finding that where an unsuccessful female

applicant for a coaching position was described as having a "dominant personality," a jury "could draw on its experience to conclude that the same behavior may be labeled 'assertive' in a man and 'aggressive' in a woman" based on the "age-old stereotype that women are or ought to be submissive"). The Court agrees that a jury could conclude based on its experience and the context that the same behavior may be labeled "venting" in a woman but taken seriously in a man based on the "age-old stereotype" that women are overly emotional or hysterical. Then in March 2019, Plaintiff again complained to Interial and Macchia that the decision to promote Paras over her was discriminatory. Neither Interial nor Macchia initiated an investigation. Instead, in response, Interial told Plaintiff that she should have been more "proactive" in explaining at the interview why her children would not present a problem with her schedule. This is further evidence from which a jury could infer that sex stereotypes regarding caretaking responsibilities were an important part of the AHRM promotion discussion.

Second, Plaintiff offers evidence from which a jury could infer that Paras was at least similarly situated to Plaintiff, or even less qualified. Plaintiff had a bachelor's degree and Paras did not. Paras never had a stronger performance review than Plaintiff. Plaintiff had seven years more experience than Paras in the full-time supervisor role. Both Plaintiff and Paras were Level 1 Fit for promotion to AHRM, although Plaintiff had held that status (or its equivalent) since 2015, while Paras was first recognized as a Level 1 Fit for promotion shortly before he was promoted. Plaintiff had directly supervised and trained Paras for two years while she was an HR Supervisor and he was an HR Specialist. Defendant has never suggested that Plaintiff's work performance "lagged" or that Paras' "surged" in advance of the decision to promote Paras. Although Defendant does not dispute these facts, it submits evidence that they were not factors in the promotion decision—it appears that Defendant's position is that only the candidates' Level

1 Fit status for promotion to AHRM, interview performance, and the fact that Paras was in school to get his bachelor's degree were considered.[9] At the very least, these factors permit the inference that Paras was similarly situated, or even less qualified, than Plaintiff. The Seventh Circuit case cited by Defendant is distinguishable. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 738 (7th Cir. 2006) (finding plaintiff failed to show she was at least as qualified for the position where she had more seniority and better relations with other employees but no supervisory experience or college degree, whereas the successful candidates had both).

The parties submit conflicting evidence as to whether a bachelor's degree was a required qualification for the AHRM position. In support of Plaintiff's argument that a bachelor's degree was required, she points to the AHRM Job Description, which states "Bachelors Degree [*sic*] – Required – Required;" UPS interview training slide decks, which state "'Required' must be specific to the business need of the job and is absolute. The applicant either has it or they do not."; and certain of Allison and Interial's testimony.

Defendant contends that the fine print on the AHRM Job Description states that it is only a "guideline," and, in practice, Defendant does not enforce any bachelor's degree requirement. Defendant relies upon the fact that Barre—the District HR Operations Manager to whom AHRMs reported—attained his position without a bachelor's degree. Barre was, at the time relevant to this lawsuit, in the process of retiring or retired, and it is not clear from the record when he began that position, what the stated "required" qualifications were for that position at

---

[9] While not a deciding factor in the Court's discrimination analysis, the Court notes the oddity that only one year later, when Allison was again faced with filling this same AHRM position, she disregarded the Level 1 Fit status for promotion to AHRM (which only Plaintiff held), purporting instead to hire a candidate that was more qualified based on experience, tenure, performance reviews, education (a master's degree versus a bachelor's degree), and interview performance (from an interview that, as it turns out, never actually took place).

that time, whether anyone else applied for the position, what Barre's own qualifications and experience were, etc. This conflicting evidence raises a material dispute of fact for the jury to decide.

Third, although Plaintiff need not show pretext at this stage, *see Joll*, 953 F.3d at 933 ("Where the plaintiff does not rely solely on *McDonnell Douglas*, she may survive summary judgment even without evidence that the employer's explanation is dishonest."), the evidence also supports an inference that by promoting Paras over Plaintiff despite his lack of a bachelor's degree, Defendant departed from its own internal procedures and so its explanation for its promotion decision (that Paras "distinguished" himself during the interview) was dishonest. *See Joll*, 953 F.3d at 931 (finding an employer's "deviation from standard procedures" can give rise to an inference of pretext); *see also Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005) (finding departure from hiring process contemplated by employer guidelines constituted evidence of pretext). There is also evidence that Allison departed from Defendant's internal interview procedures by asking different interview questions to different genders regarding their responsibilities to small children and commitment to work, cutting off a woman but not a man from speaking about her qualifications, and interviewing the woman for only 10 minutes and the man for 45 minutes.

Defendant maintains that the undisputed evidence shows that Allison honestly believed at the time of the interview that Paras was scheduled to complete his bachelor's degree in May 2019, relying upon statements Allison made in her January 25 Email. *See Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered."). But Paras testified that he was nowhere close to getting his degree at the time of his interview, that he had a

planned graduation date of 2023, and that he told Allison and Interial only that he "was in school." "[I]f the plaintiff offers evidence of her own, as she did here, the jury is free to disbelieve the defendant's contrary evidence." *Lust*, 383 F.3d at 583.

There is additional evidence supporting an inference that Defendant's explanation is dishonest. In Defendant's version of events, Plaintiff and Paras were essentially on identical footing but for their interview performances, during which Paras "distinguished" himself. In Plaintiff's version of events, Plaintiff had already been selected for the promotion when Allison met with Paras, Kish, and Plaintiff, asked only Plaintiff whether she could handle the demands of the job with small children, and decided to rescind the promotion in favor of a man who also had small children but who was not asked whether he could handle the demands of the job. The Court agrees with Plaintiff that the context in which Allison, and the others who weighed in on the promotion decision, arrived at the promotion decision matters.

There were numerous communications and documentation exchanged between May 2018 and January 2019 that used past tense and/or unconditional language when referring to Plaintiff and the promotion to AHRM from which a jury could infer that decision-makers, or those who weighed in on the decision, had selected Plaintiff for the AHRM position with some level of finality. Defendant points out that Barre testified that he and Barr expected Allison to "weigh in on the final decision of who would fill the AHRM position," and Barr testified that he never actually promoted Plaintiff to the position of AHRM. But this testimony must be weighed by the jury together with all of the above-described communications. *Lust*, 383 F.3d at 583.

At various times, Defendant relies upon the January 25 and 28 Emails as evidence that Allison decided to conduct interviews, her rationale for that decision, and her rationale for choosing Paras over Plaintiff. Even if the jury were presented with this evidence, it could infer

that Allison's rationale was concocted to cover herself with her superiors. Her and Interial's explanation to her superiors—that Paras "distinguished" himself—could be seen as conflicting with Allison's earlier explanation that she felt Plaintiff "had a lot going on right now." Again, the jury is "free to disbelieve" Allison. *Lust*, 383 F.3d at 583.

The Court must also address Defendant's arguments in its reply brief with respect to Plaintiff's EEOC Charge. Defendant points to Plaintiff's EEOC Charge for "sex discrimination," which alleges that Defendant "was aware of [her] pregnancy." Defendant argues that it is undisputed that no decision-maker knew that Plaintiff was pregnant before making the promotion decision and so Plaintiff cannot show causation. Defendant further argues that Plaintiff is now, for the first time, raising a "potential pregnancy" theory that did not appear in her EEOC charge or discovery and so should not be considered by the Court. Defendant cites no authority on point.

"[A]s a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009) (citing *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir.1994)). "The purpose of this requirement is twofold: to promote resolution of the dispute by settlement or conciliation and to ensure that the sued employers receive adequate notice of the charges against them." *Id*. (citing *Cheek*, 31 F.3d at 500). "In addition to those claims which were previously charged, Title VII plaintiffs may also litigate claims which are like or reasonably related to the allegations of the administrative charge and growing out of such allegations." *Id*. at 691–92 (cleaned up) (citing *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.2d 164, 167 (7th Cir.1976)). "This standard is a liberal one . . . , and is satisfied if there is a reasonable relationship between the allegations in the charge and those in the complaint, and the claim in the complaint could reasonably be expected to be discovered in the course of the EEOC's investigation." *Id*. (citations omitted).

As described above, Plaintiff's position is that Allison, and others who weighed in on the promotion decision, discriminated against her on the basis of the sex stereotype that women will dedicate more time to family and children at the expense of work performance. These claims fall squarely within the category of "sex discrimination" alleged in Plaintiff's EEOC Charge, for the reasons explained above. Further, sex discrimination includes discrimination on the basis of childbearing capacity, *Int'l Union v. Johnson Controls*, 499 U.S. 187, 206 (1991); *Hall v. Nalco Co.*, 534 F.3d 644, 648 n.1, 649 (7th Cir. 2008), and intent to become pregnant, *Pacourek v. Inland Steel Co.*, 858 F. Supp. 1393, 1401 (N.D. Ill. 1994) ("potential or intended pregnancy is covered" by the Pregnancy Discrimination Act).

Although Plaintiff alleges in her EEOC Charge that Defendant was "aware of [her] pregnancy," Plaintiff's sex discrimination claim should not be dismissed merely because she wrote "pregnancy" instead of "potential pregnancy" on her EEOC Charge. The nature of Plaintiff's discrimination claim could reasonably be expected to be discovered in the course of the EEOC's investigation. It stems from the same interview and promotion decision that prompted the EEOC Charge, and Plaintiff submits that she discussed her two children during the interview and that she and her husband were trying for a third, after which Allison questioned whether Plaintiff could work "long hours, working in the middle of the night" with her "small children." Plaintiff's stated intent to become pregnant goes hand in hand with her claim that she was not promoted because of the assumption that she would dedicate more time to her potentially growing family at the expense of work. "In order to further the goals of Title VII and given the fact that laypersons rather than lawyers usually are the ones initiating these charges, 'a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint.'" *Teal*, 559 F.3d at 691 (citing *Cheek*, 31 F.3d at 500).

Plaintiff's current position on her sex discrimination claim is at least reasonably related to the allegations on her EEOC Charge.

For all of these reasons, summary judgment is denied as to this claim.

## A. 2020 Failure to Promote

Defendant next argues that Plaintiff cannot establish the fourth element of a *prima facie* case of sex discrimination for the 2020 failure to promote because the person who filled that position, Macias, is in the same protected class as Plaintiff, was already a manager, and was laterally transferred to AHRM, not promoted. The complaint does not expressly base its sex discrimination claim on the 2020 failure to promote. Plaintiff makes no response to Defendant's argument and offers no argument in support of such a claim. Plaintiff does, however, base her retaliation claim in part on the 2020 instance of failure to promote. Accordingly, because it appears that Plaintiff has neither alleged nor is pursuing a sex discrimination claim based on the 2020 instance of failure to promote, the Court does not address it in this Opinion.

## II.  Retaliation under Title VII and IHRA (Counts II and V)

Turning next to Plaintiff's retaliation claims, Title VII protects an employee from discrimination when "he has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a).

"A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove that [1] he engaged in protected activity and [2] suffered an adverse employment action, and that [3] there is a causal link between the two." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). As to the first factor, there is no dispute that Plaintiff engaged in protected activity: she complained internally of discrimination in January 2019 and March 2019; she filed

41

an EEOC Charge on July 31, 2019; she participated in an EEOC mediation on January 14, 2020; and she filed an Amended EEOC Charge on January 30, 2020. *See, e.g.*, *Giese v. City of Kankakee*, 71 F.4th 582, 591 (7th Cir. 2023) ("[T]he parties do not dispute that complaining to human resources about sex discrimination is protected activity.").

Rather, the parties' disagreement lies in the second and third elements. Specifically, the parties dispute whether Plaintiff's transfer in June 2019 to the Jefferson Street facility and Allison's decision to laterally move Macias into the vacated AHRM position in early 2020 constitute adverse employment actions against Plaintiff, and if so, whether there was a causal link between each decision and Plaintiff's protected activities. Additionally, Defendant argues that even if Plaintiff establishes a *prima facie* case, Defendant has presented unrebutted evidence of a non-invidious reasons for transferring Plaintiff to Jefferson Street and not promoting her to AHRM in early 2020, and that Plaintiff has no evidence of pretext.

The Court considers Plaintiff's June 2019 transfer and 2020 failure-to-promote claim separately. *See Joll*, 953 F.3d at 930 ("[D]iscrete adverse employment actions give rise to discrete claims that must be evaluated individually.").[10]

---

[10] Defendant also argues that Plaintiff's allegations that UPS (1) attempted to dissuade her from taking twelve weeks of FMLA maternity leave, and (2) excessively scrutinizing Plaintiff's in-office work hours, do not constitute adverse actions. Based on the complaint, it does appear that Plaintiff alleges these employer actions as discrete adverse employment actions. (Compl. ¶¶ 29-30.) Plaintiff does not respond to Defendant's argument, arguing only that Plaintiff's transfer and 2020 failure to promote are the adverse actions at issue for her retaliation claims. In the absence of any argument from Plaintiff, the Court agrees with Defendant that these are not sufficiently concrete harms to amount to adverse actions for purposes of Plaintiff's retaliation claim. *See Poullard v. McDonald*, 829 F.3d 844, 856–57 (7th Cir. 2016); *see also McCready v. Title Servs. Of Ill., Inc.*, No. 06 C 6280, 2008 WL 2435933, at *3 (N.D. Ill. June 16, 2008) ("When a party fails to address an argument in his summary judgment brief, it is deemed a waiver.") (listing cases). Accordingly, summary judgment is granted in Defendant's favor with respect to Plaintiff's retaliation claims based on these two alleged adverse employment actions.

### A. June 2019 Transfer

Defendant argues that a transfer to another location categorically is not an adverse employment action, citing *Stutler v. Illinois Department of Corrections*, 263 F.3d 698, 702 (7th Cir. 2001) ("We have repeatedly held that a lateral transfer without a loss in benefits does not constitute an adverse employment action.") and *Blackmon v. City of Chicago*, 836 F. Supp. 2d 655, 668 (N.D. Ill. 2011) ("A purely lateral move to a new position, a transfer that 'does not involve a demotion in form or substance,' cannot serve as an adverse employment action." (citation and internal punctuation omitted)).

It is true that "a transfer that lengthens a commute is generally not considered a change in the *terms and conditions* of employment and, as such, is not actionable disparate treatment." *Owens-Floyd v. City of Chicago*, No. 05 C 3182, 2007 WL 4365324, at *5 (N.D. Ill. Dec. 11, 2007) (emphasis original) (citing *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004)). However, "[t]he range of conduct prohibited under [Title VII's] anti-retaliation provision is broader than its anti-discrimination provision." *Alamo v. Bliss*, 864 F.3d 541, 555 n. 39 (7th Cir. 2017) (quoting *Henry v. Milwaukee Cty.*, 539 F.3d 573, 586 (7th Cir. 2008)); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). "In the context of a retaliation claim, 'the discriminatory acts proscribed by Title VII . . . are not limited to those that affect the terms and conditions of one's employment.'" *Alamo*, 864 F.3d at 555 n. 39 (quoting *Henry*, 539 F.3d at 586). For a retaliation claim, an adverse action is one that would "dissuade a reasonable worker" from challenging discrimination. *Burlington*, 548 U.S. at 68; *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023) (same). Trivial harms and petty slights will not suffice. *Burlington*, 548 U.S. at 68. Although the reasonableness "standard for judging harm must be objective," the significance of any given act of retaliation will often depend upon the particular circumstances"

43

and "[c]ontext matters." *Id*. at 69. For example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Id*.

Here, Plaintiff submits evidence to show that her commute tripled while she was seven months pregnant, that her office furniture was not set up in the new location for weeks, and that the trailer in which the office was located lacked running water, a nearby bathroom, or a private space for breast pumping. A reasonable jury could find that the transfer in this context would dissuade a reasonable worker from challenging discrimination. *See Owens-Floyd*, 2007 WL 4365324, at *5 ("Given that plaintiff was worried about being further away from her son, a reasonable jury could find that the transfer could dissuade a reasonable worker from making or supporting a charge of discrimination.").

The Court turns next to whether Plaintiff presents sufficient evidence for a factfinder to conclude that Defendant transferred Plaintiff because Plaintiff engaged in protected activity. "A plaintiff demonstrates a causal connection by showing that the defendant 'would not have taken the adverse action but for [his] protected activity.'" *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (internal punctuation omitted) (quoting *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015)). Plaintiff does not rely on direct evidence of unlawful animus, pointing instead to purportedly "circumstantial evidence from which a jury may infer intentional discrimination." *Id*. (citation omitted). "If a plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate." *Id*. (cleaned up) (citation omitted).

Plaintiff argues that Interial's dismissive refusal to investigate Maier's discrimination complaints as "venting" in March 2019 and Macchia's sending a document to HR management containing personal details about Plaintiff and her current pregnancy in May 2019 are evidence of retaliatory intent.[11] *See Jackson v. Raemisch*, 726 F. Supp. 2d 991, 1007 (W.D. Wis. 2010) ("Disparaging comments made about a plaintiff's protected conduct followed shortly by adverse treatment is sufficient evidence to defeat defendants' motion for summary judgment"). Plaintiff also argues that Defendant has offered shifting and conflicting accounts about why Plaintiff was suddenly removed and sent to a less favorable location because the three decision-makers (Allison, Macchia, and Interial) pointed fingers at each other.

Based on the evidence, a jury could find that both Macchia and Interial were decision-makers in transferring Plaintiff to Jefferson Street.[12] Interial testified that he left the decision of who to transfer up to Macchia and merely signed off on Macchia's decision. Macchia, however, testified that Interial suggested Plaintiff should be the one to move and Macchia did not question that suggestion. While there are possible innocent explanations for why Interial and Macchia have different recollections of how the decision to transfer Plaintiff unfolded, a jury could infer, as Plaintiff argues, that Interial and Macchia "pointed fingers" at each other as an inference of

---

[11] Plaintiff also argues that Macchia's reaction in March or April 2019 to Maier's taking her full FMLA leave during "peak" supports an inference of retaliatory intent. For the reasons explained in the Background section above, the Court disregards these dates, which are set forth in Plaintiff's declaration and which contradict Plaintiff's earlier testimony that the conversation with Macchia took place in July or August 2019 (after Plaintiff was transferred).

[12] Plaintiff does not offer sufficient evidence that Allison was a decision-maker or weighed in on the transfer decision. *See Xiong v. Bd. of Regents of Univ. of Wis. Sys.*, 62 F.4th 350, 356 (7th Cir. 2023) ("[F]uture litigation on the retaliation claim should focus on what motivated Fletcher, *as the ultimate decision maker for the adverse action*, to make the contingent decision to terminate Xiong on March 7." (emphasis added)); *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 769 (7th Cir. 1994) ("Hiatt has therefore failed to show *that those in charge of his actual discharge* possessed an impermissible ulterior motive." (emphasis added)).

retaliatory intent. *See Joll*, 953 F.3d at 933; *Runkel v. City of Springfield*, 51 F.4th 736, 746 (7th Cir. 2022) (inconsistencies in employer's story for hiring decision supported inference of dishonesty and therefore intent).

Suspicious timing can also be evidence of retaliatory intent, although that alone is not enough. *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). The record is not precise as to when the transfer decision was made. Interial testified that he does not recall when the decision to transfer Plaintiff was made, but that he had always felt that the workload was not balanced correctly between facilities and finally had an opportunity to do something about it when he was promoted around January 2019. Macchia testified that Interial suggested transferring Plaintiff soon after Interial was promoted. Plaintiff testified that Nugent told her that Interial and Macchia started talking about moving Plaintiff to Jefferson Street in January 2019, at about the same time she did not get the AHRM position. Plaintiff was not officially informed that she would be transferred until May 2019, which then took place in June 2019.

A jury could infer from the evidence that Macchia and Interial began discussing transferring Plaintiff to Jefferson Street shortly after Plaintiff complained to Macchia and Interial, respectively, of sex discrimination, which was only one day after the interviews took place, which neither Macchia nor Interial investigated, and which Interial dismissed as "venting." A jury could also infer that the decision to transfer Plaintiff was not final until May 2019, when Plaintiff was officially informed. By that time, Plaintiff had complained multiple times in January and March 2019 to Macchia and Interial of sex discrimination, which was not investigated and disregarded as "venting;" Macchia had sent a document in May 2019 to HR management that included details about Plaintiff and her current pregnancy; and Plaintiff was

visibly pregnant. By that time, a triple-length commute and the working conditions at Jefferson Street would present a significant negative change for Plaintiff at seven-months pregnant. The immediacy with which Macchia and Interial began discussing transferring Plaintiff after her complaint of sex discrimination, plus Interial's ambiguous language, plus Macchia and Interial each testifying that the other made the decision to transfer Plaintiff, plus the significant negative change in Plaintiff's commute and working conditions while seven months pregnant, together permit an inference of retaliatory intent.

Accordingly, summary judgment is denied in this respect.

### B. 2020 Failure-To-Promote

Next, Defendant argues that the 2020 failure to promote, while potentially an adverse action, was not motivated by retaliatory intent. According to Defendant, Allison legitimately decided to laterally transfer Macias into the role, instead of promoting Plaintiff, because Macias's manager reached out to Allison about career development opportunities for Macias. The Court disagrees that this is the only reasonable interpretation of the evidence.

With respect to who was the decisionmaker, the only evidence before the Court is that Allison was the decisionmaker in the February 2020 promotion decision. It is unclear from the record when Allison made her decision, although the evidence places it sometime between October 2019 and February 2020. As early as October 2019, Defendant's HR investigators recommended that Paras either be demoted or lose "Merit increase," and it is undisputed that Allison decided to transfer Paras in response to the investigation. On January 24, 2020, a requisition was approved for Paras's vacated AHRM position, and on January 27, a UPS employee reached out to Allison and McClure, asking if the position should be "posted" via

MCO—Defendant's process for competitive internal promotions—to which McClure responded, "not yet," and that he would let the employee know "if/when to post."

Plaintiff offers evidence that when the AHRM position became available again in early 2020, Plaintiff was back to work and performing well. Plaintiff was the only Illinois HR Supervisor considered a Level 1 Fit for promotion to AHRM at the time. Allison had written to HR executives in her January 28 (2019) Email that Plaintiff "remains a valid candidate for future opportunities." However, Plaintiff then filed her EEOC Charge against Defendant in July 2019, attended an EEOC mediation in mid-January 2020, and filed her Amended EEOC Charge in late January 2020. Allison was involved at the time in responding to Plaintiff's charges. Then on February 11, 2020—mere weeks after Plaintiff's mediation with the EEOC—Defendant announced both Paras's transfer and that Macias would fill Paras's vacated position. A jury could reasonably infer from this evidence that Allison made her decision to transfer Macias into the AHRM role shortly after Plaintiff engaged in protected activities.

Defendant's explanation of how and why Macias was chosen for the AHRM position has both shifted over time and included falsehoods. "It has long been established that an employer's dishonesty in defending or explaining an employment decision can support an inference of illegal discrimination." *Lane v. Riverview Hosp.*, 835 F.3d 691, 697 (7th Cir. 2016); *see also Baines v. Walgreen Co.*, 863 F.3d 656, 665 (7th Cir. 2017) ("Evidence that an employer lied about the reasons for an adverse employment action permits a trier of fact to infer that the decision was actually motivated by discriminatory animus.").

Defendant represented to the EEOC that Allison considered six candidates, including Plaintiff, for the AHRM role. However, Allison identified, under penalty of perjury, only Macias as having been considered for the AHRM position. Then, in an about-face, Allison testified that

Macias was *not* the only one she considered. There is no documentation—other than the EEOC

position statement, which mentions Plaintiff—of which individuals other than Macias were

considered.

Next, Defendant represented to the EEOC that Macias was selected as the "most qualified

candidate for the position" because she was a "strong performer and came highly recommended

as a then-Manager in UPS's Integrad operations." Defendant stated in part that "when

interviewed, [Macias's] breadth of perspective, ideas for driving the success of her team, and

sharp organizational skills, all of which are critical qualities for the role, were evident."

However, Allison testified that she did not in fact interview Macias. "When an employer's

response is factually wrong in a self-serving way on a material fact, the choice between treating

it as an honest mistake or a deliberate falsehood is ordinarily a choice for a jury at trial, not for

summary judgment." *Lane*, 835 F.3d at 697.

Next, Defendant represented to the EEOC that Macias's "other superior qualifications

were thirty-two (32) years of experience with UPS, including extensive HR, operations, and

managerial experience, and a Master's degree in Business Administration . . . as well as

organizational skills" as compared to Plaintiff, who "had only fifteen (15) years of experience

with UPS, a Bachelor's degree, experience as a supervisor, not a manager, as well as

organizational skills in need of improvement." Although underdeveloped in the briefing, a jury

could find it suspicious that in January 2019, when deciding who to promote to the AHRM

position, Allison purported to consider only Level 1 Fit status, interview performance, and

education level (going with the candidate with the *lower* education level), not experience, tenure,

and performance. Then one year later, for that same AHRM position, Allison disregarded the

only person who held Level 1 Fit status (Plaintiff) and looked to education level, experience,

tenure, performance, and interview performance from an interview that, as it turns out, never took place. Now, in the summary judgment briefing, Defendant takes the position that Allison decided to transfer Macias after Macias's supervisor contacted Allison at some unspecified time about career development opportunities for Macias.

Defendant argues that even where an EEOC position statement is incorrect, there must be "further circumstantial evidence of unlawful [retaliation]" to draw an inference of retaliation. *Lane*, 835 F.3d at 697; *see also Sams v. City of Chicago*, No. 13 C 7625, 2018 WL 4679581, *8 (N.D. Ill. Sep. 28, 2018). Defendant's shifting positions regarding whether Plaintiff was considered for the 2020 AHRM position, shifting and factually inaccurate explanations for why Macias was selected over Plaintiff, and suspicious timing of the adverse employment decision are sufficient, at this stage, to infer retaliatory animus. *See Donley v. Stryker Sales Corp.*, 906 F.3d 635, 637–39 (7th Cir. 2018) (reversing summary judgment where EEOC statement conflicted with employer's later story); *Runkel*, 51 F.4th at 744–46 (same); *Starks v. George Ct. Co.*, 937 F.2d 311, 314 (7th Cir. 1991); *Hackworth v. Progressive Halcyon Ins. Co.*, No. CIV-05-1467-M, 2007 WL 397080, at *4 (W.D. Okla. Feb. 1, 2007) (denying summary judgment where adverse action occurred within weeks of mediation, suggesting causation).

## C. Retaliation Under FMLA (Count III)

The FMLA, like Title VII and the IHRA, prohibits employers from retaliating against employees who engage in activity protected under the statute. 29 U.S.C. § 2615(a)(2). In other words, to prevail on an FMLA retaliation claim, a plaintiff must show she was subjected to an adverse employment action because she requested or took FMLA leave. *Guzman v. Brown Cty.*, 884 F.3d 633, 640 (7th Cir. 2018). As with Title VII and the IHRA, *supra*, in the FMLA retaliation context, "an employer's action is adverse 'if the action would have dissuaded a

reasonable worker from engaging in protected activity.'" *Trahanas v. Nw. Univ.*, 64 F.4th 842, 856 (7th Cir. 2023) (internal punctuation omitted) (quoting *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901–02 (7th Cir. 2018)). As for causation, "a plaintiff must demonstrate that 'the protected conduct was a substantial or motivating factor in the employer's decision.'" *Id.* (citing *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1307 (7th Cir. 2022)). The parties' briefing on this claim is thin.

Plaintiff argues that both her transfer to Jefferson Street and Defendant's failure to promote Plaintiff to AHRM in 2020 constitute adverse employer actions. The Court addresses each in turn.

## A. Transfer to Jefferson Street

There is no evidence in the record before the Court that Plaintiff requested or took FMLA leave before she was transferred to Jefferson Street in June 2019. Plaintiff testified that in July or August 2019, she and Macchia had a conversation about Plaintiff's intent to take 12 weeks of FMLA leave during peak instead of the six she had initially intended to take and Macchia made ambiguous comments. Although Plaintiff submits a declaration stating the conversation took place in March or April 2019, for the reasons set forth above, the Court disregards this statement as conflicting with her prior testimony. *Supra* note 7. Then, Plaintiff took FMLA leave between August and November 2019. Because Plaintiff's conversation with Macchia and her FMLA leave occurred after Plaintiff was already transferred, it could not have been the cause of her transfer. Accordingly, summary judgment is granted in Defendant's favor in this respect.

## B. 2020 Failure-To-Promote

The same cannot be said with respect to Plaintiff's FMLA retaliation claim based on Defendant's failure to promote Plaintiff in 2020.

51

Plaintiff took FMLA leave between August and November 2019, which is indisputably protected activity. When Paras vacated his AHRM position in February 2020 and it again became available, Plaintiff was considered for but not promoted to that position. Failure to promote "no doubt qualifies as an adverse action." *Trahanas*, 64 F.4th 842, 856 (7th Cir. 2023) ("a tangible employment action to include hiring or failing to promote" (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) (internal punctuation omitted))); *see also Malin v. Hospira, Inc.,* 762 F.3d 552, 562 (7th Cir. 2014) ("Failing to promote an employee is a materially adverse employment action for purposes of the FMLA."). Defendant argues that Plaintiff does not identify any causal relationship between Plaintiff's FMLA leave and her non-selection for AHRM in January 2020. The Court disagrees.

As noted above, Allison was the decisionmaker and made her decision sometime between October 2019 (when Plaintiff was on FMLA leave) and February 2020. An inference in Plaintiff's favor could permit a short span of time between Plaintiff's FMLA leave and the adverse employment action, which alone would not be enough to show retaliatory intent. *Stone*, 281 F.3d at 644. Plaintiff compares her situation to *Malin*. 762 F.3d at 563–64. There the Seventh Circuit reversed summary judgment, finding that a reasonable jury could find that the employer retaliated against the plaintiff for requesting FMLA leave because one reasonable reading of the evidence permitted the inference that the plaintiff was still being considered for promotion when she requested leave; her direct supervisor was aware that the plaintiff requested leave; the supervisor asked an HR manager whether the requested leave would impact the superior's organizational plans in any way; and when the plaintiff returned from leave she learned she had not received the promotion as part of the reorganization and had in fact been demoted. *Id*.

The Court agrees that *Malin* is instructive. Here, as explained by the Court with respect to Plaintiff's Title VII and IHRA retaliation claims, the evidence would permit the inferences that Plaintiff was the only employee in the Illinois district who was Level 1 Fit for promotion to AHRM; at some point between October 2019 (while Plaintiff was on leave) and February 2020, Allison considered Plaintiff for promotion to fill the AHRM position vacated by Paras (although Defendant's position on this has shifted over time); Allison transferred Macias into the AHRM position and did not promote Plaintiff; unlike in January 2019, Allison disregarded Level 1 Fit status and instead purportedly made her decision based on interview performance, education level, experience, tenure, and performance; Defendant lied to the EEOC when it stated Macias was interviewed and showed her qualifications during an interview; and now Defendant takes the position that Allison selected Macias based on a phone call Allison had at some unspecified point in time with Macias's supervisor about Macias's career development opportunities. Based on suspicious timing and Defendant's materially factually inaccurate and shifting explanations, a reasonable jury could find that Plaintiff's FMLA leave was a substantial or motivating factor in Allison deciding not to promote Plaintiff in early 2020. Summary judgment is denied in this respect.

## III.  INMWA (Count VI)

Illinois law requires Defendant to "make reasonable efforts to provide a room or other location, in close proximity to the work area, other than a toilet stall, where an employee . . . can express her milk in privacy." 820 ILCS 260/15.[13] The INMWA does not define reasonable efforts.

---

[13] While the INWMA includes no express private right of action, because the parties do not address the issue, the Court assumes consistent with persuasive authority that an implied right of action exists. *See Spriesch v. City of Chicago*, 17 C 1952, 2017 WL 4864913, *5 (N.D. Ill. Oct. 26, 2017).

Defendant contends that it made "reasonable efforts" to provide a room where Plaintiff could express milk in privacy, and that Plaintiff's subjective satisfaction does not matter. *See Tolene v. T-Mobile, USA, Inc.*, 178 F. Supp. 3d 674, 686 (N.D. Ill. 2016) (two private rooms complied with the plain language of the statute where nothing in the record supported plaintiff's concern that she might not have access to them); *Lara-Woodcock v. United Air Lines, Inc.*, 999 F. Supp. 2d 1027, 1046 (N.D. Ill. 2013) (bathroom/locker room with a locking door and benches complied with the statute where nothing in the record supported plaintiff's contention that she would have had to sit on a toilet seat for privacy). Defendant points out that (1) it arranged for Plaintiff to use a private office in Lockport, (2) it installed a lock on Plaintiff's office door in Jefferson Street and arranged for her office mate to leave when she needed to pump, (3) Macchia offered Plaintiff his office or a nearby empty office, and (4) Rodriguez helped Plaintiff find another empty office she could use.

Plaintiff contends it was unreasonable to (1) ask her to kick out a Division Manager to pump in his office at Lockport, (2) have no lock on the trailer office door at the Jefferson Park facility upon her return after her prior privacy violation, (3) expect her to pump behind paper-thin walls in a shared HR trailer while interviews continued, (4) contemplate her walking up to ten minutes each way to pump in the automotive offices, and (5) compel her to search for appropriate alternatives herself. Plaintiff further contends that after weeks of trying, it was clear that Defendant's purported accommodations were insufficient to allow Plaintiff to continue expressing milk and that she was compelled to stop breastfeeding earlier than she had desired. *See Lara-Woodcock*, 999 F. Supp. 2d at 1046. Plaintiff urges the Court to consider the legislative purposes of encouraging breastfeeding and worker productivity. *See* 92nd Ill. Gen. Assem.,

House Proceedings, April 19, 2001, at 14–15, available at

https://www.ilga.gov/House/transcripts/Htrans92/T041901.PDF.

The Court finds that there are genuine disputes of fact for the factfinder to determine as to whether Defendant made "reasonable efforts" to provide a location "in close proximity to the work area" where Plaintiff could express her milk "in privacy." The two cases relied upon by Defendant, *Tolene* and *Lara-Woodcock*, are not binding on this Court, and did not address the precise issues raised by Plaintiff here regarding what constitutes "reasonable efforts," "close proximity," and "privacy." These are matters for the jury to decide. *Cf. Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001) (reasonableness is a "highly fact-specific" inquiry "determined on a case-by-case basis" by the jury). Summary judgment is denied in this respect.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment [60] is denied in part and granted in part. It is granted as to Plaintiff's claims of retaliation based on the attempt to dissuade her from taking twelve weeks of maternity leave and excessive scrutiny of her work hours, as well as Plaintiff's FMLA retaliation claim based on her transfer to Jefferson Street; it is otherwise denied. Defendant's Motion for Leave to File Certain Summary Judgment Appendix Exhibits Under Seal [64] is granted for good cause for the reasons stated in Defendant's motion. L.R. 26.2(b). Plaintiff's motion to provisionally seal [70] certain documents identified by Defendant as Confidential is granted. The materials identified in Plaintiff's motion [70] shall remain provisionally sealed until March 21, 2024. Defendant has until March 21, 2024, to file a motion justifying why there is good cause for the materials to remain under seal. L.R. 26.2(b). Should Defendant choose not to do so, the materials will be unsealed on March 21, 2024.

The Court sets a status hearing for March 26, 2024 at 9:30 a.m.. The parties are directed to file a joint status report by March 22, 2024, which shall include proposed mutually agreeable dates for trial.

**SO ORDERED.**                                    **ENTERED: February 29, 2024**

**HON. JORGE ALONSO**
**United States District Judge**